**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

| | | |
|---|---|---|
| WHOLE WOMAN'S HEALTH; BROOKSIDE WOMEN'S MEDICAL CENTER PA d/b/a BROOKSIDE WOMEN'S HEALTH CENTER and AUSTIN WOMEN'S HEALTH CENTER; DR. LENDOL L. DAVIS; ALAMO CITY SURGERY CENTER PLLC d/b/a ALAMO WOMEN'S REPRODUCTIVE SERVICES; and NOVA HEALTH SYSTEMS, INC. d/b/a REPRODUCTIVE SERVICES, | ) ) ) ) ) ) ) ) ) | |
| | ) | CIVIL ACTION |
| | ) | |
| | ) | CASE NO. __1:16cv1300____ |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| JOHN HELLERSTEDT, M.D., Commissioner of the Texas Department of State Health Services, in his official capacity, | ) ) ) | |
| Defendant. | | |

## COMPLAINT

Plaintiffs, by and through their undersigned attorneys, bring this complaint against the above-named Defendant, and his employees, agents, and successors in office, and in support thereof allege the following:

## I.    PRELIMINARY STATEMENT

1.    Pursuant to 42 U.S.C. § 1983, Plaintiffs, Texas health care providers, bring this action on behalf of themselves and their patients. They seek declaratory and injunctive relief from certain unconstitutional requirements imposed by amendments to Title 25, §§ 1.132-1.137 of the Texas Administrative Code, published December 9, 2016 in the Texas Register, 41 Tex.

Reg. 9732-41 (the "Regulation"),[1] and by a new interpretation of Title 25, § 181.7 of the Texas Administrative Code, published in responses to public comments about the Regulation.

2.     The Regulation amends Texas's current rules governing the proper disposal of "special waste from health care-related facilities." For embryonic and fetal tissue *only*, the Regulation appears to eliminate the typical methods of safe disposal, and requires healthcare facilities to dispose of fetal and embryonic tissue using methods typically used to dispose of human bodies—by burial or scattering ashes. *See* 41 Tex. Reg. at 9732-41.

3.     The Regulation was first published in the Texas Register just four days after the United States Supreme Court struck down two provisions of another Texas anti-abortion law, House Bill 2 of 2013 ("HB 2"). *Whole Woman's Health v. Hellerstedt*, 136 S. Ct. 2292 (2016). The Regulation employs precisely the same tactics as did the admitting-privileges requirement struck down in that case—compelling abortion providers to maintain a fragile, medically-unnecessary third-party relationship. The Regulation functions as the Department of State Health Services' ("DSHS") replacement for HB 2, and its response to Plaintiffs' Supreme Court victory.

4.     Like HB 2, the Regulation burdens women seeking pregnancy-related medical care. It imposes a funeral ritual on women who have a miscarriage management procedure, ectopic pregnancy surgery, or an abortion. Further, it threatens women's health and safety by providing no safe harbor for sending tissue to pathology or crime labs. It also forces healthcare providers to work with an extremely limited number of third-party vendors for burial or scattering ashes, threatening abortion clinics' provision of care and their long-term ability to remain open, as well as cost increases for women seeking pregnancy-related medical care.

---

[1] The Regulation is attached hereto as Exhibit 1. For the Court's convenience, a copy of Title 25, §§ 1.132-1.137, incorporating the changes made to it by the Regulation, is attached hereto as Exhibit 2.

5.     Also like HB 2, the Regulation has no public health benefit. It does nothing to improve public health or safety, as DSHS alleges; rather, it is a pretext for restricting abortion access.

6.     Further, DSHS accompanied the Regulation with vague language in response to public comments that seems to provide that an existing regulation, 25 Tex. Admin. Code § 181.7, which DSHS has never before applied to abortions, would govern the disposition of fetal tissue in the event of an abortion where the fetus weighs more than 350 grams or at least twenty weeks have elapsed since a woman's last menstrual period ("lmp")—and also therefore that the Regulation itself would not apply in those situations. This interpretation would, by requiring fetal death certificates to be issued in these cases, publicize the name and address of every woman who had such an abortion in Texas. It would be an unprecedented invasion of their right to the confidentiality of their private medical information.

7.     The Regulation threatens irreparable injury to Plaintiffs and their patients, including, but not limited to, by infringing Plaintiffs' patients' rights to seek pregnancy-related medical care without undue interference from government and to the privacy of their confidential information.

8.     Plaintiffs seek declaratory and injunctive relief from these constitutional deprivations.

## II.     JURISDICTION AND VENUE

9.     Jurisdiction is conferred on this Court by 28 U.S.C. §§ 1331 and 1343(a)(3).

10.     Plaintiffs' claims for declaratory and injunctive relief are authorized by 28 U.S.C. §§ 2201 and 2202, by Rules 57 and 65 of the Federal Rules of Civil Procedure, and by the general legal and equitable powers of this Court.

11.     Venue is appropriate under 28 U.S.C. § 1391(b)(1) because Defendant resides in this district.

### III.   PLAINTIFFS

12.   Plaintiff Whole Woman's Health has provided high quality reproductive health care services, including abortion services, to Texas women for nearly two decades. It operates licensed abortion facilities in Fort Worth, McAllen, and San Antonio. Whole Woman's Health sues on behalf of itself and its patients.

13.   Plaintiff Brookside Women's Medical Center PA (the "Health Centers"), operates a comprehensive women's primary care and gynecological care practice ("Brookside Women's Health Center"), and a licensed abortion facility ("Austin Women's Health Center"), in Austin. The Health Centers offers thousands of patients annually a full range of gynecologic services, including surgical and medical abortion care and miscarriage management. The Health Centers' medical director, Plaintiff Dr. Lendol L. Davis, also undertakes gynecological surgery, including miscarriage management and ectopic pregnancy treatment, at several Austin-area hospitals. The Health Centers and Dr. Davis sue on behalf of themselves and their patients.

14.   Plaintiff Alamo City Surgery Center PLLC d/b/a Alamo Women's Reproductive Services ("Alamo"), is a licensed ambulatory surgical facility in San Antonio. Alamo provides a range of reproductive health services, including medication and surgical abortions, to Texas women. Alamo provides abortion care up to Texas's legal gestational limit of twenty-two weeks lmp. Alamo sues on behalf of itself and its patients.

15.   Plaintiff Nova Health Systems, Inc. d/b/a Reproductive Services ("Reproductive Services"), operates a licensed abortion facility in El Paso. The El Paso clinic has provided high-quality reproductive health care services, including abortion services, to Texas women for over thirty-five years, except for a few months in 2015 when HB 2's admitting privileges requirement was in effect. Reproductive Services sues on behalf of itself and its patients.

16.   Plaintiffs are all members of the National Abortion Federation ("NAF"), an

international membership organization whose evidence-based *Clinical Policy Guidelines* set a high standard of quality for abortion care.

## IV.   DEFENDANT

17.   Defendant John Hellerstedt, M.D., is the Commissioner of the Texas Department of State Health Services ("the Department" or "DSHS"). The Executive Commissioner of the Health and Human Services Commission promulgated the Regulation on DSHS' behalf, and DSHS is charged with its enforcement. Commissioner Hellerstedt is sued in his official capacity and may be served with process at 1100 West 49th Street, Austin, Texas 78756-3199.

## V.   FACTUAL ALLEGATIONS

**The Regulation**

18.   Pathological waste in Texas is currently defined to include: "[h]uman materials removed during surgery, labor and delivery, autopsy, embalming, or biopsy;" "[t]he products of spontaneous or induced human abortion;" discarded laboratory specimens; and anatomical remains.

19.   Spontaneous abortion is commonly called miscarriage.

20.   Current regulations generally provide that body parts, tissue and organs, whether they are either "human materials removed during surgery" or other procedures, or "the products of spontaneous or induced human abortion," may be disposed of by healthcare facilities using any of the following seven methods:[2]

> i.    *grinding and discharging to a sanitary sewer system;*
>
> ii.   *incineration followed by deposition of the residue in a sanitary landfill;*
>
> iii.  *steam disinfection followed by interment;*

---

[2] There is one exception to the general rule: For "body parts" "removed during surgery" or other procedures, the first method listed above is not available.

      iv.    *interment;*

      v.    *moist heat disinfection followed by deposition in a sanitary landfill;*

      vi.    *chlorine disinfection/maceration followed by deposition in a sanitary landfill; or*

      vii.    *an approved alternate treatment process, provided that the process renders the item as unrecognizable, followed by deposition in a sanitary landfill.*

21.    There are no distinctions between how healthcare facilities may dispose of embryonic or fetal tissue, and any other form of human tissue. Except as noted *supra* at 5 n.2, there are no distinctions between how healthcare facilities may dispose of "human materials removed during surgery" and other procedures, and "the products of spontaneous or induced human abortion."

22.    The Regulation changes this, imposing narrow limits on how healthcare facilities may dispose of embryonic or fetal tissue.

23.    The Regulation creates a new defined term, called "fetal tissue." "Fetal tissue" is defined as "[a] fetus, body parts, organs or other tissue from a pregnancy," not including "the umbilical cord, placenta, gestational sac, blood or body fluids." It therefore includes embryonic tissue from the earliest stages of a pregnancy.

24.    The Regulation limits the number of disposal options for "fetal tissue"—whether "removed during surgery" or other procedures, or as the "products of spontaneous or induced human abortion"—to three. Those three are:

      i.    *interment;*

      ii.    *incineration followed by interment; or*

      iii.    *steam disinfection followed by interment.*

25.    The Regulation defines "interment," which under current law includes "cremation,

entombment, burial, or placement in a niche," [3] to additionally include "the process of cremation followed by placement of the ashes in a niche, grave, or scattering of ashes as authorized by law, unless prohibited by this subchapter." "Cremation," is defined by the Regulation as "[t]he irreversible process of reducing tissue or remains to ashes or bone fragments through extreme heat and evaporation." The definition further notes that this term "includes the process of incineration."

26.    Because "interment" by itself completely satisfies the Regulation, and because "interment" includes "cremation" and "cremation" includes "incineration," it appears that "cremation" or "incineration" by itself should also completely satisfy the Regulation, and the Regulation would not impose any further obligations on healthcare providers using cremation or incineration—including, in particular, any obligations regarding disposal of the resulting ashes.

27.    DSHS, however, in its responses to public comments about the Regulation, states, "[f]acilities will be responsible for disposition of cremated remains in a manner not otherwise prohibited by law," and further that the Regulation "prohibit[s] the scattering of ashes in a landfill."

28.    The Regulation does not state that it prohibits disposing of ashes in a landfill.

29.    There is no Texas law authorizing the scattering of ashes of "fetal tissue" as defined by the Regulation.

30.    DSHS states in its responses to public comments about the Regulation that "scattering of ashes is permitted under certain circumstances, to be done at specified settings in

---

[3] Plaintiffs understand "entombment or placement in a niche" to be akin to burial, as that term is commonly understood, in that these methods entail disposition into some kind of memorial structure like a mausoleum, tomb, or columbarium. Plaintiffs refer to "burial, entombment or placement in a niche" collectively as "burial."

other law (*see* Texas Health and Safety Code, Chapter 716)." However, the Regulation itself states that it does "does not extend or modify requirements of Texas Health and Safety Code, Chapters 711 and 716 . . . to disposition of fetal tissue."

31.    The provisions of Chapter 716 of the Texas Health and Safety Code governing scattering of ashes pertain only to "human remains," not to "fetal tissue," as defined by the Regulation.

32.    In its responses to public comments about the Regulation, DSHS states that healthcare facilities are "responsible for ensuring that the fetal tissue disposition is in compliance with these rules" "regardless of where the disposition of waste occurs," including across state lines.

33.    DSHS further states that a Texas health care facility "will need to demonstrate to the department that it has provided for disposition in compliance with the rules" when disposing of "fetal tissue" outside of Texas.

34.    DSHS does not require any facilities to demonstrate that human remains or pathological waste other than "fetal tissue" are disposed of in compliance with Texas law when taken outside of Texas.

35.    No DSHS regulation or other state law or regulation requires healthcare facilities to ensure the disposition of human remains by any particular method.

36.    The Regulation provides for "incineration followed by interment" of "fetal tissue," but "incineration followed by deposition of the residue in a sanitary landfill" of other pregnancy tissue, including "placenta, umbilical cord and gestational sac."

37.    Commercial incinerators and steam disinfection facilities manage wastes together as they come in, and do not have the ability to segregate materials received from customers.

Safety risks and regulations prohibit employees from sorting through their customers' waste. Additionally, these facilities' treatment operations are such that wastes, once processed, are not able to be separated out after an incineration or steam disinfection process.

38.    Therefore, there is no way to separate out certain treated material for interment from other treated material for disposition in a landfill.

39.    Before about six weeks since a woman's last menstrual period ("lmp"), a human embryo removed from a woman's body during an abortion, miscarriage, or ectopic pregnancy surgery is too small to distinguish from the surrounding pregnancy tissue, including the placenta, umbilical cord, or gestational sac. It is impossible to separate the two without micro-surgical skills and tools.

40.    Thus, in practice, "incineration followed by interment" is not available to dispose of "fetal tissue," because there is no way to ensure that "fetal tissue" is interred but "placenta, umbilical cord and gestational sac" is deposited in a landfill.

**The Regulation's Legislative History**

41.    From independence in 1836 until today, Texas has not had any law requiring healthcare providers to dispose of embryonic or fetal tissue in any way differently from how they dispose of other human-derived tissue.

42.    The Regulation was published in the Texas Register, as a proposed regulation, on July 1, 2016. This was four days after the Supreme Court decided *Whole Woman's Health v. Hellerstedt*.

43.    In the explanatory preamble of the July 1, 2016 proposed Regulation, under the heading "Public Benefit," DSHS stated, "the public benefit anticipated as a result of adopting and enforcing these rules will be enhanced protection of the health and safety of the public."

44.     On or about the same day, Governor Greg Abbott sent a fundraising letter to his supporters. Using inflammatory language, he referred to abortion providers as "soulless," asked for money, and stated that the then-proposed Regulation's purpose was to promote "respect for the sanctity of life" and "protect[] human dignity." The letter does not mention improving the public health and safety, nor the prevention of the spread of disease.

45.     On July 20, 2016, Executive Commissioner of Health and Human Services Charles Smith wrote a letter to a member of the Legislature, stating that, "[i]n line with Governor Abbott's commitment to protect unborn lives, I directed DSHS to evaluate potential changes to portions of the rules that pertain to disposition of fetal remains. . . . I charged DSHS to determine how this language could be amended, within current statutory authority, to better preserve the dignity of these unborn lives." The letter does not mention improving the public health and safety, nor the prevention of the spread of disease.

46.     DSHS received written public comments about the then-proposed Regulation through July 30, 2016, and also held a public hearing.

47.     On September 30, 2016, DSHS withdrew the then-proposed Regulation, and issued a new proposed Regulation, whose text was identical to the first version, and which contained a longer explanatory preamble. Under the "Public Benefit" heading of that preamble, DSHS stated, "the public benefit anticipated as a result of adopting and enforcing these rules will be enhanced protection of the health and safety of the public by ensuring that the disposition methods specified in the rules continue to be limited to methods that prevent the spread of disease."

48.     DSHS again received public comments about the then-proposed Regulation, and again held a public hearing.

49.     In total, 35,663 written and oral public comments were received, over the course of

the two comment periods.

50.   At no time has DSHS set forth any rationale, nor cited any evidence, to show that the Regulation will enhance the protection of the public health.

51.   At no time has DSHS set forth any rationale, nor cited any evidence, to show that the Regulation will improve protections against the spread of contagious disease.

52.   On December 9, 2016, the final Regulation was published in the Texas Register. In its explanatory preamble, under the heading "Public Benefit," DSHS states, "the public benefit anticipated as a result of adopting and enforcing these rules will be the continued protection of the health and safety of the public by ensuring that the disposition methods specified in the rules continue to be limited to methods that prevent the spread of disease. Additional public benefit will be realized in bringing up-to-date the department's rules to reflect the Legislature's articulated policy objectives of respect for life and protecting the dignity of the unborn."

**The Regulation's Burdens on Texas Women and Their Families**

53.   The Regulation places burdens on women seeking pregnancy-related care. It also places burdens on their families.

54.   Women and their families hold a diversity of views on whether and when an embryo or fetus attains the status of a human being. These views are informed by science, culture, spirituality, and religion.

55.   Religious traditions teach different values regarding the proper disposition of human bodies.

56.   The Regulation enshrines into law an exceedingly narrow set of beliefs regarding embryonic and fetal personhood, and what is appropriate for the disposition of embryonic and fetal tissue. These views do not reflect the diversity of views people hold about when human life

begins and about the proper disposition of bodies.

57.    The Regulation violates women's moral agency as independent decision makers and intrudes into their most intimate decisions about their bodies and their faith.

58.    Current Texas law allows women to choose whether to have a burial or a cremation following a pregnancy loss.

59.    The Regulation eliminates women's choice whether or not to choose burial or cremation.

60.    It forces funeral rituals onto all women who obtain miscarriage management, ectopic pregnancy surgery, or abortion.

61.    By depriving women of the moral agency to act in accordance with their own views about personhood, the Regulation deprives women of dignity.

62.    The Regulation's imposition onto women's autonomy and invasion of their privacy will also harm women spiritually and emotionally, causing trauma, guilt, shame, anger, and feelings of exploitation and violation. The Regulation will ultimately increase the stigma surrounding abortion and miscarriage in Texas.

63.    Pathological testing of abnormal pregnancy tissue is important for women's health.

64.    Plaintiffs routinely send abnormal embryonic and fetal tissue to pathology labs, sometimes out of state, to test for certain diseases, screen for cancer, and determine the cause of abnormalities and the likelihood of recurrence in future pregnancies.

65.    Forensic examination of pregnancy tissue is important for evidentiary purposes when law enforcement is investigating sex crimes. Texas law requires that Plaintiffs comply with law enforcement requests for embryonic and fetal tissue.

66.    The Regulation requires healthcare providers to ensure that embryonic or fetal

tissue is disposed of using one of the three permitted methods of disposition. This remains true even of embryonic or fetal tissue sent to a pathology lab or a crime lab.

67.     The Regulation provides for healthcare providers to be liable for violations of the Regulation by third parties to whom they send their tissue.

68.     Because Plaintiffs cannot control how pathology labs and crime labs dispose of tissue after testing, Plaintiffs must either risk liability under the Regulation when sending tissue to pathology labs or crime labs, or risk liability for malpractice or contempt for failing to send tissue to pathology labs or crime labs.

69.     The Regulation makes the availability of abortion services contingent on the ability and willingness of third-party vendors to bury or scatter the ashes of embryonic and fetal tissue at a non-prohibitive cost.

70.     Plaintiffs are not aware of any vendor willing and able to provide burial services for embryonic and fetal tissue whose cost is not an order of magnitude larger than their current special waste disposal costs.

71.     Plaintiffs are aware of only one facility in the entire state willing and able to provide cremation services for embryonic and fetal tissue from abortion clinics at a cost that is not an order of magnitude larger than their current special waste disposal costs.

72.     The Regulation would thus tie every abortion facility in the state to one vendor. This would immediately impact abortion clinic operations throughout the state, by making it plain to all that they are at risk of closure should that vendor become unavailable. Clinics would face immediate difficulties obtaining credit, and hiring and retaining staff, due to their uncertain future. It would also allow the vendor, as a monopoly, to raise prices.

73.     Additionally, abortion facility vendors can be pressured by anti-abortion activists

and by government agencies to cease working with abortion providers. Singling out one business as the sole provider of a legally-required service provides an opportunity to take out a "weak link" in abortion clinic operations, resulting in clinics' closure.

74.    Because the Regulation immediately complicates abortion clinics' operations and threatens their long-term survival, it is a threat to the availability of abortion access in Texas.

75.    Once a clinic is closed, it is likely to remain so. Thus far, only one clinic shuttered by HB 2, which was closed for only a brief period of time during the litigation, has yet reopened.

76.    The Regulation could also significantly increase the cost of miscarriage management and ectopic pregnancy treatment. Healthcare facilities, such as doctors' offices, that dispose of embryonic and fetal tissue on an occasional basis would have to arrange for special disposition of embryonic and fetal tissue, instead of disposal through their regular medical waste vendor. Because health insurance does not cover funeral expenses, these costs would likely be borne by the patients.

**DSHS' New Interpretation of the Law Governing Certificates of Fetal Death (Stillbirth) Threaten Women's Privacy**

77.    25 Tex. Admin. Code § 181.7 provides that a "certificate of fetal death (stillbirth)" be issued in the event of the death of "any fetus weighing 350 grams or more, or if the weight is unknown, a fetus aged 20 weeks or more" lmp.

78.    Hundreds of women have abortions in Texas at 20 weeks or more lmp every year.

79.    DSHS has never, until now, required a "certificate of fetal death (stillbirth)" to be issued in the event of an abortion.

80.    DSHS' received comments from groups such as the Texas Medical Association, the Texas Hospital Association, and the American Congress of Obstetricians and Gynecologists opposing the Regulation for reasons including a concern that fetal death certificates would be

required in order to dispose of embryonic or fetal tissue "for every miscarriage, abortion or ectopic pregnancy in the state, leading to private medical histories becoming part of Texas public record." 41 Tex. Reg. at 9715.

81.    In its responses to these comments, published along with the Regulation, DSHS states that a "certificate of fetal death (stillbirth)" is "required for a fetus that weighs 350 grams or is 20 weeks or more."

82.    DSHS further states, "[i]f fetal death meets this threshold age or weight requiring a death certificate, the fetal death is exempt from the [Regulation] pursuant to § 1.133(a)(2)(F)." That provision refers to "fetal remains . . . transferred for disposition to a licensed funeral director in accordance with . . . Chapter 181." The latter chapter includes the requirement to obtain a "certificate of fetal death (stillbirth)."

83.    Therefore, DSHS appears to be taking the position that an abortion under 350 grams and before twenty weeks lmp is covered by the Regulation, and an abortion at or above 350 grams or twenty weeks lmp is "exempt from the [Regulation]," and so transfer to a licensed funeral director and issuance of a "certificate of fetal death (stillbirth)" is required.

84.    A "certificate of fetal death (stillbirth)" is a public document. Like all other death certificates, it is available right away to the deceased's "immediate family," which in the case of a "certificate of fetal death (stillbirth)" would presumably include the woman's husband or partner, and possibly also other family members. After twenty-five years, it becomes available to the general public.

85.    A "certificate of fetal death (stillbirth)" contains personally-identifying information, including "the cause of fetal death" (which, here, would seem to be abortion), the "mother's current legal name," the "mother's maiden name," and the "mother's residence,"

15

among many other things.

86.    Hundreds of women in Texas each year have abortions after twenty weeks lmp.

87.    DSHS's new interpretation of 25 Tex. Admin. Code § 181.7 would therefore result in disclosing the personally-identifying details of hundreds of women's abortions every year in Texas, without their consent.

88.    This would be an unprecedented invasion of women's privacy.

89.    It would also threaten the well-being and safety of women who need to keep the fact of their abortion confidential from abusive family members.

90.    There is no legitimate justification for requiring the disclosure of this highly sensitive information.

## CLAIMS FOR RELIEF

### COUNT I

### (Liberty)

91.    The allegations of paragraphs 1 through 90 are incorporated as though fully set forth herein.

92.    The Regulation imposes onerous, unjustified, and medically-unnecessary burdens on women seeking miscarriage management, ectopic pregnancy treatment, and abortion care in Texas, in violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

### COUNT II

### (Vagueness)

93.    The allegations of paragraphs 1 through 92 are incorporated as though fully set forth herein.

94.    The Regulation, and DSHS' new interpretation of 25 Tex. Admin. Code § 181.7 in

its responses to public comments about it, do not provide healthcare facilities a reasonable opportunity to know what is required of them, and invites arbitrary and discriminatory enforcement, in violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

## COUNT III

### (Privacy)

95.      The allegations of paragraphs 1 through 94 are incorporated as though fully set forth herein.

96.      The application of DSHS' new interpretation of 25 Tex. Admin. Code § 181.7 in its responses to public comments about the Regulation would infringe the constitutional right to privacy of women seeking abortion care in Texas, in violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

## COUNT IV

### (Equal Protection)

97.      The allegations of paragraphs 1 through 96 are incorporated as though fully set forth herein.

98.      By requiring that healthcare facilities dispose of embryonic and fetal tissue differently from human remains and from other types of human tissue, the Regulation violates Plaintiffs' right to equal protection under the law guaranteed by the Fourteenth Amendment to the United States Constitution.

## COUNT V

### (Commerce Clause)

99.      The allegations of paragraphs 1 through 98 are incorporated as though fully set forth herein.

100.     By requiring healthcare facilities to dispose of embryonic and fetal tissue in compliance with Texas law when disposal occurs in another state, the Regulation is an unconstitutional burden on interstate commerce, in violation of Article I, Section 8 of the United States Constitution.

## REQUEST FOR RELIEF

Plaintiffs respectfully request that this Court:

A.     Issue a declaratory judgment that the Regulation is unconstitutional and unenforceable in all of its applications.

B.     Permanently enjoin Defendant and his employees, agents, and successors in office from enforcing the Regulation in all of its applications.

C.     Issue a declaratory judgment that 25 Tex. Admin. Code § 181.7 is unconstitutional as applied to abortion.

D.     Permanently enjoin Defendant and his employees, agents, and successors in office from enforcing 25 Tex. Admin. Code § 181.7 as applied to abortion.

E.     Award attorneys' fees and costs to Plaintiffs pursuant to 42 U.S.C. § 1988; and/or

F.     Grant such other and further relief as the Court may deem just, proper, and equitable.

Dated: December 12, 2016

Respectfully submitted,

_/s/ Patrick J. O'Connell_____

Patrick J. O'Connell                            David Brown*
Texas Bar No. 15179900                      Stephanie Toti
Jan Soifer                                           Molly Duane*
Texas Bar No. 18824530                      Center for Reproductive Rights
O'Connell & Soifer LLP                      199 Water St. 22nd Floor
2525 Wallingwood, Bldg. 14                New York, NY 10038
Austin, Texas 78746                            (917) 637-3653
(512) 222-0444                                    dbrown@reprorights.org
poconnell@oconnellsoifer.com            stoti@reprorights.org
jsoifer@oconnellsoifer.com                  mduane@reprorights.org

J. Alexander Lawrence*
Morrison & Foerster LLP
250 W. 55th Street
New York, NY 10019
(212) 336-8638
alawrence@mofo.com

*Attorneys for Plaintiffs*

*Application for admission *pro hac vice* filed herewith