**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

| | | |
|---|---|---|
| WHOLE WOMAN'S HEALTH, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| JOHN HELLERSTEDT, M.D., | ) | |
| | ) | CIVIL ACTION |
| Defendant. | ) | |
| | ) | CASE NO. _1:16-cv-1300_____ |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |

**PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER, OR
ALTERNATIVELY, A PRELIMINARY INJUNCTION,
AND MEMORANDUM OF LAW IN SUPPORT**

# <u>TABLE OF CONTENTS</u>

**Page**

BACKGROUND ........................................................................................................ 1

LEGAL AUTHORITIES SUPPORTING THE MOTION ...................................... 5

I.     PLAINTIFFS ARE SUBSTANTIALLY LIKELY TO PREVAIL ON THE MERITS OF THEIR CLAIMS ........................................................................... 5

     A.     The Regulation Invades the Personal Liberty Guaranteed by the Constitution ......................................................................................... 5

          1.     Liberty Includes the Right to Make Decisions About Pregnancy ............. 5

          2.     The Regulation Requires Searching Judicial Scrutiny ............................. 6

          3.     The Regulation Serves No Valid State Interest ......................................... 7

               a.     The Regulation Does Not Serve a Health Interest ......................... 8

               b.     The Regulation is a Pretext for Restricting Abortion Access ....... 9

          4.     The Regulation Burdens Women Seeking Pregnancy-Related Medical Care ......................................................................................... 11

               a.     The Law Unconstitutionally Forces Funeral Rituals onto Unwilling Women ................................................................... 11

               b.     The Regulation Harms Women's Health and Safety ................... 14

               c.     The Regulation Threatens Access to Medical Care .................... 14

          5.     These Burdens Are Unconstitutional ...................................................... 16

     B.     The Regulation Is Unconstitutionally Vague ...................................... 17

     C.     Requiring Death Certificates for Abortions Violates Women's Right to Privacy ......................................................................................... 22

          1.     Plaintiffs' Patients Have a Reasonable Expectation of Privacy ............. 23

          2.     The Exposure of Plaintiffs' Patients' Reproductive Health Histories to the General Public Violates Information Privacy ............... 24

II.    ALL OTHER REQUIREMENTS FOR PRELIMINARY INJUNCTIVE RELIEF ARE SATISFIED ........................................................................................... 26

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*ACLU of Miss., Inc. v. Mississippi*,
911 F.2d 1066 (5th Cir. 1990) ........................................................................24, 25

*Austin Lifecare Inc. v. City of Austin*,
No. A-11-CA-875-LY, (W.D. Tex. June 23, 2014)...................................18, 21, 22

*Barr v. City of Sinton*,
295 S.W.3d 287 (Tex. 2009).......................................................................................13

*Bellotti v. Baird*,
443 U.S. 622 (1979).....................................................................................................24

*Cantu v. Rocha*,
77 F.3d 795 (5th Cir. 1996) ......................................................................................24

*Carey v. Population Servs., Int'l*,
431 U.S. 678 (1977).....................................................................................................17

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*,
508 U.S. 520 (1993).......................................................................................................9

*Colautti v. Franklin*,
439 U.S. 379 (1979)...............................................................................................18, 19

*Corrigan Dispatch Co. v. Casa Guzman, S. A.*,
569 F.2d 300 (5th Cir. 1978) ....................................................................................28

*Deerfield Med. Ctr. v. City of Deerfield Beach*,
661 F.2d 328 (5th Cir. Unit B Nov. 1981)..............................................................27

*Elrod v. Burns*,
427 U.S. 347 (1976).....................................................................................................26

*Ferguson v. City of Charleston*,
532 U.S. 67 (2001).......................................................................................................24

*Ford Motor Co. v. Tex. Dep't of Transp.*,
264 F.3d 493 (5th Cir. 2001) ....................................................................................19

*Gonzales v. Carhart*,
550 U.S. 124 (2007)...............................................................................................10, 11

**TABLE OF AUTHORITIES**
(continued)

**Page**

*Greenville Women's Clinic v. Comm'r, S.C. Dep't of Health & Envtl. Control*,
  317 F.3d 357 (4th Cir. 2002) ................................................................26

*J.E.B. v. Alabama ex. Rel. T.B.*,
  511 U.S. 127 (1994).........................................................................11

*Jackson Women's Health Org. v. Currier*,
  760 F.3d 448 (5th Cir. 2014) ...........................................................5, 27

*Johnson v. United States*,
  135 S. Ct. 2551 (2015).....................................................................18

*Kolender v. Lawson*,
  461 U.S. 352 (1983).........................................................................19

*Lawrence v. Texas*,
  539 U.S. 558 (2003)..........................................................................6

*Margaret S. v. Edwards*,
  488 F. Supp. 181 (E.D. La. 1980) ......................................................10

*Margaret S. v. Treen*,
  597 F. Supp. 636 (E.D. La. 1984), *aff'd on other grounds sub nom. Margaret S. v.
  Edwards*, 794 F.2d 994 (5th Cir. 1986) ...............................................8

*Obergefell v. Hodges*,
  135 S. Ct. 2584 (2015)........................................................................5

*Opulent Life Church v. City of Holly Springs*,
  697 F.3d 279 (5th Cir. 2012) ............................................................27

*Planned Parenthood of Greater Tex. Surgical Health Servs. v. Abbott*,
  134 S. Ct. 506 (2013)........................................................................16

*Planned Parenthood Minn., N.D., S.D. v. Daugaard*,
  799 F. Supp. 2d 1048 (D.S.D. 2011) ..................................................15

*Planned Parenthood of Se. Pa. v. Casey*,
  505 U.S. 833 (1992) ................................................................... passim

*PPINK v. Commissioner*,
  No. 16-CV-763-TWP-DML, 2016 WL 3556914 (S.D. Ind. June 30, 2016)...........10

*Roe v. Wade*,
  410 U.S. 113 (1973).........................................................................12

**TABLE OF AUTHORITIES**
(continued)

**Page**

*Texans for Free Enter. v. Tex. Ethics Comm'n*,
No. A-12-CA-0845-LY, 2012 WL 12874899 (W.D. Tex. Dec. 6, 2012), *aff'd*, 732
F.3d 535 (5th Cir. 2013) .........................................................................................28

*Tucson Woman's Clinic v. Eden*,
379 F.3d 531 (9th Cir. 2004) .............................................................................24, 26

*United States v. Virginia*,
518 U.S. 515 (1996).............................................................................................7, 9

*United States v. Windsor*,
133 S. Ct. 2675 (2013)..............................................................................................9

*Veasey v. Abbott*,
830 F.3d 216 (5th Cir. 2016) (en banc) ..........................................................7, 9, 17

*Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*,
455 U.S. 489 (1982).............................................................................................18, 19

*W. Va. State Bd. of Educ. v. Barnette*,
319 U.S. 624 (1943)...........................................................................................6, 13

*Whalen v. Roe*,
429 U.S. 589 (1977)...........................................................................................24, 26

*Whole Woman's Health v. Hellerstedt*,
136 S. Ct. 2292 (2016).................................................................................... passim

*Women's Med. Ctr. of Nw. Houston v. Bell*,
248 F.3d 411 (5th Cir. 2001) ...........................................................18, 19, 21, 22

**STATUTES & REGULATIONS**

Tex. Gov't Code § 552.115..........................................................................................23

Tex. Health & Safety Code § 171.044.........................................................................23

Tex. Health & Safety Code § 171.046.........................................................................23

Tex. Health & Safety Code § 191.051.........................................................................23

Tex. Health & Safety Code § 245.011....................................................................20, 24

Tex. Health & Safety Code §§ 716.302-716.304.......................................................22

# TABLE OF AUTHORITIES
(continued)

**Page**

25 Tex. Admin. Code § 1.131 ...................................................................................1, 3

25 Tex. Admin. Code § 1.132 ...............................................................................4, 21, 22

25 Tex. Admin. Code § 1.133 ...................................................................................20, 21

25 Tex. Admin. Code § 1.134 ..........................................................................................22

25 Tex. Admin. Code § 1.136 ................................................................................3, 4, 14

25 Tex. Admin. Code § 139.33 ........................................................................................18

25 Tex. Admin. Code § 181.1 ...........................................................................................23

25 Tex. Admin. Code § 181.2 .............................................................................................9

25 Tex. Admin. Code § 181.7 ..............................................20, 21, 22, 23, 24, 25, 28

25 Tex. Admin. Code § 181.23 .........................................................................................23

**OTHER AUTHORITIES**

41 Tex. Reg. 4772-78 (July 1, 2016) ...................................................................... passim

41 Tex. Reg. 7659-65 (Sept. 30, 2016).................................................................... passim

41 Tex. Reg. 9709-41 (Dec. 9, 2016) ...................................................................... passim

Fed. R. Civ. P. 65(b) .........................................................................................................1

Fed. R. Civ. P. 65(c) .......................................................................................................28

Plaintiffs, providers of women's reproductive healthcare, seek a temporary restraining order, or alternatively a preliminary injunction, to preserve the status quo and prevent irreparable harm to themselves and their patients from Defendant's enforcement of the Department of State Health Services' ("DSHS") amendments to and interpretations of 25 Tex. Admin. Code §§ 1.131-1.137, published in the Texas Register at 41 Tex. Reg. 9732-41 (the "Regulation") on December 9, 2016, and scheduled to take effect December 18, 2016. The Regulation is unconstitutionally vague and would bizarrely require healthcare facilities providing women with ectopic pregnancy surgery, miscarriage management procedures, or abortions, to ensure a funeral ritual for their patients' embryos or fetal tissue, in the form of burial or scattering ashes, with or without their patients' consent, in violation of the Fourteenth Amendment to the United States Constitution. Additionally, absent injunctive relief, DSHS threatens to make available to the general public the names of numerous Texas women who obtain abortions. **Plaintiffs respectfully request the Court to act by the Regulation's effective date of December 18, 2016.**[1]

## BACKGROUND

Plaintiffs are healthcare providers who for decades have provided a wide variety of care to Texas women. Declaration of Amy Hagstrom Miller ("Hagstrom Miller Decl.") (attached hereto as App. A) ¶¶ 1-2; Declaration of Lendol L. ("Tad") Davis, M.D. ("Davis Decl.") (attached hereto as App. B) ¶¶ 5-6. This includes abortion care. Hagstrom Miller Decl. ¶ 1; Davis Decl. ¶ 6.

On June 27, 2016, the Supreme Court decided *Whole Woman's Health v. Hellerstedt*, 136 S. Ct. 2292 (2016). The Court struck down two provisions of Texas House Bill 2 ("HB 2") of

---

[1] Plaintiffs' counsel hereby certify, pursuant to Fed. R. Civ. P. 65(b), that simultaneously with the present filing, they are contacting Defendant's counsel in proceedings ongoing in this District in *Whole Woman's Health v. Hellerstedt*, No. 14-CV-00284-LY, by email and telephone, to advise them of Plaintiffs' motion and provide copies of the papers. Plaintiffs are prepared to attend a status conference at the Court's and Defendant's counsel's earliest availability.

2013, which had imposed burdensome and medically-unjustified requirements on abortion providers, including mandating that physicians who perform abortions obtain admitting privileges at a local hospital. *Id*. at 2310-18. These requirements had closed abortion clinics, including many run by Plaintiffs, throughout the state. *Id*. at 2312-13. The Court also struck down the implementing regulations of those provisions, which DSHS had written. *Id*. at 2314-15.

Four days after the Supreme Court ruling, on July 1 of this year, DSHS published in the Texas Register a proposed version of the challenged Regulation. 41 Tex. Reg. 4772-78 (attached hereto as App. G).[2] In that publication, under the heading "Public Benefit," DSHS stated, "the public benefit anticipated as a result of adopting and enforcing these rules will be enhanced protection of the health and safety of the public." 41 Tex. Reg. at 4773. On September 30, after a comment period and public hearing, DSHS withdrew the then-proposed Regulation, and issued a new proposed Regulation, containing identical text, but a longer explanatory preamble. 41 Tex. Reg. 7659-65 (attached hereto as App. H). There, under the heading "Public Benefit," DSHS stated, "the public benefit anticipated as a result of adopting and enforcing these rules will be enhanced protection of the health and safety of the public by ensuring that the disposition methods specified in the rules continue to be limited to methods that prevent the spread of disease." 41 Tex. Reg. at 7660. DSHS again received comments and held a public hearing.

On December 9, DSHS had the adopted Regulation, with some amendments made, finally published in the Texas Register. 41 Tex. Reg. 9709-41 (attached to Compl. as Ex. 1). There, under

_____

[2] DSHS had, by then, developed a history of retaliating against the *Whole Woman's Health* plaintiffs. DSHS' unlawful actions have included attempting, late last year, to enforce enjoined sections of HB 2 against Plaintiff Reproductive Services, *Whole Woman's Health v. Hellerstedt*, No. 14-CV-00284-LY, (W.D. Tex. Aug 17, 2015) (ECF Doc. No. 234), and earlier this year, issuing a baseless statement of deficiencies against Plaintiff Austin Women's Health Center, which it withdrew after receiving a strongly-worded letter from counsel, Davis Decl. ¶ 34 and Ex. B.

the heading "Public Benefit," DSHS states, "the public benefit anticipated as a result of adopting and enforcing these rules will be the continued protection of the health and safety of the public by ensuring that the disposition methods specified in the rules continue to be limited to methods that prevent the spread of disease. Additional public benefit will be realized in bringing up-to-date the department's rules to reflect the Legislature's articulated policy objectives of respect for life and protecting the dignity of the unborn." 41 Tex. Reg. at 9732.

The medical care Plaintiffs provide generates various kinds of "special waste from health care-related facilities." 25 Tex. Admin. Code § 1.131. This includes tissue from medical procedures including, but not limited to, abortion. Hagstrom Miller Decl. ¶¶ 5-6; Davis Decl. ¶ 11.

Under current Texas law, healthcare facilities are generally allowed to use any of seven methods to dispose of tissue. 25 Tex. Admin. Code § 1.136. These seven methods apply both to "human materials removed during surgery" and other procedures, and to "the products of spontaneous or induced human abortion." *Id.* § 1.136(a)(4)(A), (a)(4)(B); Ex. 2 to Compl. at 20-24. The method generally used by Plaintiffs is incineration followed by disposition in a sanitary landfill. Hagstrom Miller Decl. ¶ 5; Davis Decl. ¶ 14. This method is well within the standard of care. Declaration of Diane Schecter, M.D. ("Schecter Decl.") (attached hereto as App. C) ¶¶ 12-14. Occasionally, Plaintiffs' patients choose a funeral method of disposition, such as cremation or burial, for a lost pregnancy, and Plaintiffs refer those patients to funeral homes. Hagstrom Miller Decl. ¶ 16; Davis Decl. ¶ 23. This is allowed under current law. 25 Tex. Admin. Code § 1.136(a)(4)(A)(ii)(III), (a)(4)(B)(i)(IV); Ex. 2 to Compl. at 21-22.

The Regulation makes four relevant changes to existing law. First, it creates a new defined term, "fetal tissue," which means, "[a] fetus, body parts, organs or other tissue from a pregnancy. . . . [not including] the umbilical cord, placenta, gestational sac, blood or body fluids."

3

25 Tex. Admin. Code § 1.132(28). Second, it creates a separate "fetal tissue" sub-category both of "[h]uman materials removed during surgery" and other procedures, and of the "products of spontaneous or induced human abortion." *Id.* § 1.136(a)(4)(A)(v), (a)(4)(B)(i). Third, it limits the disposition of all "fetal tissue," "regardless of the period of gestation," (and therefore including embryonic tissue, *see* Davis Decl. ¶ 15), to three methods: "interment," "incineration followed by interment," and "steam disinfection followed by interment." 25 Tex. Admin. Code § 1.136(a)(4)(A)(v), (a)(4)(B)(i). "[I]ncineration followed by deposition of the residue in a sanitary landfill" is deleted from the list, as are several other methods Plaintiffs do not use. Ex. 2 to Compl. at 21-22. Finally, the Regulation amends a number of definitions of methods of disposition. "[I]nterment," which under current law already includes "cremation" and "entombment, burial, or placement in a niche,"[3] will now additionally include "the process of cremation followed by placement of the ashes in a niche, grave, or scattering of ashes as authorized by law, unless prohibited by this subchapter." 25 Tex. Admin. Code § 1.132(33); Ex. 2 to Compl. at 4. "Cremation," currently not defined in § 1.132, will now be "[t]he irreversible process of reducing tissue or remains to ashes or bone fragments through extreme heat and evaporation. . . . includ[ing] the process of incineration." 25 Tex. Admin. Code § 1.132(18).[4]

Thus, the Regulation treats embryonic and fetal tissue differently than all other human-derived tissue, by mandating that it ultimately be disposed of by "interment"—that is, burial or scattering ashes—with incineration or steam disinfection as an optional first step. Also, DSHS

---

[3] Plaintiffs understand "entombment" and "placement in a niche" to be akin to burial, as that term is commonly understood, in that these methods entail disposition into some kind of memorial structure like a mausoleum, tomb, or columbarium. Plaintiffs collectively refer to "entombment, burial, or placement in a niche" as "burial."

[4] The definition of "incineration" remains unchanged in relevant part: "That process of burning SWFHCRF in an incinerator as defined in 30 TAC Chapter 101 under conditions in conformance with standards prescribed in 30 TAC Chapter 111." 25 Tex. Admin. Code § 1.132(32).

avers that the Regulation prohibits depositing ashes from cremation or incineration in a landfill, although this prohibition does not appear on the face of the Regulation. 41 Tex. Reg. at 9709.

### LEGAL AUTHORITIES SUPPORTING THE MOTION

To merit a temporary restraining order or a preliminary injunction, the moving party must show: (1) a substantial likelihood of success on the merits; (2) a substantial threat that failure to grant the injunction will result in irreparable injury to the moving party; (3) the threatened injury outweighs any damages the injunction may cause defendant; and (4) the injunction is in the public interest. *Jackson Women's Health Org. v. Currier*, 760 F.3d 448, 452 (5th Cir. 2014).

### I.   PLAINTIFFS ARE SUBSTANTIALLY LIKELY TO PREVAIL ON THE MERITS OF THEIR CLAIMS.

#### A.  The Regulation Invades the Personal Liberty Guaranteed by the Constitution.

#### 1.   Liberty Includes the Right to Make Decisions About Pregnancy.

Due Process protects "all fundamental rights comprised within the term liberty." *Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 847 (1992) (quoting *Whitney v. California*, 274 U.S. 357, 373 (1927) (Brandeis, J., concurring)). Among these rights are "personal choices central to individual dignity and autonomy, including intimate choices that define personal identity and beliefs," *Obergefell v. Hodges*, 135 S. Ct. 2584, 2597 (2015), such as "choices concerning contraception, family relationships, procreation, . . . childrearing," *id.* at 2599, and "medical treatment," *Casey*, 505 U.S. at 857. Such choices "are central to the liberty protected by the Fourteenth Amendment." *Id.* at 851. It is "the right of the *individual*, married or single, to be free of unwarranted governmental intrusion into matters so fundamentally affecting a person as the decision whether to bear or beget a child." *Id.* (quoting *Eisenstadt v. Baird*, 405 U.S. 438, 453 (1972)).

The Court has further explained that its own "obligation is to define the liberty of all, not

5

to mandate our own moral code," and that "concept[s] of existence, of meaning, of the universe, and of the mystery of human life[,] . . . [and] the attributes of personhood" may not be compelled by the State. *Casey*, 505 U.S. at 850-51; *accord Lawrence v. Texas*, 539 U.S. 558, 571 (2003); *see also id.* at 577 ("[T]he fact that the governing majority in a State has traditionally viewed a particular practice as immoral is not a sufficient reason for upholding a law prohibiting the practice." (internal quotation marks omitted)). "If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein." *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943).

The Regulation violates these basic constitutional principles, and infringes the rights of women, by imposing burdensome requirements on miscarriage management, ectopic pregnancy treatment, and abortion, in an effort to impose the State's "own moral code" on women who seek pregnancy-related medical care. *Casey*, 505 U.S. at 850.

## 2.     The Regulation Requires Searching Judicial Scrutiny.

Restrictions on the practice of abortion are unconstitutional where they impose an "undue burden" on abortion access. *Whole Woman's Health*, 136 S. Ct. at 2309 (quoting *Casey*, 505 U.S. at 878). The Constitution's limits on government power to interfere with women seeking treatment for miscarriage and ectopic pregnancy are at least as stringent as those regarding abortion. *See generally Casey*, 505 U.S. at 851.

The undue burden standard "requires that courts consider the burdens a law imposes on abortion access together with the benefits those laws confer." *Whole Woman's Health*, 136 S. Ct. at 2309. A court must "consider[] the evidence in the record," and "then weigh[] the asserted benefits against the burdens." *Id.* at 2310. Where a law fails to confer "benefits sufficient to justify the burdens," those burdens are "undue"—that is to say, unconstitutional. *Id.* at 2300.

6

Applying the undue burden standard requires searching judicial scrutiny. *Id.* at 2310 ("[T]he Court . . . has placed considerable weight upon evidence and argument presented in judicial proceedings"). In evaluating a restriction's benefits and burdens, courts must rely on record evidence, and not simply a State's assertions about any purported benefits or burdens. *Id.* at 2309-10 (explaining that, where "regulation of a constitutionally protected personal liberty . . . is at issue," the "less strict review" applicable to economic legislation is not appropriate). The record must show a law actually "further[s]" the government's asserted interest, *id.* at 2310, and the State may not advance justifications for a law that are pretextual, *see Casey*, 505 U.S. at 877, or absent from the legislative (or in this case, administrative) record, *see United States v. Virginia*, 518 U.S. 515, 533 (1996) ("The justification must be genuine, not hypothesized or invented *post hoc* in response to litigation."); *see also Veasey v. Abbott*, 830 F.3d 216, 240-41 (5th Cir. 2016) (en banc) (shifting rationales offered in defense of a law can be evidence of pretext).

### 3.    The Regulation Serves No Valid State Interest.

To survive scrutiny under the undue burden standard, a law that burdens abortion access must*, in reality,* advance its purported purpose. *E.g.*, *Whole Woman's Health*, 136 S. Ct. at 2311 ("We have found nothing in Texas' record evidence that shows that, compared to prior law, . . . the new law advanced Texas' legitimate interest in protecting women's health."); *id.* at 2311-12 ("[W]hen directly asked at oral argument whether Texas knew of a single instance in which the new requirement would have helped even one woman obtain better treatment, Texas admitted that there was no evidence in the record of such a case."); *id.* at 2315 ("There is considerable evidence in the record supporting the District Court's findings indicating that the statutory provision requiring all abortion facilities to meet all surgical-center standards does not benefit patients and is not necessary."); *see also id.* at 2314 ("The record contains nothing to

7

suggest that H.B. 2 would be more effective than pre-existing Texas law at deterring wrongdoers . . . from criminal behavior.").

### a. The Regulation Does Not Serve a Health Interest.

Here, DSHS asserts that the Regulation's purpose is "the continued protection of the health and safety of the public by ensuring that the disposition methods specified in the rules continue to be limited to the methods that prevent the spread of disease." 41 Tex. Reg. at 9732. But there is no medical reason to require fetal or embryonic tissue be disposed of using different methods from all other human tissue. Schecter Decl. ¶¶ 4, 12-17; Davis Decl. ¶ 16. This is because there is no difference in the risk of the spread of disease between the two. Schecter Decl. ¶ 17; Davis Decl. ¶ 16. DSHS has even stated that the Regulation "is not intended to . . . reduce risks to human health from environmental exposure." 41 Tex. Reg. at 4773; *see also* 41 Tex. Reg. at 9709 ("These rules provide a comparable level of protection to public health . . . ."). *Cf. Margaret S. v. Treen*, 597 F. Supp. 636, 670 (E.D. La. 1984) ("There is no conceivable justification . . . in terms of protecting maternal health" of requiring doctors to inform women that they may choose burial or other methods of disposition after abortion), *aff'd on other grounds sub nom. Margaret S. v. Edwards*, 794 F.2d 994 (5th Cir. 1986). Further, even after the Regulation takes effect, disposition into a sanitary sewer will remain, as now, the most common method of disposition of embryonic and fetal tissue, because most women handle miscarriage and medication abortions at home. Schecter Decl. ¶ 18; Davis Decl. ¶¶ 20, 23. Were this a disease risk, the Regulation would presumably have addressed it.

The Regulation's failure to be "more effective than pre-existing Texas law" in furthering its purpose, *see Whole Woman's Health*, 136 S. Ct. at 2314, while imposing burdens on women who seek miscarriage management, ectopic pregnancy treatment, or abortion, *infra* at 11-16, is sufficient alone to invalidate it under the Constitution.

*b.   The Regulation is a Pretext for Restricting Abortion Access.*

The Regulation's failure to serve its stated interest, in light of the burdens it imposes on women, *see infra* at 11-16, makes clear that the Regulation is merely a pretext for restricting abortion access. *See United States v. Windsor*, 133 S. Ct. 2675, 2694 (2013) (A statute's "operation in practice confirms [its] purpose"); *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 535 (1993) ("[T]he effect of a law in its real operation is strong evidence of its object."). So does the Regulation's history, including its timing, and DSHS' shifting rationales for enacting it. *Supra* at 1-3 and n. 2. *See Veasey*, 830 F.3d at 240-41. DSHS declined to put its interest in the "dignity of the unborn" into the administrative record until after it had twice proposed the Regulation and the final public comment period was closed.[5] This interest is clearly a rationale invented in anticipation of litigation, despite DSHS holding the Regulation out to the public as a health measure. *See United States v. Virginia*, 518 U.S. at 533. Moreover, DSHS does not even impose on actual human bodies the stringent conditions the Regulation imposes on embryonic and fetal tissue. Notably, DSHS does not seek to regulate how human remains, nor any kind of pathological waste other than "fetal tissue," is disposed of, after being sent out of Texas. *Compare* 25 Tex. Admin. Code § 181.2(b) (a burial transit permit is all that is required for a funeral director to remove a body from the state), *with* 41 Tex. Reg. at 9711 ("With regard to the issue of whether the rules are intended to apply to disposition across state lines, regardless of where the disposition of waste occurs, the health care-related facility remains responsible for ensuring that *the fetal tissue disposition* is in compliance with these rules.") (emphasis added).

Moreover, the Regulation does not further any kind of interest the Supreme Court has

---

[5] The State offered other, political motives for DSHS' rulemaking, off the record. *See* Abbott Correspondence (attached hereto as App. J); Smith Correspondence (attached hereto as App. K).

9

found valid. *Casey* affirmed an interest in "potential life," which a state may further by means "calculated to inform the woman's free choice, not hinder it." 505 U.S. at 876-78. Subsequently, in *Gonzales v. Carhart*, 550 U.S. 124, 157-160 (2007), the Court confirmed that a state may ban a second-trimester abortion method that appeared perilously close to infanticide, thus "express[ing] respect for the dignity of human life."[6] But here, neither interest is actually furthered by the Regulation." There is no "potential life" *after* a miscarriage, abortion, or ectopic pregnancy. *See PPINK v. Commissioner*, __ F. Supp. 3d __, No. 16-CV-763-TWP-DML, 2016 WL 3556914, at \*10 (S.D. Ind. June 30, 2016) ("[T]he Supreme Court's recognition that the government has a legitimate interest in potential life has not been extended by *Gonzales* nor any other case 'to imposing procedures taken after the pregnancy has been terminated' like the fetal tissue disposition provisions do. . . . [T]he consistency with which the Supreme Court ties the legitimate interest to the potentiality of life . . . . suggests that it would not extend these principles to this context where, following an abortion, such a potentiality is no longer present." (citation omitted)); *accord Margaret S. v. Edwards*, 488 F. Supp. 181, 222 (E.D. La. 1980) (It is impermissible to "equat[e] fetal remains with human remains."). And though "the means chosen by the State to further the interest in potential life must be calculated to inform the woman's free choice, not hinder it," *Casey*, 505 at 877, the means the State has chosen here are compulsory and invasive. The great majority of women who miscarry or decide to have an abortion do not choose the State's preferred option, Schecter Decl. ¶ 18, Hagstrom Miller Decl. ¶ 16, Davis Decl. ¶¶ 20-23. The State cannot "express[] respect for the dignity of human life," *Gonzales*, 550 U.S. at 157, by

---

[6] This was but one of several interests the Court found promoted by the law at issue; others included "the ethics and integrity of the medical profession" and the "public's perception of the appropriate role of a physician." *Gonzales*, 550 U.S. at 157-160.

depriving women of their moral agency and compelling them to act in accordance with its own, different beliefs about "the mystery of human life." *Casey*, 505 U.S. at 851.[7]

### 4.   The Regulation Burdens Women Seeking Pregnancy-Related Medical Care.

The burdens the Regulation imposes fall into three categories: First, it forces funeral rituals on women who have had an abortion, a miscarriage management procedure, or an ectopic pregnancy surgery. Second, it threatens women's health and safety by providing no safe harbor for sending tissue to pathology or crime labs. Third, it adopts the same tactics as the admitting-privileges requirement struck down in HB 2—compelling abortion providers to maintain a fragile, medically-unnecessary third-party relationship—to once again threaten abortion clinics' ability to provide care and keep their doors open. This tactic also threatens to impose cost burdens on women, especially those obtaining treatment for miscarriage and ectopic pregnancy.

### a.   *The Law Unconstitutionally Forces Funeral Rituals onto Unwilling Women.*

The Regulation does not allow doctors to continue using the standard method of disposition of medical tissue when disposing of embryonic or fetal tissue. Schecter Decl. ¶¶ 12-15. Instead, it requires ultimate disposition of tissue be either burial or scattering ashes. Thus, the Regulation requires treating embryonic or fetal tissue like human bodies, and by extension, enforces the viewpoint that embryos are people. Declaration of the Reverend Dr. Debra W. Haffner, D. Min., M. Div., M.P.H. ("Haffner Decl.") (attached hereto as App. D) ¶¶ 7, 10;

---

[7] DSHS suggests that women not be told about the Regulation. *E.g.*, 41 Tex. Reg. at 9717 ("[T]he rules . . . do not now impose, a requirement that a woman be informed of the method of disposition or choose that method of disposition."). Keeping women in the dark about the law is patronizing and relies on offensive gender stereotypes. *See J.E.B. v. Alabama ex. Rel. T.B.*, 511 U.S. 127 (1994) (An "attitude of 'romantic paternalism' . . . put[s] women, not on a pedestal, but in a cage." (quoting *Frontiero v. Richardson*, 411 U.S. 677, 684 (1973) (plurality opinion))).

Declaration of Valerie Peterson, Ed.D. ("Peterson Decl.") (attached hereto as App. E) ¶¶ 8-12; *see also, e.g.*, 41 Tex. Reg. at 9720 (comments by Texas Catholic Conference stating that the Regulation "afford[s] the same dignity and respect as any other human body"); *id.* (comments by Texas Right to Life stating that the Regulation "recognize[s] fetal remains as human remains"). Under current law, women can, and occasionally do, choose funeral disposition for a lost pregnancy. Hagstrom Miller Decl. ¶ 16; Davis Decl. ¶ 23. Thus, the regulation, by definition, only forces these funeral rituals onto women who would not otherwise choose them.

A woman's views about when a developing human life attains the status of a person may vary greatly based on her cultural and religious traditions and personal beliefs. *See* Haffner Decl. ¶¶ 7-8, 10; Peterson Decl. ¶¶ 12-13; *Casey*, 505 U.S. at 850 ("Men and women of good conscience can disagree, and we suppose some always shall disagree, about the profound moral and spiritual implications of terminating a pregnancy, even in its earliest stage."); *Roe v. Wade*, 410 U.S. 113, 159-62 (1973) (noting that "those trained in the respective disciplines of medicine, philosophy, and theology are unable to arrive at any consensus" about "the difficult question of when life begins" and surveying different schools of thought). Likewise, views about the appropriate disposition of embryonic or fetal tissue vary based on the same factors. *See* Haffner Decl. ¶ 9; Peterson Decl. ¶¶ 8-12.

A woman has the right to decide for herself whether an embryo or fetal tissue is to be imbued with the notion of personhood. *See Casey*, 505 U.S. at 851 ("At the heart of liberty is the right to define one's own concept of existence, of meaning, of the universe, and the mystery of human life. Beliefs about these matters could not define the attributes of personhood were they formed under compulsion of the State."); *cf. Barnette*, 319 U.S. at 642. Indeed, although there are fewer areas of human life more tinged with a religious character than funeral rituals, *see* Haffner

12

Decl. ¶¶ 9, 17, DSHS has made no attempt to accommodate the Regulation's impact on women who do not view an embryo to be a person, or whose religious beliefs teach that a funeral ritual for a non-person would be burlesque and a mockery. *Id.* ¶¶ 17-18; Peterson Decl. ¶¶ 10-15; *contra Barr v. City of Sinton*, 295 S.W.3d 287, 308 (Tex. 2009) (The "T[exas] R[eligious] F[reedom] R[estoration] A[ct] requires that even when the government acts in furtherance of a compelling interest, it must show that it used the least restrictive means of furthering that interest.").

The Regulation replaces the right "at the heart of liberty" with a viewpoint "formed under compulsion of the State." *Casey*, 505 U.S. at 851. At what is a deeply personal and sometimes difficult moment in life, women and their family members will be faced with the fact that the State will treat the tissue from their and their loved ones' pregnancies as if it were a human being. This will be an unwelcome and unacceptable intrusion into personal life for many people. Haffner Decl. ¶¶ 13-15, 17; Peterson Decl. ¶¶ 8-11. It will create stress, cause offense, and impose shame and stigma on women as punishment for having miscarriage management, abortion, or ectopic pregnancy surgery. Haffner Decl. ¶¶ 17-18; Peterson Decl. ¶¶ 12-15. Women who hold different views from the State about the personhood of embryos, or the propriety of funeral practices, will be compelled to acquiesce to the State's view. Haffner Decl. ¶¶ 10-12, 19-20; Peterson Decl. ¶ 11. Further, women and their family members who are opposed to burial or scattering ashes will nevertheless be left with the macabre knowledge that the State is engaging in it anyway, and that individuals or groups might seek to perform religious rituals or create ideological memorials, at the location where burial or scattering ashes occurs, all without their consent. Haffner Decl. ¶¶ 17-18; Peterson Decl. ¶¶ 13-14; Letter from ACLU of Texas to DSHS Re: Texas Public Information Act Request (Oct. 13, 2016), and DSHS' Response (Oct. 24, 2016) (attached hereto as App. I). The Regulation effectively labels abortion, miscarriage, and ectopic pregnancy the death of a

13

person, injecting the State's viewpoint into a woman's decision-making. Abortion and miscarriage are already highly stigmatized, and the Regulation cannot help but increase that stigma. Haffner Decl. ¶¶ 10-11, 17.

> ### b.   The Regulation Harms Women's Health and Safety.

The Regulation requires healthcare providers to ensure disposal of embryonic or fetal tissue using a permitted method, even for tissue sent to a third-party such as a pathology lab or crime lab. *See* 25 Tex. Admin. Code § 1.136(a). Importantly, this means that, should a pathology or crime lab to which Plaintiffs send tissue for analysis not dispose of it by burial or scattering ashes, Plaintiffs would be liable. *Id.*; 41 Tex. Reg. at 9717. Pathological testing of abnormal pregnancy tissue is important for women's health: it can screen for cancer, or the likelihood of future abnormalities. Davis Decl. ¶ 31; Hagstrom Miller Decl. ¶ 19. Likewise, forensic examination is important for evidentiary purposes in sex crimes, and Plaintiffs are required to comply with law enforcement requests for tissue. Hagstrom Miller Decl. ¶ 20. This presents Plaintiffs with a terrible dilemma: forego the testing necessary for their patients' health and safety (and face liability for malpractice or contempt) or risk liability under the Regulation.

> ### c.   The Regulation Threatens Access to Medical Care.

The Regulation makes the availability of abortion services contingent on the ability and willingness of third-party vendors to bury or scatter the ashes of embryonic or fetal tissue at a non-prohibitive cost. Every funeral home and crematorium surveyed by plaintiffs, save one, quoted minimum prices of several hundred dollars—comparable to the cost of a first-trimester abortion. Declaration of Anne Layne-Farrar, Ph.D. ("Layne-Farrar Decl.") (attached hereto as App. F) ¶¶ 23-29. These options are thus prohibitively expensive. Hagstrom Miller Decl. ¶¶ 22-

23; Davis Decl. ¶¶ 24-25.[8]

Plaintiffs are aware of only one facility in the entire state willing and able to provide cremation services at a feasible cost. Layne-Farrar Decl. ¶ 23; Hagstrom Miller Decl. ¶ 24.[9] But restricting abortion clinics to working with one vendor in the entire state is an unacceptable threat to abortion access. As with the law struck down in *Whole Woman's Health*, the Regulation here ties the continued existence of abortion clinics to maintaining an ongoing relationship with third-party providers of a medically-unnecessary service, leaving the clinics susceptible to closure should the vendors determine it is not in their business interests to associate with abortion providers.[10] *Compare Whole Woman's Health*, 136 S. Ct. at 2312 (reviewing reasons hospitals may be unwilling to provide admitting privileges), *with* Layne-Farrar Decl. ¶¶ 39-49 (reviewing funeral homes' concerns around ability to provide services). And here, there is only one available provider, who may be unable to serve the entire state. Layne-Farrar Decl. ¶ 28; *see also id.* ¶ 64

---

[8] DSHS states that "[b]ased upon the lowest stated costs of each entity able to provide cost estimates, the department has determined that the annual cost per facility would be approximately $450," and further that "the cost of any of the new available methods would be offset by the elimination of the cost of landfill disposition." 41 Tex. Reg. at 9712. Beyond simply adopting the *lowest* estimates as the *expected* costs, these statements do not state how DSHS arrived at the $450 figure. They are merely DSHS' *ipse dixit*.

[9] This option may nevertheless result in price increases for some Plaintiffs. In light of the Regulation's complete lack of benefits, *supra* at 11-15, *infra* at 15-16, *any* price increase is a burden that outweighs the benefit, and so renders the Regulation unconstitutional under *Whole Woman's Health*.

[10] DSHS states that "private parties have offered to bury fetal remains without charge." 41 Tex. Reg. at 7660. That statement is misleading, because when asked to identify these parties, DSHS named only one, which did not offer services "without charge." Letter from ACLU of Texas to DSHS Re: Texas Public Information Act Request (Oct. 13, 2016), and DSHS' Response (Oct. 24, 2016). But this party's offer does indicate that it serves an explicitly religious and anti-abortion purpose. *Id.* DSHS' suggestion that abortion providers affiliate with such parties would thus force women who chose abortion to have their tissue buried by groups working to oppose that choice, *see Planned Parenthood Minn., N.D., S.D. v. Daugaard*, 799 F. Supp. 2d 1048, 1060 (D.S.D. 2011) (requiring an abortion patient to meet with anti-abortion crisis pregnancy centers "humiliates and degrades her as a human being").

(single cemetery "can't handle the entire state"). The survival of clinics throughout the state would thus hang by a thin thread. Seen as unstable, clinics will find it hard to obtain loans, and employees will become reluctant to join or stay. Hagstrom Miller Decl. ¶¶ 25-31; Davis Decl. ¶ 30; Layne-Farrar Decl. ¶ 28. These effects make it harder both for clinics to provide care and to keep their doors open—and help to ensure that clinic closures become permanent. *See Planned Parenthood of Greater Tex. Surgical Health Servs. v. Abbott*, 134 S. Ct. 506, 509 (2013) (Breyer, J., dissenting from denial of application to vacate stay) ("The longer a given facility remains closed, the less likely it is ever to reopen even if the [challenged] requirement is ultimately held unconstitutional."). Thus far, only one clinic shuttered by HB 2, which was closed for but a few months, has reopened. Further closures would be the predictable result of the Regulation.

Additionally, the Regulation would likely cause price increase in the cost of miscarriage management and ectopic pregnancy treatment. In particular, doctors' offices, which do not require regular disposal of embryonic or fetal tissue, would need to incur the cost of arranging for special disposition of such tissue on a case-by-case basis for miscarriage patients. *See* Layne-Farrar Decl. ¶¶ 31-33. Because health insurance does not cover funeral expenses, these extra costs would likely be borne by patients, and would represent a serious, perhaps dissuasive burden, for patients who are poor. *See id.* ¶¶ 35-37, 37 n.42, 47, 61-63; Davis Decl. ¶ 26.

### 5. These Burdens Are Unconstitutional.

Once the Regulation's numerous burdens are weighed against its failure to even minimally further a permissible state interest, it becomes clear that the Regulation imposes an undue burden on women's liberty. It is an unprecedented and bizarre intrusion into the privacy and dignity of women and their families, imposing funeral rituals and government ideology on people against their will. It would stigmatize and shame women who seek abortion, miscarriage management, or ectopic pregnancy treatment. It would threaten women's health and safety. It is the next chapter

in the Texas Government's frustrated effort to end legal abortion in the state. And, it does not further a legitimate state interest.

A law that restricts access to abortion and burdens treatment for pregnancy complications, but does nothing to further a legitimate interest, is unjustified by even a minimal burden. *Whole Woman's Health*, 136 S. Ct. at 2318 (an abortion restriction is unconstitutional where it provides "few, if any" benefits for women); *Casey*, 505 U.S. at 877; *Carey v. Population Servs., Int'l*, 431 U.S. 678, 687 (1977) ("[T]he Constitution protects individual decisions in matters of childbearing from unjustified intrusion by the State."); *cf. Veasey*, 830 F.3d at 239 ("We cannot say that the district court had to simply accept that legislators were really so concerned with this almost nonexistent problem."). Moreover, the burden that the Regulation imposes—in the loss of liberty, in stigma and shame, in risks to health and safety, in the threat of loss of access to healthcare services—is substantial. Therefore, Plaintiffs are likely to succeed on their claim that the Regulation imposes unconstitutional burdens on the right to seek pregnancy-related medical care.

**B. The Regulation Is Unconstitutionally Vague.**

The Due Process Clause prohibits the deprivation of life, liberty, or property based on a law "so vague that it fails to give ordinary people fair notice of the conduct it punishes, or standardless that it invites arbitrary enforcement." *Johnson v. United States*, 135 S. Ct. 2551, 2556 (2015); *accord Women's Med. Ctr. of Nw. Houston v. Bell*, 248 F.3d 411, 421-22 (5th Cir. 2001) (holding that plaintiffs were likely to succeed on the merits of their claim that abortion regulations were unconstitutionally vague); *Austin Lifecare Inc. v. City of Austin*, No. A-11-CA-875-LY, slip op. at 10-13 (W.D. Tex. June 23, 2014) (ECF Doc. No. 145) (holding that municipal regulations were unconstitutionally vague). "The degree of vagueness that the Constitution tolerates—as well as the relative importance of fair notice and fair enforcement—depends in part on the nature of the enactment." *Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498 (1982).

The Regulation requires application of a "stringent vagueness test" for three reasons. First, "it threatens to inhibit the exercise of constitutionally protected rights" by burdening access to abortion services. *Id.* at 499. The Supreme Court has long recognized this as "the most important factor affecting the clarity that the Constitution demands of a law." *Id.*; *accord Colautti v. Franklin*, 439 U.S. 379, 391, 394 (1979) (holding that an abortion regulation that conditioned potential liability "on confusing and ambiguous criteria" was unconstitutionally vague because it "present[ed] serious problems of notice, discriminatory application, and chilling effect on the exercise of constitutional rights"). Second, it imposes quasi-criminal penalties on abortion providers for non-compliance, through its incorporation by reference into the State's licensing standards for abortion facilities. 25 Tex. Admin. Code § 139.33 (listing penalties); *id.* § 139.53(a)(13) (incorporating the Regulation by reference). *See also Bell*, 248 F.3d at 422 (Texas's licensing standards for abortion facilities "carry potentially significant civil and administrative penalties, including fines and license revocation, which can be characterized as quasi-criminal."). Laws that impose criminal or quasi-criminal penalties are held to a higher standard of clarity than other laws.[11] *See Vill. of Hoffman Estates*, 455 U.S. at 499-500; *Ford Motor Co. v. Tex. Dep't of Transp.*, 264 F.3d 493, 508 (5th Cir. 2001). Third, abortion providers are especially vulnerable to arbitrary and discriminatory enforcement of the Regulation. *See Bell*, 248 F.3d at 422. "Although the [vagueness] doctrine focuses both on actual notice to citizens and arbitrary enforcement, . . . the more important aspect of vagueness doctrine is . . . the requirement that a legislature establish minimal guidelines to govern law enforcement." *Kolender v. Lawson*, 461 U.S. 352, 357-58 (1983) (citations and internal quotation marks omitted). In the absence of

---

[11] Notably, the Regulation lacks a scienter requirement to mitigate the impact of its vagueness. *See supra* at 14; *see also Vill. of Hoffman Estates*, 455 U.S. at 489; *Colautti*, 439 U.S. at 395.

such guidelines, a law may enable enforcement officials "to pursue their personal predilections." *Id.* at 358 (internal quotation marks omitted). This risk is heightened "in the context of abortion, a constitutionally protected right that has been a traditional target of hostility." *Bell*, 248 F.3d at 422.

The Regulation cannot satisfy the stringent vagueness test required by the Due Process Clause because it fails to provide healthcare providers and enforcement officials with clarity about two critical issues: (1) whether the Regulation applies to fetal tissue resulting from abortions performed at twenty weeks since a woman's last menstrual period ("lmp") or later; and (2) what, if anything, must be done with the ashes resulting from the cremation of embryonic and fetal tissue. As a result, Plaintiffs are likely to succeed on the merits of their vagueness claim.

First, the Regulation is unconstitutionally vague because it fails to provide clarity about whether it applies to fetal tissue resulting from abortions performed at twenty weeks lmp or later. DSHS' received comments from groups such as the Texas Medical Association, the Texas Hospital Association, and the American Congress of Obstetricians and Gynecologists opposing the Regulation for reasons including a concern that fetal death certificates would be required in order to dispose of embryonic or fetal tissue, "for every miscarriage, abortion or ectopic pregnancy in the state, leading to private medical histories becoming part of Texas public record." 41 Tex. Reg. at 9715. In response, DSHS states, "[a] fetal death certificate is only required for a fetus that weighs 350 grams or is 20 weeks or more.[12] If fetal death meets this threshold *age or weight requiring a death certificate*, the fetal death is exempt from the [Regulation] pursuant to § 1.133(a)(2)(F).[13] If no fetal death certificate is required, *due to age or weight*, there is no

---

[12] This "requirement" refers to Texas's fetal death certificate regulation, 25 Tex. Admin. Code § 181.7(a), *see infra* at 20.

[13] 25 Tex. Admin. Code § 1.133(a)(2)(F) exempts the "disposition of fetal remains . . . transferred for disposition to a licensed funeral director" from compliance with the Regulation.

requirement for a funeral director, who assumes custody of a fetus, to file a report[.]" 41 Tex. Reg. at 9715 (emphasis added). DSHS thus seems to suggest that "age or weight," but not the fact of a stillbirth, determine whether fetal tissue is to be disposed of under the Regulation, or by means of discharge to a funeral director, with the accompanying issuance of a fetal death certificate.

Texas's fetal death certificate regulation is entitled, "Fetal Death (Stillbirth);" it applies to "any fetus weighing 350 grams or more, or if the weight is unknown, a fetus aged 20 weeks or more [lmp]." 25 Tex. Admin. Code § 181.7(a).[14] The provision's title makes plain that it is intended to apply to stillbirths, not abortions. So does its purpose—to allow for the creation of usable vital statistics data. *See* 41 Tex. Reg. at 9713.[15] DSHS has never required a "certificate of fetal death (stillbirth)" for any abortion. There is no clear reason for DSHS' apparent position that § 1.133(a)(2)(F) limits the Regulation's application to abortions under 350 grams and before 20 weeks lmp, and therefore requires issuance of a fetal death certificate, pursuant to 25 Tex. Admin. Code § 181.7(a), for other abortions. To date, DSHS has not responded to requests for clarification.

Plaintiffs do not know whether they must dispose of this tissue as directed by the Regulation, or whether they must obtain a "certificate of fetal death (stillbirth)" pursuant to 25 Tex. Admin. Code § 181.7(a) and send the tissue to a funeral home.[16] Absent clarification, the Regulation is unconstitutionally vague. *Cf. Women's Med. Ctr. of Nw. Houston*, 248 F.3d at 421-22; *Austin Lifecare Inc.*, No. A-11-CA-875-LY, slip op. at 10-13.

Second, the Regulation is unconstitutionally vague because it fails to provide clarity about

---

[14] *Accord* 25 Tex. Admin. Code § 181.7(b)(2) ("A certificate of fetal death (stillbirth) shall be filed with the local registrar within five days after the date of fetal death (stillbirth).").

[15] Abortion data is subject to a different reporting system. Tex. Health & Safety Code § 245.011.

[16] Expanding the scope of 25 Tex. Admin. Code § 181.7(a) to reach induced abortions would raise grave constitutional concerns. *See infra* at 22-26.

what, if anything, healthcare providers are required to do with the ashes resulting from the cremation of embryonic and fetal tissue. The Regulation defines "interment" as "[t]he disposition of pathological waste using *the process of cremation*, entombment, burial, or placement in a niche *or* by using *the process of cremation followed by placement of the ashes in a niche, grave, or scattering of ashes as authorized by law, unless prohibited by this subchapter*." 25 Tex. Admin. Code § 1.132(33) (emphasis added). Given that cremation followed by disposition of the ashes is presented as an alternative to cremation in itself, the plain language of this provision indicates that interment can be accomplished by cremation in itself, with healthcare providers having no further disposal obligations. The preamble to the Regulation, however, casts doubt on whether the Department interprets the Regulation in this manner. *See* 41 Tex. Reg. at 9715 ("Facilities will be responsible for disposition of cremated remains in a manner not otherwise prohibited by law").

Further, if "interment" includes an obligation to ensure disposition of ashes, the Regulation fails to provide clarity about permissible methods. It indicates that ashes may be scattered "as authorized by law," 25 Tex. Admin. Code § 1.132(33), but the only Texas law regulating the scattering of ashes is Tex. Health & Safety Code §§ 716.302-716.304, and the Regulation expressly states that these provisions do not apply to the disposition of fetal tissue, *see* 25 Tex. Admin. Code § 1.134(a) ("This subchapter does not extend or modify requirements of Texas Health and Safety Code, Chapters 711 and 716 . . . to disposition of fetal tissue."). *See also* Hagstrom Miller Decl. ¶ 12. Moreover, the preamble to the Regulation states that: "The adopted rules prohibit the disposition of fetal tissue in a sanitary landfill, and the language added to paragraph (33) on adoption is subject to that limitation, prohibiting the scattering of ashes in a landfill." 41 Tex. Reg. at 9710. But the Regulation states no such prohibition. The Regulation provides neither any "authorized" nor any "prohibited" locations or methods for scattering ashes.

Thus, healthcare providers are left to guess at whether and how they must dispose of ashes. *See* Hagstrom Miller Decl. ¶¶ 12-13; Davis Decl. ¶¶ 10, 33. The lack of clarity around this issue renders the Regulation unconstitutional. *Cf. Women's Med. Ctr. of Nw. Houston*, 248 F.3d at 421-22; *Austin Lifecare Inc.*, No. A-11-CA-875-LY, slip op. at 10-13.

### C. Requiring Death Certificates for Abortions Violates Women's Right to Privacy.

As discussed *supra* at 19-20, DSHS appears to be taking the position that 25 Tex. Admin. Code § 181.7, and not the Regulation, governs the disposal of fetal tissue from abortions at and after twenty weeks lmp. Plaintiffs are likely to prevail on their claim that application of § 181.7 to abortions is unconstitutional.

Abortion in Texas is legal until twenty weeks post-fertilization. Tex. Health & Safety Code § 171.044. This is equivalent to twenty-two weeks lmp. *See* Davis Decl. ¶ 15 n.1. In cases of certain medical emergencies and severe fetal anomalies, it is also permitted after that point of pregnancy. *See* Tex. Health & Safety Code § 171.046. Thus, DSHS would apply the fetal death certificate requirement to several hundred women obtaining abortion care in Texas each year.[17]

A "certificate of fetal death (stillbirth)" is a public record. As with all death certificates, DSHS will provide one right away to the deceased's "immediate family," which would seem to include the woman's husband or partner, and possibly also other family members. *See* Tex. Health & Safety Code § 191.051; 25 Tex. Admin. Code § 181.1(21). After twenty-five years, it becomes available to the general public. Tex. Gov't Code § 552.115(a)(2).[18]

---

[17] The Centers for Disease Control's most recent statistics, from 2013, record 313 abortions in Texas at or after 21 weeks lmp, and 481 from 18 through 20 weeks lmp. Tara C. Jatlaoui, et al., *Abortion Surveillance—United States, 2013*, 65(12) CDC: Surveillance Summaries 1-44 (Nov. 25, 2016), *available at* http://www.cdc.gov/mmwr/volumes/65/ss/ss6512a1.htm.

[18] In addition, Summary Death Indexes stating surnames and counties, 25 Tex. Admin. Code § 181.23(c)(3), will also be publicly available, Tex. Gov't Code § 552.115(a)(4).

A "certificate of fetal death (stillbirth)" contains a wealth of personally-identifying information, including "the cause of fetal death" (which, here, would seemingly be abortion), the "mother's current legal name," the "mother's maiden surname," and the "mother's residence," among many other things. DSHS, *Handbook on Fetal Death Registration, Ch. 2: Completing the Certification of Fetal Death*, http://www.dshs.texas.gov/vs/handbooks/fetaldeath/Completingfdr.pdf.

### 1. Plaintiffs' Patients Have a Reasonable Expectation of Privacy.

The right to privacy protects an individual's interest in avoiding "disclosure of personal matters." *Whalen v. Roe*, 429 U.S. 589, 599 (1977). The Fifth Circuit applies a balancing test, upholding "[a]n intrusion into the interest in avoiding disclosure of personal information . . . only . . . when the government demonstrates a legitimate state interest which is found to outweigh the threat to the plaintiff's privacy interest." *ACLU of Miss., Inc. v. Mississippi*, 911 F.2d 1066, 1070 (5th Cir. 1990) (quoting *Fadjo v. Coon*, 633 F.2d 1172, 1176 (5th Cir. Unit B 1981)). "[T]he privacy interest in confidentiality [is] extensive." *Id.*

Plaintiffs' patients have a reasonable expectation of privacy in the information that will be disclosed. *See, e.g.*, *Cantu v. Rocha*, 77 F.3d 795, 806 (5th Cir. 1996) (first step of analysis is whether "the person had a legitimate expectation of privacy"). Plaintiffs' patients reasonably expect that their reproductive health care history, including their identity as a patient who has obtained an abortion, should remain confidential. *See, e.g.*, *Ferguson v. City of Charleston*, 532 U.S. 67, 78 (2001) (individual has reasonable expectation of privacy in medical test results); *Bellotti v. Baird*, 443 U.S. 622, 647-48 (1979) (requiring protection of minors' confidentiality in abortion proceedings); *Tucson Woman's Clinic v. Eden*, 379 F.3d 531, 552 (9th Cir. 2004) (holding that requirement to provide State with unredacted medical records of abortion patients that included "patient identifying information such as names and full medical histories" violated

patients' right to informational privacy); *ACLU of Miss.,* 911 F.2d at 1070 (holding that plaintiffs "undeniably have an interest in restricting the disclosure" of matters related to their sexual lives).

Also, Texas law already recognizes that the identity of abortion patients should remain confidential, *prohibiting* abortion providers from including any patient-identifying information in their required annual reports to DSHS. Tex. Health & Safety Code § 245.011(b) ("The report may not identify by any means the physician performing the abortion or the patient."). Indeed, until DSHS published the Regulation, there was never any question that 25 Tex. Admin. Code § 181.7 did not apply to abortions, and therefore the State never required healthcare providers to provide the State with personally-identifying information about their abortion patients.

### 2. The Exposure of Plaintiffs' Patients' Reproductive Health Histories to the General Public Violates the Right to Privacy.

DSHS' application of 25 Tex. Admin. Code § 181.7 would violate Plaintiffs' patients' privacy rights by leading to the disclosure to the general public of the identities of women who have obtained abortions after twenty weeks lmp. *See ACLU of Miss.*, 911 F.2d at 1070 ("Privacy rights are directed . . . to the publication of true statements about persons where those true statements . . . contain private facts that the government should not divulge."). Requiring fetal death certificates regarding abortions would publicize Plaintiffs' patients' names, ages, birthplaces, addresses, marital statuses, and the facts of their abortions, without their consent—at first to husbands or partners, and possibly others, and eventually to anyone who asks.

There is no legitimate reason for this disclosure, and certainly not one that outweighs the harms imposed on Plaintiffs' patients. In *ACLU of Mississippi*, the Fifth Circuit held that the public disclosure of unredacted records from a state anti-civil rights spying unit did not "give sufficient weight to the interest in accommodating privacy concerns," 911 F.2d at 1075, because the records would contain allegations about the sexual history of certain named individuals, *id.* at 1070. While

the court found that there was a legitimate interest in disclosing the unit's activities, the court also found that "the disclosure of a particular name would rarely, if ever, be necessary to enumerate and demonstrate the Commission's divers dealings; the actual names of the Commission's victims are much less a matter for public concern." *Id.* at 1071.

Here, the identities of women who have obtained abortions are not a matter of public concern and are supposedly protected under Texas law, *supra* at 24, so there is no justification for disclosing this information to the general public. There is simply no legitimate reason for putting a confidential piece of a woman's reproductive health history into the public record.

Courts have upheld laws requiring the disclosure of personal medical information to the State only when there were significant safeguards in place to ensure that it would not be further disclosed. *E.g.*, *Whalen*, 429 U.S. at 599; *Greenville Women's Clinic v. Comm'r, S.C. Dep't of Health & Envtl. Control*, 317 F.3d 357, 371 (4th Cir. 2002); *contra Tucson*, 379 F.3d at 552 (striking down a requirement to provide unredacted medical records to state inspectors in the absence of penalties for unauthorized disclosure).

Moreover, publicly disclosing this information threatens women with additional harms beyond the violation of privacy rights. The "potential for harm" in the "non-consensual disclosure [of a woman's abortion] is tremendous." *Tucson*, 379 F.3d at 553; *see also Casey*, 505 U.S. at 893 ("[T]here are millions of women in this country who are the victims of regular physical and psychological abuse at the hands of their husbands. . . . [T]hey may have very good reasons for not wishing to inform their husbands of their decision to obtain an abortion."). The State cannot provide any legitimate justification for exposing women to such risks.

DSHS' requirement fails the Fifth Circuit's balancing test: It serves no legitimate state interest, yet it will disclose to *the general public* highly confidential information about the

reproductive health history of hundreds of Texas women.

## II.   ALL OTHER REQUIREMENTS FOR PRELIMINARY INJUNCTIVE RELIEF ARE SATISFIED.

Plaintiffs have demonstrated that, absent an injunction, they and their patients will suffer irreparable injury. It is well established that, where a Plaintiff establishes a constitutional violation, no further showing of irreparable injury is necessary. *See Elrod v. Burns*, 427 U.S. 347, 373 (1976) (The loss of constitutional "freedoms . . . unquestionably constitutes irreparable injury."); *Opulent Life Church v. City of Holly Springs*, 697 F.3d 279, 295 (5th Cir. 2012) ("When an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary." (citation omitted)); *Deerfield Med. Ctr. v. City of Deerfield Beach*, 661 F.2d 328, 338 (5th Cir. Unit B Nov. 1981) (When "the constitutional right of privacy is 'either threatened or in fact being impaired,' . . . this conclusion mandates a finding of irreparable injury." (quoting *Elrod*, 427 U.S. at 373)). Therefore, Plaintiffs have adequately demonstrated a substantial threat of irreparable injury.

But additionally, beyond the impact on their rights, the effect of the Regulation and DSHS' interpretation of it on Plaintiffs' patients will be devastating and irreparable. The Regulation mandates funeral rituals following pregnancy loss, threatens women's health and safety by providing no safe harbor for sending tissue to pathology or crime labs, and threatens abortion clinics' ability to provide care and keep their doors open. DSHS would identify to the public every woman who has an abortion in Texas after twenty weeks lmp.

In contrast, Defendants face no injury from an injunction. It will merely preserve the status quo while questions about the Regulation's constitutionality are adjudicated, and the public health will continue to be protected under existing law, as it has been for decades.

Moreover, the public interest will be served, rather than harmed, by injunctive relief. "[I]t

is always in the public interest to prevent the violation of a party's constitutional rights." *Jackson Women's Health Org.*, 760 F.3d at 458 n.9 (alteration in original) (quoting *Awad v. Ziriax*, 670 F.3d 1111, 1132 (10th Cir. 2012)). Without a preliminary injunction, all women in Texas who seek care for miscarriage, ectopic pregnancy, and abortion will suffer unnecessary and unjustified burdens to their constitutional rights.

Finally, this court may issue the requested preliminary injunction without requiring Plaintiffs to provide security. *See* Fed. R. Civ. P. 65(c); *Corrigan Dispatch Co. v. Casa Guzman, S. A.*, 569 F.2d 300, 303 (5th Cir. 1978) ("The amount of security required is a matter for the discretion of the trial court; it may elect to require no security at all."). Here, Defendants will suffer no "costs [or] damages," Fed. R. Civ. P. 65(c), should the court later rescind the temporary restraining order or preliminary injunction, and therefore no security should be required. *See Texans for Free Enter. v. Tex. Ethics Comm'n*, No. A-12-CA-0845-LY, 2012 WL 12874899, at *7 (W.D. Tex. Dec. 6, 2012), *aff'd*, 732 F.3d 535 (5th Cir. 2013).

WHEREFORE, Plaintiffs respectfully ask this Court to enter a temporary restraining order or, in the alternative, a preliminary injunction, without bond, restraining Defendant John Hellerstedt, M.D., as well as his employees, agents, and successors in office, from enforcing the Regulation, and from applying 25 Tex. Admin. Code § 181.7 to abortions, and enter such other and further relief as the Court deems just, proper, and equitable.

Dated: December 12, 2016

Respectfully submitted,

_/s/ Patrick J. O'Connell_____

| | |
|---|---|
| Patrick J. O'Connell | David Brown* |
| Texas Bar No. 15179900 | Stephanie Toti |
| Jan Soifer | Molly Duane* |
| Texas Bar No. 18824530 | Center for Reproductive Rights |
| O'Connell & Soifer LLP | 199 Water St. 22nd Floor |
| 2525 Wallingwood, Bldg. 14 | New York, NY 10038 |
| Austin, Texas 78746 | (917) 637-3653 |
| (512) 222-0444 | dbrown@reprorights.org |
| poconnell@oconnellsoifer.com | stoti@reprorights.org |
| jsoifer@oconnellsoifer.com | mduane@reprorights.org |

J. Alexander Lawrence*
Morrison & Foerster LLP
250 W. 55th Street
New York, NY 10019
(212) 336-8638
alawrence@mofo.com

*Attorneys for Plaintiffs*

*Application for admission *pro hac vice* filed herewith

**CERTIFICATE OF SERVICE**

I certify that on this 12th day of December, 2016, I electronically filed a copy of the

above document with the Clerk of the Court using the CM/ECF system, which will send

notification to the counsel of record.


 _/s/ Patrick J. O'Connell_____
Patrick J. O'Connell