**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | | |
|---|---|---|
| WHOLE WOMAN'S HEALTH, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | CIVIL ACTION |
| v. | ) | |
| | ) | CASE NO. 1:16-cv-01300-SS |
| JOHN HELLERSTEDT, M.D., | ) | |
| | ) | |
| Defendant. | ) | |

## PLAINTIFFS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

# <u>TABLE OF CONTENTS</u>

**Page**

TABLE OF AUTHORITIES ......................................................................................... ii

PROPOSED FINDINGS OF FACT ............................................................................. 1

    I.      The Parties. ............................................................................................. 1

    II.    The Amendments. .................................................................................. 2

    III.   Procedural History. ................................................................................ 6

    IV.   Burdens on Women's Liberty. ............................................................... 6

          A.     The Amendments Impose the State's View of Personhood onto Women.................................................................................. 7

          B.     The Amendments Would Discourage Some Women from Seeking Medical Care. .......................................................... 11

          C.     The Amendments Would Impose Barriers to Accessing Healthcare by Increasing Costs and Decreasing the Availability of Services. .......... 12

          D.     The Amendments Offer No Benefits. ...................................... 18

PROPOSED CONCLUSIONS OF LAW ................................................................... 22

    I.      Plaintiffs Are Likely to Succeed on the Merits of Their Claim That the Amendments Are Unconstitutionally Vague. ...................................... 22

          A.     A Stringent Vagueness Test Is Required.... ............................. 22

          B.     The Amendments Are Vague and Susceptible to Arbitrary Enforcement. ........................................................................... 24

    II.    Plaintiffs Are Likely to Succeed on the Merits of Their Claim That the Amendments Are an Unconstitutional Deprivation of Liberty........... 28

          A.     The Amendments Require Searching Judicial Scrutiny. ........ 30

          B.     The Amendments Do Not Permissibly Further any Valid State Interest................................................................................... 31

               i.     *The Amendments Do Not Further DSHS' Purported Interest in Health.* ...................................................... 32

              ii.    *The Amendments Do Not Permissibly Further DSHS' Purported Interest in Potential Life or the Dignity of Embryos and Fetuses* .................................... 32

          C.     The Burdens Imposed by the Amendments Exceed the Benefits They Provide. ................................................................ 36

    III.   Without a Preliminary Injunction, Plaintiffs and Their Patients Will Suffer Irreparable Harm. ................................................................... 38

    IV.   The Balance of Equities and the Public Interest Weigh in Favor of a Preliminary Injunction. ....................................................................... 39

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Austin Lifecare Inc. v. City of Austin*,
No. A-11-CA-875-LY, slip op. (W.D. Tex. June 23, 2014)............................................22, 28

*Carey v. Population Servs., Int'l*,
431 U.S. 678 (1977)..................................................................................................36, 37

*Colautti v. Franklin*,
439 U.S. 379 (1979)............................................................................................ 23 & n.9

*Deerfield Med. Ctr. v. City of Deerfield Beach*,
661 F.2d 328 (5th Cir. Unit B Nov. 1981)..............................................................38

*Elrod v. Burns*,
427 U.S. 347 (1976)...............................................................................................38

*Ford Motor Co. v. Tex. Dep't of Transp.*,
264 F.3d 493 (5th Cir. 2001) ................................................................................23

*Gonzales v. Carhart*,
550 U.S. 124 (2007)...............................................................................33, 34, 35, 37

*Jackson Women's Health Org. v. Currier*,
760 F.3d 448 (5th Cir. 2014) ...........................................................................22, 39

*Johnson v. United States*,
135 S. Ct. 2551 (2015)...........................................................................................22

*Kolender v. Lawson*,
461 U.S. 352 (1983)...............................................................................................23

*Lawrence v. Texas*,
539 U.S. 558 (2003)...............................................................................................29

*Margaret S. v. Edwards*,
488 F. Supp. 181 (E.D. La. 1980).........................................................................34

*Margaret S. v. Treen*,
597 F. Supp. 636 (E.D. La. 1984), *aff'd on other grounds sub nom.*
*Margaret S. v. Edwards*, 794 F.2d 994 (5th Cir. 1986) ..................................32 n.13

*Obergefell v. Hodges*,
135 S. Ct. 2584 (2015)...........................................................................................29

## TABLE OF AUTHORITIES
(continued)

Page(s)

*Opulent Life Church v. City of Holly Springs*,
    697 F.3d 279 (5th Cir. 2012) ...................................................................38

*Planned Parenthood of Greater Tex. Surgical Health Servs. v. Abbott*,
    134 S. Ct. 506 (2013) ............................................................................39

*Planned Parenthood of Minn. v. Minn.*,
    910 F.2d 479 (8th Cir. 1990) .........................................................34 n.15

*Planned Parenthood of Minn. N.D., S.D. v. Daugaard*,
    799 F. Supp. 2d 1048 (D.S.D. 2011) ....................................................35

*Planned Parenthood of Se. Pa. v. Casey*,
    505 U.S. 833 (1992) ..................................................................... passim

*PPINK v. Commissioner*,
    No. 16-CV-763-TWP-DML, 2016 WL 3556914 (S.D. Ind. June 30, 2016) ...................33, 34

*State v. Jackson*,
    376 S.W.2d 341 (Tex. 1964) ........................................................26 n.11

*United States v. Virginia*,
    518 U.S. 515 (1996) ..............................................................................31

*Veasey v. Abbott*,
    830 F.3d 216 (5th Cir. 2016) (en banc) ................................................36

*Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*,
    455 U.S. 489 (1982) .............................................................. 22, 23 & n.9

*Virginia v. Am. Booksellers Ass'n, Inc.*,
    484 U.S. 383 (1988) ..............................................................................27

*W. Va. State Bd. of Educ. v. Barnette*,
    319 U.S. 624 (1943) ................................................................30, 35, 37

*Whole Woman's Health v. Hellerstedt*,
    579 U.S. ___, 136 S. Ct. 2292 (2016) ........................................ passim

*Women's Med. Ctr. of Nw. Houston v. Bell*,
    248 F.3d 411 (5th Cir. 2001) ...........................................22, 23, 24, 28

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

STATUTES

Tex. Gov't Code § 2006.002 .................................................................................4

Tex. Health & Safety Code ch. 716 .............................................. passim

Tex. Health & Safety Code § 716.302 ................................... 25 & n.10

Tex. Health & Safety Code § 716.304 ................................... 25 & n.10

OTHER AUTHORITIES

25 Tex. Admin. Code § 1.132 ..................................................... passim

25 Tex. Admin. Code § 1.134 .....................................................25, 27

25 Tex. Admin. Code § 1.136 ..................................................... passim

25 Tex. Admin. Code § 139.33 ..........................................................23

25 Tex. Admin. Code § 181.2 .............................................................36

30 Tex. Admin. Code § 261.61 .......................................................13 n.5

30 Tex. Admin. Code §§ 326.65-326.67 .........................................13 n.5

30 Tex. Admin. Code §§ 326.69-326.77 .........................................13 n.5

14 Tex. Reg. 1457-1462 (Mar. 21, 1989) ...........................................2

41 Tex. Reg. 4772-78 (July 1, 2016) ........................3, 4, 32 n.13

41 Tex. Reg. 7659-65 (Sept. 30, 2016) ..............................................3

41 Tex. Reg. 9709-41 (Dec. 9, 2016) ............................... passim

Fed. R. Evid. 701 .............................................................................16 n.6

## PROPOSED FINDINGS OF FACT

I.      **The Parties.**

1.      Plaintiffs are Texas healthcare providers bringing claims on behalf of themselves and their patients against the amendments to Title 25, sections 1.132 through 1.137, of the Texas Administrative Code, published in the Texas Register, Volume 41, pages 9709 through 9741, on December 9, 2016 (the "Amendments").

2.      Plaintiff Whole Woman's Health operates licensed abortion facilities in Fort Worth, McAllen, and San Antonio. ECF No. 1 ¶ 12; Tr. of Mot. Hr'g Vol. 1 (Jan. 3, 2017) (hereafter "Tr. Vol. 1") at 10:6-7 (Hagstrom Miller); Ex. P-3 (Hagstrom Miller Decl.) ¶¶ 1-2. Plaintiffs Brookside Women's Medical Center and Austin Women's Health Center are, respectively, a comprehensive women's primary care and gynecological care practice, and a licensed abortion facility, sharing premises in Austin. ECF No. 1 ¶ 13; Tr. Vol. 1 at 50:14-24 (Davis); Ex. P-4 (Davis Decl.) ¶¶ 5-6. Plaintiff Dr. Lendol L. Davis, medical director of both, performs procedures including miscarriage management, abortion, and surgery for ectopic pregnancy, both at his practice, and at several Austin-area hospitals. ECF No. 1 ¶ 13; Tr. Vol. 1 at 50:14-51:12 (Davis); Ex. P-4 ¶¶ 4-6. Plaintiff Alamo Women's Reproductive Services is a licensed ambulatory surgical facility providing a range of reproductive health services, including abortion, in San Antonio. ECF No. 1 ¶ 14. Plaintiff Reproductive Services operates a licensed abortion facility in El Paso. ECF No. 1 ¶ 15.

3.      Defendant John Hellerstedt, M.D., is the Commissioner of the Texas Department of State Health Services (the "Department" or "DSHS"). The Executive Commissioner of the Health and Human Services Commission promulgated the Regulation on DSHS' behalf, Ex. P-1 (41 Tex. Reg. 9709-41 (Dec. 9, 2016)) at 2, and DSHS is charged with its enforcement, *id*. at 24-25.

1

## II.       The Amendments.

4.       DSHS' regulations governing the disposal of "special waste from health care-related facilities," which includes all human tissue that is the product of medical care, were originally enacted in 1989. *See* 25 Tex. Admin. Code §§ 1.131-1.137; Tr. Vol. 1 at 146:5-9 (Sims). For twenty-seven years, until the Amendments were issued, embryonic and fetal tissue was treated like all other medical tissue. Tr. Vol. 1 at 146:5-9 (Sims); *see also* 14 Tex. Reg. 1457-62 (Mar. 21, 1989) (creating 25 Tex. Admin. Code §§ 1.131-1.137).

5.       Four days after the U.S. Supreme Court ruled that Texas could not enforce a pair of unnecessary health regulations that shuttered the majority of the State's abortion clinics,[1] the Department proposed amendments to its "special waste" regulations intended to prohibit the most common method for disposing of medical tissue—decontamination followed by disposition in a sanitary landfill, Tr. of Mot. Hr'g Vol. 2 (Jan. 4, 2017) (hereafter "Tr. Vol. 2") at 14:19-15:21 (Swenson); Ex. P-5 (Schecter Decl.) ¶¶ 13-14; *see also* Tr. Vol. 1 at 185:13-17 (Sims)—for embryonic and fetal tissue.[2]

6.       In particular, the Amendments create a new category of waste called "fetal tissue," defined as "[a] fetus, body parts, organs or other tissue from a pregnancy," not including "the umbilical cord, placenta, gestational sac, blood or body fluids." Ex. P-2 (blackline of adopted Amendments) at 3 (creating 25 Tex. Admin Code § 1.132(28)). The Amendments reduce the number of permissible disposal methods for "fetal tissue" from seven to three. Ex. P-2 at 20-23

---

[1] *See Whole Woman's Health v. Hellerstedt*, 579 U.S. ___, 136 S. Ct. 2292 (2016) (hereafter *Whole Woman's Health v. Hellerstedt I*).

[2] A representative of the Department testified that the Department had completed work on the proposed Amendments prior to issuance of the Supreme Court's decision, but well after the Supreme Court had agreed to hear the case and had acted to prevent interim enforcement of the challenged regulations. Tr. Vol. 1 at 155:7-156:3, 173:25-174:17 (Sims).

2

(amending 25 Tex. Admin Code § 1.136(a)(4)). Each of these three methods ultimately requires "interment," which is defined to include burial[3] or cremation. Ex. P-1 at 26-27, 32 (25 Tex. Admin. Code §§ 1.132(33), 1.136(a)(4)(A)(v), (a)(4)(B)(i)); Ex. P-2 at 5, 23 (amending 25 Tex. Admin. Code §§ 1.132, 1.136(a)(4)).

7.     Thus, under the Amendments, all embryonic and fetal tissue must ultimately be cremated or buried.

8.     Although the Amendments do not, on their face, prohibit the disposal of ashes resulting from incineration or cremation of embryonic or fetal tissue in a sanitary landfill, the Department has taken the position that they prohibit this method of disposition. Tr. Vol. 1 at 149:20-23, 185:13-20 (Sims).

9.     DSHS issued multiple versions of the proposed Amendments in succession. In the initial version, published in the Texas Register on July 1, 2016, DSHS stated that "the public benefit anticipated as a result of adopting and enforcing these rules will be enhanced protection of the health and safety of the public." Ex. P-9 (41 Tex. Reg. 4772-78 (July 1, 2016)) at 3.

10.     On September 30, after a comment period and public hearing, DSHS withdrew the initial version, and issued a new one, containing identical text, but a longer explanatory preamble. Ex. P-10 (41 Tex. Reg. 7659-65 (Sept. 30, 2016)). There, DSHS stated, "the public benefit anticipated as a result of adopting and enforcing these rules will be enhanced protection of the health and safety of the public by ensuring that the disposition methods specified in the rules continue to be limited to methods that prevent the spread of disease." Ex. P-10 at 3. DSHS again received comments and held a public hearing.

---

[3] The Amendments use the phrase "entombment, burial, or placement in a niche," Ex. P-1 at 26-27 (25 Tex. Admin. Code § 1.132(33)), which the parties referred to in shorthand as "burial" throughout the preliminary injunction hearing.

11.     Neither the July 1st nor the September 30th publications of the proposed Amendments mentioned "the dignity of the unborn" nor any other purpose beyond "protection of the health and safety of the public."

12.     During the two comment periods, DSHS received a total of 35,663 written and oral public comments. Ex. P-1 at 4. DSHS received comments in opposition to the proposed Amendments from major national and Texas-based medical groups, including the American Congress of Obstetricians and Gynecologists ("ACOG"), the Texas Medical Association, the Texas Hospital Association, the Teaching Hospitals of Texas, and the National Abortion Federation. DSHS also received comments in opposition from the Funeral Consumers Alliance of Texas, the Healthcare Waste Institute of the National Waste and Recycling Association, the National Association of Social Workers, and various national and Texas-based women's rights and civil rights organizations. *Id.*

13.     The July 1st version of the proposed Amendments did not include the small business fiscal impact analysis required by Texas law, *see* Tex. Gov't Code § 2006.002(c), because the Department had not yet gathered the needed information. Tr. Vol. 1 at 176:9-20 (Sims) ("[W]e just did not have all the information that was necessary."); *see also* Ex. P-9 at 3 ("[T]he department has identified a potential fiscal impact but does not have information sufficient to quantify the impact."). The September 30th version of the proposed Amendments contained a summary of the Department's impact analysis, which stated that the Amendments "may have a cost but that cost is expected to be off-set by the cost currently being expended for disposition." This analysis was certified by Ms. Jennifer Sims, DSHS' Deputy Commissioner.

14.     The final version of the Amendments was published in the Texas Register on December 9, 2016 with an effective date of December 18, 2016. Ex. P-1. Under the heading

4

"Public Benefit," DSHS added an additional justification, not present in the proposed versions of the Amendments: "Ms. Sims has determined that . . . . [a]dditional public benefit will be realized in bringing up-to-date the department's rules to reflect the Legislature's articulated policy objectives of respect for life and protecting the dignity of the unborn." Ex. P-1 at 25. DSHS also again noted that "the public benefit anticipated as a result of adopting and enforcing these rules will be the continued protection of the health and safety of the public by ensuring that the disposition methods specified in the rules continue to be limited to methods that prevent the spread of disease." *Id.*

15.     Along with the final version of the Amendments, DSHS published its responses to public comments to the two proposed versions. Ex. P-1 at 2-25. In these responses, DSHS stated, without explanation, that "[b]ased upon the lowest stated costs of each entity able to provide cost estimates, the department has determined that the annual cost per facility would be approximately $450." *Id.* at 5; Tr. Vol. 1 at 197:15-198:2 (Sims). Not until litigation did DSHS reveal the underlying calculations and assumptions in its analysis. *See* Exs. D-1 to D-9. In the litigation, Ms. Sims offered a different figure than the one in the impact analysis she certified: $425 per facility per year. *See* Ex. D-1 ¶¶ 12-13 & Attach. D; Tr. Vol. 1 at 197:15-196:2 (Sims).[4]

16.     In its responses to public comments, DSHS made several statements intended to clarify its position on issues raised by the public, including: embryonic or fetal tissue may be comingled with other tissue, so long as the Amendments' requirements for the disposal of

---

[4] All of Ms. Sims figures are one or two orders of magnitude lower than the prices quoted by Defendant's witness Mr. Jay Carnes, who runs a large funeral business. Mr. Carnes calculated a cost of $350 for the common cremation of twenty-five sets of embryonic or fetal tissue from a healthcare provider in the Houston area, with costs increasing for greater distance travelled, up to about $2,000 for twenty-five sets transported from the El Paso area. Tr. Vol. 2 at 134:5-15, 171:4-8 (Carnes). For a clinic providing an average of 3,000 abortions annually, *see* Ex. P-8 ¶ 30, this would be $42,000 to $240,000 per year, depending on its distance from Houston.

embryonic or fetal tissue are met, Ex. P-1 at 12, Tr. Vol. 1 at 147:20-148:17 (Sims); disposition of

fetal tissue in a sanitary landfill is prohibited, Ex. P-1 at 3, Ex. D-1 ¶¶ 6, 11, Tr. Vol. 1 at 149:20-

23, 186:4-13 (Sims); women are not required to consent to or be informed about the Amendments,

Ex. P-1 at 6, Ex. D-1 ¶ 9, Tr. Vol. 1 at 187:16-188:2 (Sims); and the Amendments do not require

individual cremation or burial, Ex. P-1 at 22, Tr. Vol. 1 at 189:16-190:6 (Sims).

17.     As discussed *infra* ¶¶ 76-95, DSHS' final publication of the Amendments did not

clarify significant ambiguities in the text of the Amendments themselves.

**III.     Procedural History.**

18.     On December 12, 2016, Plaintiffs filed a complaint alleging, *inter alia*, that the

Amendments are unconstitutionally vague and impose onerous, unjustified, and medically-

unnecessary burdens on women seeking miscarriage management, ectopic pregnancy treatment,

and abortion in Texas, in violation of the Due Process Clause of the Fourteenth Amendment. ECF

No. 1. The same day, Plaintiffs filed a motion for a temporary restraining order, or alternatively, a

preliminary injunction, to block the Amendments from taking effect on December 18, their

planned effective date. ECF No. 6.

19.     Following oral argument on December 15, 2016, the Court issued a temporary

restraining order against enforcement of the Amendments, effective through January 6, 2017. ECF

No. 24. The Court held an evidentiary hearing on Plaintiffs' preliminary injunction motion on

January 3-4, 2017. At the conclusion of the hearing, the Court extended the temporary restraining

order through January 27, 2017. ECF No. 40.

**IV.     Burdens on Women's Liberty.**

20.     The Amendments would burden women's liberty in several ways. First, they would

force the Department's views about personhood onto all women in Texas, mandating adherence

to a particular set of cultural and religious norms that are far from universal. Second, they would

discourage women from seeking medical care for abortion and miscarriage. Third, they would impose barriers to accessing healthcare by increasing costs and decreasing the availability of services.

### A.  The Amendments Impose the State's View of Personhood onto Women.

21.     It is undisputed that individuals hold differing views about whether an embryo or fetus has the status of a person. Tr. Vol. 1 at 20:13-21:10 (Hagstrom Miller), 95:18-21 (Haffner); Tr. Vol. 2 at 56:23-57:1, 74:19-23 (Bishop), 89:10-16, 90:2-6 (Allmon); Ex. P-6 (Haffner Decl.) ¶ 7; Ex. P-7 (Peterson Decl.) ¶¶ 9, 12.

22.     These views are often informed by an individual's religious and cultural traditions. Ex. P-6 ¶ 7; *see* Tr. Vol. 1 at 21:1-3 (Hagstrom Miller). They are also informed by science. Ex. P-7 ¶ 12.

23.     World religions differ in their teachings about the moral status of an embryo or fetus. Ex. P-6 ¶ 7. For example, Jewish law defines personhood as beginning at birth with the first breath. *Id.*; Tr. Vol. 1 at 96:19-24 (Haffner). Roman Catholic teaching, in contrast, currently defines personhood as beginning at conception. Ex. P-6 ¶ 7; Tr. Vol. 1 at 96:14-18 (Haffner); *see* Tr. Vol. 2 at 89:10-12 (Allmon). Roman Catholic teaching used to define personhood as beginning at "quickening," or the fetus's first movements. Tr. Vol. 1 at 96:14-18 (Haffner).

24.     Cremation and burial are rituals associated with the death of people. Ex. P-6 ¶ 10; Tr. Vol. 1 at 98:10-12 (Haffner). Many view these methods as inappropriate for the disposition of embryonic and fetal tissue. Ex. P-7 ¶ 9; Tr. Vol. 1 at 21:1-19 (Hagstrom Miller), 56:16-21 (Davis), 98:18-99:6 (Haffner).

25.     The Amendments do not reflect this diversity of religious and cultural beliefs regarding when an embryo or fetus attains personhood and what method of disposal for embryonic

and fetal tissue is appropriate following abortion or miscarriage. Tr. Vol. 1 at 17:24-18:4 (Hagstrom Miller), 98:15-99-6 (Haffner); Tr. Vol. 2 at 74:19-23 (Bishop).

26.     By insisting that embryonic and fetal tissue be disposed of via cremation or burial, the Department is equating a miscarriage, abortion, or ectopic pregnancy with the death of a person. Ex. P-6 ¶ 10; *see* Tr. Vol. 1 at 105:12-14 (Haffner); Ex. P-7 ¶¶ 8-13.

27.     Prior to the Amendments, Texas law afforded women options for disposing of embryonic and fetal tissue. Women who believe that an embryo or fetus is a person were permitted to elect interment. Ex. P.-2 at 22-23 (former 25 Tex. Admin. Code § 1.136(a)(4)(A)(ii)(III)). *See also* Tr. Vol. 1 at 16:15-18:8 (Hagstrom Miller), 56:22-57:3 (Davis); Ex. P-3 ¶ 16. Women who believe that an embryo or fetus is not a person were permitted to treat the tissue like other medical tissue. Ex. P.-2 at 22-23 (former 25 Tex. Admin. Code § 1.136(a)(4)(A)(ii)); *see also* Tr. Vol. 1 at 17:2-8 (Hagstrom Miller).

28.     The standard method for disposing of medical tissue is decontamination followed by disposition in a sanitary landfill. Ex. P-5 ¶ 14; Tr. Vol. 2 at 12:9-13:17 (Swenson); *see also* Ex. P-15 (Laboratory General Checklist) at 84.

29.     Miscarriage is estimated to occur in about fifteen percent of known pregnancies. Ex. P-4 ¶ 20; Tr. Vol. 1 at 63:11-17 (Davis). There are therefore tens of thousands of miscarriages in Texas each year. Ex. P-4 ¶ 20; Tr. Vol. 1 at 63:18-20 (Davis). Most women dispose of the embryonic or fetal tissue resulting from a miscarriage at home, as they would a menstrual period, by flushing it into a sanitary sewer. Ex. P-4 ¶ 20; Tr. Vol. 1 at 62:23-63:2 (Davis). This is also what happens when a woman has a medication abortion, which generally results in the expulsion of embryonic tissue at home. Ex. P-4 ¶ 20.

30.     On rare occasions, patients express a desire to have a funeral following an abortion or miscarriage. Plaintiffs work with those patients to facilitate their wishes. Tr. Vol. 1 at 16:15-23, 17:18-18:8 (Hagstrom Miller), 55:20-56:12, 57:1-3 (Davis); Ex. P-3 ¶ 16; Ex. P-4 ¶ 23.

31.     Sometimes, Plaintiffs' patients simply ask for information about the standard disposition of embryonic and fetal tissue, and Plaintiffs provide that information to patients. Tr. Vol. 1 at 17:11-17 (Hagstrom Miller) ("[W]e explain to them that it will be incinerated and that it will be placed in a sterile landfill."), 86:21-87:5 (Davis) ("We do talk if they want to talk about the tissue. . . ."); Ex. P-3 ¶ 16.

32.      "Moral agency" is "the ability of a person to determine what is right or wrong and to act on it." Tr. Vol. 1 at 97:10-11 (Haffner); Ex. P-6 ¶ 16.

33.     The Amendments deprive women of moral agency by preventing them from choosing a method of embryonic and fetal tissue disposal that accords with their views about personhood. Ex. P-6 ¶ 17; *see also* Ex. P-7 ¶ 9. Women who believe that embryonic or fetal tissue should be treated the same as any other medical tissue will now no longer be able to effectuate that choice. This would make women feel "less human." Ex. P-7 ¶ 15; *see also* Ex. P-3 ¶ 17 ("The regulation is completely disrespectful of woman's agency and ability to decide what happens with their bodies . . . .").

34.     For some women, the Amendments would cause significant distress. Ex. P-7 ¶¶ 10, 13; Tr. Vol. 1 at 55:2-17, 89:19-23 (Davis), 101:21-102:3 (Haffner).

35.     Dr. Valerie Peterson, a Texas woman who had an abortion after her wanted pregnancy was diagnosed with a fetal anomaly, testified that, had the Amendments been in effect at the time: "I would be concerned about where the burial took place, or what happened at the cremation. I would worry if strangers were making a memorial or holding a prayer service over

9

the burial place, inserting their sense of concern where it did not belong, not knowing me, not knowing that it seems like it was God's will that the baby not be viable." Ex. P-7 ¶ 13.

36.     Such concerns are well founded. The Department maintains that Plaintiffs can achieve compliance with the Amendments by working with religious ministries that would facilitate prayer services at embryonic and fetal tissue disposition sites. *See* Ex. P-11 (Public Information Act request and response by DSHS) (Our Lady of the Rosary Cemetery and Prayer Gardens holds "a quarterly service for babies who died before birth"); Tr. Vol. 2 at 114:7-11 (Allmon) (discussing telephone conversations between the Texas Conference of Catholic Bishops and members of the general public about "praying at grave sites"); *see also* Tr. Vol. 1 at 188:3-8 (Sims) ("Q: Now, is it your testimony that if the state's been proposing here today that all embryonic or fetal tissue is turned over en masse to the Catholic church for a mass burial or cremation, that patients of these healthcare facilities wouldn't need to be told about that? A: That's correct.").

37.     Karen Swenson, M.D., an obstetrician-gynecologist practicing in Austin, testified that she stopped performing miscarriage management procedures at Seton Medical Center because some of her patients were distressed by the hospital's policy requiring burial of all embryonic and fetal tissue at a Catholic cemetery. Tr. Vol. 2 at 21:10-23:1 (Swenson). She noted that: "Some patients have different religious beliefs and that [policy] distresses them. And other patients hadn't thought of that at all in their—during their loss, and it causes a lot more distress for them." *Id.* at 22:4-7.

38.     The Amendments could also cause women grief, guilt, shame, and anger. Tr. Vol. 1 at 99:15-21, 101:21-102:1 (Haffner); Ex. P-6 ¶ 17. Dr. Peterson further testified that: "Knowing that the government was requiring all of this would have made [my experience] much harder. I do

not think the government understands the emotional and psychological toll of this regulation." Ex. P-7 ¶ 14. They also would have affected "her feelings and her memory" of her abortion. *Id.* ¶¶ 13, 15. Ms. Hagstrom Miller, President and CEO of Plaintiff Whole Woman's Health, testified that the Amendments' disrespect of women's agency would make women "furious." Ex. P-3 ¶ 17; *see also* Tr. Vol. 1 at 13:3-14 (Hagstrom Miller). Finally, Dr. Davis testified that many of his patients would experience the Amendments as "an imposition or an invasion into their private lives." Ex. P-4 ¶ 22.

39.     Additionally, by codifying the view that an embryo or fetus is a person and requiring burial or cremation of fetal tissue, the Amendments would increase stigma around abortion and miscarriage. Ex. P-6 ¶ 17; Tr. Vol. 1 at 99:15-21, 101:23-102:1 (Haffner).

**B.  The Amendments Would Discourage Some Women from Seeking Medical Care.**

40.     The Amendments would also harm women by discouraging them from obtaining healthcare in a medical facility.

41.     Dr. Swenson testified that one of her patients once delayed a miscarriage management procedure because of Seton Medical Center's policy requiring burial of embryonic and fetal tissue at a Catholic cemetery. Tr. Vol. 2 at 22:19-21 (Swenson). The patient, who was Muslim, delayed the procedure so that she could speak with her imam before consenting to the burial. *Id.* The distress Seton's policy causes her patients is the reason Dr. Swenson has stopped scheduling miscarriage management procedures there. *Id.* at 21:13-21.

42.     Rev. Debra Haffner testified that the Amendments have the "potential to medically hurt women who will, in fact, choose to either do medical abortions at home or miscarry at home, rather than enter into a situation where the state will demand where their fetal remains are handled." Tr. Vol. 1 at 99:17-21 (Haffner). *See also* Ex. P-6 ¶ 20.

11

43.     Dr. Anne Layne-Farrar, an economist, also testified that the Amendments could influence women's decisions about whether to seek care in a healthcare facility. Tr. Vol. 1 at 119:1-18 (Layne-Farrar) ("It could push some women . . . to stay home and not seek, for example, miscarriage treatment care from their doctor's offices or from their hospitals. It could adjust women's choices in those regards.").

**C. The Amendments Would Impose Barriers to Accessing Healthcare by Increasing Costs and Decreasing the Availability of Services.**

44.     The Amendments threaten to increase the cost and decrease the availability of abortion services by introducing uncertainty and instability into a critical aspect of abortion-facility operations.

45.     Anti-abortion activists have long identified medical waste disposal as the "weak link" in abortion clinic operations. Tr. Vol. 1 at 116:22-117:6 (Layne-Farrar); Ex. P-8 ¶ 27; *see* Tr. Vol. 1 at 14:16-21 (Hagstrom Miller). By pressuring medical waste disposal companies to stop servicing abortion clinics, activists are able to raise the cost of clinic operations or to shutter the clinics entirely. Ex. P-3 ¶¶ 25-26; Ex. P-8 ¶ 27. For example, one such activist group, Created Equal, created a campaign known as "Project Weak Link" to target medical waste disposal companies that handle fetal tissue. Tr. Vol. 1 at 116:22-6 (Layne-Farrar); Ex. P-8 ¶ 27.

46.     Austin Women's Health Center was nearly forced to close after two successive medical waste disposal vendors who were targeted and harassed by anti-abortion activists dropped the healthcare facility as a client. Tr. Vol. 1 at 57:25-58:14 (Davis); Ex. P-4 ¶ 30.

47.     Whole Woman's Health has also been dropped as a client by medical waste disposal companies no longer willing to work with abortion providers, including one who was fined by the Texas Commission on Environmental Quality ("TCEQ") after anti-abortion activists filed a complaint. The allegations in the complaint itself were never substantiated, but they led to a far-

ranging investigation of medical waste disposal practices by abortion providers that served to discourage medical waste disposal companies from working with them. Tr. Vol. 1 at 18:9-23 (Hagstrom Miller); Ex. P-3 ¶¶ 25-27. Four years later, DSHS and other Texas agencies undertook yet another investigation into providers' relationships with medical waste vendors; no violations were found. Ex. P-3 ¶ 28.

48.     By prohibiting standard methods of disposal for embryonic and fetal tissue, the Amendments would drastically limit the pool of medical waste disposal companies with which abortion providers could work. Plaintiffs are aware of only one company in the state—located in the Dallas area—that would be willing and able to provide compliant services to abortion providers at a reasonable price. Tr. Vol. 1 at 32:15-21 (Hagstrom Miller), 115:6-14 (Layne-Farrar).

49.     Notably, DSHS was not able to identify any additional companies that would be willing and able to provide compliant services to abortion providers at a reasonable price.

50.     Although DSHS proffered the testimony of two witnesses who claimed to be willing to dispose of embryonic and fetal tissue at a low price, both admitted on cross-examination that they were not prepared to dispose of embryonic and fetal tissue in accordance with the laws governing pathological waste.[5] But DSHS has taken the position that the laws governing disposition of human remains do not apply to embryonic and fetal tissue under the Amendments.

---

[5] TCEQ regulates "any person that by contract, agreement, or otherwise arranges to process, store, or dispose of, or arranges with a transporter for transport to process, store, or dispose of, medical waste." Ex. P-20. "A registration [from TCEQ] is required for facilities that store or process untreated medical waste that is received from off-site sources. . . . No person may cause, suffer, allow, or permit any activity of storage, processing, removal, or disposal of any medical waste unless that activity is authorized by a registration or other authorization from the commission." 30 Tex. Admin. Code § 261.61(a). Registration requires the submission of a highly detailed design and operations plan, certified by an engineer. 30 Tex. Admin. Code §§ 326.69-326.77. TCEQ also requires registration of medical waste transporters. Ex. P-19. Localities also have the authority to impose additional permitting requirements. *See* 30 Tex. Admin. Code §§ 326.65-326.67.

*E.g.*, ECF No. 38 at 1. Rather, such tissue must be disposed of in accordance with the laws, including permit and license requirements, governing pathological waste. Ex. D-12 ¶¶ 3-4; Tr. Vol. 2 at 5:3-14 (colloquy between the Court and counsel for Defendant).

51.     Mr. Jay Carnes, owner of the Carnes Funeral Home, testified that his "crematory is not licensed to do biohazard. It's only licensed to do remains." Tr. Vol. 2 at 139:1-2 (Carnes). Likewise, Ms. Jennifer Carr Allmon, Executive Director of the Texas Catholic Conference of Bishops, testified that she did not know whether Catholic cemeteries in Texas were licensed to handle pathological waste, *id.* at 102:1-12, 108:24-109:3 (Allmon) ("I cannot speak to the pathological waste issue.").

52.     Further, Mr. Carnes candidly admitted that he has little experience disposing of embryonic or fetal remains, *id.* at 131:9-10 ("We do not handle a bunch of them currently."); he has no experience disposing of multiple sets of embryonic or fetal remains jointly, *id.* at 146:15-17; and the prices he quoted DSHS may change because he does not know what to expect, *id.* at 133:24-25 ("It could go higher, it could go lower, but that's the number we set right now because we've never done that before.").

53.     Ms. Allmon testified that she could not identify specific cemeteries willing to accept embryonic or fetal tissue resulting from abortion, *id.* at 106:25-107:20; that the Catholic bishops are not willing to pay the transportation costs associated with transferring embryonic and fetal tissue from a healthcare facility to a Catholic cemetery, *id.* at 109:23-110:1; and that the Catholic bishops have not given any thought to security issues that might arise as a result of burying embryonic and fetal tissue in publicly-identified mass graves, *id.* at 122:8-123:13. She further testified that individuals had contacted her to express a desire to pray at the mass gravesites, and that the Catholic Church would be unwilling to prohibit prayer services or rituals at the

gravesites even at the request of a woman whose tissue was buried there. *Id.* at 113:17-115:17 ("[I]f a person comes to us and says, I would like to make sure no one ever prays at my grave, we would probably suggest they be buried elsewhere.").

54.    The one Texas company that Plaintiffs understand to be willing and legally permitted to provide compliant services to abortion providers in practice, and at non-prohibitive cost, *see supra* ¶ 48, currently serves only the Dallas area, and Plaintiffs cannot ensure that it has the capacity to meet statewide demand for embryonic and fetal tissue disposal. Tr. Vol. 1 at 116:1-6 (Layne-Farrar).

55.    The Amendments impact at least several hundred healthcare providers, including hospitals, ambulatory surgical centers, abortion clinics, doctors' offices, and pathology labs. *Id.* at 181:15-183:19 (Sims). They govern tens of thousands of medical procedures. Ex. P-4 ¶ 20; *id.* at 63:18-20 (Davis). These include abortion, surgery to remove ectopic pregnancy, and procedures to manage a miscarriage. *See id.* at 51:4-24; Tr. Vol. 2 at 6:21-7:1 (Swenson).

56.    Relying on a monopoly supplier is economically risky, as monopolists are known to raise their prices. Tr. Vol. 1 at 116:7-15 (Layne-Farrar); *see also id*. at 72:6-9 (Davis) ("I would be quite concerned with the limited number of vendors that we have that this cost may skyrocket."). Further, a monopoly supplier in the disposal of embryonic and fetal tissue is particularly risky given the history of supplier intimidation by anti-abortion activists and State agencies. *Id.* at 116:16-21 (Layne-Farrar); Ex. P-3 ¶ 26; Ex. P-4 ¶ 30.

57.    Operating in the face of these risks—with the threat of abrupt closure always lurking—would pose immediate challenges to the operational capacity of abortion clinics. It would make it hard for clinics to obtain credit, as well as to recruit and maintain staff members. *See* Tr. Vol. 1 at 11:25-12:19 (Hagstrom Miller); Ex. P-3 ¶ 30; Ex. P-8 ¶ 26. Experience has borne this

out. The threat of closure posed by the enactment of H.B. 2 in 2013 made it extremely difficult for abortion clinics to operate—even the ones who were able to satisfy the admitting-privileges requirement in the short term—because creditors viewed the clinics as a risky investment and staff members knew they lacked job security. *See* Tr. Vol. 1 at 11:25-12:19 (Hagstrom Miller) ("My staff came to call those years the age of uncertainty."); Ex. P-3 ¶ 30; *see also* Tr. Vol. 1 at 62:1-2 (Davis) ("[W]e never know what the state is going to do as far as trying to shut us down."). Whole Woman's Health was denied financing by fifteen different banks during that period, and had difficulty recruiting physicians, sonographers, and registered nurses, "who are . . . in high demand in Texas." Tr. Vol. 1 at 11:25-12-19 (Hagstrom Miller).

58.     If the Dallas-area company is unable to meet statewide demand or becomes unwilling to work with abortion providers, healthcare facilities would have to try to rely on traditional funeral homes and crematories for embryonic and fetal tissue disposition (if any could be found with the proper permits), at prices that would meet or exceed the cost of providing an abortion itself. *Id.* at 31:1-4, 134:18-20 (Layne-Farrar); Ex. P-3 ¶¶ 22-23; Ex. P-4 ¶ 24; Ex. P-8 ¶¶ 15, 18. Those options would be prohibitively expensive. Tr. Vol. 1 at 113:8-11 (Layne-Farrar); Ex. P-3 ¶ 22; Ex. P-4 ¶ 25.[6]

---

[6] Ms. Sims, testified regarding the Department's legally-mandated fiscal impact statement. *See supra* ¶ 13. Ms. Sims was not an expert witness. The Court can credit her testimony to the extent of her personal knowledge about how the Department's analysis was undertaken—which was limited, as Ms. Sims testified she did not work on the analysis, nor did she read the studies it relied on, nor did it fall within her normal job duties. Tr. Vol. 1 at 156:4-25, 178:25-180:18 (Sims). The Court cannot give any weight to the results of the analysis, as the only testimony in the record regarding its accuracy and reliability, and therefore its relevance to this case, *see* Fed. R. Evid. 701(c), is Ms. Sims's statement that it is not intended to be "precise," but rather to be an "estimate." Tr. Vol. 1 at 158:16-24 (Sims). Furthermore, the analysis is clearly irrelevant to the Amendments in several key respects: it arbitrarily omitted the Amendments' application to numerous regulated facilities, including doctors' offices performing miscarriage management, hospitals performing ectopic pregnancy surgery, and pathology labs, *id.* at 181:5-183:19, 191:1-22; it was based on

59.    Further, most vendors of funeral services do not handle medical waste. *See* Tr. Vol. 2 at 149:2-3 (Carnes); Tr. Vol. 1 at 115:3-25 (Layne-Farrar). Accordingly, healthcare providers would need to retain the services of their current medical waste disposal vendors for their medical waste other than embryonic and fetal tissue. *See* Tr. Vol. 1 at 43:2-7 (Hagstrom Miller). The cost of compliance with the Amendments would be purely additive. *Id.* at 131:11-19; Ex. P-8 ¶ 31.

60.    These additional costs would be especially high for doctors' offices and other facilities that do not regularly dispose of embryonic and fetal tissue, such as ob-gyn offices that perform miscarriage management on an occasional basis, and would be unable to negotiate a contract to undertake burial or cremation at volume. Tr. Vol. 1 at 114:13-115:2 (Layne-Farrar).

61.    Transporting embryonic and fetal tissue to a cemetery or crematory would also add costs. Mr. Carnes testified that he would charge a mileage fee for potential clients more than 50 miles from his facility in the Houston area, of $2.50 per mile per trip, and that he would take only up to 25 sets of embryonic or fetal tissue per removal. Tr. Vol. 2 at 140:24-141: 12 (Carnes). This would amount to about $2,000 for a client in El Paso, some 800 miles from Houston, to remove only up to 25 sets of embryonic or fetal tissue. *Id.* at 171:4-8.

62.    Any extra costs imposed by the Amendments would be passed on to patients. Ex. P-8 ¶¶ 34-36.

63.    Healthcare providers sometimes send embryonic or fetal tissue to pathologists rather than disposing of it. This testing is important to women's health. It is done in cases of

---

unfounded assumptions regarding how healthcare facilities would cooperate to achieve lower costs, *id.* at 160:9-161:1, 193:1-13; and it used a back-of-the-envelope arithmetical calculation of the cost of cremation and burial, rather than data from healthcare or funeral services providers, *id.* at 161:5-171:17, 189:5-15, 190:23-191:25. The analysis's estimate of the cost of compliance was vastly lower than that provided by the Department's funeral director witness, Mr. Carnes. *See supra* ¶ 60.

pregnancy anomalies, either to test for the presence of genetic disorders, or to test for cancer. Tr. Vol. 1 at 16:2-16 (Hagstrom Miller), 63:25-64:5 (Davis); Tr. Vol. 2 at 15:14-15 (Swenson). Some of these labs are out of state. Tr. Vol. 1 at 64:9-22, 79:16-21 (Davis). Pathology labs traditionally dispose of the tissue they receive. Tr. Vol. 2 at 16:1-3 (Swenson); Ex. P-4 ¶ 4. In the past, Texas agencies have taken the position that healthcare providers who generate pathological waste are strictly liable for ensuring that it is disposed of in accordance with legal requirements. Tr. Vol. 1 at 20:8-12 (Hagstrom Miller). Such open-ended liability threatens abortion clinics' ability to keep their doors open, and threatens to increase costs should fines be imposed.

64.     Due to the amendments, Dr. Swenson understands that the Texas pathology lab she most commonly works with will start returning tissue to her practice, which is unprecedented in her experience. Tr. Vol. 2 at 17:2-6 (Swenson). This would also add to costs. *Id.* at 17:9-11. Dr. Swenson testified, "[w]e're hoping that there's . . . some kind of roadmap supplied by the state, since there is no roadmap." *Id.* at 16:22-24.

**D.  The Amendments Offer No Benefits.**

65.     Plaintiffs presented medical evidence through the testimony and declarations of three witnesses. Dr. Davis testified about the disposal of embryonic and fetal tissue following obstetric and gynecological procedures and the risk of infection. Ex. P-4 ¶¶ 13-20; Tr. Vol. 1 at 62:7-18 (Davis). Dr. Swenson testified regarding the standard of care in the practice of obstetrics and gynecology, including the safe disposal of human tissue from obstetric and gynecological procedures. Tr. Vol. 2 at 11:1-16:6 (Swenson). Dr. Diane Schecter, a pathologist, offered a declaration about the safe handling of human tissue. Ex. P-5. The Department did not present any medical evidence, leaving these physicians' expert testimony unrebutted.

66.     In medicine, tissue removed from patients' bodies is disposed of under the principle

18

of "universal precautions"—treating all tissue as potentially infectious, and therefore to be handled so as to eliminate the possibility of spreading infection. Tr. Vol. 2 at 11:10-13, 14:8-18 (Swenson); Ex. P-5 ¶ 14. Disposable items that contact patients' bodies or body fluids, such as blades and needles (collectively known as sharps), gloves, and table paper, are also handled with universal precautions. Tr. Vol. 2 at 13:8-13 (Swenson); *see also* Tr. Vol. 1 at 15:19-25, 43:14-17 (Hagstrom Miller).

67.     The standard practice when using universal precautions is to isolate pathological waste, disinfect it, and then dispose of it. Tr. Vol. 2 at 12:4-14:18 (Swenson); Ex. P-5 ¶¶ 13-14. For human tissue, including embryonic and fetal tissue, this is most commonly accomplished by immediately placing it into a leak-proof container, and then having the container sent to an incinerator and the resulting ash disposed of in a sanitary landfill. Tr. Vol. 2 at 14:19-15:21 (Swenson); Ex. P-5 ¶¶ 13-14; *see also* Tr. Vol. 1 at 185:13-17 (Sims) (agreeing that "deposition in a sanitary landfill" is "the most commonly used method of disposition"). This is the method generally used by Plaintiffs, and also by Dr. Swenson and Dr. Schecter in their practices. Tr. Vol. 1 at 15:9-15, 22:8-11 (Hagstrom Miller), 59:16-19 (Davis); Tr. Vol. 2 at 11:19-22, 20:22-21:1 (Swenson); Ex. P-5 ¶ 14.

68.     There is no difference in infection risk between embryonic and fetal tissue and all other forms of human tissue. Tr. Vol. 1 at 62:7-10 (Davis); Tr. Vol. 2 at 19:20-23 (Swenson); Ex. P-5 ¶ 17. There is therefore no medical reason to distinguish between the two types of tissue for disposal purposes. Tr. Vol. 1 at 62:11-13 (Davis); Tr. Vol. 2 at 19:24-20:5 (Swenson); Ex. P-5 ¶¶ 12, 17.[7] The Department's assertion that the amendments provide "enhanced protection of the

---

[7] Ms. Sims also testified she was not aware of any added potential for contagious infection from fetal or embryonic tissue as compared to other waste nor of any instances anywhere in the world

health and safety of the public" has no factual basis.

69.     The Department also claims that the Amendments provide a benefit by promoting "respect for life and protecting the dignity of the unborn." Ex. P-1 at 25. Witnesses on both sides agreed that people's notions about personhood and dignity vary, and are informed by their religions and cultures. Tr. Vol. 1 at 105:15-22 (Haffner); Tr. Vol. 2 at 69:10-16, 71:6-20, 74:9-18 (Bishop), 172:7-174:7 (Carnes). For example, Dr. Bishop testified that: "[D]ignity is a larger philosophical concept to which, then, we give specificity through Christian cultures or through Jewish cultures, or through Muslim, or Hindu, or Buddhists, or animas [sic] cultures around the worlds. Each one of those will have different ways that that dignity is articulated." Tr. Vol. 2 at 69:10-14 (Bishop).

70.     Further, both sides agreed that "there's no correct definition of the dignity that an embryo or fetus attains," and that people can disagree in good conscience about the value to be given to an embryo or fetus. Tr. Vol. 1 at 95:18-21, 96:12-24 (Haffner); Tr. Vol. 2 at 74:19-75:9 (Bishop).

71.     For example, women who miscarry at home and dispose of the embryonic and fetal remains by flushing them into a sanitary sewer generally do not view their conduct as an affront to human dignity. Tr. Vol. 1 at 63:3-5 (Davis); Tr. Vol. 2 at 20:19-21 (Swenson). But Dr. Bishop disagreed. He testified that, in his opinion, disposing of embryonic and fetal tissue in a sanitary sewer following a miscarriage is undignified. Tr. Vol. 2 at 62:8-14 (Bishop) ("My personal opinion would be yes [it is undignified], but that does not mean the woman does not have the right to do that.").

72.     Ms. Sims testified that, although scattering ashes in a sanitary landfill is not

---

of contagious disease arising from embryonic or fetal tissue that had been incinerated and disposed of in a sanitary landfill. Tr. Vol. 1 at 184:16-185:1 (Sims).

permissible under the Department's interpretation, scattering ashes in a "scrapyard" or "parking lot" is. Tr. Vol. 1 at 187:10-15 (Sims). The Department's other witnesses testified that scattering ashes in a scrapyard or parking lot would not be consistent with an interest in dignity. Tr. Vol. 2 at 66:19-23 (Bishop), 172:7-174:7 (Carnes). The Department also proposed that, to comply with the Amendments, healthcare facilities could store co-mingled tissue from thousands of abortions or miscarriages in a freezer together for up to a year, and then incinerate it and deposit the ashes jointly in a mass grave, a practice that would strike many people as undignified. Tr. Vol 1 at 189:23-190:9, 193:1-8 (Sims); ECF No. 17 at 11; *see also* Tr. Vol. 2 at 121:9-122:3 (Allmon).[8]

73.     Witnesses for both sides also testified that, when allowed to exercise moral agency, most women do not choose to have a burial or cremation after a miscarriage and abortion. Tr. Vol. 1 at 55:17-56:12 (Davis); Tr. Vol. 2 at 20:6-16, 21:7-9 (Swenson); Ex. P-3 ¶ 23; *see also* 131:9-11, 146:9-14 (Carnes) (testifying that he rarely handles embryonic or fetal tissue). A few women, however, do choose that option, which was permitted before the Amendments. Ex. P.-2 at 22-23 (former 25 Tex. Admin. Code § 1.136(a)(4)(A)(ii)(III)); *see also* Tr. Vol. 1 at 16:15-18:8 (Hagstrom Miller), 56:22-57:3 (Davis); Ex. P-3 ¶ 16.

74.     The record demonstrates that depriving women of moral agency with respect to decisions about embryonic and fetal tissue disposition strikes many people as an affront to women's dignity. *See, e.g.*, Ex. P-7 ¶ 15 ("This law would have made me feel less human. It will

---

[8] This proposal also ignores that Plaintiffs do not have the space capacity to store a year's worth of frozen tissue. Tr. Vol. 1 at 45:17-19 (Hagstrom Miller), 59:24-60:17 (Davis). Additionally, in relying on incineration, rather than cremation, DSHS ignored the evidence in the administrative record that, in practice, incineration would not be an option to comply with the Amendments because commercial incinerators are neither able to segregate any particular customer's waste apart from all the others', nor to segregate the resulting ashes, and so there is no way to separate particular ashes for "interment" apart from the remaining ashes that are sent to a sanitary landfill. *See* Tr. Vol. 1 at 113:14-114:2, 124:2-7 (Layne-Farrar); Ex. P-8 ¶ 14; Ex. P-1 at 4-5 (comments from the Healthcare Waste Institute of the National Waste and Recycling Association).

make Texas women less human."); Tr. Vol. 1 at 21:3-10 (Hagstrom Miller) ("I believe that it is my duty to serve people according to their belief systems. . . . I also believe that it is important for me to keep the woman at the center of all of her decisionmaking and to listen to what is most important to her as she approaches her reproductive healthcare decisions.").

## PROPOSED CONCLUSIONS OF LAW

75.     To merit a preliminary injunction, the moving party must show: (1) a substantial likelihood of success on the merits; (2) a substantial threat that failure to grant the injunction will result in irreparable injury to the moving party; (3) the threatened injury outweighs any damages the injunction may cause defendant; and (4) the injunction is in the public interest. *Jackson Women's Health Org. v. Currier*, 760 F.3d 448, 452 (5th Cir. 2014).

### I.     Plaintiffs Are Likely to Succeed on the Merits of Their Claim That the Amendments Are Unconstitutionally Vague.

76.     The Due Process Clause prohibits the deprivation of life, liberty, or property based on a law "so vague that it fails to give ordinary people fair notice of the conduct it punishes, or standardless that it invites arbitrary enforcement." *Johnson v. United States*, 135 S. Ct. 2551, 2556 (2015); *accord Women's Med. Ctr. of Nw. Houston v. Bell*, 248 F.3d 411, 421-22 (5th Cir. 2001) (holding that plaintiffs were likely to succeed on the merits of their claim that abortion regulations were unconstitutionally vague); *Austin Lifecare, Inc. v. City of Austin*, No. A-11-CA-875-LY, slip op. at 10-13 (W.D. Tex. June 23, 2014) (ECF No. 145) (holding that municipal regulations were unconstitutionally vague). "The degree of vagueness that the Constitution tolerates—as well as the relative importance of fair notice and fair enforcement—depends in part on the nature of the enactment." *Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498 (1982).

### A.     A Stringent Vagueness Test Is Required.

77.     The Amendments require application of a "stringent vagueness test" for three

reasons. First, they "threaten[] to inhibit the exercise of constitutionally protected rights" by burdening access to abortion services. *Id.* at 499. The Supreme Court has long recognized this as "the most important factor affecting the clarity that the Constitution demands of a law." *Id.*; *accord Colautti v. Franklin*, 439 U.S. 379, 391, 394 (1979) (holding that an abortion regulation that conditioned potential liability "on confusing and ambiguous criteria" was unconstitutionally vague because it "present[ed] serious problems of notice, discriminatory application, and chilling effect on the exercise of constitutional rights").

78.     Second, it imposes quasi-criminal penalties on abortion providers for non-compliance, through its incorporation by reference into the State's licensing standards for abortion facilities. 25 Tex. Admin. Code § 139.33 (listing penalties); *id.* § 139.53(a)(13) (incorporating the Amendments by reference). *See also Bell*, 248 F.3d at 422 (Texas's licensing standards for abortion facilities "carry potentially significant civil and administrative penalties, including fines and license revocation, which can be characterized as quasi-criminal."). Laws that impose criminal or quasi-criminal penalties are held to a higher standard of clarity than other laws.[9] *See Vill. of Hoffman Estates*, 455 U.S. at 499-500; *Ford Motor Co. v. Tex. Dep't of Transp.*, 264 F.3d 493, 508 (5th Cir. 2001).

79.     Third, abortion providers are especially vulnerable to arbitrary and discriminatory enforcement of the Amendments. *See Bell*, 248 F.3d at 422. "Although the [vagueness] doctrine focuses both on actual notice to citizens and arbitrary enforcement, . . . the more important aspect of vagueness doctrine is . . . the requirement that a legislature establish minimal guidelines to govern law enforcement." *Kolender v. Lawson*, 461 U.S. 352, 357-58 (1983) (citations and internal

---

[9] Notably, the Amendments lack a scienter requirement to mitigate the impact of their vagueness. *See Vill. of Hoffman Estates*, 455 U.S. at 489; *Colautti*, 439 U.S. at 395.

quotation marks omitted). In the absence of such guidelines, a law may enable enforcement officials "to pursue their personal predilections." *Id.* at 358 (internal quotation marks omitted). This risk is heightened "in the context of abortion, a constitutionally protected right that has been a traditional target of hostility." *Bell*, 248 F.3d at 422. The Department has recently attempted arbitrary enforcement of abortion regulations against Plaintiffs, including seeking to enforce enjoined sections of H.B. 2 against Reproductive Services, *Whole Woman's Health v. Hellerstedt*, No. 14-CV-00284-LY, (W.D. Tex. Aug 17, 2015) (ECF Doc. No. 234), and issuing a baseless statement of deficiencies against Austin Women's Health Center, which it withdrew after receiving a strongly-worded letter from counsel, Tr. Vol. 1 at 65:16-67:12 (Davis); Ex. P-4 ¶ 34; Ex. B.

### B.  The Amendments Are Vague and Susceptible to Arbitrary Enforcement.

80.     The Amendments are unconstitutionally vague because they fail to provide clarity about what, if anything, healthcare providers are required to do with the ashes resulting from the cremation of embryonic and fetal tissue. *See* Ex. P-3 ¶ 12; Ex. P-4 ¶¶ 10, 33; *see also* Tr. Vol. 1 at 13:14-20 (Hagstrom Miller), 80:24-81:14 (Davis).

81.     One of the three remaining methods of disposing of embryonic and fetal tissue permitted by the Amendments is "interment." Ex. P-1 at 32 (25 Tex. Admin. Code § 1.136 (a)(4)(A)(v)(I), (a)(4)(B)(i)(III)). The Amendments define "interment" as "[t]he disposition of pathological waste using the process of cremation, entombment, burial, or placement in a niche *or* by using the process of cremation followed by placement of the ashes in a niche, grave, or scattering of ashes as authorized by law, unless prohibited by this subchapter." Ex. P-1 at 26-27 (25 Tex. Admin. Code § 1.132(33)) (emphasis added). Given that "cremation" itself, separately from "cremation followed by placement . . . or scattering of ashes" is listed as a method of "interment," the plain language of this provision indicates that interment can be accomplished by

24

cremation itself, with healthcare providers having no further disposal obligations.

82.     Further, if "interment" includes an obligation to ensure disposition of ashes, the Amendments fail to provide clarity about permissible methods. They indicate that ashes may be scattered "as authorized by law, unless prohibited by this subchapter," Ex. P-1 at 26-27 (25 Tex. Admin. Code § 1.132(33)), but the text of the Amendments provides neither any "authorized" nor any "prohibited" locations or methods for scattering ashes. Thus, healthcare providers are left to guess at whether and how they must dispose of ashes. Further, the only Texas law regulating the scattering of ashes is Tex. Health & Safety Code §§ 716.302-716.304,[10] and the Amendments expressly state that these provisions do not apply to the disposition of fetal tissue, *see* Ex. P-1 at 29 (25 Tex. Admin. Code § 1.134(a)) ("This subchapter does not extend or modify requirements of Texas Health and Safety Code, Chapter[] . . . 716 . . . to disposition of fetal tissue.").

83.     The Department concedes that, under the plain language of its own rule, Chapter 716 does not apply to the Amendments. ECF No. 38 at 1 ("[C]hapter 716 does not govern fetal tissue or the final disposition thereof."). However, the Department also argues that Chapter 716 is incorporated into § 1.132(33) of the Amendments, "which simply adopt[] by reference the places the ashes of fetal remains may be scattered, except insofar as those places conflict with the rule itself." ECF No. 38 at 2. Those "places" are the ones authorized by chapter 716. *See* ECF No. 17 at 27 ("Pursuant to Texas Health and Safety Code sections 716.302-.304, there are multiple options available for the scattering of ashes.").

---

[10] Section 716.302(e) provides, "[a] person may dispose of cremated remains only: (1) in a crypt, niche, grave, or scattering area of a dedicated cemetery; (2) by scattering the remains over uninhabited public land, sea, or other public waterways in accordance with Section 716.304; or (3) on private property as directed by the authorizing agent with the written consent of the property owner in accordance with Section 716.304." Section 716.304 states in relevant part, "[a] person may scatter cremated remains over uninhabited public land, over a public waterway or sea, or on the private property of a consenting owner."

84.     The plain text of Chapter 716 states that scattering ashes is allowed on "any private property" with the owner's consent. However, the Department urges that a prohibition on scattering ashes in a sanitary landfill is implicit in Chapter 716, and that reading "any private property" to include sanitary landfills would not be "sound" and "would ignore the primary purpose of statutory construction, which is to give effect to the legislature's intent." ECF No. 38 at 3. The Department did not offer any evidence to support this argument.

85.     Additionally, the Department's proposed construction of Chapter 716 is not mentioned in the declaration of Ms. Janice McCoy, the Executive Director of the Texas Funeral Service Commission ("TFSC") about the application of Chapter 716. Ex. D-12. It also does not appear in any Texas regulation or guidance, or any document issued by the TFSC.

86.     Also, the Amendments do not purport to amend Chapter 716,[11] and therefore, under the Department's construction of that Chapter, depositing ashes in a sanitary landfill is already prohibited in Texas. The Department's proposed construction of Chapter 716 would make its proposed construction of "the rule itself" redundant.

87.     Nevertheless, the Department also asserts that "the rule itself" prohibits scattering of ashes in a sanitary landfill. ECF No. 38 at 2, *see also* Tr. Vol. 1 at 185:24-186:2 (Sims); Ex. D-1 ¶ 6. However, the plain text of the Amendments does not state any such prohibition, Ex. P-1 at 25-34, *see also* Tr. Vol. 1 at 186:3-16 (Sims).

88.     Ms. Sims, whose responsibilities include enforcing the Department's rules, Tr. Vol. 1 at 145:6-7 (Sims), testified that scattering ashes in a sanitary landfill is not permissible under the

---

[11] Under Texas law, they could not do so. *See State v. Jackson,* 376 S.W.2d 341, 344-45 (Tex. 1964) ("When the Legislature acts with respect to a particular matter, the administrative agency may not so act with respect to the matter as to nullify the Legislature's action even though the matter be within the agency's general regulatory field. There is little case law announcing the rule last stated, no doubt because it is self-evident.").

Department's interpretation, although she was unable to point to the language in the Amendments on which she based her interpretation. *Id*. at 186:14-187:16. She also testified that scattering ashes in a "scrapyard" or "parking lot" (with the owner's consent) is permissible under the Amendments. *Id.* at 187:1-13. Defendant's counsel later referred that interpretation as "ridiculous." Tr. Vol. 2 at 199:7.

89.     The Court should not adopt a construction of the Chapter 716 that is at odds with its plain text and its past history of enforcement, and which would make the Amendments superfluous. There simply is no fair way to read Chapter 716's use of the term "any private property" to exclude a sanitary landfill.

90.     There is likewise no basis to read a part of Chapter 716 into the Amendments, in the teeth of § 1.134(a)'s clear and precise instruction not to do so.

91.     A federal court may only apply a construction to which a provision is "readily susceptible," and may "not rewrite a state law to conform it to constitutional requirements." *Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 397 (1988).

92.     The Amendments are, on their face, ambiguous as to what, if anything, must be done with ashes from cremated embryonic or fetal tissue. The Department, which wrote the Amendments and is charged with enforcing them, has offered contradictory interpretations of them, some of which contradict their plain text and rely on an impermissible construction of a statute. They fail to resolve the ambiguities in the Amendments.

93.     Ms. Sims was not the only Department witness who did not share at least one of the Department's various understandings of how the Amendments are supposed to function. Both Mr. Carnes and Ms. Allmon testified that they understood the Amendments to require embryonic and fetal tissue to be treated as human remains, the disposition of which is governed (in part) by

27

Chapter 716. Tr. Vol. 2 at 139:1-2, 149:2-7 (Carnes), 102:13-22, 111:4-112:25 (Allmon). *See also id*. at 149:4-151:15 (Carnes) (stating his belief that "per the funeral commission," his firm is permitted to handle embryonic and fetal tissue, despite having a license only to handle "human remains."). Yet Ms. McCoy's declaration is quite clear that the Amendments "do not reclassify fetal tissue . . . as . . . 'human remains,'" and that Chapter 716 does not govern their disposal. Ex. D-12 ¶¶ 1-4.

94.     It appears that the Department gave little thought to the interaction of the various complex regulatory schemes governing disposition of pathological waste and human remains in its rush to issue the Amendments. It is now simply making up interpretations as it goes along, which is the epitome of arbitrary enforcement. If the witnesses who Defendant prepared to testify in this matter, including the Deputy Commissioner herself, cannot agree on how Defendant will interpret and enforce the Amendments, it is not reasonable to expect that Plaintiffs can anticipate how they will be enforced.

95.     The Amendments do not provide healthcare providers with adequate guidance to conform their conduct to them. They are a quasi-criminal enactment. Especially in the context of DSHS' previous actions, the potential for arbitrary enforcement of the Amendments is high. In this context, the Amendments' lack of clarity likely renders them unconstitutional. *Cf. Bell*, 248 F.3d at 421-22; *Austin Lifecare, Inc.*, No. A-11-CA-875-LY, slip op. at 10-13. Plaintiffs have therefore met their burden of showing a substantial likelihood of success on their vagueness claim.

## II.     Plaintiffs Are Likely to Succeed on the Merits of Their Claim That the Amendments Are an Unconstitutional Deprivation of Liberty.

96.     Due Process protects "all fundamental rights comprised within the term liberty." *Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 847 (1992) (quoting *Whitney v. California*, 274 U.S. 357, 373 (1927) (Brandeis, J., concurring)). Among these rights are "personal choices

central to individual dignity and autonomy, including intimate choices that define personal identity and beliefs," *Obergefell v. Hodges*, 135 S. Ct. 2584, 2597 (2015), such as "choices concerning contraception, family relationships, procreation, . . . childrearing," *id*. at 2599, and "medical treatment," *Casey*, 505 U.S. at 857. Such choices "are central to the liberty protected by the Fourteenth Amendment." *Id.* at 851. It is "the right of the *individual*, married or single, to be free from unwarranted governmental intrusion into matters so fundamentally affecting a person as the decision whether to bear or beget a child." *Id*. at 896 (quoting *Eisenstadt v. Baird*, 405 U.S. 438, 453 (1972)).

97.     The individual liberty protected by the Due Process Clause encompasses "the right of the woman to choose to have an abortion before viability and to obtain it without undue interference from the State." *Casey*, 505 U.S. at 846. This right protects more than mere access to abortion. It protects a woman's autonomy to make decisions about her body based on "her own conception of her spiritual imperatives and her place in society." *Id.* at 852. The Supreme Court's abortion jurisprudence makes clear that, while a State may seek to persuade a woman to adopt its views about personhood and abortion, it may not override her moral agency with regard to these matters. *See id.* at 851-53, 877.

98.     The Court has further explained that its own "obligation is to define the liberty of all, not to mandate our own moral code," and that "concept[s] of existence, of meaning, of the universe, and of the mystery of human life[,] . . . . [and] the attributes of personhood" may not be compelled by the State. *Casey*, 505 U.S. at 850-51; *accord Lawrence v. Texas*, 539 U.S. 558, 571 (2003); *see also id*. at 577 ("[T]he fact that the governing majority in a State has traditionally viewed a particular practice as immoral is not a sufficient reason for upholding a law prohibiting the practice . . . ." (internal quotation marks omitted)). "If there is any fixed star in our

constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein." *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943).

### A.  The Amendments Require Searching Judicial Scrutiny.

99.     Restrictions on the practice of abortion are unconstitutional where they impose an "undue burden" on abortion access. *Whole Woman's Health v. Hellerstedt I*, 136 S. Ct. at 2309 (quoting *Casey*, 505 U.S. at 878). The Constitution's limits on government power to interfere with women seeking treatment for miscarriage and ectopic pregnancy are at least as stringent as those regarding abortion. *See generally Casey*, 505 U.S. at 851.

100.     The undue burden standard "requires that courts consider the burdens a law imposes on abortion access together with the benefits those laws confer." *Whole Woman's Health v. Hellerstedt I*, 136 S. Ct. at 2309 (citing *Casey*, 505 U.S. at 887-98). A court must "consider[] the evidence in the record," and "then weigh[] the asserted benefits against the burdens." *Id.* at 2310. Where a law fails to confer "benefits sufficient to justify the burdens," those burdens are "undue"—that is to say, unconstitutional. *Id.* at 2300.[12]

---

[12] The Department urges the Court to ignore the balancing test used in *Whole Woman's Health I*, arguing that a law "expressing the State's respect for life" provides an immeasurable benefit to society that should not be weighed against the burdens it imposes on women's liberty. ECF No. 17 at 10. This is precisely the same misreading of *Casey* that the Supreme Court rejected in the *Whole Woman's Health v. Hellerstedt I*; indeed the Court explicitly noted that *Casey* had applied the balancing test to laws not purporting to further a health interest. *See* 136 S. Ct. at 2309 ("The rule announced in *Casey* . . . . requires that courts consider the burdens a law imposes on abortion access together with the benefits those laws confer. *See* 505 U.S. at 887–898, . . . (performing this balancing with respect to a spousal notification provision); *id.*, at 899–901, . . . (same balancing with respect to a parental notification provision).")). Thus, the balancing test established by the Supreme Court in *Casey* and re-affirmed in *Whole Woman's Health v. Hellerstedt I* applies to all restrictions on abortion, regardless of the State's asserted interest. The Department's position that the Court only examine the Amendments' impact on abortion access also fails for a second reason: it completely ignores their impact on women experiencing miscarriage and ectopic pregnancy.

101.    Applying the undue burden standard requires searching judicial scrutiny. *Id.* at 2310 ("[T]he Court . . . has placed considerable weight upon evidence and argument presented in judicial proceedings."). In evaluating a restriction's benefits and burdens, courts must rely on record evidence, and not simply a State's assertions about any purported benefits or burdens. *Id.* at 2309-10 (explaining that, where "regulation of a constitutionally protected personal liberty . . . is at issue," the "less strict review" applicable to economic legislation is not appropriate). The record must show a law actually "further[s]" the government's asserted interest, *id.* at 2310, and the State may not advance justifications for a law that are pretextual, *see Casey*, 505 U.S. at 877, or absent from the legislative (or in this case, administrative) record, *see United States v. Virginia*, 518 U.S. 515, 533 (1996) ("The justification must be genuine, not hypothesized or invented *post hoc* in response to litigation.").

102.    Further, "the means chosen by the State to further the interest in potential life must be calculated to inform the woman's free choice, not hinder it." *Casey*, 505 U.S. at 877.

**B.  The Amendments Do Not Permissibly Further any Valid State Interest.**

103.    To survive scrutiny under the undue burden standard, a law that burdens abortion access must*, in reality,* advance a legitimate state interest in a permissible way. *E.g.*, *Whole Woman's Health v. Hellerstedt I*, 136 S. Ct. at 2311 ("We have found nothing in Texas' record evidence that shows that, compared to prior law, . . . the new law advanced Texas' legitimate interest in protecting women's health."); *id.* at 2311-12 ("[W]hen directly asked at oral argument whether Texas knew of a single instance in which the new requirement would have helped even one woman obtain better treatment, Texas admitted that there was no evidence in the record of such a case."); *id.* at 2315 ("There is considerable evidence in the record supporting the District Court's findings indicating that the statutory provision requiring all abortion facilities to meet all surgical-center standards does not benefit patients and is not necessary."); *see also id.* at 2314

31

("The record contains nothing to suggest that H.B. 2 would be more effective than pre-existing Texas law at deterring wrongdoers . . . from criminal behavior.").

>     *i.*    *The Amendments Do Not Further DSHS' Purported Interest in Health.*

104.    Here, DSHS asserts that one benefit of the Amendments is "the continued protection of the health and safety of the public by ensuring that the disposition methods specified in the rules continue to be limited to the methods that prevent the spread of disease." Ex. P-1 at 25. But there is no medical reason to require that fetal or embryonic tissue be disposed of using different methods from all other human tissue. *Supra* ¶ 68. Undisputed record evidence demonstrates that there is no difference in the risk of the spread of disease between the two. *Id.* Defendant offered no evidence whatsoever that the Amendments are justified on public health ground.[13] The Amendments' fail to be "more effective than pre-existing Texas law" in furthering a health interest. *See Whole Woman's Health v. Hellerstedt I*, 136 S. Ct. at 2314. Accordingly, the public health benefit claimed by Defendant should get zero weight in the balancing test.

>     *ii.*    *The Amendments Do Not Permissibly Further DSHS' Purported Interest in Potential Life or the Dignity of Embryos and Fetuses.*

105.    After relying throughout the rulemaking process on a public health rationale to justify the Amendments to the public, the Department asserted, after the conclusion of all notice-and-comment periods, that "[a]dditional public benefit will be realized in bringing up-to-date the department's rules to reflect the Legislature's articulated policy objectives of respect for life and

---

[13] DSHS has even stated that the Amendments are "not intended to . . . reduce risks to human health from environmental exposure." Ex. P-9 at 3; *see also* Ex. P-1 at 2 ("These rules provide a comparable level of protection to public health . . . ."). *Cf. Margaret S. v. Treen*, 597 F. Supp. 636, 670 (E.D. La. 1984) ("There is no conceivable justification . . . in terms of protecting maternal health" of requiring doctors to inform women that they may choose burial or other methods of disposition after abortion), *aff'd on other grounds sub nom. Margaret S. v. Edwards*, 794 F.2d 994 (5th Cir. 1986).

protecting the dignity of the unborn." Ex. P-1 at 25. The Department is incorrect that this interest permits it to deprive women of moral agency and impose the State's viewpoint about the personhood of embryos and fetuses through the Amendments.

106.    *Casey* holds that States may further an interest in "potential life" when regulating abortion, provided that they further this interest by means "calculated to inform the woman's free choice, not hinder it." 505 U.S. at 876-78.

107.    There is nothing informative about the Amendments; they are purely coercive. Indeed, the Department argues that healthcare providers can keep women in the dark about the requirements the Amendments impose. *See* Ex. P-1 at 6; ECF No. 17 at 4. Thus, they do not advance the State's interest in potential life in a permissible way.

108.    In *Gonzales v. Carhart*, the Supreme Court upheld a ban on a method of aborting "a living fetus," 550 U.S. 124, 164 (2007) (quoting 18 U.S.C. § 1531(b)(1)(A)), recognizing a legitimate state interest in "regulating the medical profession in order to promote respect for life, including life of the unborn," *id.* at 158. The federal statute under review permitted the banned procedure in cases where fetal demise had occurred prior to its commencement. *See id.* at 164. As a result, the Court did not consider whether the Government's interest could justify regulation of conduct that occurred subsequent to fetal demise.

109.    Other courts have concluded that it could not. For example, the Southern District of Indiana recently issued a preliminary injunction against enforcement of an Indiana law requiring burial or cremation of embryonic or fetal tissue, similarly to the Amendments, holding that the law failed to further a legitimate state interest. *See PPINK v. Commissioner*, No. 16-CV-763-TWP-DML, __ F. Supp. 3d __, 2016 WL 3556914, at *10 (S.D. Ind. June 30, 2016). The court reasoned that "the Supreme Court's recognition that the government has a legitimate interest in potential

life has not been extended by *Gonzales* nor any other case 'to imposing procedures taken after the pregnancy has been terminated' like the fetal tissue disposition provisions do." *Id.* It went on to state that "the consistency with which the Supreme Court ties the legitimate interest to the potentiality of life . . . . suggests that it would not extend these principles to this context where, following an abortion, such a potentiality is no longer present." *Id.* (citation omitted). Likewise, the Eastern District of Louisiana struck down a comparable requirement, which had provided that "the remains of the unborn child [be] disposed of in a manner consistent with the disposal of other human remains as provided by [Louisiana law]". *Margaret S. v. Edwards*, 488 F. Supp. 181, 221-22 (E.D. La. 1980) ("[T]his Court holds that [the challenged statute] is an unconstitutional exercise of the State's police power because it requires that fetal remains be treated with the same dignity as the remains of a person and, thereby, unduly burdens the right of a woman to obtain an abortion.").[14]

110.    The Amendments are distinguishable from the statute at issue in *Gonzales* for other reasons, including that the latter did not regulate conduct based on criteria supplied by particular cultural or religious traditions. Rather, it banned conduct that appeared perilously close to infanticide, a practice that is itself unlawful. *Gonzales*, 550 U.S. at 158.

111.    The Supreme Court's precedents have long recognized that a State may not force its views about controversial matters onto unwilling individuals. *See, e.g.*, *Casey*, 505 U.S. at 851 ("At the heart of liberty is the right to define one's own concept of existence, of meaning, of the universe, and of the mystery of human life. Beliefs about these matters could not define the

---

[14] In contrast, the Eighth Circuit upheld a law requiring burial or cremation of fetal tissue based on a concession by the plaintiffs that "the state has a legitimate interest in protecting public sensibilities." *Planned Parenthood of Minn. v. Minn.*, 910 F.2d 479, 488 (8th Cir. 1990). Plaintiffs make no such concession here.

attributes of personhood were they formed under compulsion of the State."); *Barnette*, 319 U.S. at 642 ("If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein."). *Gonzales* did not alter this bedrock principle.

112.    The Amendments violate this prohibition. In contrast to the provisions upheld in *Casey*, intended to "inform, . . . not hinder" a woman's choice, the Amendments here are compulsory and invasive. They deprive women and their families of the moral agency to decide for themselves whether disposal by medical or non-medical methods is appropriate, and to act on that determination. There is no dispute that, when allowed to exercise moral agency, many women do not choose to have a burial or cremation after a miscarriage or an abortion. *See supra* ¶¶ 29-30, 73. Nevertheless, the Amendments impose the State's view that the tissue of an embryo or fetus should be disposed of by burial or cremation, like a person.

113.    The Amendments mandate adherence to a particular set of cultural and religious norms, defining the dignity of an embryo as requiring cremation or burial, which are not universal. *Supra* ¶¶ 21-24. Moreover, the State's proposed solution to the costs imposed by the Amendments' cremation or burial requirement is that healthcare providers work with religious denominations opposed to abortion. *Supra* ¶ 36. By imposing the State's viewpoint, and forcing women to ultimately rely for their healthcare on cooperation from groups who may disagree with or condemn their choices, the Amendments intrude into the "realm of personal liberty" protected by the Constitution, *Casey*, 505 U.S. at 847; *see also Planned Parenthood Minn., N.D., S.D. v. Daugaard*, 799 F. Supp. 2d 1048, 1060 (D.S.D. 2011) (forcing a woman to work with an anti-abortion counselor to have an abortion "humiliates and degrades her as a human being").

35

114.     Because the Amendments fail to further any interest in potential life or the dignity of embryos and fetuses in a permissible way, the weight from this interest in the *Whole Woman's Health* balancing must also be zero.

115.     In addition, the poor fit between the Amendments and the range of circumstances in which the State's purported interest would also logically arise highlights the Amendments' failure to further DSHS' purported interest. *Cf. Veasey v. Abbott*, 830 F.3d 216, 262 (5th Cir. 2016) (en banc) (even where a State's interest is legitimate, "there cannot be a total disconnect between the State's announced interests and the statute enacted"). The Amendments do not apply to disposing of embryonic or fetal tissue in a variety of healthcare contexts, notably including in vitro fertilization clinics, ECF 1-1 at 6, where the State would seem to have the same interest. The Amendments also do not apply to human remains. In fact, DSHS has stated an intention to impose greater liability on healthcare facilities regarding their disposition of embryonic and fetal tissue than it does regarding their disposition of bodies: DSHS only requires that healthcare facilities ensure a burial transit permit to remove a body from the state, 25 Tex. Admin. Code § 181.2(b), whereas, as to embryonic and fetal tissue only, "the rules are intended to apply to disposition across state lines, regardless of where the disposition of waste occurs." Ex. P-1 at 4. DSHS does not explain why provisions it deems necessary to ensure dignity of embryonic and fetal tissue are not also necessary to ensure dignity of human remains.

**C.   The Burdens Imposed by the Amendments Exceed the Benefits They Provide.**

116.     As detailed above, the Amendments impose significant burdens on women's liberty.

117.     A woman has the right to decide for herself whether an embryo or fetal tissue is to be imbued with the notion of personhood. *See Casey*, 505 U.S. at 851 (the "defin[ition of] the attributes of personhood [may not be] formed under compulsion of the State."); *see also Carey v.*

36

*Population Servs., Int'l*, 431 U.S. 678, 687 (1977) ("[T]he Constitution protects individual decisions in matters of childbearing from unjustified intrusion by the State."); *cf. Barnette*, 319 U.S. at 642.

118.    The Amendments replace the right "at the heart of liberty" with a viewpoint "formed under compulsion of the State." *Casey*, 505 U.S. at 851. Women who hold different views from the State about the personhood of embryos, or the propriety of funeral practices, will be compelled to acquiesce to the State's view. The Amendments will force physicians to act as though their female patients have no moral agency—as if they cannot determine right from wrong in accordance with their own personal, cultural, and religious beliefs, and act accordingly. *Supra* ¶¶ 32-33, 73-74.

119.    In addition, the Amendments will cause women emotional harms, supra ¶¶ 37-39; discourage some women from seeking medical care, *supra* ¶¶ 40-43; and make it harder for women to access pregnancy-related healthcare services by increasing the cost and reducing the availability of those services, *supra* ¶¶ 44-64.

120.    These burdens are not justified by sufficiently weighty benefits. Indeed, the Amendments do not further any legitimate state interest in a permissible way. *Supra* ¶¶ 103-115.

121.    They fail to further the State's asserted interest in health at all. *Supra* ¶ 104.

122.    They fail to further the State's asserted interest in respect for life or dignity for embryos and fetuses in a permissible way. *Supra* ¶¶ 105-115.

123.    *Gonzales* recognized a legitimate state interest in "regulating the medical profession in order to promote respect for life, *including* life of the unborn." 550 U.S. at 158 (emphasis added). It did not authorize states to elevate respect for potential life above respect for women's lives. Any weight the Court might give in the balancing test to the State's asserted interest

in respect for life and dignity must be counterbalanced by the disrespect the Amendments evince toward women and the harm the Amendments would cause to women's dignity.

124.    Plaintiffs have, at this stage of the case, demonstrated that the Amendments impose burdens that outweigh any benefits, and are therefore unconstitutional. *See Whole Woman's Health v. Hellerstedt I*, 136 S. Ct. at 2309. Plaintiffs have, therefore, established a substantial likelihood of success on their claim that the Amendments impose an unconstitutional, undue burden on women's access to pregnancy-related medical care.

## III.    Without a Preliminary Injunction, Plaintiffs and Their Patients Will Suffer Irreparable Harm.

125.    Plaintiffs have demonstrated that, absent an injunction, they and their patients will suffer irreparable injury. It is well established that, where a plaintiff establishes a constitutional violation, no further showing of irreparable injury is necessary. *See Elrod v. Burns*, 427 U.S. 347, 373 (1976) (The loss of constitutional "freedoms . . . unquestionably constitutes irreparable injury."); *Opulent Life Church v. City of Holly Springs*, 697 F.3d 279, 295 (5th Cir. 2012) ("When an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary." (citation omitted)); *Deerfield Med. Ctr. v. City of Deerfield Beach*, 661 F.2d 328, 338 (5th Cir. Unit B Nov. 1981) (When "the constitutional right of privacy is 'either threatened or in fact being impaired,' . . . this conclusion mandates a finding of irreparable injury." (quoting *Elrod*, 427 U.S. at 373)). Therefore, Plaintiffs have adequately demonstrated a substantial threat of irreparable injury.

126.    But additionally, beyond the impact on their rights, the Amendments' effect on Plaintiffs and their patients will be irreparable.

127.    The Amendments mandate methods of disposing of fetal and embryonic tissue which cannot be reversed. They will cause suffering, and a loss of access to medical care, that

cannot be repaired.

128.     During the three-year litigation over H.B. 2's admitting privileges and ASC requirements, more than half of Texas's abortion clinics closed, and those closures have largely proven permanent. *See Planned Parenthood of Greater Tex. Surgical Health Servs. v. Abbott*, 134 S. Ct. 506, 509 (2013) (Breyer, J., dissenting from denial of application to vacate stay) ("The longer a given facility remains closed, the less likely it is ever to reopen even if the [challenged] requirement is ultimately held unconstitutional."); Tr. Vol. 1 at 10:20-11:5 (Hagstrom Miller), 61:18-62:2 (Davis); Ex. P-3 ¶ 32. Further abortion clinic closures due to the lack of available providers of cost-effective funeral service providers, *see supra* ¶¶ 56-58, would once again be the predictable result should the Amendments be allowed to take effect.

## IV.     The Balance of Equities and the Public Interest Weigh in Favor of a Preliminary Injunction.

129.     Defendant faces no injury from an injunction. It will merely preserve the status quo while questions about the Amendments' constitutionality are adjudicated, and the public health will continue to be protected under existing law, as it has been for decades.

130.     The public interest will be served, rather than harmed, by injunctive relief. "[I]t is always in the public interest to prevent the violation of a party's constitutional rights." *Jackson Women's Health Org. v. Currier*, 760 F.3d 448, 458 n.9 (5th Cir. 2014) (alteration in original) (quoting *Awad v. Ziriax*, 670 F.3d 1111, 1132 (10th Cir. 2012)).


Dated: January 12, 2017

Respectfully submitted,

 _/s/ David Brown_____

David Brown*
Molly Duane*
Stephanie Toti
CENTER FOR REPRODUCTIVE RIGHTS
199 Water Street, 22nd Floor
New York, NY 10038
(917) 637-3653
dbrown@reprorights.org
mduane@reprorights.org
stoti@reprorights.org

J. Alexander Lawrence*
MORRISON & FOERSTER LLP
250 W. 55th Street
New York, NY 10019
(212) 336-8638
alawrence@mofo.com

Patrick J. O'Connell
LAW OFFICES OF PATRICK J. O'CONNELL PLLC
2525 Wallingwood Drive, Bldg. 14
Austin, Texas 78746
(512) 222-0444
pat@pjofca.com

*Attorneys for Plaintiffs*
*Admitted *pro hac vice*

**CERTIFICATE OF SERVICE**

I certify that on this 12th day of January, 2017, I electronically filed a copy of the foregoing document with the Clerk of the Court using the CM/ECF system, which will send notification to all counsel of record.

_/s/ David Brown_____
David Brown