FILED

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

2017 JAN 27  PM 4: 46

CLERK US DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY_____
                    GN

WHOLE WOMAN'S HEALTH, BROOKSIDE
WOMEN'S MEDICAL CENTER PA d/b/a
Brookside Women's Health Center and Austin
Women's Health Center, DR. LENDOL L. DAVIS,
ALAMO CITY SURGERY CENTER PLLC d/b/a
Alamo Women's Reproductive Services, and
NOVA HEALTH SYSTEMS, INC. d/b/a
Reproductive Services,

                    **Plaintiffs,**

-vs-                                                    **Case No.  A-16-CA-1300-SS**

JOHN HELLERSTEDT, M.D., Commissioner of
the Texas Department of State Health Services, in
his official capacity,

                    **Defendant.**

_____

## O R D E R

BE IT REMEMBERED on the 3rd and 4th days of January 2017, the Court held a hearing

in the above-styled cause, and the parties appeared in person or through counsel. Before the Court

are Plaintiffs Whole Woman's Health, Brookside Women's Medical Center PA d/b/a Brookside

Women's Health Center and Austin Women's Health Center, Dr. Lendol L. Davis, Alamo City

Surgery Center PLLC d/b/a Alamo Women's Reproductive Services, and Nova Health Systems, Inc.

d/b/a Reproductive Services (Plaintiffs)' Motion for a Temporary Restraining Order, or

Alternatively, a Preliminary Injunction and Memorandum of Law in Support [#6], Defendant John

Hellerstedt's Response [#17] in opposition, Plaintiffs' Proposed Findings of Fact and Conclusions

of Law [#47] in support, and Defendant's Proposed Findings of Fact and Conclusions of Law [#46]

in opposition. Having reviewed the documents, the evidence presented at the hearing, the arguments of counsel, the relevant law, and the file as a whole, the Court now enters the following opinion and orders.

'Tis the season as the litigation war between pro-life and pro-choice advocates renews with battles before this Court.[1] The last skirmish involving abortion issues in Texas resulted in two district court cases, both continuing to the Fifth Circuit Court of Appeals and one traveling to the United States Supreme Court. *See Planned Parenthood of Greater Tex. Surgical Health Servs. v. Abbott,* 951 F. Supp. 2d 891 (W.D. Tex. 2013), *rev'd in part,* 748 F.3d 583 (5th Cir. 2014); *Whole Woman's Health v. Lakey,* 46 F. Supp. 3d 673 (W.D. Tex. 2014) [hereinafter *Lakey*], *aff'd in part, vacated in part, rev'd in part sub nom. Whole Woman's Health v. Cole,* 790 F.3d 563 (5th Cir. 2015) [hereinafter *Cole*], *rev'd and remanded sub nom. Whole Woman's Health v. Hellerstedt,* 136 S. Ct. 2292 (2016). Ultimately, the Supreme Court struck down two provisions of Texas's House Bill 2 (H.B. 2) as violating the Federal Constitution. *Whole Woman's Health,* 136 S. Ct. at 2318. In particular, the Supreme Court invalidated the provisions mandating (1) a physician performing an abortion have admitting privileges at a local hospital no more than 30 miles from that abortion facility and (2) abortion facilities meet minimum standards for ambulatory surgical centers. The Court concluded these provisions imposed undue burdens on a woman's right to seek a previability abortion. *Id.* at 2309–28.

---

[1] Almost simultaneously with the events of this lawsuit, the Texas Health and Human Services Commission issued a final notice on December 20, 2016, to Planned Parenthood organizations throughout Texas that it was terminating the organizations' enrollment in Medicaid after stalling for almost a year. *See* Mot. Prelim. Inj., *Planned Parenthood of Greater Tex. Family Planning and Preventative Health Servs., Inc., et al v. Traylor et al,* No. 1:15-cv-01058 (W.D. Tex. Jan. 3, 2017), ECF No. 58.

Facing the threat of an unfavorable decision from the Supreme Court in *Whole Woman's Health*, the Texas Department of State Health Services (DSHS) began plans for the next battle. Before the ink on the Supreme Court's opinion in *Whole Woman's Health* was dry, DSHS had already drafted amendments to Title 25 of the Texas Administrative Code §§ 1.132–1.136 (the Amendments), modifying the methods for disposal of fetal tissue. Four days after the Supreme Court issued its decision in *Whole Woman's Health*, the first draft of the proposed Amendments was published. *See* 41 Tex. Reg. 4772 (July 1, 2016).

After revisions and public hearings on the Amendments, DSHS announced its intention to begin enforcement of the Amendments immediately before the Christmas holiday break. DSHS would not agree to delay enforcement despite the filing of this lawsuit, so the Court entered its order scheduling an evidentiary hearing and mandating the non-enforcement of the Amendments until after the hearing. *See* Order of Dec. 15, 2016 [#24].

Basically, the Amendments eliminate four methods of disposal—including the most used and least expensive methods—for specific tissue resulting from miscarriages, elective abortions, and other gynecological procedures performed before the twenty-week gestational mark. The Amendments inferentially establish the beginning of life and create a new term "fetal tissue," defined as "a fetus, body parts, organs or other tissue from a pregnancy" but not including "the umbilical cord, placenta, gestational sac, blood, or bodily fluids." 41 Tex. Reg. 9709, 9733 (Dec. 9, 2016) (codified at 25 TEX. ADMIN. CODE § 1.132 (28)).

The changes made by Amendments are not insubstantial and require interpretation, easily given, by DSHS. But the lack of clarity in the Amendments inviting such interpretation allows DSHS

to exercise arbitrary, and potentially discriminatory, enforcement on an issue connected to abortion and therefore sensitive and hotly contested.

But the problem extends beyond vagueness in a regulation related to a sensitive constitutional right. DSHS admits the Amendments have no health benefits and the prior version of regulations governing tissue disposal induced no health problems. Instead, DSHS maintains the singular purpose of the Amendments is to promote respect for life and protect the dignity of the unborn while also claiming fetal tissue is not human remains. Unlike the legitimate state interests recognized by the Supreme Court, DSHS's professed interest regulates a time when there is no potential life and may be pretext for restricting abortion access.

And while the record at this point is slight on the specific additional costs faced by facilities as well as the direct and indirect costs faced by women, both Plaintiffs and DSHS recognize the Amendments will increase overall costs for healthcare facilities. DSHS provides only an approximation of costs using simple, back-of-the-envelope math, which is unsupported by any research and relies heavily on assumptions. Plaintiffs confirm DSHS's simple math as the lower bound for the cost increases but emphasize costs associated with the Amendments would likely be greater than DSHS anticipates in light of DSHS's failure to consider vendor availability, administrative costs, and logistical challenges.

It is also undisputed there may be only one facility in the entire State of Texas both willing and currently able to handle disposal of fetal tissue as required by the Amendments. It is therefore reasonable to conclude there may be insufficient vendors to handle the disposal of fetal tissue in compliance with the Amendments, which would deliver a major, if not fatal, blow to healthcare providers performing abortions. Consequently, there is sufficient evidence to grant injunctive relief,

-4-

given herein, to preserve the status quo to allow discovery followed by a trial on whether the Amendments violate the Fourteenth Amendment of the United States Constitution.

## Background

This case involves claims by Plaintiffs, healthcare providers offering a variety of medical care to Texas women, that Texas's new rules for the disposal of fetal tissue violate the Fourteenth Amendment of the United States Constitution, as interpreted by the United States Supreme Court. Today, this Court only considers whether Plaintiffs have met their burden establishing entitlement to a preliminary injunction. The Court now reviews the Amendments and their context in more detail.

## I.      Medical Waste Disposal Since 1989

In 1989, Texas adopted regulations governing the treatment and disposal of special human waste such as body fluids, microbiological, or pathological waste. 14 Tex. Reg. 1457, 1457–62 (adopted Mar. 14, 1989). Under these regulations, which remained largely unchanged since their adoption in 1989, Texas healthcare facilities could use any of seven methods to depose of human tissue, regardless of whether the tissue resulted from "surgery, labor and delivery, autopsy, embalming, or a biopsy"or a "spontaneous or induced human abortion[.]" 25 TEX. ADMIN. CODE § 1.136(4)(A)(ii) (2015), *amended by* 41 Tex. Reg. 9709, 9709–41 (adopted Dec. 9, 2016). In particular, healthcare facilities could choose from the following disposal methods:

> (I) grinding and discharging to a sanitary sewer system;
>
> (II) incineration followed by deposition of the residue in a sanitary landfill;
>
> (III) steam disinfection followed by interment;
>
> (IV) interment;

(V) moist heat disinfection followed by deposition in a sanitary landfill;

(VI) chlorine disinfection/maceration followed by deposition in a sanitary landfill; or

(VII) an approved alternate treatment process, provided that the process renders the item as unrecognizable, followed by deposition in a sanitary landfill.

*Id.* Interment was defined as "[t]he disposition of pathological waste by cremation, entombment, burial, or placement in a niche." *Id.* § 1.132(31).

Under the 1989 regulations, the majority of Texas healthcare providers, Plaintiffs included, disposed of the byproducts from abortions, miscarriages, ectopic pregnancies, and other gynecological procedures by incineration followed by disposition in a sanitary landfill or, less frequently, by moist heat disinfection followed by disposition in a sanitary landfill. These methods allowed all medical waste to be treated uniformly in a single stream. Occasionally, Plaintiffs' patients would choose another method of disposition, such as cremation or burial, for a lost pregnancy, and Plaintiffs would refer those patients to funeral homes. Both Plaintiffs and DSHS concede the methods of "grinding and discharge to a sanitary sewer system" and "chlorine disinfection/maceration" were rarely used, if at all. Jan 3, 2017 Hr'g Tr. at 185:3–20.

## II.     The Amendments

DSHS's Amendments change the rules "concerning the definition, treatment, and disposition of special waste from health care-related facilities" in Texas. 41 Tex. Reg. 9709, 9709 (Dec. 9, 2016). The Amendments were first published in the *Texas Register* on July 1, 2016. *Id.* at 9719. Following a thirty-day comment period and a public hearing, alterations were made and a second version of the Amendments published. *Id.* at 9724. Another thirty-day comment period and a public

hearing ensued. *Id.* On December 9, 2016, the final version of the Amendments, adopted by the Executive Commissioner of the Health and Human Services Commission on behalf of DSHS, was published. *Id.* at 9709. These Amendments were intended to take effect on December 18, 2016. *Id.* at 9741.

As discussed above, the Amendments created a new term, "fetal tissue." Fetal tissue is defined as "a fetus, body parts, organs or other tissue from a pregnancy. This term does not include the umbilical cord, placenta, gestational sac, blood, or bodily fluids." 41 Tex. Reg. 9709, 9733 (Dec. 9, 2016) (codified at 25 TEX. ADMIN. CODE § 1.132 (28)). As explained, the Amendments limit the disposal of fetal tissue from seven methods to the following three methods regardless of gestational age: interment, incineration followed by interment, or steam disinfection followed by interment. *Id.* at 9738–39 (§ 1.136(a)(4)(A)(v)–(a)(4)(B)(i)). Essentially, the Amendments differentiate the disposal of fetal issue from all other human materials removed during surgery, labor and delivery, autopsy, embalming, or biopsy. *See id.* at 9738–39 (§ 1.136(4)(A)(i) (allowing seven methods for disposal of "body parts, other than fetal tissue"); § 1.136(4)(A)(ii) (permitting seven methods for disposal of "tissues, other than fetal tissue"); § 1.136(4)(A)(iii) (authorizing the same seven methods for disposal of "organs, other than fetal tissue")).

In addition to restricting the methods for fetal tissue disposal, the Amendments modify definitions for methods of disposition. The definition of interment is expanded to include "the process of cremation followed by placement of the ashes in a niche, grave, or scattering of ashes as authorized by law, unless prohibited by this subchapter." *Id.* at 9733–34 (§ 1.132 (33)). Undefined in the prior version of the rules, the Amendments add the term "cremation" and define it as "[t]he irreversible process of reducing tissue or remains to ashes or bone fragments through extreme heat

and evaporation. Under this subchapter, this term includes the process of incineration." *Id.* at 9733 (§ 1.132(18)).

Finally, the Amendments also create new exemptions to the rules for special waste disposition. *Id.* at 9735 (§ 1.133(a)). Relevant here, the Amendments except "human tissue, including fetal tissue, that is expelled or removed from the human body once the person is outside of a healthcare facility" from the rules governing the disposal of special waste. *Id.* at 9735 (§ 1.133(a)(2)(G)).

## III.   DSHS Commentary

DSHS's comments and explanations shape understanding of the Amendments. Each time DSHS published the proposed, and ultimately adopted, Amendments it revised the stated purpose of the Amendments. With the initial version of the Amendments, DSHS announced "the public benefit anticipated as a result of adopting and enforcing these rules will be enhanced protection of the health and safety of the public." 41 Tex. Reg. 4772, 4773 (July 1, 2016). A few months later, in offering a revised version of the Amendments for comment, DSHS declared "the public benefit anticipated as a result of adopting and enforcing these rules will be enhanced protection of the health and safety of the public by ensuring that the disposition methods specified in the rules continue to be limited to methods that prevent the spread of disease." 41 Tex. Reg. 7659, 7660 (Sept. 30, 2016).

When the final version of the Amendments was published on December 9, 2016, DSHS explained "it took into consideration a variety of statutes that express the [Texas] Legislature's will to afford the level of protection and dignity to unborn children as state law affords to adults and children." 41 Tex. Reg. 9709, 9709 (citing a variety of Texas statutes protecting unborn children). To carry out its "duty to protect public health in a manner that is consonant with the State's respect

for life and dignity of the unborn[,]" DSHS further explained, it adopted the Amendments "prohibit[ing] the disposal of fetal tissue in a landfill and eliminating grinding as a method for fetal tissue disposition . . . ." *Id.* DSHS also defined the public benefit anticipated from the Amendments, as continuing to limit disposition "to methods that prevent the spread of disease. . . . [and] reflect the Legislature's articulated policy objectives of respect for life and protecting the dignity of the unborn." *Id.* at 9732.

**IV.     Prior Texas Case on Relevant Abortion Issues**

This suit cannot be fully understood without briefly addressing Texas's immediate history with abortion regulations. As this Court discussed above, in the summer of 2016, the Supreme Court struck down two provisions of Texas law H.B. 2 as undue burdens on a woman's right to seek previability abortions. *Whole Woman's Health,* 136 S. Ct. at 2309–28. Reversing the Fifth Circuit and holding the district court applied the correct legal standard, the United States Supreme Court recounted with approval the evidence the district court relied on in finding the two provisions unduly burdensome. *Id.* at 2310 (citing *Lakey,* 46 F. Supp. 3d 673). Especially relevant here, "[p]rior to the enactment of H.B. 2, there were more than 40 licensed abortion facilities in Texas, which 'number dropped by almost half leading up to and in the wake of enforcement of the admitting-privileges requirement . . . .'" *Id.* at 2301 (citing *Lakey*, 46 F. Supp. 3d at 681). Only one abortion facility that closed following the implementation of H.B. 2 has reopened. Pls.' Mot. Prelim. Inj. [#6] at 16.

**V.     Procedural History**

With the final version of the Amendments published just three days earlier on December 12, 2016, Plaintiffs filed a complaint and a motion for a temporary restraining order, or alternatively, a preliminary injunction to prevent the Amendments from taking effect on December 18th. On

December 15, 2016, this Court held an hour-long hearing, entertaining argument from both parties to gain an initial understanding of the facts of the case. Because DSHS refused to delay implementing the Amendments until the Court had an opportunity to review the pleadings and the evidence, the Court entered an order prohibiting the Amendments from taking effect until the Court could hold a full evidentiary hearing beginning on January 3, 2017. At the conclusion of the evidentiary hearing, the Court extended its order prohibiting enforcement of the Amendments until January 27, 2016, and authorized the parties to file findings of fact and conclusions of law. Both parties have done so.

## Analysis

### I.     Legal Standard for Injunctive Relief

A preliminary injunction is an "extraordinary equitable remedy." *Jackson Women's Health Org. v. Currier,* 760 F.3d 448, 452 (5th Cir. 2014), *cert. denied,* 136 S. Ct. 2536 (2016) (citation and internal quotation omitted). In essence, "[t]he purpose of a preliminary injunction is to prevent irreparable injury so as to preserve the court's ability to render a meaningful decision on the merits." *Miss. Power & Light Co. v. United Gas Pipe Line Co.,* 760 F.2d 618, 627 (5th Cir. 1985) (citation omitted).

The Court may issue such relief only if the movant establishes "(1) a substantial likelihood of success on the merits, (2) a substantial threat of irreparable injury if the injunction is not issued, (3) that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted, and (4) that the grant of an injunction will not disserve the public interest." *Jackson Women's Health Org.,* 760 F.3d at 452 (citation and internal quotation omitted). Because preliminary injunctions are extraordinary remedies, the movant must "clearly carr[y] the burden of

persuasion on all four requirements." *PCI Transp. Inc. v. Fort Worth & W.R.R. Co.*, 418 F.3d 535, 545 (5th Cir. 2005) (citation and internal quotation omitted).

## II.   Application

### A.   Substantial Likelihood of Success

Plaintiffs bring this action under Section 1983, claiming a violation of both procedural and substantive rights secured by the Fourteenth Amendment. Under the Due Process Clause of the Fourteenth Amendment, no State shall "deprive any person of life, liberty, or property, without due process of law." To establish a substantial likelihood of success on the merits, Plaintiffs must demonstrate the Amendments, as applied to Plaintiffs in this case and on these facts, likely violate the Constitution. *See Jackson Women's Health Org.,* 760 F.3d at 453. In sum, Plaintiffs allege the Amendments are unconstitutional for two key reasons: (1) the Amendments are vague and (2) they violate the Supreme Court's undue burden standard for abortion restrictions. The Court addresses each of these reasons in turn.

### i.   Vagueness

"The Fourteenth Amendment's guarantee of Due Process proscribes laws so vague that persons of common intelligence must necessarily guess at [their] meaning and differ as to [their] application." *Women's Med. Ctr. of Nw. Hous. v. Bell,* 248 F.3d 411, 421 (5th Cir. 2001) (citation and internal quotation omitted). A law is unconstitutionally vague if it (1) fails to provide those targeted by the statute a reasonable opportunity to know what conduct is prohibited, or (2) is so indefinite that it allows arbitrary and discriminatory enforcement. *Id.* Courts in the Fifth Circuit void a regulation for vagueness "if it is inherently standardless, enforceable only on the exercise of an

unlimited, and hence arbitrary, discretion vested in the state." *Id.* (citation and internal quotation omitted).

Here, the Court finds the Amendments are likely unconstitutionally vague because they are so indefinite they allow arbitrary and discriminatory enforcement. For example, DSHS's own attorney could not articulate what types of tissue fell within the definition of fetal tissue as set forth in the Amendments. Dec. 15, 2016 Hr'g Tr. at 20:24–21:23 (DSHS's counsel admitted he did not know what "other tissue from a pregnancy" included.). If DSHS's attorney, presumably working in conjunction with DSHS, cannot articulate the parameters of the term fetal tissue, then how can Plaintiffs know when the special disposal methods for fetal tissue are triggered? Furthermore, although the Amendments do not, on their face, prohibit the disposal of ashes from incineration or cremation of fetal tissue in a sanitary landfill, DSHS has taken the position the Amendments do, in fact, prohibit this method of disposition. Jan. 3, 2017 Hr'g Tr. at 185:13–25,186:1–13, 198:15–24.

As evidence of the unlimited and arbitrary discretion the Amendments vest in DSHS, the Court notes the contradictory positions DSHS has taken over the short life of this lawsuit on whether fetal tissue is to be treated as human remains or as pathological waste. *Compare* Dec. 15, 2016 Hr'g Tr. at 22:14–18 (arguing the ashes of fetal remains can be scattered in accordance with the law on human remains) *with* Jan. 4, 2017 Hr'g Tr. at 5:3–14 (claiming fetal tissue is not human remains but pathological waste). Such a classification is relevant for determining how fetal tissue fits within the remainder of Texas's statutory scheme.[2] For example, Plaintiffs must know whether ash from fetal tissue can be scattered in accordance with the rules for scattering the ash of human remains or if

---

[2] DSHS's counsel even explained fetal tissue was not human tissue but only pathological waste in an effort to harmonize the Amendments with other Texas statutes. *E.g.*, Jan. 4, 2017 Hr'g Tr. at 192:12–193:2.

transport of fetal tissue must comply with the rules for transport of pathological waste rather than rules for the transport of human remains.

The lack of clarity in the Amendments invites arbitrary and discriminatory enforcement especially in light of evidence of the State's eagerness to find health deficiencies in the wake of the Supreme Court's decision in *Whole Woman's Health. See* Pls.' Exs. [#44-4] (Letter to DSHS) Ex. 4-B at 9 (responding to health deficiencies alleged against Austin Women's Health Center immediately following the Supreme Court's decision). Thus, the Court finds Plaintiffs have met their burden in demonstrating a substantial likelihood of success on their claim the Amendments are unconstitutionally vague.

### ii.    Undue Burden

In addition to prohibiting vagueness, the Due Process Clause of the Fourteenth Amendment extends protection "to certain personal choices central to individual dignity and autonomy, including intimate choices that define personal identity and beliefs." *Obergefell v. Hodges,* 135 S. Ct. 2584, 2597–98 (2015). Put another way, the connection between personal identity, belief, and liberty drives the Constitution's protection of certain personal choices. *See W. Va. State Bd. of Educ. v. Barnette,* 319 U.S. 624, 642 (1943) ("If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion . . . ."); *see also Obergefell,* 135 S. Ct. at 2599 (2015) ("Like choices concerning contraception, family relationships, procreation, and childrearing, all of which are protected by the Constitution, decisions concerning marriage are among the most intimate that an individual can make."); *Planned Parenthood of Se. Pa. v. Casey,* 505 U.S. 833, 851 (1992) ("[M]atters, involving

the most intimate and personal choices a person may make in a lifetime, choices central to personal dignity and autonomy, are central to the liberty protected by the Fourteenth Amendment.").

Relevant here, the Supreme Court previously addressed the close relationship between belief and state action in the abortion context: "At the heart of liberty is the right to define one's own concept of existence, of meaning, of the universe, and of the mystery of human life. Beliefs about these matters could not define the attributes of personhood were they formed under compulsion of the State." *Casey*, 505 U.S. at 851. Although it concluded a state may limit abortion in some circumstances, the Supreme Court stressed it "is too intimate and personal for the State to insist, without more, upon its own vision of the woman's role" and a woman's motherhood decisions "must be shaped to a large extent on her own conception of her spiritual imperatives and her place in society." *Id.* at 852.

On that basis, for more than forty years it has been settled constitutional law that the Fourteenth Amendment protects a woman's basic right to choose an abortion. *Jackson Women's Health Org.,* 760 F.3d at 453 (citing *Roe v. Wade,* 410 U.S. 113, 153 (1973)). Although a state may regulate a woman's right to an abortion in a manner "consistent with that state's interest in protecting potential life and the health of the mother[,]" it may not impose an "undue burden" on that right. *Id.* (citing *Casey,* 505 U.S. at 846). If a statute has "the effect of placing a substantial obstacle in the path of a woman's choice[,]" then it "cannot be considered a permissible means of serv[ice]" even if it furthers a valid state interest. *Id.* (quoting *Casey,* 505 U.S. at 877) (internal quotation omitted).

The Supreme Court recently elaborated on the standard for evaluating abortion restrictions. *See Whole Woman's Health,* 136 S. Ct. at 2309. It confirmed that a state must act on a legitimate interest. *See id.* at 2309; (assuming a statue to which the undue burden analysis is applied "further[s]

[a] valid state interest"); *id.* at 2310 ("We have found nothing in Texas'[s] record evidence that shows that . . . the new law advanced Texas'[s] legitimate interest in protecting women's health."). The Supreme Court also reiterated the standard laid out in *Casey*, which "requires courts [to] consider the burdens a law imposes on abortion access together with the benefits those laws confer." *Id.* (citing *Casey,* 505 U.S. at 887–901, which performed such a balancing test with respect to a spousal notification provision). In essence, under the undue burden test, a court evaluates the evidence in the record and then "weigh[s] the asserted benefits against the burdens." *Id.* at 2310.

Rather than focusing on the undue burden standard, DSHS claims "the Supreme Court has set forth a different test for regulations aimed at expressing the State's respect for life . . . ." Def.'s Resp. [#17] at 10. DSHS argues the appropriate test for laws reflecting a state's respect for the life of the unborn is to assume "the laws are constitutional unless they are a 'substantial obstacle to the woman's exercise of the right to choose.'" *Id.* (quoting *Casey,* 505 at 877). According to DSHS, the Court should not balance the benefits and burdens of regulations expressing respect for the life of the unborn. *Id.*

The Court disagrees. DSHS's argument a different test applies when the State expresses respect for the life of the unborn is a work of fiction, completely unsupported by reading the sections of Supreme Court opinions DSHS cites in context. *See Gonzales v. Carhart,* 550 U.S. 124, 146 (2007); *Casey,* 505 U.S. at 877. The substantial obstacle inquiry is only a portion of the one test the Supreme Court applies to evaluate abortion restrictions, the undue burden test. *See Whole Woman's Health,* 136 S. Ct. at 2309 ("A finding of an undue burden is a shorthand for the conclusion that a state regulation has the purpose or effect of placing a substantial obstacle in the path of a woman seeking an abortion . . . .') (quoting *Casey,* 505 U.S. at 877).

Here, the Court begins its analysis by examining whether DSHS has a legitimate interest in "afford[ing] the level of protection and dignity to the unborn children as state law afford to adults and children," or alternatively respecting "life and dignity of the unborn." 41 Tex. Reg. 9709, 9709. DSHS claims the Amendments advance a legitimate interest because Supreme Court precedent recognizes "the State has a substantial interest in potential life." Def.'s Resp. [#17] at 11 (quoting *Casey,* 505 U.S. at 877). While the Supreme Court has acknowledged the State has an "important and legitimate interest[] . . . in protecting the potentiality of human life[,]" *Casey,* 505 U.S. at 875–76 (quoting *Roe,* 410 U.S. at 162), the Amendments do not further such a legitimate state interest.[3] The Amendments regulate activities after a miscarriage, ectopic pregnancy, or abortion—activities that occur when there is no potential life to protect.

In addition, by seeking to respect life and the dignity of the unborn regardless of gestational age, DSHS appears to be inferentially establishing the beginning of human life as conception, potentially undermining the constitutional protection afforded to personal beliefs and central to the liberty protected by the Fourteenth Amendment. *Casey*, 505 U.S. at 846, 851 (identifying the State's legitimate interests in protecting the health of the mother and life of the fetus but reserving to individuals the right to define one's own concept of the mystery of human life).

There is also evidence DSHS's stated interest is a pretext for its true purpose, restricting abortions. For example, how DSHS analyzed the potential impact of the Amendments before

---

[3] DSHS offered the testimony of Dr. Jeffrey Bishop as an expert in healthcare, ethics, and philosophy to show states have a responsibility to uphold the dignity of human life. Dr. Bishop also testified the Amendments help fulfill that responsibility. The Court, however, finds Dr. Bishop wholly non-credible because he testified he did not read the prior version of the regulations governing the disposal of pathological tissue, he had not read the Amendments in detail, he performed no analysis of the impact of the Amendments on Texans, and he had no data on attitudes and beliefs regarding the disposal of tissue. Jan. 4, 2017 Hr'g Tr. at 54:21–55:6, 63:10–65:15. In sum, the Court finds Dr. Bishop's testimony to be based on insufficient facts or data.

-16-

adopting them indicates the department's true intention. In developing the fiscal note accompanying the Amendments, DSHS failed to account for primary care doctors, obstetricians, or gynecologists who may provide miscarriage management services or pathology and forensic labs. Jan. 3, 2017 Hr'g Tr. at 181:15–183:16. Likewise, DSHS assessed the amount of fetal tissue by looking at the number of surgical abortions performed annually and the average age at which most abortions occur. Jan. 3, 2017 Hr'g Tr. at 161:8–161:19. Other medical situations producing fetal tissue, such as miscarriages or ectopic pregnancy surgeries, were not considered. Jan. 3, 2017 Hr'g Tr. at 191:1–22. The combination of the scope of DSHS's analysis, the Amendments' initial publication on the heels of the Supreme Court's decision in *Whole Woman's Health*, and DSHS's failure to incorporate the Amendments into the rest of Texas's statutory scheme suggests the actual purpose of the Amendments is to limit abortion access in Texas. *Cf. Cole,* 790 F.3d at 585, *rev'd on other grounds, Whole Woman's Health,* 136 S. Ct. 2292 (finding the plaintiffs "failed to proffer competent evidence contradicting the legislature's statement of a legitimate purpose"). On this ground alone, the Court could find Plaintiffs meet their burden of likely success on the merits. *See Whole Woman's Health,* 136 S. Ct. at 2309 ("[R]egulations that have *the purpose* or effect of presenting a substantial obstacle to a woman seeking an abortion impose an undue burden on the right." (emphasis added) (internal quotation omitted)).

To summarize, at this time the Court is not persuaded DSHS's alleged interest in protecting the dignity of the unborn is a legitimate state interest. Alternatively, even assuming DSHS is acting upon a legitimate interest, the record contains evidence the burdens on abortion access substantially outweigh the benefits.

The Court first examines the benefits of the Amendments, and DSHS recognizes the sole benefit the Amendments provide is conferring dignity on the unborn, conceding there is no public health benefit. Dec. 15, 2016 Hr'g Tr. at 31:19–32:23. Yet, DSHS itself undercuts the strength of the asserted benefit. For instance, while insisting the Amendments confer dignity on the unborn, DSHS recommends healthcare providers place fetal tissue in a single container, commingle fetal tissue from various procedures together, and freeze the tissue until disposal can be secured or the merits of this lawsuit decided. DSHS has not explained how this better protects the dignity of the unborn. Similarly, the Amendments create a special exception for women outside of a healthcare facility, imposing no restriction on how women at home dispose of fetal tissue. DSHS does not offer any reason why fetal tissue must be treated differently at home compared to in a doctor's office. Such inconsistency reduces the strength of the asserted benefit.

Turning to the alleged burdens imposed by the Amendments, the limited record contains evidence indicating restricting disposal of fetal tissue to methods consistent with the disposal of human remains will impose burdens on abortion access. While it is undisputed the Amendments will increase costs for healthcare providers, at least incrementally, the true impact of the Amendments is unknown. DSHS supplies only an estimate of the Amendments' costs produced by simple math, which is unsupported by research and relies heavily on assumptions. See Def.'s Exs. [#45-1] Ex. 1 (Decl. of Jennifer Sims) at 4–6 (summarizing DSHS's fiscal analysis). For instance, DSHS assumed the ash from all abortions across the State of Texas could be buried at one time for only $300 per year. Id. at 5. Such an assumption ignores reality in a state that spans nearly 280,000 square miles and is home to 5.4 million women of reproductive age. See Lakey, 46 F. Supp. 3d at 681.

Plaintiffs emphasize DSHS's flawed assumptions and limited analysis. According to Plaintiffs, the costs of the Amendments will be greater than DSHS's estimation as DSHS did not consider transportation costs, administrative costs, or vendor availability. *See* Jan. 3, 2017 Hr'g Tr. at 121:4–16, 193:1–11; *see also* Decl. of Jennifer Sims at 4–6. Most significantly, Plaintiffs provided evidence showing the Amendments pose significant logistical challenges for healthcare providers in terms of sorting procedure, storage, transportation, and ultimate disposal. *E.g., id.* at 35:2–13, 42:10–43:7, 71:25–72:9, 113:1–115:2, 121:4–16. There is also some evidence in the record suggesting the Amendments could cause women grief and shame, possibly discouraging them from obtaining gynecological care, particularly abortions and miscarriage management, from a medical facility. *Id.* at 99:9–21.

Although DSHS highlights the fact both parties identified vendors willing to dispose of fetal tissue, a vast divide exists between willingness and ability. The two possible vendors for disposing of fetal tissue DSHS identified, Texas Catholic Conference of Bishops and Carnes Funeral Home, do not appear to have the proper permits or registrations to transport, store, or dispose of medical waste.[4]

Even if this Court ignores permitting problems, Texas Catholic Conference of Bishops's offer to inter fetal tissue in Catholic cemeteries as part of the organization's burial ministry raises questions about the impact on women whose beliefs differ from the Catholic Church's. Plaintiffs

---

[4] Specifically, there is no evidence Texas Catholic Conference of Bishops and Carnes Funeral Home have the permits required by the Texas Commission on Environmental Quality (TCEQ). TCEQ regulates storage, transportation, and disposal of medical waste and has a registration process for medical waste transporters and facilities receiving untreated medical waste. 30 TEX. ADMIN. CODE §§ 326.1(a), 326.53, 326.61. Other governmental authorities may have additional licensing requirements. *See, e.g., id.* § 326.67(a) ("[C]ounties are empowered to require and issue licenses authorizing and governing the operation and maintenance of medical waste storage, processing, or disposal facilities not within the territorial limits or extraterritorial jurisdiction of incorporated cities and towns.").

submitted evidence demonstrating a policy requiring the burial of fetal tissue in a Catholic cemetery distresses patients who have different religious views or do not see fetal tissue as a person. Jan. 4, 2017 Hr'g Tr. at 21:10–23:1.

While the other vendor endorsed by the DSHS, Carnes Funeral Home, does not have the same religious implications, it also faces potentially prohibitive challenges in addition to permitting. For example, the owner of Carnes Funeral Home testified his organization has no experience caring for a collection of fetal tissue, so the projected cost of disposing of fetal tissue could change. Jan. 4, 2017 Hr'g Tr. at 133:24–25, 146:15–17. The owner further testified he expected healthcare providers to individually wrap the fetal tissue in cloth and tape so he could transport the tissue, up to twenty-five units at a time, on a stretcher. *Id.* at 134:23–136:18. Such a practice deviates from the way healthcare providers operate and would likely impose additional costs. *Id.* at 42:12–43:4.

Consequently, there may be only one facility, a vendor identified by Plaintiffs, in the entire State of Texas both willing and currently able to handle the disposal of fetal tissue as required by the Amendments. Just as the Supreme Court previously affirmed the district court's view that the proposition seven or eight abortion providers could meet the demand of the entire state stretched credulity, this Court similarly finds the idea that one vendor could obtain and dispose of all the state's fetal tissue, potentially commingled with other pathological waste, exhausts credulity. *See Whole Woman's Health,* 136 S. Ct. at 2316.

Even if the one vendor identified by Plaintiffs could meet demand, Plaintiffs introduced evidence medical waste disposal is a particular vulnerability for abortion providers. For example, one women's healthcare provider testified its center was nearly forced to close after two successive medical waste disposal vendors dropped the healthcare facility as a client following harassment by

anti-abortion activists. Jan. 3, 2017 Hr'g Tr. at 57:22–59:8. Such a risk is particularly high when the one facility identified as willing and able to dispose of fetal tissue seeks to remain anonymous. *See* Order of Dec. 29, 2016 [#29]. It is therefore reasonable to conclude there may be insufficient vendors to handle the disposal of fetal tissue in compliance with the Amendments, which would be a major, if not fatal, blow to healthcare providers performing abortions.

Weighing the asserted benefit of the Amendments against the alleged burdens on abortion access and on the constitutional right of women to have an abortion in light of the limited evidentiary record, the Court finds the burdens likely substantially outweigh any claimed benefit. It is reasonable to conclude the burdens on abortion exceed any benefit. On one side of the equation DSHS has placed its weak purported benefit of protecting the dignity of the unborn, and on the other side Plaintiffs have placed evidence the Amendments increase costs for healthcare providers, enhance the stigma on women associated with miscarriage and abortion care, and create potentially devastating logistical challenges for abortion providers throughout Texas. Thus, the Court finds the Plaintiffs satisfied their burden of establishing a likelihood of success on their claim the Amendments place an undue burden on women's right to an abortion in violation of the Fourteenth Amendment.

In sum, the Court holds Plaintiffs have established a high likelihood of success on the merits by providing evidence the Amendments likely are unconstitutionally vague and impose an undue burden on the right to an abortion.

**B.    Threat of Irreparable Injury**

In light of the likely deprivation of constitutional rights, this Court agrees with "most courts [which] hold that no further showing of irreparable injury is necessary." *Opulent Life Church v. City*

*of Holly Springs, Miss.,* 697 F.3d 279, 295 (5th Cir. 2012) (citation and internal quotation mark omitted). Even so, here there are additional irreparable injuries. With only one potential vendor to handle disposal of fetal tissue under the new rules, allowing the Amendments to go into effect could substantially impair, if not eliminate, access to abortion in Texas. In particular, Plaintiffs offered evidence that, once closed in response to unconstitutional state regulations, abortion clinics are unlikely to reopen. Not only possibly inhibiting access to abortion, the logistical challenges of the Amendments, such as how to transport fetal tissue to a vendor for ultimate disposal, could also impede the ability of healthcare providers to offer a range of gynecological care. For these reasons, the Court concludes Plaintiffs have met their burden of showing a substantial threat of irreparable injury.

## C.      Threatened Injury Outweighs Harm to Defendant

While Plaintiffs demonstrate a threat of irreparable injury, DSHS seeks to protect the dignity of the unborn by implementing the Amendments. As previously discussed, it seems unlikely DSHS's professed purpose is a valid state interest and not a pretext for restricting abortion access. By comparison, Plaintiffs face likely constitutional violations, which could severely limit abortion access in Texas. Finally, because the prior version of the regulations controlled tissue disposal for twenty-eight years, the Court finds no harm in allowing the prior version to control medical waste disposal until the resolution of this lawsuit. Accordingly, the balance of harms favors Plaintiffs and granting the injunction.

## D.      Public Interest

In contesting Plaintiffs' public interest arguments, DSHS argues the public interest favors the enforcement of a state's laws. But here, the greater public interest lies in protecting constitutional

rights. *See Wyatt v. Cole,* 504 U.S. 158, 161 (1992) ("The purpose of § 1983 is to deter state actors from using the badge of their authority to deprive individuals of their federally guaranteed rights and to provide relief to victims if such deterrence fails."). In light of Plaintiffs' likelihood of success on the merits, the magnitude of the likely irreparable injury alleged by Plaintiffs, and the balance of harms, the grant of an injunction in this case will not disserve the public interest.

### Conclusion

Because Plaintiffs have met their burden on the elements for a preliminary injunction, the Court GRANTS Plaintiffs' Motion for a Preliminary Injunction. With this injunction, the Court preserves its ability to render a meaningful decision on the merits. Furthermore, as the DSHS has neither requested a security nor has it presented any evidence it would be harmed if enjoined, the Court finds no reason to require Plaintiffs to provide security for this injunction. *See A.T.N. Indus., Inc. v. Gross,* 632 F. App'x 185, 192 (5th Cir. 2015) (reiterating that under Federal Rule of Civil Procedure 65(c), a court may elect to require no security at all).

Accordingly,

IT IS ORDERED that Plaintiffs' Motion for a Preliminary Injunction [#6] is GRANTED;

IT IS FURTHER ORDERED that Defendant John Hellerstedt, as Commissioner of the Texas Department of State Health Services, in his official capacity, is PRELIMINARILY ENJOINED from implementing the Amendments to Title 25 of the Texas Administrative Code §§ 1.132–1.136. The preliminary injunction will remain in force until further ordered; and

-23-

IT IS FINALLY ORDERED that the parties confer and submit a proposed scheduling order specifying the time period requested for necessary discovery for the Court's consideration within THIRTY (30) DAYS from the entry of this order. The Court will then schedule a trial date. A form scheduling order is available at http://www.txwd.uscourts.gov/USDC%20Rules/StandingOrders/Austin/sched-ss.pdf.

SIGNED this the 27th day of January 2017.

_____
SAM SPARKS
UNITED STATES DISTRICT JUDGE