IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| WHOLE WOMAN'S HEALTH, ET AL., | § | |
|     *Plaintiffs*, | § | |
| | § | |
| v. | § | |
| | § | CIVIL ACTION NO. 1:16-cv-01300-DAE |
| CHARLES SMITH, EXECUTIVE | § | |
| COMMISSIONER OF THE TEXAS HEALTH | § | |
| AND HUMAN SERVICES COMMISSION, IN | § | |
| HIS OFFICIAL CAPACITY, | § | |
|     *Defendant*. | § | |

# DEFENDANT'S POST-TRIAL BRIEF

# TABLE OF CONTENTS

Page

Index of Authorities .......................................................................................................... iii

Statement of Facts ..............................................................................................................2

I.   The Challenged Laws Will Not Alter Any of Plaintiffs' Practices Other Than the
     Final Disposition of Fetal Remains. ...........................................................................2

     A.   Plaintiffs incinerate fetal remains and place the ashes in a landfill, but rarely
          inform their patients of that practice..................................................................2

     B.   The challenged laws require a change only in the ultimate place of
          disposition. .......................................................................................................4

II.  The State Has an Interest, Supported by Science and Bioethics, in the Respectful
     Treatment of Fetal Remains. ......................................................................................6

III. Plaintiffs Introduced No Evidence Demonstrating a Burden on Abortion Access,
     and Defendant's Evidence Shows Compliance Is Possible.........................................8

     A.   Plaintiffs can comply with the challenged laws and have no evidence to the
          contrary. ...........................................................................................................8

     B.   Plaintiffs are unaware of women's views regarding the disposition of fetal
          remains. ...........................................................................................................13

Argument ..........................................................................................................................14

I.   In an Undue-Burden Challenge, Plaintiffs Bear the Burden of Proving, at a
     Minimum, That a Large Fraction of Women Will Experience a Substantial
     Obstacle to Abortion. ...............................................................................................14

II.  Jurisdictional Doctrines Bar Several of Plaintiffs' Claims. .....................................15

     A.   Plaintiffs did not demonstrate that they have third-party standing to assert
          their patients' personal, subjective beliefs. .....................................................15

     B.   Whole Woman's Health, LLC lacks standing to assert any claims. ..............17

     C.   Plaintiffs' abortion-access claim is not ripe.....................................................17

III. Plaintiffs Did Not Prove an Undue Burden on Abortion Access or That the Laws
     Fail the Rational-Basis Test. ....................................................................................19

     A.   Plaintiffs must prove a substantial obstacle to abortion access. ....................19

          1.   Claims about rights other than abortion access are judged under the
               rational-basis test. ................................................................................. 20

          2.   Plaintiffs misinterpret *Whole Woman's Health*.....................................21

     B.   The challenged laws further the State's legitimate interest in respecting
          unborn life. ...................................................................................................... 22

C.   Plaintiffs have not proven a substantial obstacle to abortion access. ...........................26

D.   Plaintiffs have not proven an unconstitutional burden on a woman's freedom
of belief. ..............................................................................................................27

1.   Plaintiffs must demonstrate more than disagreement with the laws—they
must show the violation of a constitutional right. ................................... 28

2.   There is no constitutional right to direct the disposition of fetal remains at
a healthcare facility. .......................................................................................29

IV.   Plaintiffs Did Not Prove a Violation of the Equal Protection Clause....................................... 31

A.   The rational-basis test applies to Plaintiffs' claims.......................................................32

B.   The challenged laws are rationally related to respecting fetal life................................32

V.   Any Injunction Should Be Limited. ......................................................................................34

Conclusion ................................................................................................................................35

Certificate of Service.................................................................................................................37

# INDEX OF AUTHORITIES

Page(s)

**Cases**

*A Woman's Choice—E. Side Women's Clinic v. Newman,*
305 F.3d 684 (7th Cir. 2002) ....................................................................................... 15

*Abbott Labs. v. Gardner,*
387 U.S. 136 (1967) ..................................................................................................... 18

*Abigail Alliance for Better Access to Dev. Drugs v. Eschenbach,*
495 F.3d 695 (D.C. Cir. 2007) (en banc) ..................................................................... 21

*AIDS Healthcare Found., Inc. v. City of Baton Rouge,*
No. 17-00229-BAJ-RLB, 2017 WL 2899689 (M.D. La. July 7, 2017) ........................ 17

*Ayotte v. Planned Parenthood of N. New Eng.,*
546 U.S. 320 (2006) ..................................................................................................... 34

*Califano v. Yamasaki,*
442 U.S. 682 (1979) ..................................................................................................... 34

*Canfield Aviation, Inc. v. Nat'l Transp. Safety Bd.,*
854 F.2d 745 (5th Cir. 1988) ....................................................................................... 16

*Caprock Plains Fed. Bank Ass'n v. Farm Credit Admin.,*
843 F.2d 840 (5th Cir. 1988) .................................................................................18-19

*Carey v. Population Servs., Int'l,*
431 U.S. 678 (1977) ..................................................................................................... 28

*City of New Orleans v. Dukes,*
427 U.S. 297 (1976) ..................................................................................................... 33

*Clapper v. Amnesty Int'l USA,*
568 U.S. 398 (2013) ..................................................................................................... 19

*Cooper Hosp. v. Burwell,*
179 F. Supp. 3d 31 (D.D.C. 2016) ...........................................................................20-21

*In re Deepwater Horizon,*
857 F.3d 246 (5th Cir. 2017) ....................................................................................... 16

*Doe v. Bolton,*
410 U.S. 179 (1973) ..................................................................................................... 17

*FCC v. Beach Commc'ns, Inc.,*
508 U.S. 307 (1993) ..................................................................................................... 32

*FM Props. Operating Co. v. City of Austin,*
93 F.3d 167 (5th Cir. 1996) ......................................................................................... 21

*Gonzales v. Carhart,*
    550 U.S. 124 (2007) .................................................................................. *passim*

*Harper v. Lindsay,*
    616 F.2d 849 (5th Cir. 1980) ................................................................. 26

*Harris v. McRae,*
    448 U.S. 297 (1980) ......................................................................... 20, 32

*Heller v. Doe,*
    509 U.S. 312 (1993) ......................................................................... 21, 32

*Hopkins v. Jegley,*
    267 F. Supp. 3d 1024 (E.D. Ark. 2017) ............................................ 25

*INS v. Chadha,*
    462 U.S. 919 (1983) .............................................................................. 14

*John Doe #1 v. Veneman,*
    380 F.3d 807 (5th Cir. 2004) ................................................................. 34

*Kowalski v. Tesmer,*
    543 U.S. 125 (2004) .............................................................................. 15

*Kuromiya v. United States,*
    37 F. Supp. 2d 717 (E.D. Pa. 1999) .................................................... 21

*Labiche v. Certain Ins. Cos. or Underwriters at Lloyd's, London, England,*
    196 F. Supp. 102 (E.D. La. 1961) ....................................................... 25

*Lawrence v. Texas,*
    539 U.S. 558 (2003) .............................................................................. 28

*Leavitt v. Jane L.,*
    518 U.S. 137 (1996) (per curiam)........................................................ 34

*Maher v. Roe,*
    432 U.S. 464 (1977).............................................................................. 32

*Margaret S. v. Edwards,*
    794 F.2d 994 (5th Cir. 1986) ................................................................. 16

*Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Comm'n,*
    138 S. Ct. 1719 (2018) .......................................................................... 28

*Mazurek v. Armstrong,*
    520 U.S. 968 (1997) (per curiam)........................................................ 29

*Mitchell v. Clayton,*
    995 F.2d 772 (7th Cir. 1993)................................................................. 21

*Monk v. Huston,*
    340 F.3d 279 (5th Cir. 2003)................................................................. 18

*New Orleans Pub. Serv., Inc. v. Council of New Orleans,*
    833 F.2d 583 (5th Cir. 1987) ............................................................................18

*Obergefell v. Hodges,*
    135 S. Ct. 2584 (2015) .................................................................................. 28

*Planned Parenthood of Cent. Mo. v. Danforth,*
    428 U.S. 52 (1976) .........................................................................................29

*Planned Parenthood of Greater Tex. Surgical Health Servs. v. Abbott,*
    748 F.3d 583 (5th Cir. 2014) ............................................................14, 15, 17

*Planned Parenthood of Ind. & Ky., Inc. v. Comm'r,*
    888 F.3d 300 (7th Cir. 2018) ....................................................................20, 24, 25

*Planned Parenthood of Minn. v. Minnesota,*
    910 F.2d 479 (8th Cir. 1990) ...................................................................... 20

*Planned Parenthood of Se. Pa. v. Casey,*
    505 U.S. 833 (1992) ................................................................................ *passim*

*Poelker v. Doe,*
    432 U.S. 519 (1977) (per curiam) ............................................................ 22-23

*Roe v. Wade,*
    410 U.S. 113 (1973) .................................................................................... 24

*SCI Tex. Funeral Servs., Inc. v. Nelson,*
    540 S.W.3d 539 (Tex. 2018) .........................................................................25

*Semler v. Ore. State Bd. of Dental Exam'rs,*
    294 U.S. 608 (1935) ...................................................................................32-33

*Shields v. Norton,*
    289 F.3d 832 (5th Cir. 2002) .........................................................................18

*Singleton v. Wulff,*
    428 U.S. 106 (1976) ...................................................................................16, 17

*Susan B. Anthony List v. Driehaus,*
    134 S. Ct. 2334 (2014) .................................................................................19

*Thomas v. Union Carbide Agric. Prods. Co.,*
    473 U.S. 568 (1985) .....................................................................................18

*W. Va. State Bd. of Educ. v. Barnette,*
    319 U.S. 624 (1943) .................................................................................... 28

*Warth v. Seldin,*
    422 U.S. 490 (1975) .................................................................................... 15

*Washington v. Glucksberg,*
    521 U.S. 702 (1997) .....................................................................................30

*Webster v. Reprod. Health Servs.*,
    492 U.S. 490 (1989) ................................................................. 22

*Whole Woman's Health v. Hellerstedt*,
    136 S. Ct. 2292 (2016) ................................................. 18, 22, 26, 30

**Statutes and Rules**

Tex. Gov't Code § 312.013 ................................................................ 34

Tex. Health & Safety Code
    § 241.010 ............................................................................... 29
    ch. 697 .......................................................... 2, 4, 5, 6, 11, 33
    § 697.001 ............................................................................ 6-7
    § 697.002(3) ..................................................................... 4, 33
    § 697.003 .............................................................. 4, 5, 6, 11, 24
    § 697.004 .............................................................................. 24
    § 697.004(a) ........................................................................... 4
    § 697.004(b) ....................................................................... 4, 6
    § 697.004(d) ................................................................ 5, 6, 11
    § 697.005(1) .......................................................................... 11
    ch. 711 ................................................................................... 5
    § 711.021 ................................................................................ 9
    ch. 716 ................................................................................... 5
    § 716.156 ................................................................................ 6
    § 716.302 ............................................................................ 5, 9
    § 716.304 ............................................................................ 5, 9

Tex. Occ. Code ch. 651 ............................................................... 5-6

Tex. Penal Code § 42.08 ............................................................... 25

Fed. R. Civ. P. 25(d) ...................................................................... 2

25 Tex. Admin. Code
    ch. 138 ................................................................................... 2
    § 138.2(13) ........................................................................... 17
    § 138.4(a) ............................................................................... 5
    § 138.6 ............................................................................... 5, 8

30 Tex. Admin. Code
    § 326.41(c)(1) ........................................................................ 11
    § 326.53 .................................................................................. 3

41 Tex. Reg. 7659 (2016) ...................................................... 3, 29, 30

In 2017, the Texas Legislature passed a law prohibiting healthcare facilities from putting fetal remains in the sewer or the ashes of fetal remains in a landfill. The expressly stated purpose of the law is to provide for a "dignified disposition of embryonic and fetal tissue remains." The law is modest in both form and substance: it does not require any changes to how the remains are currently treated; it changes only the ultimate place of disposition. Under the new law, remains must be finally interred or scattered as ashes somewhere other than a landfill. Instead of making any attempt to determine whether and how they might comply, Plaintiffs immediately mounted a constitutional challenge to the law. But they have no evidence that the law imposes a burden on abortion access, much less an undue burden, or that Texas is somehow constitutionally prohibited from requiring the respectful treatment of fetal remains.

Because Plaintiffs have made no attempt whatsoever to comply with the new law or even investigated their ability to comply in conjunction with this lawsuit, they cannot support their claim that the challenged fetal-remains law is a logistical barrier to abortion access. And because they have not asked the overwhelming majority of their patients about their views on the disposition of fetal remains, Plaintiffs have no basis for asking the Court to find that their patients' freedom of belief will be violated by the more dignified treatment of fetal remains.

Plaintiffs' legal arguments fare no better, as their attempt to cobble together a variety of irrelevant Supreme Court statements fails to establish a constitutional right for women to direct the disposition of fetal remains at a healthcare facility. There are no factual or legal grounds that would permit a ruling in Plaintiffs' favor. The Court should find for Defendant and dismiss Plaintiffs' claims.[1]

---

[1] Defendant's brief addresses arguments identified in Plaintiffs' First Amended Complaint, proposed findings of fact and conclusions of law, and the evidence and statements made at trial.

## STATEMENT OF FACTS

Plaintiffs are several abortion providers and a healthcare management company. They allege that portions of Texas Health and Safety Code chapter 697 and 25 Texas Administrative Code chapter 138 (the challenged laws), which require the respectful disposition of fetal remains, are unconstitutional. Defendant is Charles Smith, the Executive Commissioner of the Texas Health and Human Services Commission.[2]

## I.   The Challenged Laws Will Not Alter Any of Plaintiffs' Practices Other Than the Final Disposition of Fetal Remains.

Implementation of the challenged laws will have virtually no effect on the operations of Plaintiffs' clinics.  Only the ultimate location for the final disposition of fetal remains will necessarily change—an aspect that the clinics already delegate to outside service providers. As Plaintiffs conceded, their own internal practices—the abortion procedure, post-abortion processing of tissue, and informed-consent policies—may remain unchanged.

### A.   Plaintiffs incinerate fetal remains and place the ashes in a landfill, but rarely inform their patients of that practice.

Prior to the change in law giving rise to this litigation, Texas law treated fetal remains as pathological waste and permitted healthcare facilities to dispose of fetal remains through: (1) grinding and discharging to a sanitary sewer system; (2) incineration followed by deposition of the residue in a sanitary landfill; (3) steam disinfection followed by interment; (4) interment; (5) moist heat

---

To the extent Plaintiffs' simultaneously filed post-trial brief includes arguments not foreseen by Defendant, Defendant's failure to address them in this brief should not be considered a waiver.

[2] Although Smith is no longer serving as Executive Commissioner, because the suit was brought against him in his official capacity, his successor may be substituted once he or she is known. Fed. R. Civ. P. 25(d).

disinfection followed by deposition in a sanitary landfill; (6) chlorine disinfection/maceration followed by deposition in a sanitary landfill; or (7) an approved alternate treatment process, provided that the process renders the item unrecognizable, followed by deposition in a sanitary landfill. 41 Tex. Reg. 7659, 7664 (2016). Thus, fetal remains were ultimately disposed of in the sanitary sewer system, a sanitary landfill, or through interment. Moreover, because fetal remains were considered pathological waste, they could be transported only by individuals with appropriate authority from the Texas Commission on Environmental Quality (TCEQ). 30 Tex. Admin. Code § 326.53.

Plaintiffs currently comply with this law by contracting with a medical waste vendor. 1.RR.80:3-9; 2.RR.190:16-20; 3.RR.79:17-80:4.[3] Plaintiffs testified that, following an abortion or miscarriage management procedure, the embryonic and fetal tissue remains are placed in a Ziploc bag, then into a biohazard bag and stored in a freezer. 1.RR.143:10-24; 2.RR.237:17-238:11; 3.RR.98:19-99:10. The vendor picks up medical waste, including fetal remains, every few weeks from each clinic, incinerates the waste, and places the ashes in a landfill. 1.RR.145:2-9; 2.RR.190:23-191:1; 3.RR.80:8-10; D.Ex. 43, 44, 52, 53, 56. Although Plaintiffs' clinics are located throughout Texas, all use the same medical waste vendor—identified at trial as Vendor A—located in the Dallas/Fort Worth area. List of Stips. (ECF No. 221); D.Ex. 43, 44, 49. There are presently only 19 landfills in Texas authorized to accept the incinerated ash of medical waste. 4.RR.165:3-5.

Plaintiffs do not inform their patients as a matter of course that fetal remains will be incinerated and placed in a landfill. 1.RR.103:8-21; 2.RR.16:9-13, 202:23-203:10; 3.RR.84:15-17. The consent form used by Whole Woman's Health clinics and Dr. Bhavik Kumar states only that "the fetal

---

[3] Defendant's citations to the transcript will be [Day of trial].RR.[page]:[lines]. References to Plaintiffs' and Defendant's exhibits will be P.Ex. [number] and D.Ex. [number].

tissue removed during the abortion will be disposed of following legal and Texas DSHS guide-lines." D.Ex. 37. And the consent form used by Austin Women's Health Center and Dr. Lendol Davis states only that the woman "consent[s]" to the "disposal" of her pregnancy and related tissue. D.Ex. 47.

### B. The challenged laws require a change only in the ultimate place of disposition.

During the 2017 legislative session, the Texas Legislature enacted Senate Bill 8 (SB 8), P.Ex. 9, which in turn created Chapter 697 of the Texas Health and Safety Code. D.Ex. 1. Chapter 697 defines "embryonic and fetal tissue remains" as

> an embryo, a fetus, body parts, or organs from a pregnancy that terminates in the death of the embryo or fetus and for which the issuance of a fetal death certificate is not re-quired by state law. The term does not include the umbilical cord, placenta, gestational sac, blood, or body fluids.

Tex. Health & Safety Code § 697.002(3). The law also removes "embryonic and fetal tissue re-mains" from the definition of "pathological waste," *id.* § 697.003, and provides that healthcare facilities must dispose of those remains by

> (1) interment;
>
> (2) cremation;
>
> (3) incineration followed by interment; or
>
> (4) steam disinfection followed by interment.

*Id.* § 697.004(a). The ashes resulting from the cremation or incineration of embryonic and fetal tissue remains may be "interred or scattered in any manner as authorized by law for human re-mains" but "may not be placed in a landfill." *Id.* § 697.004(b). The ashes of human remains may be scattered over uninhabited public land, over a public waterway or sea, or on the private property

of a consenting owner. *Id.* §§ 716.302, .304. Thus, under Chapter 697, the methods of final disposition are interment and scattering of ashes.

Chapter 697 also permits the associated products of conception—the umbilical cord, placenta, gestational sac, blood, and body fluids—to be disposed of in the same manner as the embryonic and fetal tissue remains. *Id.* § 697.004(d). Pursuant to the Chapter 138 rules adopted by the Health and Human Services Commission, entities that may store, handle, or transport embryonic and fetal tissue remains for disposition include: any entity authorized by the Texas Funeral Service Commission to store, handle, or transport human remains; any entity authorized by the TCEQ to store, handle, or transport special waste; and the healthcare facility that generated the embryonic and fetal tissue remains. 25 Tex. Admin. Code § 138.6. In short, storage, handling, and transportation may now be done by licensed funeral providers, licensed medical waste handlers, and the clinics themselves.[4]

SB 8 exempts the disposition of "embryonic and fetal tissue remains" from many of the laws governing the disposition of "human remains."[5] Tex. Health & Safety Code § 697.003 (exempting, unless otherwise provided, compliance with Tex. Health & Safety Code ch. 711 (governing cemeteries, including right to control interment, records of interment, and removal of remains), Tex. Health & Safety Code ch. 716 (governing crematories, including authorization to cremate, records of cremation, simultaneous cremation, and disposition of cremated remains), and Tex.

---

[4] The rules also make clear that the challenged laws "may not be used to require or authorize disclosure of confidential information . . . not permitted to be disclosed by state or federal privacy or confidentiality laws." 25 Tex. Admin. Code § 138.4(a).

[5] Solely to adhere to the convention used at trial, this brief will use "human remains" to refer only to those dead human bodies for which a death certificate has been issued.

Occ. Code. ch. 651 (governing funeral directors and embalmers, including transportation of remains and pricing of services)).

As a result of these exemptions, fetal remains may be commingled for purposes of cremation. D.Ex. 28. Similarly, following cremation, the fetal remains do not have to be returned to any specific individual by law, *see* Tex. Health & Safety Code § 697.003 (exempting application of Tex. Health & Safety Code § 716.156), but instead, the disposition of ashes will be a matter of contract between the healthcare facility and the crematory. Possibilities include sending the ash to a cemetery for interment or scattering the ashes by the crematory, healthcare facility, or other third party. *Id.* § 697.004(b).

The challenged laws do not require a healthcare facility to inform patients or obtain their consent prior to disposing of the fetal remains, so Plaintiffs' current notification practices and consent forms need not change. *See, e.g.*, D.Ex. 37, 47. The challenged laws also have no impact on the abortion procedure itself. 1.RR.148:24-149:23; 2.RR.10:12-11:12, 242:9-15; 3.RR.97:20-25. And, because Plaintiffs already segregate the fetal remains and associated products of conception from medical waste, no additional segregation of tissue will be required. 1.RR.143:21-24; 2.RR.238:8-11; 3.RR.99:8-10; *see also* Tex. Health & Safety Code § 697.004(d) (permitting associated products of conception to be disposed of in the same manner). The only change required by the challenged laws is the final disposition of fetal remains.

## II.   The State Has an Interest, Supported by Science and Bioethics, in the Respectful Treatment of Fetal Remains.

The purpose of Chapter 697 is to "express the state's profound respect for the life of the unborn by providing for a dignified disposition of embryonic and fetal tissue remains." Tex. Health

& Safety Code § 697.001. Defendant will discuss in the argument section the Supreme Court precedent that permits the State to enact laws respecting the unborn. *See infra* pp. 22-26.

But Defendant also put on evidence that science and bioethics support the respectful treatment of fetal remains. As a matter of science, embryos and fetuses are human organisms. 2.RR.36:14-22; 175:24-176:2; 5.RR.11:12-15. Dr. Mikeal Love's unrebutted testimony demonstrated that fetuses and embryos are organisms that are genetically and immunologically distinct from the pregnant woman. 5.RR.11:12-15. A heartbeat is audible at 6 weeks from the woman's last menstrual period (LMP). 5.RR.12:17-19. At 7 weeks LMP, arms and legs begin to form, as well as facial features such as ears and eyes. 5.RR.13:2-10. By 10 weeks LMP, the fetus has fingers, toes, elbows, a nose, and a mouth. 5.RR.16:15-22. And by 12 weeks LMP, the fetus has all the features one would find in a newborn. 5.RR.20:5-20; *see also* D.Ex. 24, 25, 26 (admitted for demonstrative purposes). Fetuses and embryos are, thus, biologically distinct from medical waste such as diseased organs, limbs, body fluids, and sharps.

From a bioethical perspective, it is proper to show respect for fetal and embryonic remains. As explained by Defendant's bioethics experts, Dr. Farr Curlin and Dr. Aasim Padela, fetuses are human organisms and have intrinsic value, as well as value for what they can do and what they can become. 2.RR.35:14-36:6, 101:10-102:15. The remains of embryos and fetuses are not partial pieces of a human organism that continues to live (such as a liver or tumor), but the entirety of an organism that has died. 2.RR.36:25-37:6. Because treatment of the dead impacts treatment of the living, showing respect for fetal life does not terminate in the fetus's death, just as society respects the bodies of dead humans. 2.RR.37:23-38:14. Respectful treatment of the dead, even fetal deaths, is common across cultures and religions and is not specific to any single religion. 2.RR.54:15-55:4, 103:24-104:14.

Plaintiffs' witnesses also bear this out. Whole Woman's Health's pathology procedure recognizes that "the visualization of the products of conception/fetal parts is a real challenge" for some, D.Ex. 39, and Amy Hagstrom Miller, president of Whole Woman's Health, explained that some individuals can have "an emotional reaction to the pregnancy tissue." 1.RR.96:1-20. Thus, Whole Woman's Health's express policy is that staff members may pray over fetal remains. D.Ex. 39. Blake Norton understandably viewed her pregnancy as a "potential child." 1.RR.191:23-25. And both Ms. Norton and Dr. Valerie Peterson spoke of their devastation upon losing their pregnancies. 1.RR.168:20-23; 2.RR.147:5-10.

Thus, although not "persons" under the Fourteenth Amendment, embryos and fetuses still have significant value, demonstrated through science, bioethics, and personal experience, that can be respected through dignified disposition.

### III. Plaintiffs Introduced No Evidence Demonstrating a Burden on Abortion Access, and Defendant's Evidence Shows Compliance Is Possible.

Plaintiffs raise two general burdens allegedly imposed by the challenged laws: (1) abortion access/logistics, and (2) freedom of belief. Plaintiffs have waived any argument that costs would render compliance with the Texas law an unconstitutional undue burden. List of Stips. (ECF No. 221).

### A. Plaintiffs can comply with the challenged laws and have no evidence to the contrary.

*Defendant's Evidence of Ability to Comply:* Although not his burden, Defendant demonstrated that there are hundreds, if not thousands, of providers in Texas that are qualified to help with the disposition of fetal remains. Transportation of the remains may be by any of the over 1300 licensed funeral providers in Texas, as well as licensed medical waste transporters (including Plaintiffs' current vendor) and Plaintiffs themselves. 25 Tex. Admin. Code § 138.6; 4.RR.227:19-22, 235:18-21; D.Ex. 27. The remains may be cremated at any of the 164 crematories in Texas. 4.RR.227:23-

25, 235:22-236:2; D.Ex. 27. These funeral providers and crematories are located all across Texas, in both urban and rural areas. 4.RR.228:1-14; D.Ex. 27. But Plaintiffs made no effort to contact any of these entities.

There can be no question that Texas presently has room to inter or scatter the ashes of fetal remains. Morgan Cook, a funeral director at a non-sectarian establishment, testified that approximately 50 sets of fetal remains can fit in a small 2x1x1 foot box. 3.RR.156:20-157:2. Even if providers chose to inter 50,000 sets of fetal remains without cremating them, P.Ex. 130, that amounts to interring 1000 small boxes in the entire State per year.[6] Should facilities wish to use existing cemeteries, there are many to choose from, as Texas law permits multiple types of cemeteries, including perpetual care cemeteries, religious-affiliated cemeteries, public (city, county and state) cemeteries, and fraternal, family, and community cemeteries. 4.RR.224:22-225:1; Tex. Health & Safety Code § 711.021. Moreover, it blinks reality to suggest that Texas lacks the capacity to scatter the ashes of fetal remains, given that any uninhabited public land or waterway may be used. Tex. Health & Safety Code §§ 716.302, .304. In short, anywhere permissible for interment or scattering of ashes of human remains is also permissible for the interment or scattering of ashes of fetal remains under the challenged laws. And Plaintiffs offered no evidence that Texas is running out of room to inter human remains.[7]

---

[6] Since trial, the Texas Department of State Health Services Center for Health Statistics has published the 2016 data for abortions in Texas. Notably, the number of surgical (non-medical) abortions in Texas has dropped from approximately 50,000 in 2015 to 42,000 in 2016. *See* https://www.dshs.texas.gov/chs/2016ITOP.aspx.

[7] Of the over 50,000 abortions that occurred in Texas in 2015, only 45 occurred in doctor's offices. P.Ex. 130. Thus, a solo practitioner would rarely need to dispose of fetal remains but could do so in any local cemetery. Even so, providers like Johnny Garcia would be able to meet any need for disposition in a rural community. Dep. Desig. of Johnny Garcia (ECF No. 224).

As for specific options, Defendant presented testimony regarding quarterly hospital burials that already occur at Our Lady of the Rosary Cemetery in Georgetown. 3.RR.109:18-110:17. James Shields, the cemetery director, testified that the cemetery was prepared to inter 700-800 un-cremated remains per month or 4000 cremated remains per month. 3.RR.116:6-14. That would more than cover all of Plaintiffs' procedures in Texas.[8] Mr. Shields also testified that the cemetery was willing to enter into long-term contracts with abortion providers, but had not been contacted by any. 3.RR.112:25-113:2, 116:15-21, 145:3-8. Mr. Shields also showed the plans of the cemetery to expand its burial grounds, if necessary, 3.RR.114:7-115:15, and noted that people of all faiths are buried at the cemetery, 3.RR.105:7-8. Mr. Cook, who assists Mr. Shields with the quarterly hospital burials, also testified that the funeral establishment at which he works was willing to assist in the interment and cremation of fetal remains and could purchase additional refrigeration units if necessary. 3.RR.159:17-23, 183:11-22.

Deacon Charles Stump of the Catholic diocese in Dallas testified to the willingness of the Catholic church in Dallas to enter into long-term contracts with abortion providers to inter fetal remains from abortion clinics. 4.RR.26:14-19. He testified that the existing cemeteries under his authority currently have space to inter fetal remains. 4.RR.9:9-19. Finally, Jennifer Carr Allmon, Executive Director of the Texas Catholic Conference of Bishops (TCCB), testified that the Bishops, as announced in December 2016, have committed to assist in the provision of a proper burial of every unborn fetus, including those who are aborted, in the State of Texas. 4.RR.88:20-23, 94:2-

---

[8] In 2017, Plaintiffs performed fewer than 8000 abortions and procedures to complete medical abortions. D.Ex. 43, 44, 53, 56. Plaintiffs did not disclose how many miscarriage management procedures they performed, D.Ex. 43, 44, 53, 56, and did not put on evidence at trial of the number of miscarriage management procedures they handle annually.

5, 94:17-19, 102:21-24. The fifteen Catholic dioceses in Texas cover every mile of the State, 4.RR.83:21-25, and there are more than 100 official Catholic cemeteries in the state, including in rural areas. 4.RR.90:1-10, 91:1-3. The Bishops are also willing to obtain additional cemetery capacity if needed, though Mrs. Allmon testified that the TCCB does not believe that will be necessary. 4.RR.104:12-14, 107:25-108:3.

In addition to the witnesses at trial, Defendant put on evidence of the Burial or Cremation Assistance Registry. Chapter 697 requires the Health and Human Services Commission to establish and maintain a registry of funeral homes and cemeteries willing to provide free common burial or low-cost private burial for fetal remains. Tex. Health & Safety Code § 697.005(1). An entity does not have to sign up with the registry in order to provide disposition services in accordance with Texas law. 4.RR.185:8-15. And even though the challenged laws are currently enjoined, sixteen entities have registered. D.Ex. 9.

*Plaintiffs' Evidence of Inability to Comply:* Plaintiffs have no evidence that they will be unable to comply with the challenged laws. Plaintiffs did not contact any potential vendors to see if they would work with Plaintiffs to inter, cremate, incinerate, steam disinfect, or scatter the ashes of fetal remains. 1.RR.153:9-12, 155:17-156:9; 2.RR.13:1-4, 251:2-24; 3.RR.95:5-20. Plaintiffs did not ask their current vendor if it could comply.[9] 1.RR.152:24-153:5; 2.RR.229:19-21; 3.RR.94:4-8. Ms. Hag-

---

[9] Plaintiffs erroneously assert that incineration is not a treatment option because incinerated ash must be placed in a landfill. Pls. Proposed FOF & COL (ECF No. 195) ¶ 33. But the regulation to which they refer, 30 Tex. Admin. Code § 326.41(c)(1), applies only to the incinerated ash of medical waste. Because embryonic and fetal tissue remains are not medical waste, Tex. Health & Safety Code § 697.003, and because the associated products of conception may be disposed of in the same manner, *id.* § 697.004(d), the rule regarding the incinerated ash of medical waste does not apply, and incineration is still an option. 4.RR.70:4-12.

strom Miller even received a letter from potential vendors offering their services regarding interment and cremation, D.Ex. 41, but ignored the offer. 1.RR.160:4-10. Instead, Plaintiffs testified that they chose not to attempt to comply because they intended to challenge the law in court. 1.RR.152:5-13; 2.RR.229:19-230:1; 3.RR.100:17-21.

Plaintiffs claim that they had some difficulty in securing their current medical waste vendor, 1.RR.118:6-23; 2.RR.193:6-9, and ask the Court to presume that it will be similarly difficult to find a new disposition vendor. But Plaintiffs' current vendor may be willing to transport the fetal remains to a cemetery for interment—Plaintiffs simply have not asked. And numerous vendors have signed up on the Registry or testified at trial of their willingness to assist, *see supra* p. 11, but again Plaintiffs have failed to make any attempts to contact them. Unless and until Plaintiffs attempt to comply with the law, their logistical claims are pure speculation.[10]

The few specific "burdens" Plaintiffs attempted to demonstrate are nonsensical and speculative. Dr. Davis testified that, if the new vendor could not come every few weeks, he might need an additional freezer in which to store remains, which might necessitate buying an entirely new clinic. 2.RR.225:23-226:14. But Dr. Davis also testified that he had previously gone 1-2 months without medical waste pickup. 2.RR.252:10-13. And his current freezer is less than 3 feet tall and 2 feet wide. D.Ex. 57. It is beyond belief that he lacks any place in his clinic to put an additional miniature freezer. Even so, his fears are entirely speculative, given his complete unwillingness to even investigate the options for complying.

---

[10] Plaintiffs' assertion that Defendant had not issued the associated Chapter 138 rules in December 2017 no longer helps them, as Plaintiffs have been aware of those rules since they were published in January 2018. D.Ex. 3.

Dr. Kumar speculated that some women who might otherwise choose a surgical abortion would choose a medical abortion to avoid having the fetal remains interred. 1.RR.214:4-219:17. But he had no conversations with any woman regarding the potential interment or scattering of ashes of fetal remains generally, 2.RR.17:7-18, much less any conversation in which a woman indicated she would choose a different type of abortion as a result. 2.RR.15:20-23. His fears are entirely speculative and have no basis in the record.

Finally, Dr. Thomas Cunningham testified that the challenged laws might cause abortion providers to feel stigmatized and that they will, in turn, provide fewer or less optimal medical services. 3.RR.26:1-10. But there is no evidence of this alleged impact on the actual abortion providers in this case—all of whom were very committed to providing abortions despite the opposition of others to the practice.

### B. Plaintiffs are unaware of women's views regarding the disposition of fetal remains.

Although basing a large portion of their lawsuit on a claim that the challenged laws violate women's beliefs, Plaintiffs put forward no evidence of their patients' personal, subjective beliefs about the disposition of fetal remains. 1.RR.147:1-9. Plaintiffs uniformly testified that their patients almost never ask about disposition. 1.RR.73:6-15, 147:10-15; 2.RR.15:24-16:13, 246:8-11; 3.RR.85:2-7. And on the few occasions that women raise the issue, it is often to request burial for a wanted pregnancy or testing at a forensic or pathological laboratory. 1.RR.98:23-99:14; 2.RR.249:10-19; 3.RR.88:18-89:5. While Plaintiffs seek to accommodate those requests, Plaintiffs have denied patient requests to take the tissue home, as that would violate current law. 1.RR.98:23-99:22.

No Plaintiff testified that a patient expressed a personal or religious preference for disposition in a landfill or sewer. 1.RR.151:5-8; 2.RR.16:14-25. Nor have Plaintiffs' patients expressed religious

objections to burial or cremation. 1.RR.150:21-151:4; 2.RR.17:19-18:1, 250:7-14; 3.RR.99:11-18. At most, Plaintiffs offered a few anecdotes of individuals who disliked Seton Hospital's burial policy—which is different from SB 8's requirements—but who still went through with their procedures. 1.RR.172:20-22, 178:3-4; 4.RR.55:23-56:7. Plaintiffs completely failed to demonstrate that a large fraction of women would be so upset about the challenged laws that they would refuse to have an abortion at a healthcare facility. 1.RR.146:22-25; 2.RR.19:18-25.

## Argument

### I.   In an Undue-Burden Challenge, Plaintiffs Bear the Burden of Proving, at a Minimum, That a Large Fraction of Women Will Experience a Substantial Obstacle to Abortion.

The Court begins with the presumption that the challenged laws are constitutional. *INS v. Chadha*, 462 U.S. 919, 944 (1983). The Fifth Circuit has recognized that, "[a]s in litigation generally, the burden of proving the unconstitutionality of abortion regulations falls squarely on the plaintiffs." *Planned Parenthood of Greater Tex. Surgical Health Servs. v. Abbott*, 748 F.3d 583, 597 (5th Cir. 2014). In a facial challenge, such as this case, the Supreme Court has called it "a heavy burden" that requires, at a minimum, a showing that the challenged law imposes an undue burden in a large fraction of cases. *Gonzales v. Carhart*, 550 U.S. 124, 167-68 (2007).[11] Thus, the burden is not on the *State* to prove that Plaintiffs can comply with the law—it is on *Plaintiffs* to prove that they cannot.

Speculation about possible problems is not sufficient to demonstrate facial unconstitutionality. As the Supreme Court stated in *Gonzales*, it is not the Court's role to resolve constitutional

---

[11] Defendant preserves the argument that the large-fraction test does not apply, but rather that Plaintiffs must prove that there is no set of circumstances in which the challenged laws are constitutional in order to sustain a facial challenge to the laws. *See Gonzales*, 550 U.S. at 167 (recognizing uncertainty in the law).

questions "with respect to each potential situation that *might* develop." *Id.* at 168 (emphasis added); *see also A Woman's Choice—E. Side Women's Clinic v. Newman*, 305 F.3d 684, 693 (7th Cir. 2002) ("[I]t is an abuse of discretion for a district judge to issue a pre-enforcement injunction while the effects of the law (and reasons for those effects) are open to debate."). Rather than require the Court to "consider every conceivable situation which might possibly arise," individual instances of unconstitutionality may be brought in as-applied challenges. *See Gonzales*, 550 U.S. at 168.

## II.   Jurisdictional Doctrines Bar Several of Plaintiffs' Claims.

### A.   Plaintiffs did not demonstrate that they have third-party standing to assert their patients' personal, subjective beliefs.

Plaintiffs assert that the challenged laws are unconstitutional because they place an undue burden on a woman's "freedom of belief" about the status of her embryo or fetus. 1.RR.29:17-21. They bring this challenge on behalf of their patients, presumably under the doctrine of third-party standing. Third-party standing is an exception to the general rule that a party "cannot rest his claim to relief on the legal rights or interests of third parties." *Warth v. Seldin*, 422 U.S. 490, 499 (1975). Third-party standing, however, requires a plaintiff to show a "close" relationship with the individuals whose rights he is asserting, and that those individuals face a hindrance to protecting their own interests. *Kowalski v. Tesmer*, 543 U.S. 125, 130 (2004). Plaintiffs have not shown this close relationship with respect to their freedom-of-belief claim because they have failed to demonstrate that (1) they are aware of their patients' personal, subjective beliefs regarding the disposition of fetal remains, and (2) their patients want the challenged laws to be held unconstitutional.

Courts have recognized that abortion providers generally have standing to assert *abortion-access* claims on behalf of their patients, *see, e.g.*, *Planned Parenthood of Greater Tex.*, 748 F.3d at 589, as it may reasonably be assumed that an abortion provider's patients wish to access abortion clinics.

But Plaintiffs take it a step too far when they assert their patients' (unknown) personal, subjective *beliefs* unrelated to access. *See Singleton v. Wulff*, 428 U.S. 106, 113-14 (1976) (plurality op.) (recognizing that individuals may not always wish to have their rights asserted by third parties). Plaintiffs are simply assuming, without having introduced evidence in this litigation, that their patients are uniformly opposed to this law. *See supra* pp. 13-14. And Plaintiffs' current assertion—namely, that women want a constitutional right to choose the method of disposition—was not the case thirty years ago, when abortion providers argued that requiring a woman to choose the method of disposition of fetal remains was unconstitutional. *Margaret S. v. Edwards*, 794 F.2d 994, 997-98 (5th Cir. 1986). An abortion patient's constitutional rights should not depend on whatever legal theory her abortion provider wishes to assert at the time.

On the record before the Court, it cannot be determined whether Plaintiffs' patients would prefer disposition in a landfill or something more dignified, such as interment or scattering of ashes. *See supra* pp. 13-14. Moreover, Plaintiffs claim that their patients want to have choices regarding disposition, but Plaintiffs also wish to retain the status quo in which they do not affirmatively offer their patients any choice regarding disposition. If Plaintiffs' interests are not aligned with their patients' interests, the Court should deny third-party standing. *See Canfield Aviation, Inc. v. Nat'l Transp. Safety Bd.*, 854 F.2d 745, 748 (5th Cir. 1988).

Plaintiffs demonstrated only that women have a variety of personal beliefs and that Plaintiffs do not know what those beliefs are with respect to the disposition of fetal remains. They have not shown a sufficiently close relationship with their patients to allow them to assert their patients' personal, subjective beliefs in a lawsuit. *See In re Deepwater Horizon*, 857 F.3d 246, 253 (5th Cir. 2017) (holding that third-party plaintiff has burden to establish standing and that it may not be inferred by the Court).

### B.    Whole Woman's Health, LLC lacks standing to assert any claims.

Plaintiff Whole Woman's Health, LLC does not have a close relationship with patients because it has no patients. 1.RR.141:15-17. Instead, it is a management company that contracts with abortion clinics to provide non-medical services, such as accounting, payroll, and development of policies. 1.RR.50:11-19. It, therefore, lacks third-party standing to assert the rights of abortion patients in Texas. *See Singleton*, 428 U.S. at 115 (plurality op.) (referring to the confidential nature of the doctor-patient relationship as a ground to permit third-party standing). To hold otherwise would allow any entity that contracts with a healthcare provider to assert the rights of the healthcare provider's patients. Indeed, the Fifth Circuit has recognized only that doctors (not clinics) have the requisite close relationship to assert their patients' rights. *Planned Parenthood of Greater Tex.*, 748 F.3d at 589 (declining to decide whether abortion clinics have third-party standing); *see also Doe v. Bolton*, 410 U.S. 179, 189 (1973) (finding corporations "another step removed" from patients and declining to rule whether they had standing).[12]

Moreover, because Whole Woman's Health, LLC is not a healthcare facility, but rather a management company, it cannot claim an equal-protection violation because the challenged laws do not apply to it in the first place. 25 Tex. Admin. Code § 138.2(13) (defining health care facility). Whole Woman's Health, LLC should be dismissed from the lawsuit.

### C.    Plaintiffs' abortion-access claim is not ripe.

Plaintiffs' claim regarding abortion access is not ripe for adjudication, as any obstacle to abortion access is abstract, conjectural, and hypothetical. A court lacks jurisdiction to decide disputes

---

[12] Arguably, then, only Drs. Kumar and Davis are permissible third-party plaintiffs. *See AIDS Healthcare Found., Inc. v. City of Baton Rouge*, No. 17-00229-BAJ-RLB, 2017 WL 2899689, at *3 (M.D. La. July 7, 2017). The abortion-clinic plaintiffs would be proper parties to the equal-protection claim to the extent they assert their own equal-protection rights.

that are not ripe. *See Shields v. Norton*, 289 F.3d 832, 835 (5th Cir. 2002). If a purported injury is "contingent [on] future events that may not occur as anticipated, or indeed may not occur at all," the claim is not ripe for adjudication. *Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 580-81 (1985) (quotation marks omitted); *see also Monk v. Huston*, 340 F.3d 279, 282 (5th Cir. 2003) ("A court should dismiss a case for lack of 'ripeness' when the case is abstract or hypothetical."). The ripeness doctrine "prevent[s] the courts, through premature adjudication, from entangling themselves in abstract disagreements." *Abbott Labs. v. Gardner*, 387 U.S. 136, 148 (1967).

Plaintiffs have refused to take any concrete steps to determine whether they can, in fact, comply with the challenged laws.  They have not shown any evidence of a substantial logistical obstacle. The evidence instead shows that there are multiple avenues open to finally disposing of the remains in compliance with the law. *See supra* pp. 8-11. Thus, the possibility that Plaintiffs would cease providing abortions due to a lack of a disposition vendor is entirely hypothetical and is contradicted by Defendant's unrebutted evidence at trial of many potential vendors. The same holds for any concerns that Texas could someday run out of room to inter fetal remains or scatter their ashes or that other healthcare facilities in Texas might be unable to comply. This case is, therefore, unlike *Whole Woman's Health v. Hellerstedt*, in which there was evidence that 50-75% of the abortion clinics were supposedly going to close. 136 S. Ct. 2292, 2301 (2016). Plaintiffs have no evidence that even a single healthcare facility will close due to these challenged laws.

Should Plaintiffs (or any other healthcare facility) be unable to comply at some point in the future, they may file a new lawsuit and seek immediate injunctive relief. But those challenges may be brought only if, and when, there is an unconstitutional impact. *See New Orleans Pub. Serv., Inc. v. Council of New Orleans*, 833 F.2d 583, 587 (5th Cir. 1987); *see also Caprock Plains Fed. Bank Ass'n*

*v. Farm Credit Admin.*, 843 F.2d 840, 845-46 (5th Cir. 1988) (finding claim unripe because plaintiffs' "fear of impending harm is based on contingent future events that may not occur as anticipated") (internal quotation marks and citation omitted).[13]

### III.  Plaintiffs Did Not Prove an Undue Burden on Abortion Access or That the Laws Fail the Rational-Basis Test.

Although claims concerning Plaintiffs' purported inability to comply with the challenged law should be evaluated under the undue burden test, Plaintiffs' "freedom of belief" claim is made up of a hodge podge of Supreme Court precedent that must be evaluated in accordance with a rational-basis analysis. Rational basis also applies to any right-to-healthcare claim. But regardless of the legal test, Defendant's interest in respecting fetal life is sufficient to support the challenged laws.

#### A.  Plaintiffs must prove a substantial obstacle to abortion access.

The Supreme Court in *Planned Parenthood of Southeastern Pennsylvania v. Casey* set out the constitutional test—the undue-burden test—for abortion regulations: a court must ask whether a law's "purpose or effect is to place a substantial obstacle in the path of a woman" seeking a previability abortion. 505 U.S. 833, 878 (1992) (plurality op.).[14] With respect to laws that demonstrate respect for fetal life, the Supreme Court has repeatedly held that "[r]egulations which do no more than create a structural mechanism by which the State . . . may express profound respect for the life of the unborn are permitted, if they are not a substantial obstacle to the woman's exercise of

---

[13] Plaintiffs' failure to demonstrate an imminent injury also warrants a finding that they lack standing to obtain prospective relief. *See Susan B. Anthony List v. Driehaus*, 134 S. Ct. 2334, 2341 (2014) (requiring a plaintiff to prove that the "threatened injury is 'certainly impending'" or that there is a "'substantial risk' that the harm will occur" (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409, 414 n.5 (2013)).

[14] All references to *Casey* are to the plurality opinion.

the right to choose." *Gonzales*, 550 U.S. at 146 (quoting *Casey*, 505 U.S. at 877). Plaintiffs, therefore, must demonstrate that the challenged laws pose a substantial obstacle to abortion access.

### 1. Claims about rights other than abortion access are judged under the rational-basis test.

Although Plaintiffs' claims regarding abortion access use the substantial-obstacle test set forth in *Casey*, two claims have been discussed in this case that do not warrant scrutiny under that higher standard: freedom of belief and the right to healthcare. Both of those claims are subject only to a rational-basis analysis.

As recognized by both the Seventh and Eighth Circuits, if a fetal-remains law does not impact the right to an abortion, then it is judged under the rational-basis test. *Planned Parenthood of Ind. & Ky., Inc. v. Comm'r*, 888 F.3d 300, 307-08 (7th Cir. 2018) (*PPINK*);[15] *Planned Parenthood of Minn. v. Minnesota*, 910 F.2d 479, 486-87 (8th Cir. 1990). These holdings are supported by Supreme Court precedent, which applied the rational-basis test to the Hyde Amendment (prohibiting federal funding of elective abortions) after first determining that it impacted no fundamental right. *Harris v. McRae*, 448 U.S. 297, 323 (1980). And, as held in *Casey*, unless it presents a substantial obstacle to a woman's right to an abortion, "a state measure designed to persuade her to choose childbirth over abortion will be upheld if reasonably related to that goal." 505 U.S. at 878. Thus, Plaintiffs' freedom-of-belief claim (which does not impact the right to abortion) should be judged only under the rational-basis test.

The same holds for any claim regarding healthcare generally. The Supreme Court has never held that there is a specific constitutional right to healthcare. *See Cooper Hosp. v. Burwell*, 179 F.

---

[15] Although originally vacated when an en banc petition was granted, the Seventh Circuit has subsequently reinstated its opinion. Order, *PPINK v. Comm'r*, No. 17-3163 (7th Cir. June 25, 2018).

Supp. 3d 31, 46 (D.D.C. 2016). Thus, lower courts have used the rational-basis test for any regulation touching on healthcare. *See, e.g.*, *Abigail Alliance for Better Access to Dev. Drugs v. Eschenbach*, 495 F.3d 695, 712 (D.C. Cir. 2007) (en banc); *Mitchell v. Clayton*, 995 F.2d 772, 775–76 (7th Cir. 1993); *Kuromiya v. United States*, 37 F. Supp. 2d 717, 726-27 (E.D. Pa. 1999). The only medical procedure with a separate constitutional test is abortion. But the rationale for recognizing a right to abortion—a woman's right to choose to terminate her pregnancy—does not apply to other medical procedures, such as miscarriage management, which are not undertaken by choice. Thus, the impact of the challenged laws on procedures other than abortion should be analyzed only under the rational-basis standard.

Under the rational-basis test, government action is constitutional "if the action is rationally related to a legitimate government interest." *FM Props. Operating Co. v. City of Austin*, 93 F.3d 167, 174 (5th Cir. 1996). A court must uphold the law if "there is any reasonably conceivable state of facts that could provide a rational basis for the classification." *Heller v. Doe*, 509 U.S. 312, 320 (1993); *see also FM Props.*, 93 F.3d at 174 ("Only if such government action is 'clearly arbitrary and unreasonable, having no substantial relation to the public health, safety, morals, or general welfare,' may it be declared unconstitutional."). And, as discussed below, the challenged laws are a rational way to further the State's interest in respecting fetal life.

### 2.  Plaintiffs misinterpret *Whole Woman's Health*.

Plaintiffs assert that, to apply the undue-burden test, the Court need undertake only a simple benefit-burden balancing analysis. Pls. Proposed FOF & COL (ECF No. 195) ¶ 138. While Defendant would still prevail under such a standard, it is not the test the Supreme Court has applied.

The Supreme Court in *Casey* described the undue-burden test as requiring proof of a "substantial obstacle" to abortion. 505 U.S. at 878. The Court did not overrule that decision in *Whole*

*Woman's Health*. While the Court said the burdens of a law must be judged together with the benefits, *Whole Woman's Health*, 136 S. Ct. at 2309, at no point did the Court suggest that any burden that was less than a substantial obstacle to abortion access would be sufficient to hold a law unconstitutional. Instead, the Court determined that the laws at issue constituted a substantial obstacle to abortion access by causing the closure of multiple abortion clinics. *Id.* at 2312 (finding the admitting-privileges requirement created a "substantial obstacle"), 2316 (finding the ambulatory-surgical-center requirement created a "substantial obstacle"). Thus, the substantial-obstacle test still applies and, unless the burdens proven by Plaintiffs amount to a substantial obstacle to abortion access, no imbalance between benefits and burdens will suffice to find the challenged laws unconstitutional.

Requiring proof of a substantial obstacle also makes sense because it is difficult to objectively weigh the benefits of laws that respect unborn life given the wide variety of opinions on what unborn life is worth. *See, e.g.*, *Casey*, 505 U.S. at 850. *Whole Woman's Health*, which concerned only medical regulations, did not address respect for unborn life and, therefore, cannot be read to overturn the Supreme Court's prior application of the substantial-obstacle test. Pursuant to Court precedent, then, laws respecting unborn life are constitutional unless they present a substantial obstacle to abortion access. Regardless, the challenged laws are constitutional under any standard.

**B.   The challenged laws further the State's legitimate interest in respecting unborn life.**

The Supreme Court has recognized that States have "a substantial state interest in potential life throughout pregnancy." *Casey*, 505 U.S. at 876. Thus, a State may constitutionally "encourage [a woman] to know that there are philosophic and social arguments of great weight" in favor of continuing her pregnancy. *Id.* at 872. A State may "'express[] a preference for normal childbirth.'"

22

*Webster v. Reprod. Health Servs.*, 492 U.S. 490, 511 (1989) (quoting *Poelker v. Doe*, 432 U.S. 519, 521 (1977) (per curiam)). And a State may use "its voice and its regulatory authority to show its profound respect for the life within the woman." *Gonzales*, 550 U.S. at 157. Such laws are not required to further a health interest: "[U]nder the undue burden standard a State is permitted to enact persuasive measures which favor childbirth over abortion, even if those measures do not further a health interest." *Casey*, 505 U.S. at 886.

Just as the partial-birth abortion procedure at issue in *Gonzales* was "laden with the power to devalue human life," 550 U.S. at 158, so, too, is the treatment of fetal remains as refuse to be put in a landfill. Testimony from Defendant's experts confirmed this from both a bioethical view that it is appropriate to respect fetal life, and a scientific view that a fetus is a distinct human organism. *See supra* pp. 6-7. Indeed, Plaintiffs' entire lawsuit is premised on the idea that the challenged laws show respect for fetal life that Plaintiffs believe is not warranted, so there can be no argument that the challenged laws fail to further the State's respect for unborn life.

Nevertheless, Plaintiffs rely on opinions from several courts that have wrongly considered laws that require the dignified treatment of fetal remains to lack any benefit. Pls. Proposed FOF & COL ¶¶ 147-49. In general, these courts and Plaintiffs make three erroneous arguments: (1) it is impermissible to treat fetal remains as human remains, (2) the laws do not provide sufficient respect for fetal life, and (3) there is no potential life to respect after an abortion or miscarriage. All are incorrect.[16]

---

[16] Plaintiffs also assert that laws respecting fetal life must do so "in a permissible way" in order to be considered a "benefit." Plfs. Prop. FOF & COL ¶¶ 141, 146, 150. But whether a law respecting fetal life is "permissible" is determined by applying the substantial-obstacle test described above. It is not a threshold issue to be determined at the "benefit" stage of the analysis.

**Treatment as human remains** – Plaintiffs and the Seventh Circuit have erroneously concluded that the Supreme Court's decision in *Roe v. Wade*, 410 U.S. 113 (1973), prohibits treating fetal remains with respect similar to human remains or "persons." *PPINK*, 888 F.3d at 308; Pls. Proposed FOF & COL ¶¶ 135-36. This is a significant misinterpretation of *Roe*. The decision in *Roe* that a fetus is not a "person" under the Fourteenth Amendment simply prohibits States from banning elective abortion by relying on the Fourteenth Amendment's guarantee of life. 410 U.S. at 156-57. It is not a prohibition on laws that treat fetal life with respect. As subsequently recognized by the Supreme Court, there are a variety of beliefs regarding unborn life. *Casey*, 505 U.S. at 850. But the Court has still approved of laws suggesting that unborn life has value beyond that of medical waste. *See, e.g.*, *Gonzales*, 550 U.S. at 132 (banning partial-birth abortion); *Casey*, 505 U.S. at 886-87 (requiring 24-hour waiting period). Fetal-disposition laws merely confer constitutionally permissible respect, not constitutional personhood.

Even so, prohibiting putting ashes in a landfill or remains in a sewer is not treating fetuses as constitutional persons, nor does burial confer constitutional personhood. Much of Texas law that applies to the interment or cremation of human remains does not apply to fetal remains: fetal remains can be commingled without consent, no death certificate is required, and they can be incinerated and steam disinfected. Tex. Health & Safety Code §§ 697.003, .004; 4.RR.77:20-78:2. Texas law provides a modest form of respect based on what a fetus is—a separate human organism—but does not require that it be treated as a Fourteenth Amendment "person."

**Law is not sufficiently respectful** – After holding that Indiana's fetal-disposition law unconstitutionally treated fetal remains as human, the Seventh Circuit reversed course and held that the law was not actually respectful because it did not treat fetal remains as human remains. *PPINK*, 888 F.3d at 309 (noting that law allowed commingling for cremation). Plaintiffs likewise urge the

Court to hold that the law does not respect fetal life because it does not cover all potential life, such as pre-implantation embryos or tissue sent to a laboratory for testing. Pls. Proposed FOF & COL ¶ 151. This type of argument was squarely rejected in *Gonzales*. There, the plaintiffs argued that the partial-birth abortion ban did not go far enough to respect life because abortion through dismemberment (standard D&E) was still permitted. 550 U.S. at 160. The Court found it was rational to ban only one of the procedures when plaintiffs would have argued that banning both procedures was unconstitutional. *Id.* Likewise here, the fact that fetal remains are not given the full respect shown to human remains is not proof that the law fails to show respect, but rather a reasoned judgment of the Legislature to draw a constitutional line.[17]

**No potential life left** – Plaintiffs also echo the sentiments of courts that have held that a State may not show respect for unborn life through fetal-disposition laws because there is no "life" left to respect after an abortion or miscarriage. *PPINK*, 888 F.3d at 308; *Hopkins v. Jegley*, 267 F. Supp. 3d 1024, 1105 (E.D. Ark. 2017); Pls. Proposed FOF & COL ¶ 149. As explained by Defendant's bioethicists, respect for fetal life can be shown after death, just as a human body is given respect after the individual has died. *See supra* p. 7; *see also Labiche v. Certain Ins. Cos. or Underwriters at Lloyd's, London, England*, 196 F. Supp. 102, 104-05 (E.D. La. 1961) ("Respect for the body of the dead is part of our culture . . . ."). And the partial-birth abortion ban in *Gonzales* would not have survived such a test, as it altered only the method of abortion, 550 U.S. at 160, but did not prohibit

---

[17] Plaintiffs' argument that the challenged laws should be extended to human remains is also without merit. Pls. Proposed FOF & COL ¶ 152. Texas law already prohibits the mistreatment or mishandling of human remains. Tex. Penal Code § 42.08; *SCI Tex. Funeral Servs., Inc. v. Nelson*, 540 S.W.3d 539, 546 (Tex. 2018). Further, there is no evidence that additional laws were necessary to prevent human remains from being disposed of in landfills and sewers.

the abortion from occurring, *id.* at 181 (Ginsburg, J., dissenting) (stating that the partial-birth abortion ban "saves not a single fetus from destruction").

For this same reason, Plaintiffs' argument that laws respecting fetal life are permissible only if they "inform" or attempt to "persuade" a woman to give birth is erroneous. Pls. Proposed FOF & COL ¶¶ 133, 136, 140, 143. The law in *Gonzales* required respect by banning partial-birth abortion—it did not inform or persuade.[18]

Embryos and fetuses are different from livers, gallbladders, diseased limbs, tumors, and other medical waste. The State has a legitimate interest in treating them with respect after death, and the challenged laws do so by keeping their remains out of landfills and sewers. *See Harper v. Lindsay*, 616 F.2d 849, 854 (5th Cir. 1980) ("[T]he state's police power encompasses the authority to pass legislation aimed at regulating the health, welfare and morals of the community . . . .").

### C.   Plaintiffs have not proven a substantial obstacle to abortion access.

In *Whole Woman's Health*, the Supreme Court found a substantial obstacle to abortion access based on evidence that the number of abortion clinics in Texas dropped from 40 to 20 when the admitting-privileges law took effect and would drop to 7 or 8 if the ambulatory-surgical-center law took effect. 136 S. Ct. at 2301. Nothing remotely similar has been proven in this case.

---

[18] The existence of laws designed to recognize the dignity of the remains of a fetus may also encourage individuals contemplating abortion to consider the impact of the procedure on the fetus. *Casey*, 505 U.S. at 882 ("Nor can it be doubted that most women considering an abortion would deem the impact on the fetus relevant . . . .").

Because Plaintiffs have affirmatively waived any cost argument, the only potential obstacle is one of finding willing and able disposition vendors.[19] But, as demonstrated above, there are hundreds, if not thousands of potential vendors in Texas. *See supra* pp. 8-11. Plaintiffs have simply refused to contact any of them. And the ones who testified at trial appear more than able to handle disposition of Plaintiffs' fetal remains. *See supra* pp. 10-11. The only actual obstacle, then, is a lack of effort from Plaintiffs.

Including miscarriage management procedures does not alter this calculus. Plaintiffs did not put on any evidence of the number of miscarriage management procedures they handle annually and refused Defendant's discovery requests to obtain that number.[20] D.Ex. 43, 44, 53, 57. If Plaintiffs believe that number severely alters their calculations, then they failed to prove it. As it stands, though, if Plaintiffs can comply with the law for their abortion procedures, they can do so for any miscarriage management procedures as well. There is, therefore, no substantial obstacle to any type of healthcare access, much less abortion access.

### D. Plaintiffs have not proven an unconstitutional burden on a woman's freedom of belief.

Plaintiffs' other claimed burden is on a woman's freedom of belief—that the challenged laws require a woman to inter or scatter the ashes of a fetus that she may prefer be placed in a landfill. 1.RR.29:17-21. But disagreement with a law does not demonstrate that the law is unconstitutional. Plaintiffs must establish that the law violates a constitutional right. But there is no constitutional

---

[19] Plaintiffs' suggestion that they must "redirect . . . resources" away from patient care is an impermissible attempt to reintroduce the issue of costs. Plfs. Proposed FOF & COL ¶ 159.

[20] The only figure Plaintiffs introduced at trial was that there are 80,000 miscarriages in Texas each year. 4.RR.47:21-24. But it is also "very common" for women to miscarry at home, 2.RR.169:7-10, in which case the challenged laws would not apply. Plaintiffs did not introduce the number of miscarriage management procedures performed at healthcare facilities.

right to direct the disposition of fetal remains at a healthcare facility. And the Court should not extend *Roe* and *Casey* in order to create one.

### 1. Plaintiffs must demonstrate more than disagreement with the laws—they must show the violation of a constitutional right.

Plaintiffs base their freedom-of-belief claim on selective quotations from multiple Supreme Court cases, Pls. Proposed FOF & COL ¶¶ 129-31, but fail to grapple with the actual rulings: (1) all of the cases concerned infringement of an underlying constitutional right, and (2) none of them create a constitutional right to direct the disposition of fetal tissue. For example, the government act at issue in *Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Commission* infringed the First Amendment right to free exercise of religion. 138 S. Ct. 1719, 1723-24 (2018). The law banning same-sex marriage in *Obergefell v. Hodges* infringed the constitutionally protected right to marriage. 135 S. Ct. 2584, 2599 (2015). Other cases cited by Plaintiffs are similar. *See, e.g.*, *Lawrence v. Texas*, 539 U.S. 558, 564 (2003) (right to privacy); *Carey v. Population Servs., Int'l*, 431 U.S. 678, 684-85 (1977) (right to privacy and childbearing); *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 639 (1943) (freedom of speech).

Try as they might, Plaintiffs have failed to identify any Supreme Court precedent that allows an individual to refuse to comply with a law simply because they disagree with it. The law must actually violate the individual's constitutional rights. And Plaintiffs, as shown below, have not demonstrated a constitutional right to direct the disposition of fetal tissue at a healthcare facility.

Plaintiffs' freedom of belief argument most closely resembles a First Amendment claim—one which Plaintiffs have declined to bring. If any woman has a sincere religious objection to the disposition of the remains of her fetus by interment or scattering of ashes, she may bring an as-applied

challenge under the First Amendment—much like the baker in *Masterpiece Cakeshop*. But that would provide only as-applied relief. It would not justify what Plaintiffs seek: facial invalidation.

> **2.    There is no constitutional right to direct the disposition of fetal remains at a healthcare facility.**

The right to abortion recognized in *Roe* and *Casey* is simply the right to choose to have an abortion. It is not the right to an abortion "'without interference from the State.'" *Casey*, 505 U.S. at 875 (quoting *Planned Parenthood of Cent. Mo. v. Danforth*, 428 U.S. 52, 61 (1976)). Thus, a State may constitutionally mandate the types of permissible abortions, *Gonzales*, 550 U.S. at 132; require certain information be given prior to the procedure, *Casey*, 505 U.S. at 884-85; require a woman to wait 24 hours before having an abortion, *id.* at 887; or require that the procedure be performed by a physician, *Mazurek v. Armstrong*, 520 U.S. 968, 971 (1997) (per curiam).

Plaintiffs have not identified any precedent holding that the right to an abortion includes the right to direct the disposition of fetal remains at a healthcare facility after the abortion is complete. A right to dictate the disposition of fetal remains at a healthcare facility is not found in Texas law either. Texas law currently requires healthcare facilities to dispose of fetal remains in a limited number of ways. 41 Tex. Reg. 7664. It does not create a right for the woman to mandate how healthcare facilities would dispose of the fetal remains.[21]

The constitutional right to abortion is only "the woman's right to make the ultimate decision, not a right to be insulated from all others in doing so." *Casey*, 505 U.S. at 877. The Court should not extend the right to abortion to cover post-abortion processes such as disposing of fetal remains.

---

[21] The only specific right a woman has under Texas law is to request the remains of an unintended intrauterine fetal death from a hospital. Tex. Health & Safety Code § 241.010. Even then, though, the release must still be in compliance with the law.

Similarly, the Court should not create a right of "personal autonomy" that covers the disposition of fetal remains at a healthcare facility. Pls. Proposed FOF & COL ¶¶ 133, 136. The few Supreme Court precedents that consider "personal autonomy" concern laws impacting the individual himself or herself—not the treatment of something separate from that individual. *See, e.g.*, *Washington v. Glucksberg*, 521 U.S. 702, 724-27 (1997) (discussing "personal autonomy" in the context of assisted suicide); *Casey*, 505 U.S. at 857 (discussing "personal autonomy" in the context of abortion). But even in the context of abortion, that autonomy is limited, as the State may impose waiting periods and bans on partial-birth abortions. Indeed, the laws that Plaintiffs seek to retain do not give a woman authority over fetal disposition, but rather require a healthcare facility to dispose of remains in one of a limited number of ways. 41 Tex. Reg. 7664. And, as explained by Defendant's bioethics experts, there is no unfettered right to personal autonomy in a healthcare setting—all facilities have laws, policies, and ethical concerns that limit what a patient can demand. 2.RR.39:20-40:16, 106:21-108:15. There are no grounds to create a constitutional right to personal autonomy that encompasses directing the disposition of fetal remains at healthcare facilities.

Finally, Plaintiffs' claims regarding the burdens of shame and stigma have never been recognized by the Supreme Court as unconstitutional undue burdens. Instead, the Court has looked solely to whether a law creates a substantial obstacle to abortion access. *See, e.g.*, *Whole Woman's Health*, 136 S. Ct. at 2300 (finding an undue burden on "abortion access"); *id.* at 2309 (requiring courts to consider burdens on "abortion access"); *Casey*, 505 U.S. at 885-87. Plaintiffs' arguments in that regard cannot be squared with the Supreme Court's holdings that States may respect fetal life and encourage women to choose childbirth. *See supra* pp. 22-23. Under Plaintiffs' rationale, any such law would cause shame and stigma as they suggest fetuses have value—and yet those laws have received Supreme Court approval.

* * *

Plaintiffs utterly failed to prove a substantial obstacle to abortion access—they provided no evidence of imminent clinic closures or of even a single woman who would be denied a medical procedure were the challenged laws to take effect. Plaintiffs did not demonstrate either a substantial obstacle to abortion access or that the burdens of the challenged laws outweigh their benefits. And should Plaintiffs' unfounded fears about finding vendors come to pass, Plaintiffs may do what they did in this case and have done in other cases—file a lawsuit and seek immediate injunctive relief. But as of today, there are no grounds for finding the challenged laws unconstitutional.

Plaintiffs' arguments about freedom of belief find no support in the law or the facts of this case. They should be judged only under the rational-basis test and, under that test, the challenged laws are rationally related to the State's interest in respecting unborn life. But even if judged under the substantial-obstacle test, Plaintiffs have failed to prove that the laws will burden any woman, group of women, or large fraction of women, such that they would face a substantial obstacle to abortion if the challenged laws go into effect. Consequently, there are no legal or factual grounds to justify finding the challenged laws impose an undue burden to abortion.

## IV.  Plaintiffs Did Not Prove a Violation of the Equal Protection Clause.

Plaintiffs assert that the challenged laws violate the Equal Protection Clause because the laws do not require interment or scattering of ashes of (1) pre-implantation embryos, (2) tissue sent to laboratories for testing, and (3) tissue passed by a woman in her home during a miscarriage or medication abortion. But all three of these classifications easily pass the rational-basis test.

### A.   The rational-basis test applies to Plaintiffs' claims.

When the Legislature "has neither invaded a substantive constitutional right or freedom, nor enacted legislation that purposefully operates to the detriment of a suspect class, the only requirement of equal protection is that [governmental] action be rationally related to a legitimate governmental interest." *Harris*, 448 U.S. at 326. Plaintiffs have not identified any suspect class, nor have they demonstrated that the classifications impact a fundamental right.

Plaintiffs suggest that the challenged laws discriminate among "reproductive healthcare options" and, therefore, require heightened scrutiny. Pls. Proposed FOF & COL ¶¶ 167-69. But the Supreme Court has already held that laws that discriminate between reproductive healthcare choices—namely childbirth and elective abortion—do not implicate a fundamental right and are subject only to rational-basis analysis. *Harris*, 448 U.S. at 326 (regarding law that funded childbirth but not elective abortion); *Maher v. Roe*, 432 U.S. 464, 478 (1977) (same).

Under the rational-basis test, a court must uphold the law if "there is any reasonably conceivable state of facts that could provide a rational basis for the classification." *See Heller*, 509 U.S. at 320 (internal quotation marks omitted). The burden is on the plaintiff to negate every conceivable basis that might support the classification. *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 315 (1993).

### B.   The challenged laws are rationally related to respecting fetal life.

After arguing that the challenged laws impose an unconstitutional undue burden, Plaintiffs now argue that the laws should be more burdensome in order to survive an equal-protection challenge. As explained above, the Supreme Court has already rejected similar arguments. *See Gonzales*, 550 U.S. at 160. Considering the merits, however, each classification drawn by the Legislature has a rational purpose. And the Supreme Court has made clear that a legislature need not "strike at all evils at the same time or in the same way," *Semler v. Ore. State Bd. of Dental Exam'rs*, 294

U.S. 608, 610 (1935), but "may implement [its] program step by step, . . . adopting regulations that only partially ameliorate a perceived evil and deferring complete elimination of the evil to future regulations," *City of New Orleans v. Dukes*, 427 U.S. 297, 303 (1976) (citation omitted).

1.   Pre-implantation embryos – The challenged laws do not apply to pre-implantation embryos because the laws apply only to tissue "from a pregnancy." Tex. Health & Safety Code § 697.002(3). Plaintiffs assert that pre-implantation embryos are due just as much respect as post-implantation embryos. Pls. Proposed FOF & COL ¶ 170. But the Legislature chose to draw the line at embryos that have implanted and begun to grow during a pregnancy—when the potential for life has been more fully realized. This distinction is rational, and the Legislature was not constitutionally required to include pre-implantation embryos in Chapter 697.

2.   Pathological and forensic laboratories – The challenged laws permit healthcare facilities to send fetal remains to pathological and forensic laboratories, and do not require those laboratories to inter or cremate the remains (as they are not healthcare facilities). List of Stips. (ECF No. 221). This line is reasonable because it was demanded by Plaintiffs themselves: Plaintiffs' First Amended Complaint alleges that the challenged laws would be unconstitutional if they required healthcare facilities to ensure that tissue sent to laboratories was disposed of in compliance with the challenged laws. Pls. First Am. Compl. ¶¶ 83-89 (ECF No. 93) (suggesting that Plaintiffs might be reluctant to risk liability by sending tissue to laboratories). Allowing healthcare facilities freely to forward embryonic and fetal remains for health testing and cooperation with criminal investigations is a rational way to address this concern. And the evidence shows that tissue is sent only rarely to these laboratories, so the exclusion impacts only a minimal amount of tissue. P.Ex. 14, 18.

3.   Women at home – Plaintiffs assert that it is unconstitutional to require healthcare facilities to inter or scatter the ashes of fetal remains but not require women to do so when they miscarry

or have a medication abortion at home. A woman at home has different and greater privacy rights than a woman at a healthcare facility, who must submit to the laws and policies governing that facility. Further an individual woman is not as equipped as a healthcare facility to maintain standard compliance protocols.  It should be obvious that the Legislature was free to strike a balance between regulating a healthcare facility versus individual women in their own homes.

The classifications drawn by the Texas Legislature are rationally related to its goal of respecting unborn life. But even if a higher standard of scrutiny is used, the classifications pass that test as well. There are no grounds for holding that the challenged laws violate the Equal Protection Clause.

## V.   Any Injunction Should Be Limited.

Should the Court determine that injunctive relief is appropriate, it should limit that relief to only what is necessary to cure the constitutional problem. "'[T]he scope of injunctive relief is dictated by the extent of the violation established'" by plaintiffs. *John Doe #1 v. Veneman*, 380 F.3d 807, 818 (5th Cir. 2004) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979)). Moreover, courts should "enjoin only the unconstitutional applications of a statute while leaving other applications in force, or to sever its problematic portions while leaving the remainder intact." *Ayotte v. Planned Parenthood of N. New Eng.*, 546 U.S. 320, 328-29 (2006) (citations omitted).

Federal courts must also follow state severability clauses. *See Leavitt v. Jane L.*, 518 U.S. 137, 139 (1996) (per curiam) ("Severability is of course a matter of state law."). And SB 8 has a robust severability clause. P.Ex. 9, §§ 20-21; *cf.* Tex. Gov't Code § 312.013 (declaring default rule of severability for statutes). Thus, to the extent the Court concludes that injunctive relief is appropriate, it should sever the purportedly unconstitutional portions of the law and allow the rest to take effect.

## Conclusion

For the foregoing reasons, the Court should enter judgment for Defendant on each of Plaintiffs' claims.

Respectfully submitted,

KEN PAXTON
Attorney General of Texas

JEFFREY C. MATEER
First Assistant Attorney General

BRANTLEY STARR
Deputy First Assistant Attorney General

JAMES E. DAVIS
Deputy Attorney General for Civil Litigation

*/s/Darren McCarty*
DARREN MCCARTY
Special Counsel for Civil Litigation
Texas Bar No. 24007631
AUSTIN R. NIMOCKS
Special Counsel for Civil Litigation
Texas Bar No. 24002695
ADAM ARTHUR BIGGS
Special Counsel for Civil Litigation
Texas Bar No. 24077727
BETH KLUSMANN
Assistant Solicitor General
Texas Bar No. 24036918
KARA HOLSINGER
Assistant Attorney General
Texas Bar No. 24065444
BENJAMIN S. WALTON
Assistant Attorney General
Texas Bar No. 24075241

OFFICE OF THE ATTORNEY GENERAL
Administrative Law Division
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
Telephone: (512) 475-4300
Facsimile: (512) 320-0167
Darren.McCarty@oag.texas.gov
Austin.Nimocks@oag.texas.gov
Adam.Biggs@oag.texas.gov
Beth.Klusmann@oag.texas.gov
Kara.Holsinger@oag.texas.gov
Benjamin.Walton@oag.texas.gov
**Counsel for Defendant**

## CERTIFICATE OF SERVICE

I hereby certify that on August 3, 2018, a true and correct copy of this document was electronically filed using the Court's CM/ECF system, which will send notification of such filing to all counsel of record, including the following:

David Brown
Dipti Singh
Stephani Toti
Juanluis Rodriguez
THE LAWYERING PROJECT
25 Broadway, 9th Fl.
New York, NY 10004
Fax: (646) 480-8852
dbrown@lawyeringproject.org
dsingh@lawyeringproject.org
stoti@lawyeringproject.org
prodriguez@lawyeringproject.org

Molly Duane
Caroline Sacerdote
Autumn Katz
Emily B. Nestler
CENTER FOR REPRODUCTIVE RIGHTS
199 Water St. 22nd Floor
New York, NY 10038
Fax: (917) 637-3666
mduane@reprorights.org
csacerdote@reprorights.org
akatz@reprorights.org
enestler@reprorights.org

J. Alexander Lawrence
Francesca Cocuzza
MORRISON & FOERSTER LLP
250 W. 55th Street
New York, NY 10019
Fax: (212) 468-7900
alawrence@mofo.com
fcocuzza@mofo.com

Patrick J. O'Connell
LAW OFFICES OF PATRICK J. O'CONNELL
PLLC
2525 Wallingwood, Bldg. 14
Austin, Texas 78746
pat@pjofca.com

*/s/ Darren McCarty*
DARREN MCCARTY
Special Counsel for Civil Litigation

37