**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

| | | |
|---|---|---|
| WHOLE WOMAN'S HEALTH, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | CIVIL ACTION |
| v. | ) | |
| | ) | CASE NO. 1:16-cv-01300- |
| CHARLES SMITH | ) | DAE-AWA |
| | ) | |
| Defendant. | ) | |

## <u>PLAINTIFFS' CLOSING ARGUMENT BRIEF</u>

# TABLE OF CONTENTS

**Page**

FACTS ........................................................................................................................ 2

I.      THE CHALLENGED LAWS............................................................................... 2

    A.      Scope of the Challenged Laws. ................................................................ 2

    B.      Differences from Prior Law. .................................................................... 3

    C.      Creation of a Second System for Medical Waste Disposal....................... 4

    D.      The Registry and Grant Program.............................................................. 4

    E.      Enforcement of the Challenged Laws. ..................................................... 4

II.     THE PARTIES...................................................................................................... 5

III.    ABORTION AND MISCARRIAGE CARE. ....................................................... 5

IV.     PEOPLE HOLD DIVERSE BELIEFS ABOUT THE STATUS OF A
    DEVELOPING EMBRYO OR FETUS, AND THE DIGNIFIED DISPOSITION
    OF EFTR BASED ON THEIR RELIGION, CULTURE, AND PERSONAL
    EXPERIENCE AND CIRCUMSTANCE. ........................................................... 6

V.      THE CHALLENGED LAWS HARM WOMEN WHOSE BELIEFS DIFFER
    FROM THE STATE'S. ......................................................................................... 8

VI.     THE CHALLENGED LAWS THREATEN THE AVAILABILITY OF
    ABORTION AND MISCARRIAGE CARE ...................................................... 11

    A.      The Challenged Laws Destabilize Healthcare Facilities' Currently
        Functional Waste Disposal System. ....................................................... 11

    B.      The Disruption and Uncertainty Created by the Challenged Laws Threaten
        Healthcare Facilities' Ability to Continue to Provide Care. ................... 12

    C.      Neither the Registry nor the state's Catholic cemeteries are an adequate
        substitute for medical waste vendors. .................................................... 14

ARGUMENT .......................................................................................................... 16

I.      THE CHALLENGED LAWS VIOLATE THE DUE PROCESS CLAUSE OF
    THE FOURTEENTH AMENDMENT BY IMPOSING AN UNDUE BURDEN
    ON ABORTION AND MISCARRIAGE TREATMENT ................................... 16

    A.      The Right to Abortion is Part of a Broader Right to Act in Accordance
        with One's Personal Beliefs about Developing Human Life. ................... 16

    B.      The Challenged Laws Are Subject to the Undue Burden Standard. ......... 17

    C.      The Undue Burden Standard Does Not Vary Based on the State's Asserted
        Interest in Enforcing a Restriction. ......................................................... 18

# TABLE OF CONTENTS
(continued)

Page

D.   Defendant Bears the Burden of Proving That the Challenged Laws Advance a Valid State Interest to An Extent Sufficient to Justify the Burdens They Impose on Women. ...................................................................21

E.   The Challenged Laws Fail to Advance a Valid State Interest by Permissible Means. ..........................................................................................21

    i.   The Challenged Laws use impermissible means to serve the State's valid interest in potential life. ................................................................22

    ii.   The Challenged Laws are not rationally related to the State's valid interest in potential life. ...................................................................23

    iii.   The State does not have a valid interest in elevating one set of beliefs about developing human life over others. ..................................24

F.   Alternatively, the Challenged Laws Fail to Advance the State's Interest to an Extent Sufficient to Justify the Burdens They Impose on Women.................26

    i.   The Challenged Laws impose significant burdens on women. ..............27

    ii.   The burdens imposed by the Challenged Laws are not justified by proportional benefits..........................................................................29

II.   THE CHALLENGED LAWS DENY EQUAL PROTECTION TO PLAINTIFFS AND THEIR PATIENTS. ................................................................................32

A.   Heightened Scrutiny Applies to the Challenged Laws. .....................................32

B.   The Classifications Established by the Challenged Laws Fail Heightened Scrutiny. ............................................................................................................33

C.   The Challenged Laws' Classifications Also Fail Rational Basis Scrutiny. .........34

CONCLUSION ....................................................................................................35

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*City of Cleburne v. Cleburne Living Ctr.*,
473 U.S. 432 (1985)................................................................ 32, 33, 35

*De Leon v. Perry*,
975 F. Supp. 2d 632 (W.D. Tex. 2014)......................................28

*Feminist Women's Health Ctr., Inc. v. Philibosian*,
157 Cal. App. 3d 1076 (Cal. Ct. App. 1984)...............................26

*Fisher v. Univ. of Tex. at Austin*,
570 U.S. 297 (2013)................................................................33

*Gonzales v. Carhart*,
550 U.S. 124 (2007)...........................................................*passim*

*Hopkins v. Jegley*,
267 F. Supp. 3d 1024 (E.D. Ark. 2017), *appeal docketed*, No. 17-2879 (8th
Cir., Aug. 28, 2017) ...........................................................*passim*

*June Med. Servs. LLC v. Gee*,
280 F. Supp. 3d 849 (M.D. La. 2017) ......................................35

*Lawrence v. Texas*,
539 U.S. 558 (2003)...........................................................17, 24

*Margaret S. v. Edwards*,
488 F. Supp. 181 (E.D. La. 1980)............................................26

*Masterpiece Cakeshop, Ltd. v. Colo. Civil Rights Comm'n*,
138 S. Ct. 1719 (2018) ......................................................24, 25, 28

*Obergefell v. Hodges*,
135 S. Ct. 2584 (2015) ..........................................................32

*Planned Parenthood of Ind. & Ky., Inc. v. Comm'r*,
__ F.3d __, No. 17-1883, 2018 WL 3567829 (7th Cir. July 25, 2018).....................18, 19, 20

*Planned Parenthood of Ind. & Ky, Inc. v. Comm'r*,
888 F.3d 300 (7th Cir. 2018), *vacated in part by* 727 F. Appx 208, *reinstated
by Op.* No. 17-3163, 2018 WL 3655854 (7th Cir. June 25, 2018) ...................17, 18

*Planned Parenthood of Ind. and Ky. v. Comm'r*,
265 F. Supp. 3d 859, *aff'd on other grounds PPINK I* .......................................35

*Planned Parenthood Minn., N.D., S.D. v. Daugaard*,
  799 F. Supp. 2d 1048 (D.S.D. 2011) ..................................................... 15

*Planned Parenthood of Minnesota v. Minnesota*,
  910 F.2d 479 (8th Cir. 1990) ............................................................... 26

*Planned Parenthood of Se. Pa. v. Casey*,
  505 U.S. 833 (1992) ...................................................................... *passim*

*Roe v. Wade*,
  410 U.S. 113 (1973) .......................................................... 17, 24, 25, 26

*Skinner v. Okla. ex rel. Williamson*,
  316 U.S. 535 (1942) ............................................................................ 32

*United States v. Virginia*,
  518 U.S. 515 (1996) ..................................................................... 21, 33

*United States v. Windsor*,
  570 U.S. 744 (2013) ............................................................................ 28

*W. Va. State Bd. of Educ. v. Barnette*,
  319 U.S. 624 (1943) ............................................................................ 25

*Wallace v. Jaffree*,
  472 U.S. 38 (1985) .............................................................................. 25

*Whole Woman's Health v. Hellerstedt*,
  136 S. Ct. 2292 (2016) .................................................................. *passim*

*Whole Woman's Health v. Hellerstedt*,
  231 F. Supp. 3d 218 (W.D. Tex. 2017) (Sparks, J.) ............................... 19, 23, 28

*Whole Woman's Health v. Paxton*,
  264 F. Supp. 3d 813 (W.D. Tex. 2017) (Yeakel, J.) ............................... 19, 20

**Statutes**

Tex. Health & Safety Code
  § 697.004(a)-(b) ................................................................................... 4
  § 171.004 ............................................................................................ 5
  § 245.003 ............................................................................................ 5
  § 245.004 ............................................................................................ 5
  § 171.044 ............................................................................................ 6
  § 173.006 ............................................................................................ 9
  §§ 692A.001 – 692A.023 ...................................................................... 9
  § 692A.015(9) .................................................................................... 10
  § 697.001 ............................................................................... 2, 24, 30

§§ 697.001 – 697.004 ................................................................................... 2, 36
§§ 697.007 – 697.009 ................................................................................... 2, 36
§ 697.002(3) ...................................................................................................... 2
§ 697.002(6) ...................................................................................................... 4
§ 697.004(a) .................................................................................................. 2, 3
§ 697.004(b)(1) ............................................................................................ 4, 12
§ 697.004(b)(2) .................................................................................................. 4
§ 697.005(1) ...................................................................................................... 4
§ 697.006 ........................................................................................................... 4
§§ 697.007 – 697.008 ................................................................................... 5, 14
§ 716.001(5) .................................................................................................... 31
§ 6973.005(2) .................................................................................................. 24
§ 607.001 ......................................................................................................... 35

## Other Authorities

25 Tex. Admin. Code
§§ 1.131 – 1.137 ........................................................................................ 3, 4, 12
§ 1.132(33) ......................................................................................................... 3
§§ 1.132(42), (44), (46) ..................................................................................... 3
§ 1.136(4) ........................................................................................................... 3
§§ 1.136(4), 1.132(33) ....................................................................................... 3
§ 138(13) ............................................................................................................ 3
§§ 138.1 – 138.7 ........................................................................................... 2, 36
§ 138.2(15) ......................................................................................................... 4
§ 138.3(c)(3) ...................................................................................................... 2
§ 138.3(c)(5) ...................................................................................................... 2
§ 138.5(a) ........................................................................................................... 3
§ 138.5(a), (c) .................................................................................................... 4
§ 138.5(c)(1) ...................................................................................................... 4
§ 138.5(c)(2) ...................................................................................................... 4
§ 138.8 ............................................................................................................... 4

U.S. Const. Amend. XIV ................................................................................. 32

Reva B. Siegel, *Dignity and the Politics of Protection: Abortion Restriction
Under* Casey/Carhart, 117 Yale L.J. 1694, 1751 (2008) ....................................... 22

Plaintiffs challenge a set of Texas laws that require women's embryonic and fetal tissue from certain abortion and miscarriage management procedures to be disposed of like human remains—by interment or scattering of ashes—without their consent. This imposition violates the Constitution's guarantee of personal liberty to act in accordance with one's own beliefs about developing human life. It also violates decades of Supreme Court precedent forbidding a State from using compulsory, rather than persuasive, means of advancing its interest in potential life.

Prior to the Challenged Laws' enactment, Texas permitted a variety of disposition options for embryonic and fetal tissue sufficient to accommodate the wide range of beliefs held by women who experience pregnancy loss or choose to end their pregnancies. Patients who wanted their tissue to be buried or cremated had those options, and Plaintiffs worked with them to effectuate their choices. The challenged laws do not provide Texas women with additional options; instead, they eliminate options for women who do not view their embryonic and fetal tissue as a person.

The evidence presented at trial demonstrates that the challenged laws impose significant burdens on women. These burdens include deprivation of liberty; imposition of grief, stigma, shame, and distress; deterrence from seeking treatment at a healthcare facility; and reduced availability of pregnancy-related medical care. These burdens are not justified by proportional benefits. Moreover, they are imposed arbitrarily. The challenged laws apply to some types of embryonic and fetal tissue but not others. Preimplantation embryos are exempted, as is all tissue sent to a laboratory for testing or research, with no explanation by the State for the differential treatment.

Due to their violation of women's liberty, significant burdens, and arbitrary classifications, the challenged laws are unconstitutional. Plaintiffs respectfully request that they be permanently enjoined.

**FACTS**

## I.     The Challenged Laws

Plaintiffs challenge the constitutionality of certain provisions of Chapter 697 of the Texas Health & Safety Code, codified at Tex. Health & Safety Code §§ 697.001 – 697.004, 697.007 – 697.009 (the "Act"), and the implementing regulations promulgated thereunder, codified at 25 Tex. Admin. Code §§ 138.1 – 138.7 (collectively, the "Challenged Laws"), which prescribe methods of treatment and disposition of embryonic and fetal tissue following certain abortions and miscarriages. Their stated purpose "is to express the state's profound respect for the life of the unborn by providing for a dignified disposition of embryonic and fetal tissue remains." Tex. Health & Safety Code § 697.001.

### A.     Scope of the Challenged Laws.

The Challenged Laws apply to certain "embryonic and fetal tissue remains" ("EFTR") defined as "an embryo, a fetus, body parts, or organs from a pregnancy that terminates in the death of the embryo or fetus and for which the issuance of a fetal death certificate is not required by state law." Tex. Health & Safety Code § 697.002(3).

Many kinds of embryonic and fetal tissue are exempt from the Challenged Laws, including: preimplantation embryos, such as those created for possible use in in vitro fertilization, Pls.' Ex. 128 at 7; Tr. Vol. 4, 182:16-21; 194:5-17 (Kostroun); EFTR donated for research purposes, 25 Tex. Admin. Code § 138.3(c)(3); EFTR sent to laboratories or law enforcement agencies, *see* Tex. Health & Safety Code § 697.004(a); Stipulations (ECF No. 221) at 1; and EFTR passed at home in connection with a medication abortion or miscarriage, *see* 25 Tex. Admin. Code § 138.3(c)(5). In fact, the Challenged Laws only apply to EFTR resulting from a surgical abortion or miscarriage management procedure performed in a licensed healthcare facility or doctor's office. *See* 25 Tex. Admin. Code § 138(13).

2

## B.        Differences from Prior Law.

Prior to enactment of the Challenged Laws, all EFTR was regulated as "special waste from health care-related facilities," ("special waste") a category of biohazardous material that includes "human materials removed during surgery, labor and delivery, autopsy, embalming, or biopsy, including: (1) body parts; (ii) tissues; (iii) organs; and (iv) bulk blood and body fluids," as well as other medical waste products such as sharps (sharp items like needles, scalpels) and non-pregnancy tissue. 25 Tex. Admin. Code §§ 1.132(42), (44), (46). The treatment and disposition of special waste is governed by 25 Tex. Admin. Code §§ 1.131 – 1.137 (the "Special Waste Rules"). The standard practice for treatment and disposition of special waste—in Texas and nationwide—is incineration followed by deposition in a sanitary landfill. *See* Tr. Vol. 1, 208:12-18 (Kumar); Tr. Vol. 4, 42:15-20, 46:15-24 (Swenson); Tr. Vol. 1, 81:1-4 (Hagstrom Miller).

The purpose of treating special waste before disposal is decontamination. Tr. Vol. 1, 80:20-81:1 (Hagstrom Miller); Tr. Vol. 4, 46:11-14 (Swenson). The Special Waste Rules permitted several methods of EFTR treatment, including incineration; cremation; grinding; steam disinfection; moist heat disinfection; and chlorine disinfection/maceration. *See* 25 Tex. Admin. Code §§ 1.136(4), 1.132(33). The Challenged Laws permit only three: cremation; incineration; and steam disinfection. Tex. Health & Safety Code § 697.004(a); 25 Tex. Admin. Code § 138.5(a).

The Special Waste Rules permitted several methods of EFTR disposition, including deposition into a sanitary landfill; discharge into a sanitary sewer system; entombment, burial, or placement in a niche; or scattering of ashes. 25 Tex. Admin. Code § 1.136(4); 25 Tex. Admin. Code § 1.132(33). The Challenged Laws permit only two: interment, defined as "entombment, burial, or placement in a niche," Tex. Health & Safety Code § 697.002(6); 25 Tex. Admin. Code § 138.2(15); and scattering of ashes. Tex. Health & Safety Code 697.004(a)-(b); 25 Tex. Admin. Code § 138.5(a), (c). They prohibit disposition of EFTR or ashes in a sanitary landfill or sanitary

3

sewer. Tex. Health & Safety Code § 697.004(b)(2); 25 Tex. Admin. Code § 138.5(c)(2).

Thus, while the Special Waste Rules permitted EFTR disposal in accordance with standard practice for human tissue, the Challenged Laws forbid it. Instead, the Challenged Laws equate the disposition of EFTR with the disposition of "human remains" (*i.e.*, the bodies of people who have died). Tex. Health & Safety Code § 697.004(b)(1); 25 Tex. Admin. Code § 138.5(c)(1). Notably, the Challenged Laws do not add any options for treatment or disposition of EFTR to those previously available under the Special Waste Rules; they only eliminate certain options.

### C.  Creation of a Second System for Medical Waste Disposal.

To comply with the Challenged Laws, healthcare facilities that generate EFTR must employ two separate systems for medical waste disposal. EFTR must be disposed of in accordance with the Challenged Laws, while other medical waste, such as sharps and non-pregnancy tissue, must be disposed of in accordance with the Special Waste Rules.

### D.  The Registry and Grant Program.

Chapter 697 of the Texas Health & Safety Code directs Defendant to establish and maintain a registry of funeral homes, cemeteries, and nonprofit organizations willing to provide free or low-cost burial of EFTR or assist with the cost of burying or cremating EFTR (the "Registry"). Tex. Health & Safety Code § 697.005(1); *see also* 25 Tex. Admin. Code § 138.8. It further directs Defendant to "develop a grant program that uses private donations to provide financial assistance for the costs associated with disposing of embryonic and fetal tissue remains." Tex. Health & Safety Code § 697.006.

Plaintiffs do not challenge the statutory and regulatory provisions concerning the registry and grant program, which do not impose any legal obligations on Plaintiffs or their patients.

### E.  Enforcement of the Challenged Laws.

A health care facility that violates the Challenged Laws is subject to suspension or

revocation of its license. Tex. Health & Safety Code § 697.007. Any person who violates the Challenged Laws is liable for a civil penalty in the amount of $1,000 for each violation. Tex. Health & Safety Code § 697.008.

## II.    The Parties.

Plaintiffs are Texas reproductive healthcare providers. Collectively, they operate five licensed abortion facilities; one licensed ambulatory surgery center that provides abortion care; and one office-based medical practice that provides gynecological care including miscarriage management procedures. Tr. Vol. 1, 50:11:-51:22 (Hagstrom Miller); Tr. Vol. 2, 180:11-181:24, 183:3-25 (Davis); Tr. Vol. 3, 76:10-77:4 (Braid). Dr. Kumar is a Board-certified family medicine doctor who provides abortions. Tr. Vol. 1, 195:5-6, 197:17-23 (Kumar); Pls.' Ex.41. Dr. Davis is a Board-certified obstetrician-gynecologist who provides abortions and miscarriage management procedures. Tr. Vol. 2, 180:13-17, 181:11-21, 183:7-25 (Davis); Pls.' Ex. 20.

Defendant Charles Smith is the former Executive Commissioner of the Texas Health and Human Services Commission ("HHSC"), sued in his official capacity. The Executive Commissioner of HHSC is charged with enforcing the Challenged Laws. *See* Tex. Health & Safety Code §§ 697.007 – 697.008.

## III.    Abortion and Miscarriage Care.

In Texas, an abortion must be provided at a licensed healthcare facility. Tex. Health & Safety Code §§ 171.004, 245.003, 245.004. An abortion may be either a procedure, called a "surgical abortion," *see* Tr. Vol. 1, 64:24-65:16 (Hagstrom Miller), or a "medication abortion," in which a physician provides medications to a patient for her to take at home later. Tr. Vol. 1, 213:19-22 (Kumar). Abortion is legal in Texas up to 22 weeks lmp. Tex. Health & Safety Code § 171.044. Medication abortion is available only before ten weeks lmp. Tr. Vol 1, 197:19-21 (Kumar), Tr. Vol. 3 78:14-15 (Braid), Tr. Vol. 2, 183:14-19 (Davis).

A miscarriage is the spontaneous loss of a pregnancy before viability, which may also require treatment in a healthcare facility through a surgical procedure called dilation and curettage, or D&C. Tr. Vol. 4, 52:2-5 (Swenson). An incomplete medication abortion may also be treated through a D&C. Tr. Vol. 1, 218:2-20 (Kumar).

The earliest stage of human development is called an "embryo," defined as the time from fertilization of an egg cell up to the time when the organ systems have emerged in the most rudimentary form. Tr. Vol. 2, 155:19-156:8 (Maienschein). At that point, at around eight to ten weeks in pregnancy, an embryo becomes a "fetus." *Id.* Most of the approximately 55,000 abortions, Pls.' Ex.130, and 80,000 miscarriages, Tr. Vol. 4, 47:23-24 (Swenson), that occur in Texas annually occur in the embryo stage. *See* Pls.' Ex. 128 at 5-6, Tr. Vol. 4, 47:16-20 (Swenson).

IV. **People Hold Diverse Beliefs about the Status of a Developing Embryo or Fetus, and the Dignified Disposition of EFTR Based on their Religion, Culture, and Personal Experience and Circumstance.**

Individuals hold diverse beliefs regarding the nature of embryos and fetuses, and when in a developing pregnancy they attain a special status. Tr. Vol. 2, 156:21-24 (Maienschein); Tr. Vol. 3, 35:7-22 (Cunningham); Tr. Vol. 1, 173:10-13 (Norton). These diverse beliefs are integral to people's identities, and shape their decisions about abortion and pregnancy loss. Tr. Vol. 2, 163:2-12, 166:10-19 (Maienschein).

These views are informed by many factors, including religion, science, culture, and personal experience. Tr. Vol. 2, 156:9-20 (Maienschein). For some people, the point at which an embryo or fetus takes on a special status depends on physical benchmarks, such as fertilization, quickening, viability, or birth. Tr. Vol. 3, 35:10-22 (Cunningham); Tr. Vol. 2, 102:1-15 (Padela). Others point to spiritual benchmarks, such as ensoulment, or to a development stage that has significance in their religion. *See* Tr. Vol. 2, 125:19-126:7; 127:5-12 (Padela); Tr. Vol. 2, 157:6-159:6 (Maienschein); Tr. Vol. 3, 35:7-22 (Cunningham). These views vary, both among religions,

and among individual adherents of religions. Tr. Vol. 2, 158:21-16, 161:6-18 (Maienschein); 115:14-25 (Padela).

Many peoples' beliefs about developing human life are also shaped by their personal experiences, including with past miscarriages or abortions. Tr. Vol. 2, 163:2-163:12, 166:10-166:18 (Maienschein); *see also* Tr. Vol. 1, 173:10-174:14 (Norton); Tr. Vol. 2, 140:8-141:5 (Peterson). People may view a pregnancy differently depending on whether it is viable or non-viable, wanted or unwanted, intended or unintended, consensual or the product of rape. *See, e.g.,* Tr. Vol. 2, 140:8-141:5 (Peterson); Tr. Vol. 1, 99:25-100:3 (Hagstrom Miller); Tr. Vol. 2, 198:15-21 (Davis); Tr. Vol. 4, 50:7-19 (Swenson); Tr. Vol. 2, 175:7-11 (Maienschein).

As a result of their diverse beliefs about the status of an embryo or fetus, individuals also hold diverse beliefs about disposition of EFTR. Tr. Vol. 2, 122:11-13; 125:19-126:7; 127:5-12 (Padela); Tr. Vol. 3, 35:23-36:10, 42:11-43:16 (Cunningham); *see also* Tr. Vol. 2, 169:14-170:13, 172:1-172:12 (Maienschein); Tr. Vol. 1, 173:13-174:16 (Norton).

Some individuals who have abortions and miscarriages view the EFTR as human remains and elect to have it buried or cremated. Tr. Vol. 1, 73:2-74:8, 86:11-20 (Hagstrom Miller); Tr. Vol. 4, 46:24-47:8 (Swenson); Tr. Vol. 1, 208:25-209:4 (Kumar); Tr. Vol. 2, 169:21-24 (Maienschein); Tr. Vol. 3, 83:5-9 (Braid); Tr. Vol. 2, 215:22-216:7 (Davis); Pls.' Exs. 14, 18, 28. This is rare and most often occurs when the pregnancy ends at an advanced stage. Tr. Vol. 4, 50:4-19 (Swenson); Tr. Vol. 1, 73:2-74:8, 86:11-20 (Hagstrom Miller).

People miscarrying at home, or having a medication abortion, which brings about a miscarriage at home, generally choose to dispose of the resulting EFTR in a sanitary sewer. Tr. Vol. 4, 47:9-24 (Swenson); Tr. Vol. 2, 215:3-7 (Davis). They do not consider this disrespectful. Tr. Vol. 4, 47:25-48:9 (Swenson); Tr. Vol. 2, 215:3-14 (Davis).

Patient questions about EFTR disposition are rare. Patients generally assume that their EFTR will be handled in accordance with standard medical practices, and do not view those practices to be disrespectful or undignified. *See* Tr. Vol. 1, 177:10-17 (Norton); Tr. Vol. 3, 84:19-85:11 (Braid); Tr. Vol. 2, 141:2-5 (Peterson).[1]

## V.   The Challenged Laws Harm Women Whose Beliefs Differ from the State's.

The Challenged Laws force the State's beliefs onto people who obtain surgical abortion or miscarriage care. This harms individuals whose beliefs are different from the State's.

Women who do not believe that EFTR is a person—or has any special status—will nevertheless have to accept disposition of their EFTR in a manner associated with human remains as a condition of obtaining a surgical abortion or miscarriage management procedure. This undermines their autonomy and moral authority—their capacity to make moral decisions for themselves. Tr. Vol. 3, 23:3-13, 46:10-17 (Cunningham); Tr. Vol. 4, 65:24-66:3 (Swenson); Tr. Vol. 1, 176:10-15 (Norton). *See also* Tr. Vol. 2, 170:9-13, 172:4-174:12 (Maienschein) (describing inconsistency between the State's views and the views of many women).[2]

---

[1] This does not mean patients would not object to disposition in a manner associated with human remains. Blake Norton testified that although she had not asked about EFTR disposition in advance of her procedure, when she learned that it would be interred, she was "shocked and upset and confused," Tr. Vol. 1, 172:22. Dr. Swenson testified that most of her patients "don't ask about" EFTR disposition, Tr. Vol. 4, 49:3-5, but many objected to a hospital policy requiring burial of EFTR when they learned about it, Tr. Vol. 4, 51:15-24. This "happened frequently enough" that her practice moved its miscarriage procedures to a different hospital. Tr. Vol. 4, 57:11-13.

[2] Although the Challenged Laws do not require healthcare providers to inform patients what is happening to their EFTR, the evidence shows that some will be informed about the Challenged Laws through media or word-of-mouth. Tr. Vol. 1, 79:18-20, 105:18-20, 150:12-16, 151:9-22 (Hagstrom Miller); Tr. Vol. 2, 204:12-20, 207:6-21, 211:12-14, 211:25-212:3 (Davis). Moreover, it is a basic legal presumption that individuals generally have knowledge of the law. The State's suggestion that women should not be informed about the Challenged Laws, as a means of mitigating their harms, is not only unrealistic, but also patronizing and disrespectful. *See* Tr. Vol. 1 (Norton) 178:23-179:5 ("[N]ot being told that something was happening with my tissue is deeply disturbing to me."). It is also an extraordinary departure from Texas's requirement of a patient's

By depriving women of the freedom to act on their beliefs, the Challenged Laws debase women's decision-making capacity. *See* Tr. Vol. 1., 175:21-176:1, 176:20-21 (Norton) ("it was this idea that my pregnancy loss was needing to be treated as a separate and distinct fully formed human being, and that the hospital's definition of what was allowed to happen and what needed to happen and what was supposed to happen was dictating what the limited options were . . . . [I]t didn't really leave me with a whole lot of free will at that point."). They also deprive women of the dignity and respect due to them as individuals capable of making and acting on moral choices. Tr. Vol. 3 20:22-21:22, 42:11-43:16, 45:21-46:17 (Cunningham); Tr. Vol. 4, 61:20-25 (Swenson).

Thus, healthcare providers may circumscribe patients' decisionmaking abilities for a valid medical reason, but not to impose their own or someone else's moral values. Tr. Vol. 3, 46:3-17, (Cunningham); Tr. Vol. 2, 111:2-5 (Padela) ("the conversation about respect for autonomy comes out of a notion of paternalism, right? To check for paternalism. That doctors do not trump or override the feelings and values of patients willy-nilly."); Tr. Vol. 2 175:15-19 (Maienschein).

In all other areas of healthcare, patients' ability to make autonomous moral choices is respected. Tr. Vol. 1, 205:22-206:14 (Kumar); Tr. Vol. 3, 20:22-21:10 (Cunningham); Tr. Vol. 2, 122:2-13 (Padela). *See also, e.g.,* Tr. Vol. 2, 135:14-16 (Padela); Tex. Health & Safety Code § 692A.015(9) (requiring hospitals to "encourage sensitivity to families' beliefs and circumstances in all discussions relating to [organ] donations."). One of Defendant's experts, Dr. Padela, thus testified that, in his professional opinion, allowing disposition of EFTR as medical waste is ethically preferable to forbidding it. Tr. Vol. 2, 125:9-13.

---

consent for non-standard methods of tissue disposition in other contexts. *See, e.g.*, Tex. Health & Safety Code § 173.006 ("An authorized facility may not donate human fetal tissue under this chapter unless the facility has obtained the written, voluntary, and informed consent of the woman from whose pregnancy the fetal tissue is obtained."); *see also* Tex. Health & Safety Code §§ 692A.001 – 692A.023 (requiring consent of donor or family member for an anatomical gift).

The kind of forcible deprivation of moral authority imposed by the Challenged Laws not only violates' patients' dignity, it shames and stigmatizes them, Tr. Vol. 1, 176:8-15 (Norton), and is likely to cause "grief, confusion, moral anxiety, [and] moral distress." Tr. Vol. 3, 17:13-21 (Cunningham).

Austin-based Seton Hospital's policy requiring interment of EFTR illustrates the harms that such a requirement imposes on women who do not share the beliefs underlying it. Blake Norton testified about her 2015 diagnosis of a missed miscarriage at eleven weeks, an experience she described as "devastating." Tr. Vol. 1, 168:22. She explained that "part of how I was coming to terms with it through conversations with my doctor, . . . was through this understanding that . . . whatever brief life had existed in me was not compatible with life outside of my womb, and that it had never had the full potential to become a life beyond those short weeks;" and that "it felt like a pregnancy, not a separate and distinct person." Tr. Vol. 1, 173:10-22. She sought treatment at Seton, which imposed its interment policy on her, and she felt shamed and stigmatized for her beliefs, like "I was doing something that they believed to be wrong and that somebody needed to correct me." *Id.*, 176:14-15; *accord id.*, 177:24-177:7 ("And that felt very much like I was being . . . told this is the right way that it should be done, and if I wanted something different, then I was wrong or bad for wanting that."). This incongruence worsened her grieving, and deprived her of autonomy and free will at a time when she needed precisely the opposite. *Id.*, 175:8-17, 176:8-21. She never went back to Seton and found a different facility to care for her next pregnancy. *Id.*, 190:6-13. The Challenged Laws would implement a similar policy throughout Texas.

By imposing a requirement that associates abortion and miscarriage with the death of a person, the Challenged Laws also communicate to women that they are responsible for death of a person, either by exercising their constitutional right to choose abortion, *see* Tr. Vol. 2, 37:10-12,

79:6-9 (Curlin), or due to the commonly-held perception that patients cause their miscarriages, Tr. Vol. 4, 49:19-50:3 (Swenson). This deepens the shame and stigma that surrounds both. Tr. Vol. 1, 176:22-177:7 (Norton).

The only certain way to avoid the burdens of the Challenged Laws is to avoid pregnancy-related medical care in a Texas healthcare facility, thus creating incentives to manage abortion and miscarriage care at home or out-of-state. *See* Tr. Vol. 1, 178:14-17, 190:12-13 (Norton); Tr. Vol. 2, 147:13-18 (Peterson) (describing leaving Texas to seek abortion care where burdened by in-state restrictions); Tr. Vol. 4, 57:11-13 (Swenson). This can harm women's health in several ways. Some women may be dissuaded from choosing surgical abortion even if that is the best method of abortion for them, or may refrain from returning to a clinic to treat medication abortion complications. Tr. Vol. 1, 216:15-217:5; 217:16-219:17 (Kumar). Some women may seek care out of state, which delays their care and provides them no benefit. *Id*. at 223:9-11; 224:5-12. Some women—especially those who may not have the financial resources to leave the state—may avoid seeking abortion care in a healthcare facility altogether, and instead take matters into their own hands. *Id*. at 219:18-220:8, 220:25-221:18.

## VI.   The Challenged Laws Threaten the Availability of Abortion and Miscarriage Care

### A.   The Challenged Laws Destabilize Healthcare Facilities' Currently Functional Waste Disposal System.

Currently, Texas healthcare providers have a stable and functional system for disposing of regulated waste through a licensed medical waste vendor. Tr. Vol. 1, 120:22-121:8 (Hagstrom Miller); Tr. Vol. 2, 224:9-18 (Davis); Tr. Vol. 3, 97:15-16 (Braid); Tr. Vol. 4, 42:7-43:2 (Swenson). Healthcare facilities' medical waste vendors collect special waste—both tissue and non-tissue—on a regular basis, and arrange for it to be treated by incineration, and for the resulting ash to be disposed of in a sanitary landfill. Tr. Vol. 1, 144:18-145:14 (Hagstrom Miller); Tr. Vol.

2, 225:23-226:1 (Davis); Tr. Vol. 3, 79:21-80:10, 81:12-14 (Braid).

The Challenged Laws destabilize this system by requiring healthcare facilities to dispose of EFTR by interment or scattering of ashes only, but without creating a reliable means to do so. They instead require healthcare facilities to work within the system for interment or scattering of ashes of human remains, which is designed to provide individualized funeral services to bereaved families, not to serve healthcare facilities that care for thousands of patients. *See* Garcia Dep. Tr. 16:5-7, 50:1-25, 59:13-15, 59:13-15; Tr. Vol 3, 168:24-169:2 (Cook); Tr. Vol. 4, 21:21-22:1, 22:13-16 (Stump).

Funeral homes do not provide either of the Challenged Laws' required disposition methods. *See* Tex. Health & Safety Code § 697.004(b)(1). They do not inter, *see* Tr. Vol. 3, 177:20-178:1 (Cook); Garcia Dep. Tr. 92:1-6, and they are "required by law to give [ashes] back to the family." Tr. Vol. 4, 237:14-15 (McCoy); *accord* Garcia Dep. Tr. 42:22-43:3. Funeral homes and cemeteries are also generally not licensed to handle special waste in compliance with the Special Waste Rules, *e.g.*, Tr., Vol. 4, 170:13-19 (Hagle); Garcia Dep. Tr. 5:9-25; 17:4-9, 17:20-18:1, so healthcare providers would need to maintain their current vendors for special waste. The evidence shows they are not ready or willing to sign contracts to provide healthcare facilities with the full scope of services needed to comply with the Challenged Laws. Tr. Vol. 4, 144:5-7 (Allmon); Tr. Vol. 3, 178:4-15 (Cook); Tr. Vol. 4, 21:21-23:3 (Stump).

### B. The Disruption and Uncertainty Created by the Challenged Laws Threaten Healthcare Facilities' Ability to Continue to Provide Care.

The Challenged Laws' destabilization of the waste disposal system threatens healthcare providers' ability to legally provide miscarriage and abortion services, and consequently their ability to offer patients these services. *See generally* Tr. Vol. 3, 90:5-16 (Braid); Tr. Vol. 2, 230:3-13, 252:13-16 (Davis); Tr. Vol. 4, 57:11-19, 60:10-15 (Swenson).

This is of special concern to abortion providers. Plaintiffs all share a single vendor, identified after a months-long, trial-and-error process, as the only one willing and able to work with abortion providers in Texas. Tr. Vol. 1, 118:8-23, 121:14-19, 122:10-123:5, 130:17-131:8, 138:16-139:5 (Hagstrom Miller); Tr. Vol. 2, 195:4, 225:4-5, 230:11-13 (Davis); Tr. Vol. 3, 80:14-17 (Braid).

In the recent past, laws requiring abortion facilities to work with third-party providers of medically unnecessary services have caused the closure of abortion clinics when they were unable to maintain the required relationship. *See* Tr. Vol. 1, 117:12-19 (Hagstrom Miller) (H.B. 2's admitting-privileges requirement "serve[d] as a way to shutter the clinic facility."); Tr. Vol. 2, 184:23-185:6 (Davis). During the time Plaintiffs were seeking their current vendor, several of their clinics came within a short time of needing to suspend services due to the inability to dispose of special waste. Tr. Vol. 2, 193:6-194:25 (Davis); Tr. Vol. 1, 122:17-19 (Hagstrom Miller).

HHSC's enforcement plans are still unsettled. Defendant entered into a Stipulation that healthcare facilities sending EFTR to a pathology lab are not required to ensure that it is subsequently disposed of as provided under the Challenged Laws. ECF No. 194 (June 29, 2018). Yet the agency official overseeing the Challenged Laws' enforcement, Mr. Kostroun, testified that healthcare facilities that sent all EFTR to a pathology lab would be subject to investigation "to verify that the facility was not trying to skirt the law." Tr. Vol. 4, 210:17-25. Mr. Kostroun could not testify to any criteria that would guide HHSC's discretion or determination in such an investigation. *Id.* 211:1-212:11. But he is prepared to impose license suspension or revocation, and liability of $1,000 per violation, should the Challenged Laws take effect. Tr. Vol. 4, 217:15-24; *see also* Tex. Health & Safety Code §§ 697.007, 697.008.

The lack of able and willing vendors and the uncertainty regarding what will be required

of healthcare facilities threaten the provision of healthcare. Tr. Vol. 1 122:17-19 (Hagstrom Miller); Tr. Vol. 2, 194:24-25, 226:10-11, 252:4-12 (Davis); Tr. Vol. 3, 90:9-16 (Braid). A clinic's closure would deprive up to "50 to 70 or 80 patients a week," of healthcare. *See* Tr. Vol. 1, 125:14-23 (Hagstrom Miller), *see also* Tr. Vol. 2, 216:12-14 (Davis) (Austin Women's Health Center provides about 1,600 procedures annually). When clinic-based abortion is inaccessible, some patients will take care into their own hands. *See* Tr. Vol. 1, 221:3-9 (Kumar).

At minimum, the time and effort required by healthcare facilities to maintain two waste disposal systems is time and effort diverted from patient care, which will reduce clinics' capacity to serve patients. *See* Tr. Vol. 2, 230:11-13 (Davis); Tr. Vol. 1, 117:4-11 (Hagstrom Miller); Tr. Vol. 3, 90:1-16 (Braid). *See also* Tr. Vol. 3, 25:18-26:10 (Cunningham). The maintenance of multiple systems for waste disposal also results in an increased potential for error and complication, Tr. Vol. 4, 60:10-19 (Swenson), with no offsetting medical benefit.

### C.   Neither the Registry nor the state's Catholic cemeteries are an adequate substitute for medical waste vendors.

The Registry does not address these problems. It does not provide reliable information about its entities' ability or capacity to satisfy the Challenged Laws' requirements. HHSC does not require that enrolled entities provide any particular kind of service, nor any minimum quantity. Tr. Vol. 4, 197:3-8, 198:2-8 (Kostroun); Pls.' Ex. 63. HHSC has undertaken no efforts to vet Registry applicants or verify the accuracy of the information provided in their applications, nor made any inquiry as to the applicants' history of regulatory violations, financial stability, or even whether they are actually in business. Tr. Vol. 4, 190:8-190:24, 196:15-18 (Kostroun); Tr. Vol. 3, 118:2-199:24 (Shields); 167:7-168:2 (Cook). HHSC also does not require that an entity be willing to enter into a contract with any healthcare facility. Tr. Vol. 4, 198:13-16 (Kostroun).

Further, there are only twelve cemeteries on the Registry. Tr. Vol. 4, 199:1-2 (Kostroun),

14

D-9. Several locations where Plaintiffs operate clinics, including McAllen and Fort Worth, do not have a Registry cemetery nearby. Tr. Vol. 4, 199:14-18 (Kostroun). There are only two in the entire Western half of the State, in El Paso and San Angelo. Any facility in the Rio Grande Valley or the Panhandle will be more than 200 miles from the nearest Registry cemetery.

Additionally, each of the cemeteries on the Registry is a Catholic cemetery. *See* Pls.' Ex. 10.[3] Some patients would object to having their EFTR interred with a religious institution whose beliefs they do not share. Tr. Vol. 4, 55:23-56:10 (Swenson); Tr. Vol. 1,179: 17-24 (Norton). As these cemeteries are opposed to abortion, *see* Tr. Vol. 2, 158:9-12 (Maienschein), Tr. Vol. 3, 120:21-22 (Shields), some women may oppose having their tissue interred with an organization that condemns the medical care they have chosen. *See* Tr. Vol. 1, 129:7-16 (Hagstrom Miller); *see also* Tr. Vol. 1, 224:23-226:7 (Kumar); *Planned Parenthood Minn., N.D., S.D. v. Daugaard*, 799 F. Supp. 2d 1048, 1060 (D.S.D. 2011) (requiring an abortion patient to meet with an anti-abortion counselor "humiliates and degrades her as a human being").

The Catholic Diocese of Dallas, without seeking patient consent, will place a grave marker at the site of EFTR from abortion facilities, Tr. Vol. 4, 15:25-16:2; 23:4-9; Tr. Vol. 4, 15:25-16:2 (Stump), and allow a vigil to be held over it annually as part a national day of remembrance for aborted children. Tr. Vol. 4, 17:9-11, 30:25-31:5 (Stump). Our Lady of the Rosary Cemetery & Prayer Gardens plans to place EFTR from abortion providers in its Holy Family Garden, under a statue of the Holy Family, with a memorial that "can read something like: little ones are welcomed

---

[3] Seven of the twelve cemeteries on the Registry have a Diocesan email address or "Catholic" in their name. *See* Pls.' Ex. 10. Of the remainder, Sacred Heart Cemetery, Calvary Hill Cemetery, and Holy Redeemer Cemetery are affiliated with the diocese of Dallas, Tr. Vol. 4, 7:12-8:12; *see also* Pls.' Ex. 98; Mary Queen of Heaven Cemetery is part of the Mary Queen of Heaven Church in the Diocese of Tyler, *see* Pls.' Ex. 78; and Our Lady of the Rosary Cemetery & Prayer Gardens is an independent Catholic cemetery, Tr. Vol. 3, 104:23-105:1 (Shields).

by Jesus, and by Our Lady," in order to "'adopt' these tragically lost little ones." Tr. Vol. 3, 113:15-114:17 (Shields); Pls.' Ex. 91 at 1, 2; Pls.' Ex. 91, 4-5.

The evidence also showed these cemeteries are not prepared to offer services should the Challenge Laws take effect. The Executive Director of the Texas Catholic Conference of Bishops ("TCCB"), Mrs. Jennifer Carr Allmon, testified that her organization's public offer to accept EFTR was merely a "media advisory," unsupported by any documentation or planning. Tr. Vol. 4, 153:11-154:16. Mrs. Allmon testified that she did not know whether Catholic cemeteries throughout Texas were willing and able to provide healthcare facilities with disposition services that would comply with the Challenged Laws, whether they had the capacity to do so, nor how long it would take for cemeteries that intended to provide for burial to put their plans into practice. Tr. Vol. 4, 137:13-18, 138:19-140:8, 136:8-136:24. She was also uncertain as to what services the cemeteries would agree to provide, consistent with Catholic doctrine. Tr. Vol. 4, 148:9-149:4. She also could not say what, if any, contracts the cemeteries would be willing to enter into. Tr. Vol.4, 143:21-144:7. Similarly, Deacon Stump, of the Catholic Diocese of Dallas, also testified he did not know whether two of the three cemeteries there would accept EFTR for disposition, nor what their capacity to do so would be. Tr. Vol. 4, 22:9-16.

## ARGUMENT

I.  **The Challenged Laws Violate the Due Process Clause of the Fourteenth Amendment by Imposing an Undue Burden on Abortion and Miscarriage Treatment**

   A.  **The Right to Abortion is Part of a Broader Right to Act in Accordance with One's Personal Beliefs about Developing Human Life.**

"It is a promise of the Constitution that there is a realm of personal liberty which the government may not enter." *Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 847 (1992). The Due Process Clause of the Fourteenth Amendment protects that personal liberty from encroachment by the states. *See id.* at 846-47.

In an unbroken line of precedent spanning more than four decades, the Supreme Court has held that a woman's right to end a pregnancy is a fundamental component of the liberty protected by the Due Process Clause. *See, e.g., Whole Woman's Health v. Hellerstedt*, 136 S. Ct. 2292, 2309-10 (2016) ("*Whole Woman's Health I*"); *Lawrence v. Texas*, 539 U.S. 558, 565, 573-74 (2003); *Casey*, 505 U.S. at 851-53 (opinion of the Court); *Roe v. Wade*, 410 U.S. 113, 152-54 (1973). The right at stake encompasses not merely the right to obtain an abortion procedure, but also, more broadly, "the right to define one's own concept of existence, of meaning, of the universe, and of the mystery of human life." *Casey*, 505 U.S. at 851 (opinion of the Court). The Supreme Court has explained that "[b]eliefs about these matters could not define the attributes of personhood were they formed under compulsion of the State." *Id.*

### B.    The Challenged Laws Are Subject to the Undue Burden Standard.

Laws that infringe on this right are subject to the undue burden standard set forth in *Casey*. Pursuant to that standard, a law is unconstitutional if it "has the purpose or effect of placing a substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus." *Id.* at 877. The Supreme Court recently clarified that "[t]he rule announced in *Casey* . . . requires that courts consider the burdens a law imposes on abortion access together with the benefits those laws confer." *Whole Woman's Health*, 136 S. Ct. at 2309.

The first step of the undue burden analysis requires the Court to determine whether the Challenged Laws serve a valid state interest through permissible means. *See Casey*, 505 U.S. at 877. A law that fails to serve a valid state interest through permissible means not only fails the undue burden test, it also fails rational basis scrutiny. *See Planned Parenthood of Ind. & Ky, Inc. v. Comm'r*, 888 F.3d 300, 307-08 (7th Cir. 2018) ("*PPINK I*") (explaining that a law fails rational basis scrutiny if it is not rationally related to a legitimate state interest), *vacated in part by* 727 F.

Appx 208, *reinstated by Op.* No. 17-3163, 2018 WL 3655854 (7th Cir. June 25, 2018) (Doc. 57).[4]

Should the Court determine that the Challenged Laws serve a valid state interest by permissible means, the second step of the undue burden analysis requires the Court to determine whether the Challenged Laws advance that interest to an extent sufficient to justify the burdens they impose on women. *See Whole Woman's Health*, 136 S. Ct. at 2300, 2309-10.

The Due Process Clause limits a state's power to burden women seeking treatment for miscarriage to at least the same degree as it limits a state's power to burden women seeking abortion. *See Casey*, 505 U.S. at 857 ("*Roe* . . . may be seen . . . as a rule . . . of personal autonomy and bodily integrity, with doctrinal affinity to cases recognizing limits on governmental power to mandate medical treatment or to bar its rejection. . ."); *see also id.* at 851 ("Our law affords constitutional protection to personal decisions relating to marriage, procreation, contraception, family relationships, child rearing, and education.").

### C.     The Undue Burden Standard Does Not Vary Based on the State's Asserted Interest in Enforcing a Restriction.

*Whole Woman's Health* did not create a "balancing test" that is distinct from the "substantial obstacle test" applied in *Casey*. To the contrary, it explained that the substantial obstacle test applied in those cases requires courts to engage in a balancing analysis. *See Whole Woman's Health*, 136 S. Ct. at 2309-10; *see also Planned Parenthood of Ind. & Ky., Inc. v. Comm'r*, __ F.3d __, No. 17-1883, 2018 WL 3567829, *6 (7th Cir. July 25, 2018) ("*PPINK II*")

---

[4] In *PPINK I*, the plaintiffs challenging an embryonic and fetal tissue disposition law took the position that the law did not implicate a fundamental right. *See* 888 F.3d at 307. As a result, the district court applied rational basis scrutiny to the law, concluding that it failed that test, and the Seventh Circuit affirmed. *See id.* at 307-10. Neither court made a holding concerning whether the law at issue implicated a fundamental right. *See id.* In an opinion concurring in the vacatur of an order granting rehearing en banc, three Seventh Circuit judges criticized the plaintiffs' "strategic litigation choice," asserting that it "was probably incorrect." 2018 WL 3655854 at *2. In their view, the "case involve[d] a fundamental right: the woman's right to decide whether to carry a child (or, put negatively, whether to have an abortion)." *Id.*

("Nor is there anything in the Court's decision in *Whole Woman's Health* to suggest that it applied a different standard than the undue burden test articulated in *Casey*."); *Whole Woman's Health v. Paxton*, 264 F. Supp. 3d 813, 821 (W.D. Tex. 2017) (Yeakel, J.); *Hopkins v. Jegley*, 267 F. Supp. 3d 1024, 1055 (E.D. Ark. 2017), *appeal docketed*, No. 17-2879 (8th Cir., Aug. 28, 2017). *Casey* equated the term "undue burden" with the term "substantial obstacle." *Casey*, 505 U.S. at 877 ("A finding of undue burden is a shorthand for the conclusion that a statute has the purpose or effect of placing a substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus."). Resolving a circuit split over the meaning of those terms, *Whole Woman's Health* clarified that they denote relative measures, not absolute ones: whether an obstacle is substantial—and a burden therefore undue—must be judged in relation to the benefit the law provides. *See Whole Woman's Health*, 136 S. Ct. at 2309; *see also Paxton*, 264 F. Supp. 3d at 821. Where a law's burdens exceed its benefits, those burdens are—by definition—undue, and the obstacles they embody are—by definition—substantial. *See Whole Woman's Health*, 136 S. Ct. at 2300, 2309-10, 2312, 2318; *see also Paxton*, 264 F. Supp. 3d at 821. Accordingly, the "balancing test" described in *Whole Woman's Health* and the "substantial obstacle test" described in *Casey* are one and the same.

Neither *Casey* nor *Whole Woman's Health* distinguish between a state's interests in patient health and potential life when applying the undue burden standard. *See PPINK II*, 2018 WL 3567829 at *6; *Whole Woman's Health v. Hellerstedt*, 231 F. Supp. 3d 218, 228 (W.D. Tex. 2017) (Sparks, J.) ("DSHS's argument a different test applies when the State expresses respect for the life of the unborn is a work of fiction, completely unsupported by reading the sections of Supreme Court opinions DSHS cites in context."). *Casey* described a unitary standard that applies regardless of the state's asserted interest. *See Casey*, 505 U.S. at 877 ("[A] statute which, while furthering the interest in potential life or *some other valid state interest*, has the effect of placing a substantial

19

obstacle in the path of a woman's choice cannot be considered a permissible means of serving its legitimate ends.") (emphasis added)); *see also PPINK II*, 2018 WL 3567829 at *6; *Paxton*, 264 F. Supp. 3d at 821. *Casey* applied this standard in a uniform manner to all of the restrictions it reviewed, some of which were intended to advance the state's interest in patient health and some of which were intended to advance the state's interest in potential life. *Compare id.* at 887-98 (discussing spousal notification requirement) *with id.* at 900-01 (discussing recordkeeping and reporting requirements). Accordingly, the undue burden standard does not vary based on the State's asserted interest in enforcing a restriction. *See PPINK II*, 2018 WL 3567829 at *6 ("The State is incorrect that the standard for evaluating abortion regulations differs depending on the State's asserted interest . . ."); *Paxton*, 264 F. Supp. 3d at 821; *Hopkins*, 267 F. Supp. 3d at 1056.

Notwithstanding Defendant's earlier assertions, the balancing analysis required by *Whole Woman's Health* is not unworkable in the context of laws intended to advance the State's interest in potential life. The measure of a law's benefit is the extent to which the law furthers a valid state interest through permissible means. When the State's asserted interest in enforcing a law is related to potential life, the measure of the law's benefit does not depend on a judge's personal views regarding the value of potential life. Instead, it depends on the extent to which the law permissibly furthers the State's interest.

As in other areas of constitutional law, in evaluating a law's benefits, a court may consider the degree to which the restriction is over-inclusive or under-inclusive and the existence of alternative, less burdensome means to achieve the State's goal. *See Whole Woman's Health*, 136 S. Ct. at 2311 (noting that Texas's prior law was sufficient to serve its asserted interest); *id.* at 2314 ("The record contains nothing to suggest that H.B. 2 would be more effective than pre-existing Texas law at deterring wrongdoers . . . from criminal behavior."); *id.* at 2315 (discussing

the underinclusive scope of the provision at issue); *see also Hopkins*, 267 F. Supp. 3d at 1056. After a court evaluates a law's benefits, it must weigh those benefits against the law's burdens to determine whether the burdens are justified. *See Whole Woman's Health*, 136 S. Ct. at 2300.

> **D.    Defendant Bears the Burden of Proving That the Challenged Laws Advance a Valid State Interest to An Extent Sufficient to Justify the Burdens They Impose on Women.**

The undue burden test is a form of heightened scrutiny, not rational basis scrutiny. *See Whole Woman's Health*, 136 S. Ct. at 2309 (holding that the court of appeals erred in "equat[ing] the judicial review applicable to the regulation of a constitutionally protected personal liberty with the less strict review applicable where, for example, economic legislation is at issue.").

Accordingly, the State bears the burden of proving that the Challenged Laws advance a valid state interest through permissible means to an extent sufficient to justify the burdens they impose on women. *See Hopkins*, 267 F. Supp. 3d at 1056 (holding that, although the plaintiff bears the ultimate burden of proof in an undue burden case, the State bears the burden of proving that the challenged laws serve a legitimate state interest to a sufficient extent); *see generally United States v. Virginia*, 518 U.S. 515, 533 (1996) (holding that, under intermediate scrutiny, "the burden of justification is demanding and it rests entirely on the State"). For the reasons set forth below, Defendant has failed to satisfy this burden of proof.

> **E.    The Challenged Laws Fail to Advance a Valid State Interest by Permissible Means.**

The Challenged Laws fail the first step of the undue burden analysis for three reasons. First, they use impermissible means to advance the State's valid interest in potential life. Second, the Challenged Laws are not rationally related to the State's valid interest in potential life. Third, the State does not have a valid interest in elevating one set of beliefs about developing human life over others. For these reasons, they also fail rational basis scrutiny. *See supra* at 17-18.

i. **The Challenged Laws use impermissible means to serve the State's valid interest in potential life.**

The Supreme Court has held that "there is a substantial state interest in potential life throughout pregnancy." *Casey*, 505 U.S. at 876; *accord Gonzales v. Carhart*, 550 U.S. 124, 157-58 (2007). That interest encompasses an interest in "regulating the medical profession in order to promote respect for life, including life of the unborn." *Id.* at 158.

The Supreme Court developed the undue burden standard as a "means of reconciling the State's interest with the woman's constitutionally protected liberty." *Casey*, 505 U.S. at 876. In so doing, it struck a careful balance, seeking to ensure, on one hand, that "[not] all governmental attempts to influence a woman's decision on behalf of the potential life within her [are treated] as unwarranted," *id.*, and on the other, that "[t]he destiny of the woman [is] shaped to a large extent on her own conception of her spiritual imperatives and her place in society," *id.* at 852. *See generally, Gonzales*, 550 U.S. at 146 ("*Casey*, in short, struck a balance."). To sustain this balance, the undue burden standard places important limitations on the types of actions a state may take to advance its interest in potential life. These limitations serve to ensure that the means used to advance that interest in potential life respect women's dignity. *See generally*, Reva B. Siegel, *Dignity and the Politics of Protection: Abortion Restriction Under* Casey/Carhart, 117 Yale L.J. 1694, 1751 (2008) ("The joint opinion adopts an undue burden framework that allows government to regulate abortion in ways that respect the dignity of life, so long as the regulation respects the dignity of women.").

Notably, *Casey* held that "the means chosen by the State to further the interest in potential life must be calculated to inform the woman's free choice." 505 U.S. at 877. It later explained that, "[t]o promote the State's profound interest in potential life, throughout pregnancy the State may take measures to ensure that the woman's choice is informed, and measures designed to advance

this interest will not be invalidated *as long as their purpose is to persuade* the woman to choose childbirth over abortion." *Id.* at 878 (emphasis added). Thus, the State may advance its interest in potential life through means that seek to inform or persuade a woman, but not through means that coerce or hinder her. *See id.* at 877. The former respect a woman's dignity by treating her as an autonomous moral agent; the latter undermine it by denying her the ability to act in accordance with her own beliefs.

The Challenged Laws have no informational or persuasive component. They do not present a woman with options for EFTR disposition, nor with information that might persuade her to choose burial or cremation instead of a standard medical disposition. Indeed, Defendant stipulated that the Challenged Laws do not require healthcare facilities to make any disclosures to patients. Stipulations at 1 (ECF No. 221). They do not even authorize Defendant to share the Registry with patients. Tex. Health & Safety Code § 6973.005(2). The Challenged Laws simply require that EFTR be disposed of like human remains rather than other postsurgical tissue, regardless of a patient's preferences.

Because the Challenged Laws have no informational or persuasive component, they do not advance the State's interest in potential life through permissible means.

> **ii.    The Challenged Laws are not rationally related to the State's valid interest in potential life.**

The Challenged Laws are not rationally related to the State's interest in potential life because they regulate conduct that occurs only after potential life has been extinguished. *See PPINK I*, 888 F.3d at 308 (distinguishing fetal disposition laws from laws that serve "a valid state interest in promoting respect for potential life") ("The fetal disposition provisions differ because there is no potential life at stake."); *Whole Woman's Health II*, 231 F. Supp. 3d at 229 ("The Amendments regulate activities after a miscarriage, ectopic pregnancy, or abortion—activities that

occur when there is no potential life to protect."); *Hopkins*, 267 F. Supp. 3d at 1105 ("Neither can any interest the State has in potential life support the Tissue Disposal Mandate because it applies to tissue disposal after an abortion or miscarriage, when there is no 'potential life.'").

*Gonzales* made clear that the State's interest in promoting respect for life derives from its broader interest in protecting potential life. There, as here, the purpose of the challenged statute was to "express[] respect for the dignity of human life."[5] 550 U.S. at 157; *accord* Tex. Health & Safety Code § 697.001. The Court described the interests it served as "show[ing] [the government's] profound respect for the life *within the woman*," *Gonzales*, 550 U.S. at 157 (emphasis added), and "protecting the life of the fetus *that may become a child*," *id.* at 158 (emphasis added). Thus, the State's interest in expressing respect for human life cannot be divorced from its interest in protecting potential life. *See Roe*, 410 U.S. at 150 ("[A]s long as at least potential life is involved, the State may assert interests beyond the protection of the pregnant woman alone."). When the potential for life is extinguished, so is the State's interest.

        **iii.**    **The State does not have a valid interest in elevating one set of beliefs about developing human life over others.**

The State does not have a valid interest in taking sides in a religious debate, prescribing a moral code, or stigmatizing people whose personal belief systems differ from those of the majority. *See, e.g., Masterpiece Cakeshop, Ltd. v. Colo. Civil Rights Comm'n*, 138 S. Ct. 1719, 1731 (2018) ("[I]t is not . . . the role of the State or its officials to prescribe what shall be offensive."); *Lawrence*, 539 U.S. at 577 ("[T]he fact that the governing majority in a State has traditionally viewed a particular practice as immoral is not a sufficient reason for upholding a law prohibiting the practice . . . ."); *Casey*, 505 U.S. at 850 ("Our obligation is to define the liberty of all, not to mandate our

---

[5] Notably, the statutory ban upheld in *Gonzales* concerned a method for aborting a live fetus, not for disposing of fetal remains.

own moral code."); *Wallace v. Jaffree*, 472 U.S. 38, 52 (1985) ("[T]he individual's freedom to choose his own creed is the counterpart of his right to refrain from accepting the creed established by the majority."); *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943) ("If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion . . . .").

It is beyond dispute that individuals hold widely divergent beliefs about the status of developing human life that are informed by religion, science, culture, and personal experience. *See supra* 6-8; *accord Casey*, 505 U.S. at 850 ("Men and women of good conscience can disagree, and we suppose some always shall disagree, about the profound moral and spiritual implications of terminating a pregnancy, even in its earliest stage."); *Roe*, 410 U.S. at 159 ("[T]hose trained in the respective disciplines of medicine, philosophy, and theology are unable to arrive at any consensus" on "the difficult question of when life begins."). Yet the Challenged Laws enforce the belief that EFTR has a special status that requires it to be disposed of in a manner associated with human remains rather than as medical tissue. Tr. Vol. 2, 170:5-13 (Maienschein); *accord PPINK I*, 888 F.3d at 308 ("Such a position inherently requires a recognition that aborted fetuses are human beings, distinct from other surgical byproducts, such as tissue or organs."). In so doing, they elevate one set of beliefs about the status of developing of human life over all others. *Cf. Masterpiece Cakeshop*, 138 S. Ct. at 1731 ("The Colorado court's [reasoning] elevates one view of what is offensive over another and . . . sends a signal of official disapproval of [the baker's] religious beliefs.").

The State has no legitimate interest in privileging one set of beliefs about developing human life over others. *See PPINK I*, 888 F.3d at 308 ("[T]he State interest in requiring abortion providers to dispose of aborted fetuses in the same manner as human remains is not legitimate.");

*Margaret S. v. Edwards*, 488 F. Supp. 181, 222 (E.D. La. 1980) (holding that the challenged statute "impermissibly raise[d] the status of a fetus to that of a human being by using language equating fetal remains with human remains," despite the Supreme Court's holding that "the word 'person,' as used in the Fourteenth Amendment, does not include the unborn") (citing *Roe*, 410 U.S. at 158); *cf. Roe*, 410 U.S. at 162 ("[W]e do not agree that, by adopting one theory of life, Texas may override the rights of the pregnant women that are at stake."); *Feminist Women's Health Ctr., Inc. v. Philibosian*, 157 Cal. App. 3d 1076, 1089-92 (Cal. Ct. App. 1984) (holding that a government official's transfer of fetal tissue to a Catholic organization for burial served no secular purpose).[6]

### F.   Alternatively, the Challenged Laws Fail to Advance the State's Interest to an Extent Sufficient to Justify the Burdens They Impose on Women.

Even if the Challenged Laws serve a valid state interest through permissible means, they fail to advance that interest to an extent sufficient to justify the burdens they impose on women.

A restriction need not prevent access to abortion to make it unconstitutional. *See Whole Woman's Health*, 136 S. Ct. at 2309-10. Rather, the undue burden standard "requires that courts consider the burdens a law imposes on abortion access together with the benefits those laws confer." *Id.* at 2309 (citing *Casey*, 505 U.S. at 887-98). A court must "consider[] the evidence in the record," and "then weigh[] the asserted benefits against the burdens." *Id.* at 2310. Where a law fails to confer "benefits sufficient to justify the burdens," those burdens are "undue"—that is to say, unconstitutional. *Id.* at 2300.

---

[6] *Planned Parenthood of Minnesota v. Minnesota*, 910 F.2d 479, 488 (8th Cir. 1990) and *Hopkins v. Jegley*, 267 F. Supp. 3d 1024, 1098 (E.D. Ark. 2017) are not to the contrary. In the former case, the plaintiffs conceded that the disposition statute at issue served a legitimate state interest, and so the question was not before the court. *Planned Parenthood of Minn.*, 910 F.2d at 488. In the latter case, on a motion for preliminary injunction, the court assumed without deciding that the disposition statute served a legitimate state interest, but it nevertheless held that the plaintiffs were likely to succeed on the merits of their undue burden claim. *Hopkins*, 267 F. Supp. 3d at 1098.

i.      **The Challenged Laws impose significant burdens on women.**

The Challenged Laws impose significant burdens on women who have abortions or experience pregnancy loss. These burdens include deprivation of liberty; imposition of grief, stigma, shame, and distress; deterrence from seeking treatment at a healthcare facility; and reduced availability of pregnancy-related medical care.

First, the Challenged Laws deprive a woman of the liberty to act in accordance with her personal beliefs. Women have a variety of beliefs about developing human life, and some do not ascribe special status to EFTR. *See supra* 6-8, 10. And there is no dispute that, when allowed to exercise their autonomy, many women do not choose interment or scattering of ashes after a miscarriage or an abortion. *See supra* 7-8. Yet the Challenged Laws deprive women of the liberty to act in accordance with their personal beliefs about developing human life and their own pregnancies. Instead, they force women to act in accordance with the State's belief that EFTR has a special status and should be disposed of in a manner associated with human remains.

Although the evidence shows that many people do not consider EFTR to have a special status, particularly during the early stages of pregnancy when most abortions and miscarriages take place, *see supra* 7-8, 10, the percentage of women who object to burial or cremation of their EFTR is not relevant to the constitutional analysis. *Casey* explained that "[t]he proper focus of the constitutional inquiry is the group for whom the law is a restriction, not the group for whom the law is irrelevant." 505 U.S. at 894. It struck down a spousal notification requirement even though the record showed that ninety-nine percent of abortion patients would be unaffected by it either because they were unmarried or because they would voluntarily involve their spouses in their abortion decisions. *Id.* ("The analysis does not end with one percent of women upon whom the statute operates; it begins there."). Here, the group for whom the law is a restriction is women who object to interment or scattering of ashes of EFTR. It does not matter what percentage of Texas

27

women are in that group; it only matters whether the Challenged Laws impose an undue burden on them. *See id.*

Second, the Challenged Laws impose grief, stigma, and shame on women who seek abortion care or miscarriage management. *See supra* 6-8, 10-11; *see Whole Woman's Health II*, 231 F. Supp. 3d at 232 (finding that the Amendments' burdens included "enhanc[ing] the stigma on women associated with miscarriage and abortion care"). That these burdens are intangible makes them no less real or cognizable. *See Whole Woman's Health I*, 136 S. Ct. at 2318 (considering the loss of "individualized attention, serious conversation, and emotional support," among the challenged law's burdens); *De Leon v. Perry*, 975 F. Supp. 2d 632, 645-46 (W.D. Tex. 2014) (granting preliminary injunction against Texas' ban on same-sex marriage based on the "stigmatic harm[s]" that plaintiffs experienced as a result of the challenged law, including "the pain of humiliation, stigma, and emotional distress"). Indeed, the Supreme Court has recognized that laws infringing on personal liberty can impose stigmatic harms. *See United States v. Windsor*, 570 U.S. 744, 770 (2013) ("The avowed purpose and practical effect of the law here in question are to impose a disadvantage, a separate status, and so a stigma upon all who enter into same-sex marriages made lawful by the unquestioned authority of the States."); *see also Masterpiece Cakeshop*, 138 S. Ct. at 1727 (observing that the eradication of stigma imposed by discrimination is an important objective of civil rights protections).

The Challenged Laws also recruit health care providers to perpetuate the stigmatization of women seeking abortion care or miscarriage management. Plaintiffs and similarly situated healthcare providers are forced to disregard their patients' beliefs and preferences and instead impose the State's value judgments on them. This undermines the physician-patient relationship and erodes women's ability to trust their doctors. *See supra* 7-8, 10.

Third, the Challenged Laws will serve to discourage some women from seeking abortion or miscarriage management care in a Texas healthcare facility. Women who object to the burial or cremation of their EFTR may seek care from out-of-state health care providers, delaying their access to care. *See supra* 11. Some women may also avoid surgical abortion even if that is the best method of abortion for them, or refrain from returning to a clinic for follow-up treatment for complications from a medication abortion. *See id*. Others—especially those who may not have the financial resources to leave the state—may avoid seeking care in a facility altogether, instead taking matters into their own hands. *See id*.

Fourth, the Challenged Laws threaten to reduce the availability of pregnancy-related healthcare. They impose logistical challenges on healthcare providers and introduce an unprecedented level of operational uncertainty. *See supra* 12-14. They destabilize healthcare providers' current waste disposal systems without providing an adequate replacement. *See supra* 12. Without a reliable system for disposing of EFTR, facilities would be unable to provide healthcare services requiring disposition of EFTR. *See supra* 12-14. At best, healthcare providers would have to divert resources from patient care to address these challenges, reducing their capacity to provide abortions or miscarriage management procedures. *See supra* 14. At worst, they would be forced to shut down. *See supra* 13-14. There is no evidence in the record that the Registry or the state's Catholic cemeteries will be able to prevent or mitigate these harms. *See supra* 14-16.

      **ii.    The burdens imposed by the Challenged Laws are not justified by proportional benefits.**

The burdens imposed by the Challenged Laws are not justified by proportional benefits. The Challenged Laws provide no direct benefits to women who have abortions or experience pregnancy loss. They do not serve to inform women about disposition methods; they do not give women more disposition options than they had previously; and they do not provide women with

financial assistance to effectuate their disposition preferences. *See supra* 2-4.

The Act's stated purpose is "to express the state's profound respect for the life of the unborn by providing for a dignified disposition of embryonic and fetal tissue remains." Tex. Health & Safety Code § 697.001. With respect to that purpose, the Challenged Laws are substantially underinclusive, exempting a vast amount of EFTR, including pre-implantation embryos created for use in IVF; in vitro tissue cultures; and EFTR donated for research purposes, sent to pathology laboratories, released to law enforcement agencies, requiring the issuance of a fetal death certificate, or passed at home in connection with a medication abortion or miscarriage. *See supra* 2-4. In fact, the Challenged Laws apply only to EFTR resulting from a surgical abortion or miscarriage management procedure performed in a licensed healthcare facility or doctor's office and not subsequently sent for analysis. The underinclusive scope of the Challenged Laws indicates that they do not advance the State's asserted interest to a significant degree and therefore provide little benefit.

Moreover, the Challenged Laws are not effective in advancing the State's asserted interest because they embody an arbitrary concept of dignity. Dignity is not inherent in any form of disposition of human remains or EFTR; rather, it is a function of the values that people bring to the form of disposition. The State has repeatedly cited the desire to eliminate "grinding" as a treatment method for EFTR as a motivating factor for the Challenged Laws[7] because, in its view, grinding is not dignified. Yet cremation, permitted by the Challenged Laws, entails grinding. Mr. Cook, a funeral director, testified that cremation entails the application of heat to human remains followed by a secondary grinding process, in which the remains are processed in a machine akin

---

[7] Of course, there is no evidence in the record that this method is currently used. *See, e.g.,* Tr. Vol. 1, 85:6-7 (Hagstrom Miller).

to a large "blender." Tr. Vol. 3, 152:9-153:8, 160:20-161:20 (Cook); *see also* Tex. Health & Safety Code § 716.001(5) (defining "cremation" to include "pulverization," "the process of reducing identifiable bone fragments after cremation and processing granulated particles by manual or mechanical means"). The Challenged Laws permit scattering of ashes, a disposition method that the Catholic Church views as undignified. *See* Tr. Vol. 4, 31:6-15 (Stump); Tr. Vol. 4, 145:24-25 (Carr Allmon). But they prohibit disposition of EFTR in a sanitary sewer, even though tens of thousands of women who miscarry at home each year elect that method of disposition, without the intention of expressing disrespect for the pregnancy they lost. *See supra* 7-8. Likewise, the Challenged Regulations prohibit disposition of the ashes of EFTR in a sanitary landfill, a method of disposition that people who view EFTR as no different than other postsurgical tissue deem appropriate and dignified, *see supra* 7-8, 10 but they permit disposition of the ashes of EFTR in a parking lot or scrapyard, Tr. Vol. 4, 214:23-215:22 (Kostroun), Pls.' Ex. 128 at 5, *see also* Tr. Vol. 4, 240:1-3, 245:17-20 (McCoy) (no other state agencies regulate disposition of ashes). In deciding that certain disposition methods for EFTR are dignified and others are not, the State engages in arbitrary classification based on subjective values and personal beliefs. These classifications fail to advance its stated interest and therefore do not provide a benefit.

Finally, any respect for embryonic and fetal life that the Challenged Laws succeed in expressing is offset by the disrespect that they express for women's lives. As explained above, a State may not advance its interest in potential life at the expense of women's dignity. *See supra* 22-23. But in overriding women's autonomy to act in accordance with their own belief systems, the Challenged Laws do precisely that. The State could have pursued its interest through means that respect women's dignity and autonomy—such as by publishing materials that seek to persuade women to choose burial or cremation of EFTR over standard medical disposition, or by offering

financial assistance directly to women who would prefer burial or cremation but cannot afford it. Such measures would have provided a net benefit. The Challenged Laws, however, do not.

Because the Challenged Laws impose burdens on women that exceed their benefits, those burdens are undue and unconstitutional. *See Whole Woman's Health*, 136 S. Ct. at 2300; *Casey*, 505 U.S. at 877 ("In our considered judgment, an undue burden is an unconstitutional burden.").

## II.     The Challenged Laws Deny Equal Protection to Plaintiffs and Their Patients.

### A.     Heightened Scrutiny Applies to the Challenged Laws.

The Equal Protection Clause of the Fourteenth Amendment commands that no State shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. Amend. XIV. States may not establish legislative classifications discriminating against individuals exercising a fundamental constitutional right, or members of a protected class, absent an exceedingly weighty justification. *See City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 440 (1985) ("[W]hen a statute classifies by race, alienage, or national origin . . . [its classifications are] subjected to strict scrutiny and will be sustained only if they are suitably tailored to serve a compelling state interest. Similar oversight by the courts is due when state laws impinge on personal rights protected by the Constitution."); *Skinner v. Okla. ex rel. Williamson*, 316 U.S. 535, 541 (1942) (holding that classifications which burden fundamental rights such as marriage and procreation are subject to strict scrutiny); *see also Obergefell v. Hodges*, 135 S. Ct. 2584, 2602-03 (2015) (discussing the interplay between the Due Process Clause and the Equal Protection Clause when fundamental rights are at stake).

The Supreme Court has recognized two forms of heightened scrutiny in the equal protection context. Under strict scrutiny, generally applicable to race-based classifications and classifications that burden fundamental rights, "the means chosen to accomplish the government's asserted purpose must be specifically and narrowly framed to accomplish that purpose. . ." *Fisher*

*v. Univ. of Tex. at Austin*, 570 U.S. 297, 311 (2013) (citation and internal punctuation omitted). Under intermediate scrutiny, generally applicable to sex-based classifications, the State must show "at least that the [challenged] classification serves important governmental objectives and that the discriminatory means employed are substantially related to the achievement of those objectives." *United States v. Virginia*, 518 U.S. at 533 (internal quotation marks omitted).

The classifications in the Challenged Laws should be subject to strict scrutiny because they implicate the fundamental right to end a pregnancy, which includes not only the right to obtain an abortion procedure, but to define one's own concept of life, meaning, and individual place in the world. *See supra* at 17; *City of Cleburne*, 473 U.S. at 440. *Casey*, however, held that strict scrutiny of abortion restrictions undervalued the State's interest in potential life while reaffirming constitutional protection for abortion access and prohibiting States from unduly burdening it. *Casey*, 505 U.S. at 851–53, 871, 876–77. Consequently, some would argue that the Challenged Laws' classifications should be subject to intermediate rather than strict scrutiny. Because the classifications in the Challenged Laws cannot satisfy intermediate scrutiny, the Court need not decide whether strict or intermediate scrutiny should apply.

Under any form of heightened scrutiny, "[t]he justification [for the classification] must be genuine, not hypothesized or invented *post hoc* in response to litigation." *Virginia*, 518 U.S at 533. Surviving review under heightened scrutiny requires "persuasive evidence in th[e] record" in support of the classification. *Id.* at 539.

**B.    The Classifications Established by the Challenged Laws Fail Heightened Scrutiny.**

To survive intermediate scrutiny, the "State must show at least that the [challenged] classification serves important governmental objectives and that the discriminatory means employed are substantially related to the achievement of those objectives." *Id.* at 533 (internal

quotation marks and citations omitted). The Challenged Laws fail this standard because they single out certain kinds of EFTR for differential treatment. However, there is no substantial relationship between the asserted government interest and the means chosen by the State to serve that interest.

The Challenged Laws classify among types of EFTR, imposing disposition limitations on some, but not others. *See supra* 2-4. Notably, they exempt from their requirements all preimplantation embryos, such as unused embryos disposed of after IVF, and EFTR sent to laboratories including pathology laboratories, crime laboratories, and research laboratories. *See id*. For the purpose of "demonstrating profound respect [through] providing for a dignified disposition," Texas Health & Safety Code § 607.001, the State's own expert testified that there is no relevant difference between pre- and post-implantation embryos, nor between EFTR sent to laboratories and other EFTR. *See* Tr. Vol. 2, 80:21-81:10 (Curlin). All are, by definition, the remains of an embryo or fetus. *Id*.

Therefore, the classifications embodied in the Challenged Laws are not substantially related to the achievement of the State's objectives. There is simply no good reason related to the expression of respect for developing human life that warrants treating EFTR at IVF clinics and laboratories differently from EFTR at abortion clinics, ASCs, hospitals, and doctor's offices. And the State has presented no evidence to justify this differential treatment. The State has therefore failed to demonstrate that the Challenged Laws' classifications are based on a real and adequate distinction between EFTR that is and is not subject to their requirements.

Because the Challenged Laws have not been shown to be substantially related to attaining the State's objectives based on persuasive record evidence, they do not survive heightened scrutiny.

### C.     The Challenged Laws' Classifications Also Fail Rational Basis Scrutiny.

Even where a classification does not burden a suspect class or a fundamental right, at

minimum it must be based on a unique characteristic of the targeted group that is rationally related to the State's interest in the law. *City of Cleburne*, 473 U.S. at 449-50 ("The question is whether it is rational to treat the mentally [disabled] differently. It is true that they suffer disability not shared by others; but why this difference warrants a density regulation that others need not observe is not at all apparent."). Thus, even under the most deferential level of scrutiny, the Equal Protection Clause requires that "all persons similarly situated should be treated alike." *Id*. at 439. Because there is no "real difference" between the affected and unaffected classes of EFTR, the Challenged Laws fail even the minimal relationship required to sustain it under rational basis scrutiny. *See id*. at 450; *see also June Med. Servs. LLC v. Gee*, 280 F. Supp. 3d 849, 868 (M.D. La. 2017) (declining to dismiss an Equal Protection claim against a Louisiana law requiring burial or cremation after abortion but not miscarriage); *cf. Planned Parenthood of Ind. and Ky. v. Comm'r,* 265 F. Supp. 3d 859, 872 (law whose purpose is to treat EFTR "the same as other human remains" fails rational basis review where it treats the two differently), *aff'd on other grounds PPINK I.*

EFTR does not differ in any way relevant to the Challenged Laws' stated purpose based on whether it is created in an IVF clinic or sent to a laboratory. Thus, the Challenged Laws' classifications are arbitrary. They are not based on any meaningful difference between the tissue that they do and do not regulate. Therefore, the Challenged Laws' classifications do not survive even the most deferential review under the Equal Protection Clause.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court permanently enjoin Texas Health & Safety Code §§ 697.001 – 697.004, 697.007 – 697.009, and 25 Texas Administrative Code §§ 138.1 – 138.7.

Respectfully submitted,

*/s/ David Brown*

David Brown*
Dipti Singh*
Stephanie Toti
Juanluis Rodriguez*
LAWYERING PROJECT
25 Broadway, 9th Floor
New York, NY 10004
(646) 490-1225
dbrown@lawyeringproject.org
dsingh@lawyeringproject.org
stoti@lawyeringproject.org
prodriguez@lawyeringproject.org


J. Alexander Lawrence*
Francesca Cocuzza*
MORRISON & FOERSTER LLP
250 W. 55th Street
New York, NY 10019
(212) 336-8638
alawrence@mofo.com
fcocuzza@mofo.com

Molly Duane*
Autumn Katz*
Caroline Sacerdote*
Emily Nestler*
CENTER FOR REPRODUCTIVE RIGHTS
199 Water Street, 22nd Floor
New York, NY 10038
(917) 637-3631
mduane@reprorights.org
akatz@reprorights.org
csacerdote@reprorights.org
enestler@reprorights.org


Patrick J. O'Connell
LAW OFFICES OF PATRICK J.
O'CONNELL, PLLC
2525 Wallingwood Drive, Bldg. 14
Austin, TX 78746
(512) 222-0444
pat@pjofca.com

*Attorneys for Plaintiffs*

*Admitted pro hac vice

## CERTIFICATE OF SERVICE

I certify that, on the 3rd day of August, 2018, a copy of the foregoing document was electronically filed with the Clerk of Court using the CM/ECF system, which will send notification to all counsel of record.

*/s/ David Brown*
David Brown
