IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

WHOLE WOMAN'S HEALTH,
WHOLE WOMAN'S HEALTH
ALLIANCE, DR. BHAVIK KUMAR,
BROOKSIDE WOMEN'S MEDICAL
CENTER PA d/b/a BROOKSIDE
WOMEN'S HEALTH CENTER, DR.
LENDOL L. DAVIS, and ALAMO CITY
SURGERY CENTER PLLC d/b/a
ALAMO WOMEN'S REPRODUCTIVE
SERVICES,
              Plaintiffs,

-vs-

CHARLES SMITH, Executive
Commissioner of the Texas Health and
Human Services Commission, in his
official capacity,
              Defendant.

CAUSE NO.:
A-16-CV-01300-DAE

## MEMORANDUM OPINION INCORPORATING FINDINGS OF FACT AND CONCLUSIONS OF LAW

Before the Court is the above-styled and numbered action. Plaintiffs, women's healthcare providers in Texas,[1] bring this action against Defendant Charles Smith, in his official capacity as the Executive Commissioner of the Texas Health and Human Services Commission, challenging the constitutionality of Texas laws concerning the disposal of embryonic and fetal tissue remains. In particular, Plaintiffs challenge certain provisions of Chapter 697 of the Texas Health and Safety Code (§§ 697.001–.004, 697.007–.009) as well as associated implementing rules (25 Texas Administrative Code §§ 138.1–.7) (collectively, the challenged laws). On July 16, 2018, the Court began a bench trial in this case that concluded on July 20, 2018. After careful consideration of the trial testimony and its credibility, the exhibits, arguments by counsel, post-

---

[1] Plaintiffs Whole Woman's Health, Whole Woman's Health Alliance, Dr. Bhavik Kumar, Brookside Women's Medical Center PA, Dr. Lendol L. Davis, and Alamo City Surgery Center PLLC bring this action on behalf of themselves and their patients (collectively, Plaintiffs).

trial briefing, the governing law, and the file as a whole, the Court enters the following findings of fact and conclusions of law.

## Background

### I.   Abortions and Miscarriages in Texas

Each year, there are approximately 80,000 miscarriages and 55,000 induced abortions in Texas. Pls.' Ex. 130; Tr. Vol. 4, 47:21–24.[2] An abortion may be induced through a surgical procedure (surgical abortion) or by taking medication (medication abortion). *See, e.g.*, Tr. Vol. 1, 197:17–198:1. Generally, a physician performs a surgical abortion in a licensed healthcare facility while a patient consumes, at home, medication provided by a physician for a medication abortion. *See id.* However, an incomplete medication abortion may require surgical follow-up. *See* Tr. Vol. 1, 218:2–20. Annually, there are approximately 5,800 medication abortions in Texas. *See* Pls.' Ex. 130 at 2.

Expert and witness testimony at trial reveals that the line between miscarriage and abortion can be less than precise. Also called a spontaneous abortion, a miscarriage is generally defined as the spontaneous loss of a pregnancy before viability. *See* Tr. Vol. 4, 47:11–14. However, a miscarriage can be missed. *See, e.g.*, Tr. Vol. 4, 35:19–36:2. Abnormalities in fetal development can occur rendering a fetus incompatible with life, but a woman's body nevertheless maintains the pregnancy. *See* Tr. Vol. 2, 140:14–20, 185:15–21. Alternatively, a woman may have an incomplete miscarriage where the pregnancy is terminated, but the uterus retains some or all tissue from the pregnancy. *See* Tr. Vol. 4, 35:19–36:2. These situations require medical or surgical intervention.[3] *See id.*; Tr. Vol 2, 181:11–182:12.

---

[2] The Court cites the trial transcript as Tr. Vol. [day of trial], [page]:[lines] and cites to exhibits admitted at trial as Pls.' Ex. [#] or Def.'s Ex. [#].
[3] Data concerning the number of miscarriage management procedures and the number of induced abortions where the fetus was incompatible with life were not introduced at trial.

The vast majority of abortions and miscarriages occur in the embryonic stage of pregnancy, which runs from fertilization to approximately eight to ten weeks into the pregnancy. At approximately eleven weeks following a woman's last menstrual period (lmp), the embryo is termed a fetus. Tr. Vol. 5, 11:18–25. In 2015, 88.6% of abortions occurred before eleven weeks lmp. Likewise, approximately 80% of miscarriages occur in the first thirteen weeks lmp. Tr. Vol. 4, 47:16–20.

## II.     Medical Waste Disposal from 1989 to 2016

In 1989, Texas adopted rules governing the treatment and disposal of human waste such as body fluids and microbiological or pathological waste. 14 Tex. Reg. 1457, 1457–62 (adopted Mar. 14, 1989) (Tex. Dep't of Health, Definition, Treatment, and Disposition of Special Waste from Health Care Related Facilities), *amended by* Act of June 6, 2017, 85th Leg., R.S., ch. 441, 2017 Tex. Sess. Law Serv. 1165 (former 25 TEX. ADMIN. CODE §§ 1.132–1.137). Under the 1989 rules, Texas law treated embryonic and fetal tissue as pathological waste. *Id.* Texas healthcare facilities could use any of the following seven methods to dispose of human tissue, regardless of whether the tissue resulted from "surgery, labor and delivery, autopsy, embalming, or a biopsy" or a "spontaneous or induced human abortion[:]"

> (I) grinding and discharging to a sanitary sewer system;
> (II) incineration followed by deposition of the residue in a sanitary landfill;
> (III) steam disinfection followed by interment;
> (IV) interment;
> (V) moist heat disinfection followed by deposition in a sanitary landfill;
> (VI) chlorine disinfection/maceration followed by deposition in a sanitary landfill; or
> (VII) an approved alternate treatment process, provided that the process renders the item as unrecognizable, followed by deposition in a sanitary landfill.

*Id.* After adoption of the 1989 rules, Texas's medical waste disposal scheme remained largely unchanged for over twenty-five years.

### III.   2016 Revisions to the Medical Waste Rules

In 2016, the Texas Department of State Health Services (DSHS) modified the medical waste disposal rules. Final revisions to the medical waste disposal rules were adopted on December 9, 2016, and were set to take effect on December 18, 2016. 41 Tex. Reg. 9709, 9709–9741 (Dec. 9, 2016). The revisions created a new term, "fetal tissue," defined as "[a] fetus, body parts, organs or other tissue from a pregnancy" and not including "the umbilical cord, placenta, gestational sac, blood or body fluids." *Id.* The revisions limited disposal of fetal tissue to three methods regardless of gestational age: interment, incineration followed by interment, or steam disinfection followed by interment. *Id.*[4] Although the modified rules did not, on their face, prohibit the disposal of ashes from cremation of "fetal tissue" in a sanitary landfill, DSHS took the position that the modified rules prohibited placement of cremated fetal tissue in a landfill. *See* Dkt. # 49 at 12.

### IV.   Filing of this Case and First Preliminary Injunction

On December 12, 2016—three days after the final 2016 revisions were published and six days before they were set to take effect—Plaintiffs filed this lawsuit challenging the constitutionality of the revisions to the medical waste rules.[5] *See* Dkt. # 1. The case was assigned to the Honorable Sam Sparks, who temporarily enjoined the revisions pending further review.

Beginning January 3, 2017, Judge Sparks held a two-day evidentiary hearing and subsequently entered a preliminary injunction prohibiting the revisions from taking effect until a

---

[4] On May 18, 2018, HHSC aligned the Texas Administrative Code with Chapter 697 and effectively repealed the 2016 revisions to medical waste rules. *See* 43 Tex. Reg. 3242 (May 18, 2018) (adopting without changes the proposed text published at 43 Tex. Reg. 1558 (Mar. 16, 2018)).

[5] Plaintiffs initially filed suit against Dr. John Hellerstedt, in his official capacity as Commissioner of DSHS. *See* Dkt. # 1. However, because Texas transferred certain DSHS responsibilities to HHSC on September 1, 2017, the parties agreed that Charles Smith, as the Executive Commissioner of HHSC, was the proper defendant in this case and should be substituted for Dr. Hellerstedt. *See* Dkt. # 221 at 3–4. However, Mr. Smith is no longer the Executive Commissioner of HHSC. Because this suit was brought against Mr. Smith in his official capacity, his successor may be substituted once known. *See* FED. R. CIV. P. 25(d).

full trial on the merits could be held. DSHS appealed the preliminary injunction to the Fifth Circuit Court of Appeals, and Judge Sparks stayed the case pending a decision from the appellate court.

## V.     Texas Senate Bill 8

While appeal of the preliminary injunction was pending, Texas enacted Texas Senate Bill 8 (SB 8). *See* Act of June 6, 2017, 85th Leg., R.S., ch. 441, 2017 Tex. Sess. Law Serv. 1165 (West). SB 8 contained numerous restrictions on pregnancy-related medical care, including a ban on the most commonly performed second-trimester abortion, which a court in this district previously ruled facially unconstitutional. *Whole Woman's Health v. Paxton* (*Whole Woman's Health II*), 280 F. Supp. 3d 938 (W.D. Tex. 2017), *appeal docketed*, No. 17-51060 (5th Cir. Dec. 1, 2017).

Most significant here, SB 8 created a new chapter in the Texas Health and Safety Code, Chapter 697, modifying Texas's rules for embryonic and fetal tissue disposal. SB 8 § 13. The sole stated purpose of Chapter 697 is to "express the state's profound respect for the life of the unborn by providing for a dignified disposition of embryonic and fetal tissue remains." TEX. HEALTH & SAFETY CODE § 697.001.

To achieve this purpose, Chapter 697 defines a new category of tissue, "embryonic and fetal tissue remains" as:

> an embryo, a fetus, body parts, or organs from a pregnancy that terminates in the death of the embryo or fetus and for which the issuance of a fetal death certificate is not required by state law. The term does not include the umbilical cord, placenta, gestational sac, blood, or body fluids.

*Id.* § 697.002(3). Chapter 697 removes this new category of waste from the definition of pathological waste and creates different disposal requirements for it. *Id.* § 697.003. Specifically, under § 697.004, a Texas healthcare facility "that provides health or medical care to a pregnant

woman shall dispose of embryonic and fetal tissue remains that are passed or delivered at the facility" by:

> (1) interment;
> (2) cremation;
> (3) incineration followed by interment; or
> (4) steam disinfection followed by interment.

*Id.* § 697.004(a). Any ashes resulting from cremation of embryonic and fetal tissue remains "(1) may be interred or scattered in any manner as authorized by law for human remains; and (2) may not be placed in a landfill." *Id.* § 697.004(b).

In addition to restricting fetal tissue disposal, Chapter 697 requires DSHS to establish and maintain a registry (the Registry) of "participating funeral homes and cemeteries willing to provide free common burial or low-cost private burial" and "private nonprofit organizations that register with the department to provide financial assistance for the costs associated with burial or cremation of the embryonic and fetal tissue remains of an unborn child." *Id.* § 697.005. Chapter 697 further mandates that DSHS establish a grant program "us[ing] private donations to provide financial assistance for the costs associated with disposing of embryonic and fetal tissue remains." *Id.* § 697.006.[6]

Although the entirety of SB 8 took effect September 1, 2017, SB 8 established a variety of effective dates for Chapter 697. SB 8 §§ 18–19, 22. SB 8 mandated that HHSC "adopt any rules necessary to implement" Chapter 697 by December 1, 2017. *Id.* § 18(a). It also required DSHS to establish the grant program by October 1, 2017, and award grants under that program by February 1, 2018. *Id.* § 18(b). Finally, SB 8 decreed Chapter 697 would govern the disposition of embryonic and fetal tissue remains starting February 1, 2018. *Id.* § 19(d).

---

[6] Plaintiffs do not challenge the constitutionality of the Registry or the grant program. Dkt. # 242 at 4.

Penalties for failure to comply with Chapter 697 include suspension or revocation of a healthcare facility's license, a civil penalty of $1,000 for each violation, and payment of the State's expenses to enforce a civil penalty via suit. TEX. HEALTH & SAFETY CODE §§ 697.007–.008.

## VI.    Second Preliminary Injunction

On December 6, 2017, the Fifth Circuit dismissed the appeal of the preliminary injunction in light of an unopposed motion to dismiss filed by DSHS. Dkt. # 80. Judge Sparks then transferred this case to the undersigned. The Court subsequently lifted the stay and Plaintiffs filed an amended complaint alleging both Chapter 697 and the 2016 revisions violate Plaintiffs' due process and equal protection rights under the Fourteenth Amendment as well as the Commerce Clause. Dkt. # 84; Dkt. # 93 ¶¶ 105–12. Shortly thereafter, Plaintiffs filed their second preliminary injunction motion, asking the Court to enjoin Chapter 697 from taking effect.

On January 29, 2018, the Court granted limited injunctive relief to preserve the status quo, prohibiting only the provisions of Chapter 697 and any associated implementing rules restricting the disposition of embryonic and fetal tissue remains from taking effect. Dkt. # 110. The Court sought to protect its ability to render a meaningful decision following the full presentation of evidence at a bench trial.

## VII.   Regulatory Developments

On January 26, 2018—four days before SB 8's provisions governing embryonic and fetal tissue remains disposal were intended to take effect and almost two months after the deadline set by the Texas Legislature—HHSC published the final version of the rules necessary to implement Chapter 697. 43 Tex. Reg. 465, 465–73 (codified at 25 TEX. ADMIN. CODE §§ 138.1–.7). In

general, the rules restate provisions of Chapter 697, but they also provide detail on the scope of Chapter 697 and additional restrictions. *See id.*

For instance, the rules define healthcare facility to include ambulatory surgical centers, abortion clinics, facilities that provide emergency medical services, "professional offices, including the offices of physicians," and "other health care-related facilities that provide health or medical care to a pregnant woman." 25 TEX. ADMIN. CODE § 138.2(13). Furthermore, the rules exempt from Chapter 697's application embryonic and fetal tissue expelled or removed from the human body once the woman is outside of a healthcare facility, in vitro tissue cultures, embryonic and fetal tissue remains of a single pregnancy transferred to a licensed funeral director with consent of the authorized person, and placentas designated for sale and obtained from a licensed hospital or birthing center, among other items. *Id.* § 138.3. The rules also limit the types of containers that may be used to hold embryonic and fetal tissue remains for cremation. *Id.* § 138.5(b).

In addition, the rules require any facility that receives embryonic and fetal tissue remains for treatment to "maintain records to document the methods and conditions of treatment" as well as "ensure the reduction of microbial activity of any embryonic and fetal tissue remains." *Id.* § 138.5. And the rules allow three types of people or entities to store, handle, or transport embryonic and fetal tissue remains: a person or entity authorized to handle human remains by the Texas Funeral Service Commission, a person or entity authorized by the Texas Commission on Environmental Quality (TCEQ) to handle special waste from healthcare facilities, and any healthcare facility generating embryonic and fetal tissue remains. *Id.* § 138.6.

Finally, on June 27, 2018, the TCEQ adopted new rules permitting licensed crematories to dispose of embryonic and fetal tissue remains. 43 Tex. Reg. 4757, 4757–62 (July 13, 2018).

The TCEQ's new rules became effective July 19, 2018, in the middle of this case's trial. *Id.* at 4762. Before the TCEQ's new rules became effective, crematories were not legally permitted to cremate embryonic and fetal tissue remains. *See* Tr. Vol. 4, 167:9–168:1.

## VIII.   Subsequent Procedural History

In granting Plaintiffs' second preliminary injunction and in an effort to quickly proceed to trial on the merits as requested by both parties, the Court referred this case to United States Magistrate Judge Andrew W. Austin to enter an expedited scheduling order and discovery schedule. The Court also referred nondispositive discovery matters to Magistrate Judge Austin. In consultation with the parties and this Court, Magistrate Judge Austin set the close of discovery for June 15, 2018, and trial for July 16, 2018. Dkt. # 115.[7]

On March 1, 2018, the State identified Ms. Jennifer Carr Allmon, executive director of the Texas Catholic Conference of Bishops (TCCB), as a trial witness. TCCB is a not a party to this suit. However, TCCB, an unincorporated ecclesiastical association that furthers the religious ministry of the Roman Catholic Bishops and Archbishops in the State of Texas, has publicly announced the Catholic Church is offering free burial for embryonic and fetal tissue remains in cemeteries across the state.

During discovery, Plaintiffs served a subpoena for documents on TCCB. Despite an agreement to limit the scope of the subpoena, Plaintiffs and TCCB were unable to agree on what documents should be produced. Ultimately, TCCB produced emails sent or received by Ms. Allmon that were sent to or received from an external email address and included key search

---

[7] After consultation with the parties, this Court ordered expedited scheduling and a July 16th trial date to accommodate both sides, affording particular sensitivity to the State of Texas whose laws this Court had enjoined in order to preserve its ability to render a meaningful decision following a full review of the evidence. The undersigned accepted this case at the end of 2017. Since the beginning of 2018, the undersigned has been almost continuously in trial. The July 16th trial date featured the only opportunity for the Court to conduct a full trial on the merits in 2018. If this case had missed its July 16th trial date, the opportunity to try this case might not have arisen until 2019 or even 2020. In an effort to be fair to both parties in this suit, the Court preliminarily enjoined key provisions of Chapter 697 with the expectation that trial would occur at the first opportunity.

terms. TCCB withheld the corresponding internal emails, asserting that the internal emails were privileged under the First Amendment and irrelevant and that production was burdensome. In a second motion to quash Plaintiffs' subpoena filed four days before the close of discovery, TCCB objected to production of these emails.[8] Dkt. # 150.

On June 13, 2018, Magistrate Judge Austin held a hearing and subsequently issued an order denying TCCB's second motion to quash. Dkt. # 161. TCCB appealed Magistrate Judge Austin's order to this Court. Following a thorough review of Magistrate Judge Austin's order, the parties' briefing, a recording of the hearing, and a sampling of the allegedly privileged emails themselves, the Court concluded the Magistrate Judge's order was not clearly erroneous or contrary to law. The Court therefore denied TCCB's appeal.[9] Dkt. # 168.

Almost a month later, while the Court was conducting the pretrial conference for this case on the Friday before trial, the Fifth Circuit issued a ruling reversing denial of TCCB's motion to quash and indicated an opinion was forthcoming. Dkt. # 212. The Sunday evening before trial, the Fifth Circuit issued its opinion concerning TCCB's motion to quash. Dkt. # 223. Avoiding constitutional questions such as whether TCCB's emails were privileged under the First Amendment, the Fifth Circuit ruled the Court misapplied Federal Rule of Civil Procedure 45(d) by failing to consider the burdens of production on TCCB.[10] *Id.*

---

[8] Magistrate Judge Austin denied TCCB's first motion to quash—which was filed April 2, 2018—without prejudice for failing to contain a certificate of conference as required by Local Rule CV-7(i) and for failing to follow the case's scheduling order. Dkt. # 133.

[9] In light of statements made during the hearing and the likelihood that the losing party (regardless of which party would lose) would appeal the Magistrate Judge's ruling to this Court and the Fifth Circuit, the Court issued an order expediting briefing on any appeal to preserve the case's July 16th trial date. Defendant's attorneys were particularly interested in the Court expediting its ruling and being able to keep the July 16th trial date. As a member of the judiciary charged with treating all parties fairly, the undersigned carefully balanced the interests of Plaintiffs, Defendant, the State of Texas, TCCB, and the Court itself in promoting a quick resolution of this last-minute discovery dispute.

[10] The undersigned has enormous respect for the fine Judges on the Fifth Circuit; however, in an opinion unlike any other the undersigned has seen in his thirty years on the bench, the concurrence opined on the merits, giving an advisory opinion on the underlying case which was not before the panel, in ruling on a collateral discovery dispute. This was particularly concerning as trial was set to begin the day after the Fifth Circuit's discovery opinion was

Without the opportunity for additional discovery following the Fifth Circuit ruling, this case proceeded to trial. Several joint stipulations restricted the issues for trial. *See* Dkt. # 221. Most importantly, the parties agreed neither party would present evidence regarding the monetary cost of complying with the challenged laws or argue the challenged laws were unconstitutional due to any monetary costs of compliance. *Id.* at 1–3. With such stipulations in place, the Court conducted a one-week bench trial. Following trial, the Court requested closing argument briefs in place of oral closing arguments and the parties complied. The Court now analyzes Plaintiffs' claims and the parties' arguments.

## Analysis

Plaintiffs claim the challenged laws impose onerous, unjustified, and medically unnecessary burdens on women seeking miscarriage management, ectopic pregnancy treatment, and abortion care in Texas in violation of the Due Process Clause of the Fourteenth Amendment. Plaintiffs also allege the challenged laws violate Plaintiffs' right to equal protection under the law as guaranteed by the Equal Protection Clause of the Fourteenth Amendment by requiring healthcare facilities to dispose of embryonic and fetal tissue differently from other types of tissue.[11] On these bases, Plaintiffs request a declaratory judgment that the challenged laws are unconstitutional as well as a permanent injunction preventing Defendant from enforcing the challenged laws.

---

issued. In light of the comments made in both the majority opinion and concurrence (but see the dissent by Circuit Judge Costa), the undersigned offered to recuse himself from the case should either party wish him to do so. After an opportunity to consult with their clients (and, in the case of Defendant, the Attorney General of the State of Texas), the parties expressed, on the record, full confidence in the undersigned's impartiality and ability to rule on this case fairly and without influence from the Fifth Circuit's majority and concurring opinions.

[11] Plaintiffs' amended complaint alleges the challenged laws and 2016 revisions to the medical waste disposal rules (1) impose an undue burden on women's abortion access, (2) are vague, (3) violate the Equal Protection Clause, and (4) violate the Commerce Clause. Dkt. # 93. At the final pretrial conference, Plaintiffs abandoned their vagueness and commerce clause claims. July 13, 2018 Hr'g Tr. 59:20–62:23. Thus, the Court only considers whether the challenged laws are an undue burden and violate the Equal Protection Clause.

Defendant contends the Texas Legislature appropriately expressed its respect for unborn life, which Defendant asserts is a legitimate state interest, in promulgating the challenged laws. According to Defendant, the challenged laws do not create a substantial obstacle to abortion access and rationally further the State's interest. Thus, Defendant argues the Court should deny Plaintiffs' claims and find the challenged laws a constitutional exercise of the Texas Legislature's authority.

Before fully engaging with Plaintiffs' claims and the parties' arguments, the Court pauses to highlight the unique nature of this case. The challenged laws govern the disposal of embryonic and fetal tissue remains from all pregnancies less than twenty weeks in duration where the tissue is passed or delivered at a Texas healthcare facility that provides health or medical care to a pregnant woman. *See* TEX. HEALTH & SAFETY CODE § 697.004. The challenged laws apply regardless of whether a woman sought an abortion or merely had a spontaneous miscarriage at the Texas healthcare facility. *See id.* The challenged laws are not limited to healthcare facilities that predominately provide pregnancy-related care. Instead, the challenged laws broadly define healthcare facility to include ambulatory surgical centers, hospitals, "professional offices, including the offices of physicians," and "other health-care related facilities that provide health or medical care to a pregnant woman." *See* TEX. ADMIN. CODE § 138.2(13). Consequently, if embryonic and fetal tissue remains are passed at any facility providing health or medical care to a pregnant woman, the facility has a legal obligation under the challenged laws to inter or scatter the ashes of the tissue. *See* TEX. HEALTH & SAFETY CODE § 697.004.

A simple hypothetical illustrates the sweeping effect of the challenged laws. If a pregnant woman (anywhere from one week to twenty weeks pregnant) visits an ophthalmologist's office and miscarries while in the office due to a medical emergency, that office has a legal obligation

to inter or scatter the ashes of the embryonic or fetal tissue in accordance with the challenged laws. While such a scenario is unlikely, it is likely that a woman experiencing pain due the onset of a miscarriage may well visit a healthcare facility that is unprepared to comply with the challenged laws.

Thus, enforcement problems aside, the challenged laws potentially affect every pregnant woman in the State of Texas (notably including those opposed to abortion) who seeks health or medical care as well as the professionals who offer them that care. Therefore, questions broader than whether the challenged laws impose an undue burden on abortion access or deprive Plaintiffs of equal protection of the laws besiege this case. In addition, also unique to this case, Plaintiffs have waived the argument that the cost of complying with the challenged laws would be an undue burden on a woman seeking an abortion and Defendant does not argue the challenged laws serve a health purpose.

Having noted key distinctive features of this case, the Court turns to Plaintiffs' claims.

## I.        Due Process Claim

For over forty years, courts have recognized the "[c]onstitutional protection of the woman's decision to terminate her pregnancy [that] derives from the Due Process Clause of the Fourteenth Amendment." *See Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 846 (1992) (plurality opinion);[12] *see also Jackson Women's Health Org. v. Currier*, 760 F.3d 448, 453 (5th Cir. 2014) (citing *Roe v. Wade*, 410 U.S. 113, 153 (1973)).

In *Casey*, a plurality of the Supreme Court reaffirmed *Roe*'s essential holding, stating three principles:

> First is a recognition of the right of the woman to choose to have an abortion before viability and to obtain it without undue interference from the State. Before viability, the State's interests are not strong enough to support a prohibition of

---

[12] All cites to *Planned Parenthood of Southeastern Pennsylvania v. Casey* are cites to the plurality opinion.

abortion or the imposition of a substantial obstacle to the woman's effective right to elect the procedure. Second is a confirmation of the State's power to restrict abortions after fetal viability, if the law contains exceptions for pregnancies which endanger the woman's life or health. And third is the principle that the State has legitimate interests from the outset of the pregnancy in protecting the health of the woman and the life of the fetus that may become a child.

*Id.*; *see also Gonzales v. Carhart*, 550 U.S. 127, 145 (2007).

From these principles, *Casey* "struck a balance," articulating the undue burden standard. *Gonzales*, 550 U.S. at 146. Before viability, a state "may not prohibit any woman from making the ultimate decision to terminate her pregnancy." *Id.* (quoting *Casey*, 505 U.S. at 879). A state "also may not impose upon this right an undue burden, which exists if a regulation's 'purpose or effect is to place a substantial obstacle in the path of a woman seeking an abortion before the fetus attains viability.'" *Id.* (quoting *Casey*, 505 U.S. at 878). On the other hand, "[r]egulations which do no more than create a structural mechanism by which the State . . . may express profound respect for the life of the unborn are permitted, if they are not a substantial obstacle to the woman's exercise of the right to choose." *Id.* (quoting *Casey*, 505 U.S. at 877). "A finding of an undue burden is a shorthand for the conclusion that a state regulation has the purpose or effect of placing a substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus." *Casey*, 505 U.S. at 877.

In *Whole Woman's Health v. Hellerstedt* (*Whole Woman's Health I*), the Supreme Court confirmed courts are to apply the undue burden standard when evaluating potential restrictions on abortion. *See* 136 S. Ct. 2292, 2309–10 (2016). "[A] statute which, while furthering a valid state interest, has the effect of placing a substantial obstacle in the path of a woman's choice cannot be considered a permissible means of serving its legitimate ends." *Id.* at 2309 (quoting *Casey*, 505 U.S. at 877). Applying the undue burden standard "requires that courts consider the burdens a law imposes on abortion access together with the benefits those laws confer." *Id.* at

2309 (citing *Casey*, 505 U.S. at 887–98). In essence, a court evaluates the evidence in the record and then "weigh[s] the asserted benefits against the burdens." *Id.* at 2310. Where laws do not confer "benefits sufficient to justify the burdens upon abortion access that each imposes," then "[e]ach places a substantial obstacle in the path of women seeking a previability abortion, each constitutes an undue burden on abortion access, and each violates the Federal Constitution." *Id.* at 2300 (internal citation omitted).

## A. Jurisdictional Issues

Before delving into the merits of Plaintiffs' undue burden claims, the Court must address Defendant's argument that the Court lacks jurisdiction over those claims. Specifically, Defendant asserts Plaintiffs lack third-party standing to bring undue burden claims on behalf of their patients and, even if Plaintiffs possess standing, the undue burden claims asserted here are not yet ripe.

First, the Court finds Plaintiffs have standing to bring undue burden claims on behalf of their patients. "[T]hird-party standing requires the named plaintiff to have suffered an injury in fact and to share a 'close' relationship with third-parties who face an obstacle inhibiting them from bringing the claim on their own behalf." *Planned Parenthood of Greater Tex. Surgical Health Servs. v. Abbott*, 748 F.3d 583, 589 (5th Cir. 2014) (citing *Kowalski v. Tesmer*, 543 U.S. 125, 129–30 (2004)).

Here, the two physician plaintiffs, Drs. Kumar and Davis, have standing to assert undue burden claims on behalf of their patients: (1) these physicians face potential administrative and criminal penalties for failing to comply with the challenged laws; (2) they are doctors who perform abortions and share a sufficiently close relationship with their patients; and (3) "a

pregnant woman seeking to assert her right to abortion faces obvious hindrances in timely now bringing a lawsuit to fruition." [13] *See id.*

Defendant disputes whether the physician plaintiffs share a close enough relationship with their patients to assert their patients' beliefs. However, during trial Plaintiffs presented considerable evidence that the physician plaintiffs, like other doctors who provide abortion and miscarriage care, regularly communicate with their patients about the abortion decision and that decision's social, cultural, and psychological implications. *See, e.g.,* Tr. Vol. 1, 201:19–202:9, 205:22–206:21, 224:23–226:7; Tr. Vol. 2, 199:2–201:17; *see also* Tr. Vol. 3, 83:14–84:14. Plaintiffs also supplied evidence the physicians discuss fetal tissue disposal with their patients when the issue is raised. *See, e.g.,* Tr. Vol. 1, 208:19–211:14; Tr. Vol. 2, 196:8–11, 198:8–21; *see also* Tr. Vol. 3, 84:15–86:25. It is hard to imagine a more intimate doctor–patient scenario than that described by Plaintiffs here. Plaintiffs have therefore demonstrated they have a sufficiently close relationship with their patients to assert claims based on, in part, their patients' beliefs. *See Singleton v. Wulff*, 428 U.S. 106, 117 (1976) (plurality opinion) ("Aside from the woman herself, therefore, the physician is uniquely qualified to litigate the constitutionality of the State's interference with, or discrimination against, [the abortion] decision.").

As an additional component to its overarching standing argument, Defendant argues Plaintiffs have not shown their patients have uniform personal beliefs and thus Plaintiffs cannot show their legal position aligns with their patients' beliefs. But Plaintiffs do not argue their patients hold a uniform set of beliefs about fetal tissue disposal. Quite the contrary, Plaintiffs contend their patients hold a diverse set of beliefs and the challenged laws would infringe on

---

[13] Defendant argues Whole Woman's Health cannot satisfy the requirements for third-party standing because it is too removed from the provision of healthcare. By contrast, Plaintiffs argue Whole Woman's Health is a consortium of companies operating women's healthcare clinics. However, because the Court finds the physician plaintiffs have third-party standing to assert the undue burden claims of their patients, the Court need not consider the issue of standing as it relates to the remaining plaintiffs. *See Planned Parenthood of Greater Tex.*, 748 F.3d at 589.

some of those beliefs. Because Plaintiffs have shown a relationship permitting them to give voice to these concerns as well as others, Plaintiffs have sufficient standing to bring the instant undue burden claims on their patients' behalf.

Turning to Defendant's ripeness argument, the Court also finds Plaintiffs' undue burden claims are ripe. Ripeness is a prudential doctrine designed to prevent courts from "entangling themselves in abstract disagreements over administrative policies" and to "protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 807–08 (2003) (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 148–49 (1967)). A court balances two factors when evaluating ripeness: "(1) the fitness of the issues for judicial decision and (2) the hardship to the parties of withholding court consideration." *Texas v. United States*, 497 F.3d 491, 498 (5th Cir. 2007). Defendant only argues that any obstacles to abortion access are conjectural and hypothetical as Plaintiffs have not taken concrete steps to comply with the challenged laws. Therefore, Defendant argues, Plaintiffs' undue burden claims are not fit for judicial decision.

"A challenge to administrative regulations is fit for review if (1) the questions presented are purely legal ones, (2) the challenged regulations constitute final agency action, and (3) further factual development would not significantly advance the court's ability to deal with the legal issues presented." *Id.* (internal quotation marks and alterations omitted). In assessing the fitness for review, a court also considers "whether the resolution of the issues will foster effective administration of the statute." *Id.* at 499 (citation omitted). Defendant does not dispute that the questions presented by this case are purely legal and that the challenged laws constitute

final agency action. Instead, Defendant contends implementation of the challenged laws would better illuminate the ability of Texas healthcare providers to comply.

But the inevitability of the application of the challenged laws to Plaintiffs supports deciding constitutionality before the laws are implemented. *See Pearson v. Holder*, 624 F.3d 682, 684 (5th Cir. 2010) ("Where the inevitability of the operation of a statute against certain individuals is patent, it is irrelevant to the existence of a justiciable controversy that there will be a time delay before the disputed provisions will come into effect." (quotation omitted)). And the hardship of withholding court consideration outweighs any marginal benefit gained by delaying review. To require healthcare providers to attempt to comply with the challenged laws without knowing whether the challenged laws are valid would require healthcare providers to suffer considerable uncertainty and expense.[14] *See Thomas v. Union Carbide Agr. Prod. Co.*, 473 U.S. 568, 581–82 (1985). If Plaintiffs cannot object to the challenged laws via this lawsuit, Plaintiffs must choose one of two undesirable options: attempt to comply with allegedly unconstitutional disposal rules and incur costs and logistical difficulties or refuse to comply and risk severe civil penalties. *See Texas*, 497 F.3d at 499 (citing *Abbott Labs.*, 387 U.S. at 152). Consequently, the Court finds Plaintiffs' undue burden claims are ripe for review.

**B.    Legitimate State Interest**

A law that does not further a legitimate or valid state interest fails the undue burden test. *See Whole Woman's Health I*, 136 S. Ct. at 2309 (citing *Casey*, 505 U.S. at 877). Accordingly, the first step in the undue burden analysis requires the Court to evaluate whether the challenged laws further a legitimate state interest.

---

[14] The Court does not consider such costs in evaluating the constitutionality of the challenged laws but merely remarks on costs as part of the hardship of complying with allegedly unconstitutional laws.

The stated purpose of the challenged laws "is to express the state's profound respect for the life of the unborn by providing for a dignified disposition of embryonic and fetal tissue remains." TEX. HEALTH & SAFETY CODE § 697.001. The parties do not genuinely dispute that the State generally possesses a legitimate interest in regulating the disposal of embryonic and fetal tissue remains for public health purposes. But here, Defendant does not argue the challenged laws serve a public health purpose. *See* Dkt. # 100 ¶ 3. The resulting question becomes whether the State may, without any public health objectives, express respect for potential life after a pregnancy has ended. The answer, admittedly, is a close call.

Limited authority exists to guide this Court's inquiry. Although the Supreme Court previously examined a similar fetal disposition law, *see City of Akron v. Akron Ctr. for Reprod. Health, Inc.*, 462 U.S. 416, 451 (1983), that decision is not definitive here, at least in part because it was subsequently overruled. *See Casey*, 505 U.S. 833 ("We must overrule those parts of . . . *Akron I* which, in our view, are inconsistent with *Roe*'s statement that the State has a legitimate interest in promoting the life or potential life of the unborn . . . ."). In *Akron I*, the Supreme Court reviewed a city ordinance requiring physicians performing abortions to "insure that the remains of the unborn child are disposed of in a humane and sanitary manner." *Id.* Highlighting the concern that the language might be construed to "mandate some sort of 'decent burial' of an embryo at the earliest stages of formation," the Supreme Court affirmed the lower court's ruling that the word "humane" was impermissibly vague. *Id.*

Striking down the statute, the Supreme Court declined to sever "humane" from the ordinance because it was unclear whether the city would have enacted the ordinance with the word "sanitary" alone. *Id.* at 452 n.45. Immediately thereafter, the Supreme Court noted that the

city could "enact more carefully drawn regulations that further its legitimate interest in *proper disposal of fetal remains*." *Id.* (emphasis added).

Reading this language closely in the context of the opinion suggests the city had a legitimate interest in determining the sanitary disposal of fetal remains but perhaps not in mandating the burial of an embryo at the earliest stages of formation. *See id.* On the other hand, the same language can be read to condone any state effort to define "the proper" disposal method of fetal remains. *See id.* Thus, not only was *Akron I* overruled, it does not offer a clear indication on whether the State's interest in this case is legitimate.

Likewise, the only Fifth Circuit case concerning fetal tissue disposition also offers limited insight. In 1986, well before *Casey*, the Fifth Circuit examined a Louisiana statute requiring an attending physician to inform the woman, within twenty-four hours of an abortion, that she could choose to have the fetus cremated, buried, or disposed of as waste tissue. *Margaret S. v. Edwards*, 794 F.2d 994, 997–98 (5th Cir. 1986).

The district court in that case ruled the statute "suggests to the woman that [the State] equates abortion with taking of a human life . . . [and] thus penalizes those women who do exercise their constitutional right in choosing abortion." *Margaret S. v. Treen*, 597 F. Supp. 636, 670 (E.D. La. 1984). The district court further concluded "the disposal statute unreasonably places 'obstacles in the path of the doctor upon whom [the woman is] entitled to rely for advice in connection with her decision.'" *Id.* at 671 (quoting *Akron I*, 462 U.S. at 445, *overruled by Casey*, 505 U.S. at 881–84).

On appeal, the Fifth Circuit affirmed the district court's conclusion the statute was unconstitutional, albeit on narrower grounds. *Id.* Relying on *Akron I*'s conclusion that a statute requiring a physician to personally disclose important information to women before an abortion

20

was unconstitutional—a conclusion later overruled in *Casey*—the Fifth Circuit held that mandating the attending physician inform the patient about her options for fetal tissue disposition was unconstitutional. *Margaret S. v. Edwards*, 794 F.2d at 998. In reaching its decision, the Fifth Circuit avoided considering whether the State's interest was valid. *See id.* at 998 (noting only that "the State's strong interest in ensuring that physicians obtain the patient's informed consent before performing abortions" was not present). Though factually comparable to the case here, *Margaret S.* does not aid the Court in its current analysis because the Fifth Circuit did not address whether Louisiana had a legitimate interest in obtaining women's fetal tissue disposition preferences. *See id.*

Because the Fifth Circuit has not explicitly addressed whether a state has an interest in mandating or determining how fetal tissue should be disposed of for reasons other than public health objectives, the Court looks to other circuits for persuasive authority. Thus far, two circuit courts have opined on the issue of whether a state possesses a valid interest in conferring respect on fetal remains. Earlier this year, the Seventh Circuit considered a statute like the laws challenged here. *See Planned Parenthood of Ind. & Ky., Inc. v. Comm'r of Ind. State Dep't of Health*, 888 F.3d 300 (7th Cir. 2018) (2-1 decision). Indiana asserted an interest in "the humane and dignified disposal of human remains." *Id.* at 308. As the Seventh Circuit noted, the statute's practical effect required healthcare providers to bury, cremate, or entomb aborted fetuses. *Id.* at 304. However, a key difference exists between this case and *Planned Parenthood of Indiana*: in the Seventh Circuit's case, the parties agreed no fundamental right was at stake and thus the court was obligated to apply rational basis review.[15] *Id.* at 307–08.

---

[15] The Seventh Circuit initially granted *en banc* review of this case but later vacated its order granting *en banc* review and reinstated the above-described panel opinion. *Planned Parenthood of Ind. and Ky. v. Comm'r of the Ind. State Dep't of Health*, No. 17-3163, 2018 WL 3655854, at *1 (7th Cir. June 25, 2018). In concurring with the reinstatement, three circuit judges noted the parties' concession concerning the standard of review "was probably

Applying rational basis review, the Seventh Circuit found Indiana's interest in enacting the fetal tissue disposition statute was not legitimate. *Id.* at 307–10. The Seventh Circuit reasoned that advancing "the interest of humane and dignified disposal of aborted fetuses requires recognizing that the fetus is legally equivalent to a human." *Id.* at 309. Relying on the principle that the law does not recognize an aborted fetus as a person, the Seventh Circuit concluded "the State's interest in requiring abortion providers to dispose of aborted fetuses in the same manner as human remains [was] not legitimate." *Id.* at 308–09.

By contrast, twenty-eight years ago, the Eighth Circuit found a Minnesota fetal disposition law passed constitutional muster although "the question [was] close." *Planned Parenthood of Minn. v. State of Minn.*, 910 F.2d 479, 481 (8th Cir. 1990). The Minnesota law required fetal remains resulting from abortions and miscarriages to be disposed of by "cremation, interment by burial, or in manner directed by the commissioner of health." *Id.* at 481 n.2. The plaintiff in the Eighth Circuit case "concede[d] the state has a legitimate interest in protecting public sensibilities." *Id.* at 488. Nevertheless, the Eighth Circuit stated in dicta that "the State has a legitimate interest in regulating the disposal of fetal remains." *Id.* at 481–82 (citing *Akron I*, 462 U.S. at 451–52 nn. 44–45). And to the extent that statute conveyed "the state's conclusion that fetal remains are the equivalent of human remains," the Eighth Circuit did not find such a purpose to be invalid as "the state may make a value judgment favoring childbirth over abortion." *Id.* at 487.

---

incorrect." *Id.* at *2 (Wood, C.J., concurring). The judges noted the case "involve[d] a fundamental right[,] the woman's right to decide whether to carry a child (or, put negatively, whether to have an abortion)," and should have been evaluated under the undue burden standard. *Id.* (citing *Roe*, 410 U.S. 113; then citing *Casey*, 505 U.S. at 846; and then citing *Whole Women's Health I*, 136 S. Ct. at 2309).

In sum, a review of these authorities offers no clear direction concerning the legitimacy of the State's interest in respecting fetal remains. Consequently, the Court undertakes its own analysis.

On one hand, there is support for the conclusion that the challenged laws do not advance a legitimate interest. The Supreme Court has frequently articulated the State has a legitimate interest in regulating healthcare during pregnancy and while the potential for life exists. *See Gonzales*, 550 U.S. at 157 ("The government may use its voice and its regulatory authority to show its profound respect for the life within the woman."); *id.* at 158 ("[T]he State, from the inception of the pregnancy, maintains its own regulatory interest in protecting the life of the fetus that may become a child . . . ."); *Casey*, 505 U.S. at 876 (recognizing there is a substantial state interest in potential life throughout the pregnancy). By contrast, the challenged laws here express respect for unborn life after the pregnancy has ended, when there is no longer a potential life to protect.

Moreover, a consistent theme runs through the Supreme Court's jurisprudence, present in abortion and non-abortion cases alike: a state does not have a valid interest in taking sides in a religious debate or prescribing a moral code. *See, e.g.*, *Masterpiece Cakeshop, Ltd. v. Colo. Civil Rights Comm'n*, 138 S. Ct. 1719, 1731 (2018) ("Just as 'no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion,' it is not, as the Court has repeatedly held, the role of the State or its officials to prescribe what shall be offensive." (quoting *West Virginia Bd. of Ed. v. Barnette*, 319 U.S. 624, 642 (1943) (internal citation omitted))); *Lawrence v. Texas*, 539 U.S. 558, 577 (2003) (finding a Texas statute furthered no legitimate interest in prohibiting a practice the governing majority traditionally viewed as immoral); *Casey*, 505 U.S. at 850 ("Our obligation is to define the liberty of all, not to

23

mandate our own moral code."); *see also Reliable Consultants, Inc. v. Earle*, 517 F.3d 738, 745 (5th Cir. 2008) (holding interests in "public morality" could not sustain a statute prohibiting sales of devices used for sexual stimulation). Under this purview, as Plaintiffs argue, the State's interest in expressing respect for the unborn by providing for the dignified disposition of embryonic and fetal tissue remains could be interpreted as impermissible morality-based legislation.

Perhaps most directly at issue here is the ideal that the Constitution shields individual beliefs, such as those about the mystery of human life and about the consequences of abortion, from interference by the State. *See, e.g., Casey*, 505 U.S. at 851 ("At the heart of liberty is the right to define one's own concept of existence, of meaning, of the universe, and of the mystery of human life. Beliefs about these matters could not define the attributes of personhood were they formed under the compulsion of the State."); *id.* at 852 (stating that the consequences of abortion "depend[] on one's beliefs, for the life or potential life that is aborted"). Speaking directly to this protection, the Supreme Court explained that a woman's motherhood decisions "must be shaped to a large extent on her own conception of her spiritual imperatives and her place in society." *Id.* The decision to carry a child to full term "is too intimate and personal for the State to insist, without more, upon its own vision of the woman's role . . . ." *Id.* From these principles derives the idea that the State cannot—without additional rationale—enshrine its morality-based beliefs concerning the significance of embryonic and fetal tissue remains and when life begins.

Collectively, the above-outlined considerations favor finding the State does not have a valid interest in respecting unborn life by restricting the disposal of embryonic and fetal remains.

On the other hand, authority also supports finding the State has a legitimate interest in respecting potential life, and thus it may derivatively have an interest in conferring dignity on

unborn life. *See Gonzalez*, 550 U.S. at 157–58. Within the abortion context, the Supreme Court indicated the State "has an interest in protecting the integrity and ethics of the medical profession" and "in regulating the medical profession in order to promote respect for life, including the life of the unborn." *Id.* (quoting *Washington v. Glucksberg*, 521 U.S. 702, 731 (1997)). The State is also "permitted to enact persuasive measures which favor childbirth over abortion, even if those measures do not further a health interest." *Casey*, 505 U.S. at 886. Together, these principles endorse Defendant's argument that the State has a valid interest in regulating the disposal of fetal remains to promote respect for life, even when there is no health interest.

In addition, under the umbrella of its police power, the State may generally regulate public morality. *See Berman v. Parker*, 348 U.S. 26, 32 (1954) ("Public safety, public health, morality, peace and quiet, law and order—these are some of the more conspicuous examples of the traditional application of the police power to municipal affairs."); *Davidson v. City of Clinton, Miss.*, 826 F.2d 1430, 1433 (5th Cir. 1987) ("The police power confers upon the states and local governmental units broad regulatory authority over public health, welfare, and morals."); *see also Tsoras v. Manchin*, 431 F. App'x 251, 253 (4th Cir. 2011) ("The police power embraces regulations . . . in the interest of the public health, morals, or safety." (quoting *Chicago & Alton R.R. Co. v. Tranbarger*, 238 U.S. 67, 77 (1915))).

Consequently, while there is some authority to the contrary, this Court declines to say, as a matter of law, the challenged laws do not further a valid state interest. *Cf. Whole Woman's Health I*, 136 S. Ct. at 2310 (inferring that the legislature sought to further a constitutionally acceptable objective). As summarized above, there is some case law indicating the State advances a legitimate interest in regulating healthcare providers to promote respect for potential

life, even when that potential no longer exists. And the expansive police power of the State also counsels in favor of finding the State's interest valid. Therefore, as legislatures are given broad deference in their embodiment of the democratic ideals upon which this nation was founded, this Court assumes the challenged laws further a legitimate state interest. *See Schuette v. BAMN*, 572 U.S. 291, 312 (2014) (plurality opinion) ("Our constitutional system embraces, too, the right of citizens to debate so they can learn and decide and then, through the political process, act in concert to try to shape the course of their own times and the course of a nation that must strive always to make freedom ever greater and more secure.").

**C.     Benefits and Burdens**

The second step in the undue burden analysis requires the Court to identify the benefits conferred and the burdens imposed on abortion access and "weigh[] the asserted benefits against the burdens." *See id.* at 2309.

Benefits

Turning first to the benefits, the Court finds the challenged laws confer minimal benefits. The main benefit (indeed, perhaps the only benefit) of the challenged laws is the expression of respect for potential life via the dignified disposition of embryonic and fetal tissue remains. Defendant also argues that "any laws designed to recognize the dignity of the remains of a fetus may encourage individuals contemplating abortion to consider the impact of the procedure on the fetus." Dkt. # 240 at 26 n.18. However, the extent to which the challenged laws confer these benefits is limited.

For one thing, the degree to which the challenged laws confer a benefit by providing for a dignified disposition is qualified by the fact that "dignified" is a subjective term. Whether a particular method of treatment or disposition is dignified depends on the eye of the beholder. For

instance, the Catholic Church generally prohibits the scattering of ashes from human remains because it views the scattering of ashes to be an undignified form of disposition. Tr. Vol. 4, 31:6–15. While the challenged laws permit the commingling of fetal remains, Catholic teaching does not accept the commingling of remains as a respectful practice. *Id.* at 143:14–15. Likewise, many in the Islamic tradition consider cremation to be a prohibited practice altogether. Tr. Vol. 2, 116:18–117:13. Still others see incineration and placement in a landfill or the use of a sanitary sewer as a dignified disposal method for tissue. Tr. Vol. 1, 163:3–6; Tr. Vol. 2, 215:3–14. Thus, treatment and disposition methods in general are not themselves inherently respectful or dignified. Instead, dignity and respect are conferred based on one's personal opinion of a given treatment or disposition option. Consequently, whether the challenged laws achieve the subjective benefit of expressing respect or conferring dignity—a relatively light benefit compared to protecting women's health or potential life—depends on one's perception of the prescribed treatment and disposition methods.

Nevertheless, in its attempt to achieve that subjective benefit, the State of Texas applied inconsistent criteria in determining what treatment and disposition methods confer dignity. For example, in enacting the challenged laws, Texas removed grinding from the treatment options available for embryonic and fetal tissue remains. However, the challenged laws allow cremation, which includes a secondary grinding process through which remains are processed after being exposed to extreme heat. Tr. Vol. 3, 160:20–161:20; *see also* TEX. HEALTH & SAFETY CODE § 716.001(5) (defining "cremation" to include "pulverization, which is the process of reducing identifiable bone fragments after cremation and processing granulated particles by manual or mechanical means"). Similarly, the challenged laws expressly prohibit the placement of embryonic and fetal tissue in a landfill but allow the ashes from these remains to be scattered on

any other privately-held land, such as a parking lot or junkyard, so long as the owner consents. *See* Tr. Vol. 4, 214:23–216:1; Pls.' Ex. 128 at 5. And while the challenged laws exclude disposition via a sanitary sewer for healthcare providers, women at home may still use this method.[16] *See* TEX. ADMIN. CODE § 138.3(c)(5).

In addition, the process of life and death is inherently messy and thus, at least in part, undignified. Safely disposing of human remains includes practical realities such as the need for refrigeration, appropriate containers, and appropriate embalming or processing. *See, e.g.*, Tr. Vol. 3, 152:8–152:18; 168:18–23; Tr. Vol. 4, 227:5–12, 235:4–11. The end of a pregnancy, be it intentional or not, is similarly messy and features similar practical realities. *See, e.g.*, Tr. Vol. 1, 89:4–22, 90:23–91:5, 163:16–164:7; Tr. Vol. 2, 189:19–190:15, 237:17–238:22. Thus, the ability of any particular treatment or disposition method to confer dignity is circumscribed.

Finally, the challenged laws likely have *de minimis* persuasive effect, if any at all.[17] The State of Texas already employs numerous mechanisms such as a required ultrasound, heightened informed consent disclosures, and a twenty-four-hour waiting period to convey its preference for childbirth and ensure a woman fully appreciates the consequences of an abortion decision. *See, e.g.*, Tr. Vol. 1, 61:17–63:17, 199:22–201:18. Furthermore, the evidence presented at trial demonstrates that women are well aware of the impact a miscarriage or an abortion has on a fetus. *See* Tr. Vol. 1, 173:9–22, 225:3–226:7; Tr. Vol. 2, 146:22–147:10; Tr. Vol. 3, 83:16–84:1. As a result, the impact that the challenged laws may have as an additional persuasive mechanism

---

[16] Curiously, a plain reading of the challenged laws indicates the laws do not apply when a healthcare provider offers health or medical care outside of a healthcare facility, i.e. when a doctor makes house calls. For example, if a doctor or paramedic visits a woman at home when she is experiencing complications from a medication abortion or miscarriage, it seems the doctor, paramedic, or the woman may dispose of resulting embryonic and fetal tissue without restriction, including flushing it down the toilet or disposing of it in a landfill.

[17] In fact, Defendant only raises this potential benefit via footnote and provides no supporting evidence or argument. *See* Dkt. # 240 at 26 n.18.

will likely be marginal or nonexistent. The persuasive effect of challenged laws therefore adds little to the benefit analysis.

Burdens

By contrast, the Court finds the challenged laws impose significant burdens on women seeking an abortion or experiencing pregnancy loss (1) by requiring women's healthcare facilities to use unreliable and nonviable waste disposal options and thus reducing access to abortion in Texas and (2) by enshrining one view of the status of and respect that should be given to embryonic and fetal tissue remains thereby burdening a woman's abortion decision. The Court examines each of these burdens in depth below.

*1.  Requiring unreliable and nonviable waste disposal options*

Safely and legally disposing of waste, including special waste and embryonic and fetal tissue remains, is a critical component of providing gynecological care and is typically achieved through third-party relationships with entities offering disposal services.[18] *See* Tr. Vol. 1, 122:17–19; Tr. Vol. 3, 90:9–16; Tr. Vol. 2, 226:10–11, 194:24–25, 252:4–16; *see also* Tr. Vol. 2, 230:3–7. Currently, women's healthcare providers in Texas have a functional system for disposing of their special medical waste through a licensed medical waste vendor. *See, e.g.*, Tr. Vol. 1, 120:22–121:8; Tr. Vol. 2, 224:9–11; Tr. Vol. 3, 97:15–19; Tr. Vol. 4, 42:7–43:2. Under the present system, healthcare providers have no role in the treatment and disposal of embryonic and fetal tissue remains after collecting the remains, storing them in a freezer, and arranging pick up by a medical waste vendor. *See* Tr. Vol. 1, 144:13–17; Tr. Vol. 2, 21:8–22:5; Tr. Vol. 3, 93:18–25. A healthcare facility's medical waste vendor collects special waste—both tissue and

---

[18] Plaintiffs offered evidence that third-party relationships feature a particular vulnerability for healthcare facilities that offer abortion services. Tr. Vol. 1, 122:23–123:5. In fact, the Supreme Court recently overturned a Texas law requiring such facilities to maintain medically unnecessary third-party relationships where the requirement for such relationships resulted in the shuttering of at least half of the State's healthcare facilities that offered abortion services. *Whole Woman's Health I*, 136 S. Ct. 2292; *see also* Tr. Vol. 1, 115:15–24; Tr. Vol. 2, 227:3–9.

non-tissue—on a regular basis, incinerates the waste, and disposes of the ash in a sanitary landfill. Tr. Vol. 1, 144:18–145:14; Tr. Vol. 2, 190:23–191:19, 225:23–226:1; Tr. Vol. 3, 79:21–80:10, 81:12–14.

Even without the effect of the challenged laws, this system for disposing of Plaintiffs' special waste is precarious at best. Plaintiffs all share a single special waste vendor, Vendor A,[19] the only vendor known in Texas that is willing and able to work with abortion providers. Tr. Vol. 1, 118:8–23; Tr. Vol. 2, 195:1–4; Tr. Vol. 3, 80:14–20. Securing Vendor A and establishing a functional relationship was a lengthy process that included failed negotiation efforts with some vendors as well as trial and error with other vendors who proved unusable. Tr. Vol. 1, 118:8–23, 121:14–19, 138:16–139:12; Tr. Vol. 2, 225:4–5. Previously, while conducting the vendor search that resulted in the contracts with Vendor A, several clinics nearly suspended their services due to the inability to dispose of their special waste. *See, e.g.*, Tr. Vol. 2, 193:6–194:25.

The currently-operating system is in line with Texas law's traditional treatment of embryonic and fetal tissue remains as pathological waste, a category of special waste from healthcare facilities. *See* 14 Tex. Reg. 1457, 1457–62. Separate regulatory schemes governed the disposition of pathological waste and human remains. *Compare id.*, *with* TEX. HEALTH & SAFETY CODE ch. 711 (governing cemeteries, including right to control interment, records of interment, and removal of remains), *and* TEX. HEALTH & SAFETY CODE ch. 716 (governing crematories, including authorization to cremate, records of cremation, simultaneous cremation, and disposition of cremated remains), *and* TEX. OCC. CODE ch. 651 (governing funeral directors and embalmers, including the transportation of remains and pricing of services).

Now, the challenged laws create a *sui generis* waste category; they remove embryonic and fetal tissue remains from restrictions governing pathological waste and apply some of the

---

[19] At trial, the parties used the label "Vendor A" to protect the identity of Plaintiffs' medical waste vendor.

restrictions governing human remains. *See, e.g.*, TEX. HEALTH & SAFETY CODE § 697.003. Yet, embryonic and fetal tissue remains still maintain characteristics of pathological waste. Most significantly, embryonic and fetal tissue is routinely collected as a byproduct of medical procedures—abortion and miscarriage procedures—administered daily in the State of Texas. *See, e.g.*, Tr. Vol. 1, 141:24–142:7; Tr. Vol. 2, 189:19–190:15, 237:17–238:7. Women's healthcare facilities offering abortion and pregnancy-related care need to dispose of their accumulation of embryonic and fetal tissue regularly, weekly or every few weeks depending on the facility. *See, e.g.*, Tr. Vol. 2, 190:16–20; Tr. Vol. 3, 81:10–14.

While the challenged laws permit four methods of treatment for embryonic and fetal tissue remains, the laws restrict disposal to only two methods: interment and the scattering of ashes. *See* TEX. HEALTH & SAFETY CODE § 697.004. Interment and the scattering of ashes are both disposal methods typically used for human remains. *See* Tr. Vol. 2, 57:22–24; Tr. Vol. 3, 15:15–17. Neither party suggests that a new industry or waste disposal mechanism has developed or will develop to accommodate the disposal of embryonic and fetal tissue remains as required by the challenged laws. And, as analyzed below, the entities traditionally used to inter human remains or scatter their ashes are not structured or prepared to accommodate disposal of the *sui generis* category of embryonic and fetal tissue remains to the degree that will be required. Put another way, reliable and viable options for disposing of embryonic and fetal tissue remains in compliance with the challenged laws do not exist.

At its core, the system for disposing of human remains utilizes mechanisms providing individualized care and caters to grieving families. Funeral homes, for example, handle a limited amount of human remains and are not structured to accommodate the regularly-generated byproducts of abortion and miscarriage procedures. The managing partner of one funeral home

testified that each year his business cares for approximately eighty-five families who have lost a loved one. Garcia Dep. Tr. 59:13–15. The managing partner further testified his funeral home has handled cremation or burial services for approximately twenty infants, a category including both fetuses and babies, during the past eleven years. Garcia Dep. Tr. 50:1–25, 59:25–60:23. Another funeral home director testified his funeral home could handle no more than 100 fetal remains per quarter, a capacity already filled by the funeral home's efforts to dispose of the embryonic and fetal tissue remains of three local hospitals. Tr. Vol 3, 168:14–169:20. The same funeral director also testified his funeral home would require embryonic and fetal remains scheduled for burial to be tagged in some manner to allow for later individual identification.[20] *Id.* at 178:19–25. Furthermore, before contracting with an abortion clinic, his funeral home would require approval from the funeral home's directors and a guarantee that the abortion clinic would obtain the consent of each patient. *Id.* at 178:4–15. Such evidence demonstrates how funeral homes are not a viable option for transporting or treating embryonic and fetal tissue remains.

In addition to structural barriers, funeral homes cannot offer full compliance with the challenged laws because they do not provide disposition services. They do not scatter ashes or inter remains. *See* Tr. Vol. 3, 177:20–178:1; Garcia Dep. Tr. 92:1–6. Thus, funeral homes are a treatment option, providing transportation, cremation, and burial preparation. Likewise, crematoriums are only a treatment option for embryonic and fetal tissue remains as they do not scatter or inter ashes. *See* Tr. Vol. 4, 237:12–15; Garcia Dep. Tr. 42:22–44:11. As a result, where a healthcare provider uses a cremating facility, it must also find a disposition option. *See* TEX. HEALTH & SAFETY CODE § 697.004.

---

[20] The potential for embryonic and fetal tissue remains to be traced back to a patient is particularly concerning given the confidential and sensitive nature of pregnancy-related healthcare, especially abortion. For example, a woman might well be deterred from seeking an abortion from a healthcare facility where she believes her identity will be linked to the disposition of embryonic and fetal tissue remains and may instead attempt to obtain an abortion elsewhere.

Therefore, if a healthcare facility uses either a funeral home or crematorium to treat waste, the healthcare facility must also transport its embryonic and fetal tissue remains to a disposition site such as a cemetery or location for scattering ashes. The challenged laws permit funeral providers, licensed medical waste transporters, and healthcare providers themselves to transport the embryonic and fetal remains. *See* TEX. ADMIN. CODE § 138.6. But there is no evidence these transportation options have the capacity or ability to transport the remains from the many thousands of abortions and miscarriages occurring in Texas each year to treatment and final disposition.

As with the treatment options, the disposition options for complying with the challenged laws are not reliable or compatible with the provision of healthcare services. Defendant principally points to an offer made by the Catholic Church to assist healthcare providers with the burial of embryonic and fetal tissue remains. *See* Tr. Vol. 4, 88:22–23; 93:17–94:5. But relying on one religious sect, the Catholic Church and its affiliated cemeteries, to honor a non-contractual promise to provide disposition services to the State of Texas is not a reliable (or conventional) option for healthcare providers required by law to inter or scatter the ashes of embryonic and fetal tissue remains. Due to the non-contractual nature of the offer, the Catholic Church has the right to withdraw or revise that policy at any time even though it has suggested it presently has no intent to do so. *See* Tr. Vol. 4, at 160:11–161:1. And given that the Catholic Church and its affiliated cemeteries oppose abortion, the Catholic Church has reason to withdraw its offer or heavily restrict its disposition services. *See* Tr. Vol. 2, 158:9–12; Tr. Vol 3, 120:21–23. Therefore, healthcare providers, especially abortion providers, are unable to rely on the provision of burial services by Catholic entities.[21]

---

[21] Moreover, the State of Texas's reliance on Catholic-affiliated cemeteries to bury the embryonic and fetal tissue remains is problematic because it raises the specter of Establishment and Freedom of Religion Clause concerns. *See*

Additionally, the Catholic Church offered no evidence it is able to bury embryonic and fetal tissue remains throughout Texas. *See* Tr. Vol. 3, 21:21–22:16; Tr. Vol. 4, 107:25–109:7, 140:1–141:17, 150:22–151:3. Rather, the testimony of TCCB's executive director indicates the contrary.[22] The Catholic Church does not bury remains, only individual cemeteries do. Tr. Vol. 4, 140:1–141:17. The Catholic Church does not own or control all of the Catholic-affiliated cemeteries in Texas; instead, Catholic-affiliated cemeteries have a range of involvement with the Catholic Church depending on an individual cemetery's governing structure and ownership. *Id.* at 103:15–104:5, 152:5–21. Thus, women's healthcare providers must enter into individual contracts concerning burial services with each cemetery. *Id.* at 144:5–18.

In entering contracts with Catholic-affiliated cemeteries, healthcare providers can only obtain limited disposition services. Such cemeteries will not allow the scattering of ashes. *Id.* at 145:21–146:5. Furthermore, there is an odd divergence in what Catholic-affiliated cemeteries will contract to do and what the cemeteries may be willing to do when faced with a factual situation. For example, although the challenged laws permit the commingling of embryonic and fetal tissue remains, Catholic-affiliated cemeteries will not contract to bury commingled remains

---

*Larkin v. Grendel's Den, Inc.*, 459 U.S. 116, 125–26 (1982) ("[T]he mere appearance of a joint exercise of legislative authority by Church and State provides a significant symbolic benefit to religion in the minds of some by reason of the power conferred."). There is evidence that the burial sites will be marked with Catholic religious symbols and will be visited by religious services. *See* Pls.' Ex. 91 at 4–5; Def.'s Exs. 29-J, 29-I; Tr. Vol. 3, 113:18–114:6; Tr. Vol. 4, 15:12–16:1, 17:9–11. Such evidence further undermines the reliability and feasibility of using Catholic-affiliated cemeteries to inter embryonic and fetal tissue remains from women's healthcare providers.

[22] To the extent TCCB's executive director testified the Catholic Church and its affiliated cemeteries have the capacity to bury the embryonic and fetal tissue remains of Texas healthcare providers, the Court finds the executive director's testimony lacked sufficient foundation and therefore credibility because she had no personal knowledge or support for her conclusions. For instance, the record contains unrefuted testimony that the Catholic Church does not own a substantial number of Catholic-affiliated cemeteries in Texas and does not control burial within such cemeteries. The executive director visited two cemeteries over ten years ago and did not recently contact any cemeteries concerning the fetal burial services they are able to provide. *See, e.g.,* Tr. Vol. 4, 110:12–111:10, 133:5–23; 137:6–18. The Kennedy Directory, cited by the executive director as factual support for her conclusions, was not authenticated or provided to the Court. *See id.* at 114:7–18, 118:1–9.

as the commingling of remains is against Catholic doctrine. *Id.* at 148:9–23.[23] Thus, a healthcare provider would need to agree to individualized burial of its embryonic and fetal tissue remains, a significant logistical hurdle for both the healthcare providers and the cemeteries, to obtain consistent burial services from a Catholic-affiliated cemetery.

Defendant also points to the Registry established by SB 8 as evidence Plaintiffs can comply with the challenged laws because the Registry contains sixteen entities willing to help healthcare providers dispose of the embryonic and fetal tissue remains. However, the Court finds the Registry provides no reliable information. To enroll on the Registry, an entity must simply complete a one-page application form that requests contact information and asks the applicant to indicate whether it is willing to provide "Free or low cost transportation, burial, or cremation services," "Financial Assistance," or "Other." *See, e.g.*, Pls.' Ex. 63. None of these categories is defined. *See id.*; *see also* Tr. Vol. 4, 197:1–8, 198:2–16. An entity need not commit to provide any minimum quantity of services to be added to Registry. Tr. Vol. 4, 197:9–12.

No effort is undertaken to verify the accuracy of Registry applications or to check the identity of Registry applicants. Tr. Vol. 4, 196:5–197:8; Tr. Vol. 3, 117:20–120:4. The entities listed could be fabricated or unwilling to actually provide services. In fact, the director of one funeral home added to the Registry testified he mistakenly applied to the Registry because he thought applying was required to continue his current practices. Garcia Dep. Tr. 67:25–68:24, 71:16–72:6. He also testified he provided the incorrect website address for his funeral home on his Registry application. *Id.* at 77:1–78:5. Moreover, each of the cemeteries on the Registry is a Catholic cemetery. *See* Pls.' Ex. 10. As previously discussed, relying on Catholic-affiliated cemeteries is not a viable option because of dependability and feasibility concerns. Thus, the

---

[23] However, the TCCB executive director indicated Catholic doctrine teaches a cemetery should bury commingled remains when such remains unexpectedly show up on a cemetery's metaphorical doorstep. *See* Tr. Vol. 4, 148:21–149:4.

Registry presents no reliable alternatives that women's healthcare providers can use to comply with the challenged laws.

Defendant argues Plaintiffs could potentially comply with the challenged laws by using their current vendor, Vendor A. But Vendor A is a medical waste vendor that collects medical waste, incinerates it, and disposes of it in a landfill. It is not a vendor configured to maintain the segregation of embryonic and fetal tissue remains, separately incinerate these remains, and then scatter or inter the resulting ashes outside of a landfill. *See* Tr. Vol. 1, 121:20–122:9, 124:8–125:1.[24] In an additional attempt to refute the Plaintiffs' evidence, Defendant cites evidence Texas possesses many licensed funeral homes and crematories, over 100 Catholic cemeteries, a variety of types of cemeteries, and acres of uninhabited public land as well as waterways. *See* Def.'s Ex. 27; Tr. Vol. 4, 90:1–10, 91:1–3, 224:22–225:1; TEX. HEALTH & SAFETY CODE §§ 711.021, 716.302, 716.304. But the State's large numbers do not refute Plaintiffs' evidence that the options for complying with the challenged laws, i.e. the mechanisms for disposing of human remains, are presently incompatible with the disposal needs of healthcare providers offering abortion and miscarriage care.

As an additional comment, there is some evidence that the challenged laws are part of a thinly veiled effort to further restrict abortion access in the State. Texas has a clear history of regulating abortion care. *See, e.g., Whole Woman's Health I,* 136 S. Ct. 2292 (finding unconstitutional Texas laws requiring physicians to have admitting privileges at a local hospital and mandating that abortion facilities meet minimum standards for ambulatory surgical centers); *Women's Med. Ctr. of Nw. Hous. v. Bell,* 248 F.3d 411 (5th Cir. 2001) (examining Texas laws

---

[24] It is possible the forced division of healthcare providers' medical waste into two streams—special medical waste and embryonic and fetal tissue remains—will cause the entire waste disposal system to collapse for women's healthcare providers. *See* Tr. Vol. 2, 230:8–13. A medical waste vendor may be unwilling or economically unable to provide disposal services for a reduced volume of special waste.

changing the licensing requirements for physicians providing abortions). In this case, Chapter 697 was included in the same legislation that also banned the most commonly performed second-trimester abortion method. *Whole Woman's Health II*, 280 F. Supp. 3d at 942–43 (citing SB 8 § 6 (codified at TEX. HEALTH & SAFETY CODE § 171.152)). And the timing of the State's efforts to alter the disposition of embryonic and fetal tissue remains lends support to Plaintiffs' argument that the State actually intended the collapse of the waste disposal system for healthcare providers offering abortion care thereby reducing the number of such providers. *See* 43 Tex. Reg. 465, 465–73 (Jan. 26, 2018) (publishing the final rules implementing Chapter 697 four days before SB 8's provisions governing embryonic and fetal tissue remains disposal were intended to take effect and almost two months after the deadline set by the Texas Legislature); 43 Tex. Reg. 4757, 4757–62 (July 13, 2018) (publishing revised TCEQ rules to permit licensed crematories to dispose of embryonic and fetal tissue beginning July 19, 2018, well after Chapter 697's effective dates and while this case's trial was ongoing); 41 Tex. Reg. 9709, 9709–9741 (Dec. 9, 2016) (providing only a nine-day window from adoption to effectiveness for the final version of the 2016 revisions to the rules governing medical waste disposal). While the Court declines to find such a dire consequence to be the State's impermissible purpose, the Court does consider such evidence in assessing the credibility of the options to comply with the challenged laws.

Thus, as the disposal system stands today, implementation of the challenged laws would deprive healthcare providers, especially those offering abortion care, of a reliable and viable system for disposing of their embryonic and fetal tissue remains. Without a workable disposal system, healthcare providers cannot offer surgical care for miscarriages or abortions. *See* Tr. Vol. 2, 226:10–11. Moreover, the challenged laws would likely trigger a shutdown of women's healthcare providers unable to cobble together a patchwork of funeral homes, crematoriums, and

cemeteries to meet their disposal needs. Clinic closures would further constrain access to abortion in a state where access to abortion has already been dramatically curtailed. *See Whole Woman's Health I*, 136 S. Ct. at 2301 (finding the number of abortion facilities in Texas dropped by almost half following the enactment of a prior law); *see also, e.g.*, Tr. Vol 1, 114:7–115:24; Tr. Vol. 2, 184:23–185:6. In sum, the challenged laws meaningfully inhibit women's access to pregnancy-related healthcare, especially abortion services, by requiring women's healthcare providers to use unreliable and nonviable waste disposal options.

2. *Endorsing one viewpoint*

The challenged laws also impose intrusive and heavy burdens on women whose beliefs about the status of embryonic and fetal tissue and the meaning of abortion or miscarriage diverge from the viewpoint endorsed by the State.

People hold diverse beliefs about the status of developing human life based on religion, science, culture, and personal experience. The parties presented substantially contradicting testimony at trial that predictably reached opposing conclusions regarding the nature of embryos and fetuses as well as the meaning of abortion and pregnancy loss. *See, e.g.*, Tr. Vol. 1, 172:24–174:14, 175:8–17; Tr. Vol. 2, 36:14–22, 140:16–141:5, 175:24–176:2; Tr. Vol 5, 11:12–15; *see also Casey*, 505 U.S. at 850 ("Men and women of good conscience can disagree, and we suppose some always shall disagree about the profound moral and spiritual implications of terminating a pregnancy, even in its earliest stage.").

For some people, the point at which an embryo or fetus takes on a special status depends on pregnancy benchmarks, such as fertilization, quickening, viability, or birth. Tr. Vol. 3, 35:10–22; Tr. Vol. 2, 102:1–15. Others point to spiritual benchmarks, such as ensoulment. Tr. Vol. 2, 125:19–126:7, 157:6–159:6; Tr. Vol. 3, 35:7–22. Still others point to the physical characteristics

of a fetus. Tr. Vol. 5, 11:12–20:20. Even within a particular religion, views vary about when embryonic and fetal tissue should be given respect. *See, e.g.,* Tr. Vol. 2, 115:14–25, 158:21–159:3, 159:7–16, 161:6–18. People also view a pregnancy differently depending on an array of factors such as whether the pregnancy is viable or nonviable, wanted or unwanted, intended or unintended. *See, e.g.,* Tr. Vol. 2, 140:8–141:5, 198:15–21; Tr. Vol. 4, 50:7–19. These views shape attitudes and beliefs about how embryonic and fetal tissue remains should be treated and disposed. *See, e.g.,* Tr. Vol. 2, 122:11–13, 127:5–12, 172:1–172:12; Tr. Vol. 3, 35:23–36:10.

For over twenty-five years, Texas law permitted women's healthcare providers to dispose of embryonic and fetal tissue remains in accordance with standard medical practices. *See, e.g.,* Tr. Vol. 1, 30:12–15, 207:20–208:18; Tr. Vol. 2, 212:4–11. And Texas's prior disposal system allowed healthcare providers to accommodate patients who expressed a desire for a particular disposition so long as that disposition complied with the State's public health and safety rules. *See, e.g.,* Tr. Vol. 1, 30:15–19; Tr. Vol. 2, 215:15–216:11. Such a system enabled Texas to avoid entangling itself in the conflicting beliefs surrounding embryonic and fetal tissue and its disposal.

In enacting the challenged laws, Texas endorses the viewpoint that embryonic and fetal tissue remains should be afforded special status from the moment of conception and should be handled in a manner similar to human remains. *See, e.g.,* Tr. Vol. 2, 170:9–13; Tr. Vol. 3, 42:11–43:16. Such a viewpoint communicates strong implications about when life begins and the meaning of a miscarriage or abortion. And that state-sanctioned viewpoint goes to the heart of the liberty protected by the Fourteenth Amendment and recognized in the protection given to a woman's right to decide whether to carry a child to term. *See Casey*, 505 U.S. at 851 ("At the heart of liberty is the right to define one's own concept of existence, of meaning, of the universe, and of the mystery of life. Beliefs about these matters could not define the attributes of

personhood were they formed under compulsion of the State."); *see also Gonzales*, 550 U.S. at 145 (restating *Roe*'s essential holding includes "a recognition of the right of the woman to *choose* to have an abortion before viability") (quoting *Casey*, 505 U.S. at 846 (emphasis added)).

Defendant argues there is no constitutional right to direct the disposition of fetal remains at a healthcare facility and this Court agrees that right does not exist. Instead, the Court merely observes the additional burdens the challenged laws impose. At best, enshrining the State's view of pregnancy increases the grief, stigma, shame, and distress of women experiencing an abortion, whether induced or spontaneous. Women who do not believe embryonic and fetal tissue has a special status will be required to accept the State's prescribed methods of disposition as a condition of obtaining pregnancy-related health care. The evidence produced at trial shows that when a woman disagrees with how her embryonic and fetal tissue remains will be disposed, she experiences a greater amount of grief, stigma, shame, and distress. *See, e.g.*, Tr. Vol. 1, 173:10–174:14; Tr. Vol. 2, 140:8–141:5. At worst, the challenged laws intrude into the realm of constitutional protection afforded to "personal decisions concerning not only the meaning of procreation but also human responsibility and respect for it." *See Casey*, 505 U.S. at 851–53 (citing cases affording constitutional protection to personal decisions relating to marriage, procreation, contraception, family relationships, child rearing, and education).[25]

Such burdens exist regardless of the viewpoint the State endorses. Suppose, instead, Texas endorsed a different viewpoint. If the challenged laws required embryonic and fetal tissue remains to be incinerated as medical waste and placed in a landfill, Texas would be upholding a

---

[25] The impact of the challenged laws, the benefits and burdens they confer, is not to be confused with the question of whether a state has a legitimate interest in enacting a particular statute. The Court, as previously described, declines to find the State's interest in expressing respect for the life of the unborn invalid but identifies and evaluates the burdens the State imposes in its effort to effectuate that interest. Specifically, the Court concludes the challenged laws place mental and emotional burdens on women, burdens that when viewed in the most favorable light increase a woman's grief and shame and when viewed in the most unfavorable light intrude on personal decisions often given constitutional protection.

view of pregnancy that does not afford embryonic and fetal tissue remains special status and is in line with only respecting remains after birth. Women who believe differently would suffer increased grief, stigma, shame, and distress because of their inability to honor their embryonic and fetal tissue remains. And, as described above, Texas would have intruded into personal decisions concerning the meaning of procreation and human responsibility and respect for it. By involving itself in the debate over the status of embryonic and fetal tissue, Texas burdens those women whose beliefs differ from the viewpoint of the State. Thus, by endorsing one view of the status and respect to be accorded to embryonic and fetal tissue remains, the State imposes intrusive and heavy burdens upon personal decisions concerning procreation and, in particular, upon a woman's right to choose to have an abortion.

Balancing Analysis

In light of the foregoing analysis, the Court finds the challenged laws convey minimal, if any, benefits while simultaneously imposing significant burdens on pregnancy-related medical care, especially abortion access. Expressing respect for potential life via the dignified disposition of embryonic and fetal tissue remains generates a slight benefit, especially when compared with the historically recognized benefits of protecting women's health or potential life.

Comparatively, the challenged laws create heavy burdens for women seeking to access pregnancy-related medical care, not the least of which is abortion care. The lack of capable and reliable options to dispose of embryonic and fetal remains in compliance with the challenged laws would likely cripple the ability of healthcare providers to offer surgical abortions and thus is a substantial obstacle in the path of women seeking a previability abortion. As the disposal system is currently structured, implementation of the challenged laws would likely cause the shutdown of women's healthcare providers unable to patch together a hodgepodge of funeral

homes, crematoriums, and cemeteries to meet their disposal needs. Women would experience further limited abortion access in a state where such access had already been greatly diminished. Additionally, the challenged laws intrude on the diverse personal beliefs women (and men) hold about the status of an embryo or fetus and the moral and spiritual implications surrounding an abortion or miscarriage. The challenged laws therefore impose burdens, such as a greater amount of grief, stigma, shame, and distress, on those women whose beliefs differ from the viewpoint of the State.

As a result, based on the evidence submitted at trial, the Court concludes the challenged laws impose significant burdens on abortion access that far outweigh the benefits the challenged laws confer. And given that the challenged laws do not govern the disposal of embryonic and fetal tissue remains outside of a healthcare facility, such burdens could cause women to avoid obtaining or be unable to obtain pregnancy-related medical care from a healthcare facility, particularly in more rural and remote areas where there are fewer healthcare options. Such an implication is dangerous, particularly in the context of abortion. Women without access to abortion care or who do not believe embryonic and fetal tissue remains should be afforded special status from the moment of conception might well seek an abortion outside of healthcare facilities and the doctor–patient relationship. *See* Tr. Vol. 1, 221:3–18.

Having found the burdens of the challenged laws substantially outweigh the benefits, the Court also applies the large-fraction test. Generally, to prevail in a challenge to an abortion regulation, a plaintiff must demonstrate that "in a large fraction of cases in which [the law] is relevant, it will operate as a substantial obstacle to a woman's choice to undergo an abortion." *Casey*, 505 U.S. at 895. In the large-fraction test, a court uses as the denominator those cases "in which the provision at issue is relevant," which is a narrower class than "pregnant women" or

"the class of women seeking abortions." *Whole Woman's Health I*, 136 S. Ct. at 2320 (citing *Casey*, 505 U.S. at 894–95).

Here, the application of the large-fraction case is difficult to apply because the challenged laws have such a sweeping application. In theory, the challenged laws apply not only to healthcare providers offering abortion services but also apply to any healthcare facility that provides health or medical care to a pregnant woman and has embryonic and fetal tissue remains passed or delivered at that facility. If, however, the Court limits the large-fraction test to those women who seek to obtain an abortion and disregards the thousands of other women the challenged laws apply to, the class of women here consists of all women in Texas who are one week to twenty weeks pregnant and seek a surgical abortion. As for the numerator, the challenged laws constrain abortion access for the entire class because the challenged laws would likely result in the closure of facilities unable to comply and would restrict the ability of healthcare providers to offer surgical abortions. Thus, the laws would decrease all of the relevant class's healthcare options for obtaining a previability abortion. Furthermore, the challenged laws also operate as a substantial obstacle to all women who do not consider embryonic and fetal tissue remains to have a special status and object to interring or scattering the ashes of their embryonic or fetal tissue remains. Therefore, the Court finds the challenged laws burden, at least, a large fraction of the relevant class of women.

To summarize, the Court finds the challenged laws do not confer benefits sufficient to justify the heavy burdens on pregnancy-related medical care, particularly abortion care, that they impose. As a result, the challenged laws place a substantial obstacle in the path of women seeking a previability abortion and constitute an undue burden. The challenged laws therefore violate the Due Process Clause of the Fourteenth Amendment.

## II.     Equal Protection Claim

The Equal Protection Clause of the Fourteenth Amendment instructs no State shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. CONST. amend. XIV, § 1. To establish an equal protection claim, a plaintiff "must show that two or more classifications of similarly situated persons were treated differently." *Gallegos-Hernandez v. United States*, 688 F.3d 190, 195 (5th Cir. 2012). Once this element is established, "the court must then determine the appropriate level of scrutiny." *Id.*

Here, the challenged laws apply only to embryonic and fetal tissue remains passed or delivered at a healthcare facility. TEX. HEALTH & SAFETY CODE § 697.004(a). The challenged laws do not apply to embryonic and fetal tissue remains passed outside of a healthcare facility and thus do not govern tissue passed by a woman in her home. 25 TEX. ADMIN. CODE § 138.3(c). Most notably, the challenged laws exempt in vitro tissue cultures, such as those from an IVF clinic, and embryos or fetuses sent to a variety of laboratories for testing. *See id.*; Dkt. # 221 ¶¶ 1–3. Thus, the challenged laws differ in their treatment of healthcare facilities and other entities possessing embryonic and fetal tissue remains, namely individual women, laboratories, and IVF clinics. Plaintiffs have therefore shown the challenged laws treat two or more classifications of similarly situated persons differently and the Court turns to determine the appropriate level of scrutiny.

## A.     Level of Scrutiny

Generally, classifications are subject to the rational-basis test, which means a court will uphold a legislative classification so long as the classification is rationally related to a legitimate government interest. *See Gallegos-Hernandez*, 688 F.3d at 195. If a classification implicates a suspect class or a fundamental right, a court is to apply strict scrutiny. *Id.* To survive strict

scrutiny, the classification must be narrowly tailored to serve a compelling state interest to survive. *Fisher v. Univ. of Tex. at Austin*, 570 U.S. 297, 310 (2013). Still other classifications have been subjected to intermediate review, where a law is upheld if it is substantially related to an important government purpose. *See, e.g.*, *United States v. Virginia*, 518 U.S. 515, 531 (1996) (applying intermediate review to a classification based on sex); *Clark v. Jeter*, 486 U.S. 456, 461 (1988) (applying intermediate scrutiny to a classification based on illegitimacy).

At first glance, it is unclear which level of scrutiny should be applied. This is due in part to the unorthodox facts surrounding Plaintiffs' equal protection claim, the dearth of binding authority, and, ultimately, the parties' less-than-helpful equal protection briefing. While neither party argues the challenged laws implicate a suspect class, the question remains whether the challenged laws implicate a fundamental right. Plaintiffs contend the classifications made by the challenged laws implicate "the fundamental right to end a pregnancy, which includes not only the right to obtain an abortion procedure, but to define one's own concept of life, meaning, and individual place in the world." Dkt. # 243 at 33. But Plaintiffs also assert that the Court need not decide whether strict or intermediate scrutiny applies because the challenged laws would fail under either level. Defendant, on the other hand, argues no fundamental right is implicated and the challenged laws should be evaluated under the rational-basis test.

There is relatively little binding authority, especially in the wake of *Casey*, examining equal protection claims in an abortion-related context and articulating which level of scrutiny should apply. Defendant points to *Harris v. McRae* in support of its argument that the rational-basis test should apply. *See* 448 U.S. 297, 323 (1980). In *Harris*, the Supreme Court examined an equal protection challenge to the Hyde Amendment, which restricts the use of federal funds for abortion. *Id.* at 324–26. The Supreme Court reasoned that "[a]lthough the liberty protected by the

Due Process Clause affords protection against unwarranted government interference with freedom of choice in the context of personal decisions, it does not confer an entitlement to such funds as may be necessary to realize all the advantages of that freedom." *Id.* at 317–18. Therefore, because the Hyde Amendment did not implicate a substantive constitutional right, the Supreme Court applied the rational-basis test and subsequently upheld the Hyde Amendment. *Id.* at 324–26. While *Harris* provides helpful context, it is not precisely on point here as the challenged laws do not concern the relationship between abortion decisions and state funding.

Instead, the Court looks to *Women's Medical Center of Northwest Houston v. Bell*, 248 F.3d 411 (5th Cir. 2001).[26] In that case, Texas physicians brought an equal protection challenge against laws requiring them to license their medical offices as abortion facilities. *Id.* at 413. On appeal, the Fifth Circuit lauded the district court for "correctly cho[osing] to evaluate the [laws] as health and safety regulations subject to rational basis review" because "the record contain[ed] no evidence of anti-abortion animus, and no evidence that the [laws] were passed in an attempt to limit abortion access or for any other improper purpose." *Id.* at 419 (citing, *inter alia*, *Romer v. Evans*, 517 U.S. 620, 632–33 (1996) and *City of Cleburne, Tex. v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 446 (1985)).

Here, however, unlike *Women's Medical Center*, there is some evidence in the record of anti-abortion animus and that Texas passed the challenged laws as an attempt to limit abortion access. As this Court previously commented in analyzing Plaintiffs' due process claim, the record contains evidence the State of Texas may have intended to cause the waste disposal system surrounding abortion services to collapse. But the mere presence of some evidence of animus does not compel the Court to apply a different standard of review. *See Romer*, 517 U.S.

---

[26] A more recent Fifth Circuit case examined an equal protection claim brought by healthcare providers who offered abortion services but the providers conceded the application of the rational-basis test. *See K.P. v. LeBlanc*, 729 F.3d 427, 440 n.82 (5th Cir. 2013) ("The Providers do not contend that heightened scrutiny is appropriate.").

at 644 (applying the rational-basis test despite evidence of animus toward the class affected but finding law at issue did not withstand the most deferential form of scrutiny).

Although the Fifth Circuit in *Women's Medical Center* did not explicitly address the district court's through examination of what level of scrutiny to apply to post-*Casey* equal protection claims, this Court finds the district court's examination particularly helpful. *See Women's Med. Ctr. of N.W. Hous. v. Archer*, 159 F. Supp. 2d 414, 454–60 (S.D. Tex. 1999). Like the *Women's Medical Center* plaintiffs, Plaintiffs here assert the challenged laws implicate a fundamental right. *See id.* at 459. And like the *Women's Medical Center* plaintiffs, Plaintiffs here "do not appear to be claiming that they personally, as physicians, have a fundamental right to *perform* abortions, independent of their patients' right to seek an abortion." *See id.* (emphasis in original). Plaintiffs' right to provide medical care, particularly abortion care, "is derivative of the right of patients to seek abortions [and] it is not the sort of fundamental right that, apart from the rights of patients, would trigger strict scrutiny review." *See Tucson Woman's Clinic v. Eden*, 379 F.3d 531, 547 (9th Cir. 2004). Thus, to the extent that Plaintiffs are asserting their own equal protection rights, the Court should therefore apply rational basis review. *See Women's Med. Ctr. of N.W. Hous. v. Archer*, 159 F. Supp. 2d at 459.

Like the amended complaint in *Women's Medical Center*, the amended complaint here does not contain an assertion of the Plaintiffs' patients' equal protection rights. Instead, the amended complaint carefully states that the challenged laws "violated *Plaintiffs'* right to equal protection under the law . . . ." Dkt. # 93 ¶ 110. And, Plaintiffs' post-trial briefing only argues the challenged laws unconstitutionally impose greater restrictions on healthcare facilities disposing of embryonic and fetal tissue remains. *See* Dkt # 242 ¶¶ 197, 199, 202. As a result, because Plaintiffs have not argued the challenged laws affect their patients' equal protection

rights, they can only be asserting their own equal protection rights.[27] Consequently, the Court applies rational basis review.

**B.    Application**

"Rational basis review begins with a strong presumption of constitutional validity." *Duarte v. City of Lewisville, Tex.*, 858 F.3d 348, 354 (5th Cir. 2017) (quotation omitted). A court will uphold the classification "if there is a rational relationship between the disparity of treatment and some legitimate governmental purpose." *Id.* (quoting *Heller v. Doe*, 509 U.S. 312, 320 (1993)). As rational basis review "requires only that the legislative *classification* rationally promote a legitimate objective," a court focuses on the specific classification at hand. *Id.* at 354–55 (quotation omitted).

Rational basis review does not require that "a legislature or governing decisionmaker actually articulate at any time the purpose or rationale supporting its classification." *Id.* at 355 (quoting *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992)). A reviewing court need only determine "that a purpose may conceivably or may reasonably have been the purpose and policy of the relevant governmental decisionmaker." *Id.* (internal quotation marks omitted). "As long as there is a conceivable rational basis for the official action, it is immaterial that it was not *the* or *a* primary factor in reaching a decision or that it was not *actually* relied upon by the decisionmakers or that some other nonsuspect irrational factors may have been considered." *Id.* (emphasis in original) (quotation omitted). The burden falls on a plaintiff to show there is no "reasonably conceivable state of facts that could provide a rational basis for the classification." *Id.* (quoting *Heller*, 509 U.S. at 320).

---

[27] Because the Court finds Plaintiffs did not argue the challenged laws violate Plaintiffs' patients' equal protection rights, the Court does not examine third-party standing in the context of an equal protection claim.

However, although it is difficult to show a law violates the equal protection clause under rational basis review, it is not impossible. *See, e.g., Romer*, 517 U.S. at 632; *City of Cleburne*, 473 U.S. at 448–49 (1985). "[E]ven in the ordinary equal protection case calling for the most deferential of standards, we insist in knowing the relation between the classification adopted and the object to be attained." *Romer*, 517 U.S. at 632.

Outside of a Healthcare Facility

Turning to the classifications at issue here, the Court finds the classification of "within a healthcare facility" versus "outside of a healthcare facility" is rationally related to a legitimate government interest. In exempting tissue passed outside of a healthcare facility, the Texas Legislature chose not to apply the duties of the challenged laws to individual women who undergo spontaneous or induced abortions at home. A woman at home has different and greater privacy rights than a healthcare facility. Moreover, healthcare facilities are generally better situated to comply with state disposal regulations than an individual woman. Thus, differentiating between within and outside of a healthcare facility is justified by a rational basis.

Laboratories

The Court also finds application of the challenged laws to healthcare facilities but not to pathology, crime, or research laboratories rationally promotes a legitimate objective. Through testing, evaluation, and experimentation, laboratories could destroy the embryonic and fetal tissue remains or integrate the tissue with other materials requiring different disposal methods. Thus, the Texas Legislature could have assumed that laboratories would be unable or unwilling to use embryonic and fetal tissue if required to comply with the challenged laws. As a result, requiring healthcare facilities but not laboratories to use specific methods to dispose of embryonic and fetal tissue remains survives rational basis review.

<u>In Vitro Tissue Cultures</u>

Finally, the Court considers the State's decision to treat healthcare facilities differently from IVF clinics. At the time of disposal, the embryos possessed by both facilities are not located in a woman's body. Furthermore, IVF clinics are a subset of healthcare facilities as defined by the challenged laws because IVF clinics are also healthcare facilities that provide health or medical care to a pregnant woman. However, the State chose to draw a line between in vitro tissue cultures (pre-implantation embryos) and post-implantation embryos and thus drew a line between the different types of facilities that handle these embryos. *Compare* TEX. HEALTH & SAFETY CODE § 697.002(3), *with* 25 TEX. ADMIN. CODE § 138.3(c).

Defendant argues the distinction is rational because after implantation "the potential for life has been more fully realized." Dkt. # 240 at 33. However, the Court can discern no legitimate state interests in distinguishing between identical tissue and thus between the facilities that handle that tissue because the State believes the tissue in one context previously had a greater potential for life. The philosophical or religious question of the degree of potential life in an embryo is distinct from the scientific question of whether tissue is an embryo and had the potential for life. Regardless of a state's ability to express respect for potential life via dignified disposition, the State may not compel its philosophical or religious answer concerning the degree of life present in pre-implantation compared to post-implantation embryos under current law. *See Barnette*, 319 U.S. at 642 ("If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein.").

When applying the rational-basis test, the Court typically assumes the State "may take one step at a time, addressing itself to the phase of the problem which seems acute to the

legislative mind." *See Williamson v. Lee Optical*, 348 U.S. 483, 489 (1955). But here, as previously discussed, there is some evidence suggesting the State enacted the challenged laws as part of an effort to restrict abortion access. This same evidence suggests the State drew the classification between healthcare facilities and IVF clinics for the purpose of disadvantaging the healthcare clinics that most regularly deal with embryonic and fetal tissue remains, i.e. healthcare facilities that provide abortions. Where, as here, the adverse impact on a disfavored class is a possible aim of the legislature, the legislature's impartiality is suspect and the Court cannot assume the legislature was merely addressing a problem in a piecemeal fashion. *See Romer*, 517 U.S. at 633 (citation omitted).

The Court therefore concludes the classification of pre-implantation embryos and post-implantation embryos and thus disparate treatment of the facilities that handle them does not demonstrate a rational relationship to a legitimate governmental purpose. Consequently, the challenged laws do not pass the rational-basis test and violate the Equal Protection Clause of the Fourteenth Amendment.

## Conclusion

After careful analysis of current law and precedent as it exists, this Court declines to rule, as a matter of law, the State of Texas does not have a legitimate interest in enacting a well-thought-out and workable statute that accomplishes the asserted purpose of respecting potential life by providing for the dignified disposition of embryonic and fetal tissue remains. However, under United States Supreme Court precedent, such a statute may not violate the Equal Protection Clause and may not impermissibly place substantial obstacles in the path of women seeking pregnancy-related care such that it constitutes an undue burden in abortion access, violating the Due Process Clause.

Here, the Court finds the challenged laws violate both the Equal Protection and Due Process Clauses.

While the provisions that exempt women outside of a healthcare-facility context and certain laboratories from the duties of the challenged laws are rationally related to a legitimate government interest, the decision to distinguish between pre-implantation and post-implantation embryos and the facilities that handle them is not. In concluding the challenged laws' disparate treatment of healthcare facilities and IVF clinics is not rationally related to a legitimate government interest, the Court finds the challenged laws do not pass the rational-basis test and therefore violate the Equal Protection Clause of the Fourteenth Amendment.

Further, the challenged laws place substantial obstacles in the path of women seeking pregnancy-related medical care, particularly a previability abortion, while offering minimal benefits. By endorsing one view of the status and respect to be accorded to embryonic and fetal tissue remains, the State imposes intrusive burdens upon personal decisions concerning procreation, especially upon the right of the woman to choose to have an abortion. And most importantly, the evidence in this case overwhelmingly demonstrated that if the challenged laws were to go into effect now, they would likely cause a near catastrophic failure of the healthcare system designed to serve women of childbearing age within the State of Texas. This would not simply be a failure of the healthcare system serving women who seek to voluntarily terminate a pregnancy but also a failure of the system serving the thousands of Texas women who seek medical care for pregnancy complications and miscarriages. The simple fact is that Texas currently has no viable, integrated system in place for disposing of embryonic and fetal tissue remains in compliance with the challenged laws nor has Texas appropriated resources to insure the challenged laws operate as intended.

Instead, the clear weight of the evidence shows that the waste disposal options required by the challenged laws would cause many, if not most, doctors and healthcare facilities providing pregnancy-related care to women to be overwhelmed with embryonic and fetal tissue remains with no acceptable method of disposal. Indeed, those few state officials tasked with attempting to insure implementation of the challenged laws were relegated to asking private cemeteries, funeral homes, and crematoriums for help. With the exception of a non-contractually binding offer from the Catholic Church in Texas that it would do what it could, little else was forthcoming. The Court in this order discusses the many issues that make this offer, although well intended, problematic and presently unworkable in light of the numerous unresolved logistical problems. Therefore, the Court finds the challenged laws have the effect of placing substantial obstacles in the path of a woman's right to choose an abortion and thus violate the Due Process Clause of the Fourteenth Amendment.

Based on the foregoing, the Court **DECLARES** Texas Health and Safety Code §§ 697.001–.004, 697.007–.009 and the associated implementing rules codified at Title 25 of the Texas Administrative Code §§ 138.1–.7 are **VOID** for violating the Due Process and Equal Protection Clauses of the Fourteenth Amendment of the United States Constitution. The Court also **ENTERS A PERMANENT INJUNCTION** prohibiting Defendant Charles Smith, in his official capacity as the Executive Commissioner of the Texas Health and Human Services Commission, from enforcing Texas Health and Safety Code §§ 697.001–.004, 697.007–.009 and the associated implementing rules codified at Title 25 of the Texas Administrative Code §§ 138.1–.7. The Clerk's Office is instructed to **ENTER JUDGMENT** and **CLOSE** this case.

**IT IS SO ORDERED.**
**DATED:** Austin, Texas, September 5, 2018.

DAVID ALAN EZRA
SENIOR UNITED STATES DISTRICT JUDGE